IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PLAINTIFF JOSEPH WARD, by his next friend FLOYD JENNINGS, et al. | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. 1:16-cv-00917-LY |
| COURTNEY PHILLIPS, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission, | § § § § | |
| Defendant. | § § § | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs respectfully propose the following Findings of Fact and Conclusions of Law pursuant to the Court's September 3, 2019, Order (Doc #117).

## PROPOSED FINDINGS OF FACT

### I.     Introduction to the Classes and Requested Relief

1.     Plaintiffs have defined their proposed Incompetent to Stand Trial ("IST") class as "all persons who are now, or will be in the future, (a) charged with a Texas crime, (b) court-ordered to an HHSC mental health facility for competency restoration services; but, (c) because of HHSC's insufficient forensic capacity, (d) remain incarcerated in a county jail more than 21 days from the day HHSC receives the court order to the day HHSC makes a bed available in an HHSC mental health facility.[1]" Plaintiffs' Motion for Class Certification, Doc. No. 104 (hereinafter "P. Mot. Doc. No. 104"), at 19.

---

[1] "HHSC forensic mental health facilities" means any facility that HHSC operates, contracts with, or funds that admits persons under the Texas Code of Criminal Procedure Article 46B or Article 46C.

2. Plaintiffs have defined their proposed Not Guilty by Reason of Insanity ("NGRI") class as "all persons who are now, or will be in the future, (a) charged with a Texas crime and found not guilty by reason of insanity, (b) ordered to receive evaluation and/or treatment services at an HHSC mental health facility, but, (c) due to HHSC's insufficient forensic capacity (d) remain incarcerated in a county jail more than 14 days from the day HHSC receives the court order to the day HHSC makes a bed available in an HHSC mental health facility." P. Mot. Doc. No. 104, at 19.

3. Plaintiffs do not request monetary damages, only injunctive and declaratory relief. Plaintiffs' Fifth Amended Complaint for Injunctive and Declaratory Relief (hereinafter "P. Comp. Doc. No. 97"), at 31-32; Defendant's Answer and Defenses to Plaintiffs' Fifth Amended Complaint for Injunctive and Declaratory Relief, Doc. No. 98 (hereinafter "D. Ans. Doc. No. 98"), at ¶ 20.

4. Plaintiffs seek to enjoin HHSC from failing to make a bed available for persons found incompetent to stand trial and ordered to an HHSC mental health facility no later than 21 days from the date HHSC receives notice of a criminal court's commitment order under Chapter 46B of the Texas Code of Criminal Procedure. P. Comp. Doc. No. 97, at 32.

5. Plaintiffs seek to enjoin HHSC from failing to make a bed available for persons found not guilty by reason of insanity and ordered to an HHSC mental health facility no later than 14 days from the date HHSC receives notice of a criminal court's commitment order under Chapter 46C of the Texas Code of Criminal Procedure. P. Comp. Doc. No. 97, at 31.

## II.      Framework for Detention of Incompetency Detainees

6.      Texas Code of Criminal Procedure Article 46B sets forth the legal standard and process for a court's finding a person incompetent to stand trial ("IST"). P. Comp. Doc. No. 97, at ¶¶ 33-43; D. Ans. Doc. No. 98, at ¶¶ 31-34.

7.      Once a person is found incompetent to stand trial, the criminal proceedings against him or her are stayed.  TEX. CODE CRIM. PROC. art. 46B.004(d); D. Ans. Doc. No. 98, at ¶ 34.

8.      After an incompetency determination is made, the only purpose for the detainee's continued detention is the competency restoration treatment and education services mandated in the Texas Code of Criminal Procedure for all defendants found incompetent to stand trial.  Report and Recommendation of the United States Magistrate Judge, Doc.  No. 49 (hereinafter "Mag. R & R. Doc. No. 49"),[2] at 4-5 ("Given Texas law's stated purpose for their detention, this means the nature and duration of [Plaintiffs'] confinement must bear a reasonable relation to their receiving restorative…treatment."); TEX. CODE CRIM. PROC. art. 46B.073(b).

9.      Competency restoration services can be provided in one of only three settings: (1) on an outpatient basis as a condition of bail, (2) in one of five jail-based competency restoration programs, or (3) in an HHSC mental health facility.  TEX. CODE CRIM. PROC. art. 46B.071(a).

10.      HHSC has no discretion over which incompetency detainees criminal courts order into its mental health facilities and which are released on outpatient restoration commitments or referred to the jail-based competency restoration programs.  April 18, 2019 Deposition of Timothy Bray, attached as Exhibit A to P. Mot. Doc. No. 104 (hereinafter "Bray Dep., P. Mot. Ex. A, Doc. No. 104-2"), at 42:16-25.

---

[2] Approved and accepted on June 14, 2017 in "Order on Report and Recommendation," Doc. No. 50, following no objection from Defendant.

11.     A court's ability to release an incompetent detainee to an outpatient commitment is based on the alleged crime, the availability of an outpatient commitment program, and whether outpatient treatment is appropriate.  TEX. CODE CRIM. PROC. arts. 46B.071, 46B.0711, & 46B.072.

12.     There are only 11 outpatient competency restoration programs, serving individuals incarcerated in 35 counties, in the entire state of Texas.  Defendant's Objections & Answers to Plaintiffs' First Set of Interrogatories (2017), attached as Exhibit K to P. Mot. Doc. No. 104 (hereinafter "D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12"), # 11.

13.     Texas Code of Criminal Procedure Art. 46B.091 sets out the standard in Texas for jail-based competency restoration services.  Jail-based competency restoration services are required to (1) "provide jail-based competency restoration services through the use of a multi-disciplinary treatment team that are directed toward the specific objective of restoring the defendant's competency to stand trial," (2) provide the competency restoration services through licensed or qualified mental-health professionals, (3) "provide weekly competency restoration hours commensurate to the hours provided as part of the competency restoration program at an inpatient mental health facility," and (4) operate in a "designated space that is separate from the space used for the general population of the jail." TEX. CODE CRIM. PROC. art. 46B.091(d)(1), (3)–5).

14.     Only five jails in Texas—Dallas County Jail, Tarrant County Jail, Lubbock County Jail, Midland County Jail, and Nueces County Jail—operate jail-based competency restoration programs.  P. Mot. Doc. No. 104, at 5.

15.     Outside of the five jails that operate formal jail-based competency restoration programs in a designated space separate from other inmates, the remaining jails in Texas are not required by law to provide, nor do they provide, competency restoration services.  Declaration of

Melissa Shearer, attached as Exhibit C to P. Mot. Doc. No. 104 (hereinafter "Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4"), at ¶ 7; Declaration of Floyd Jennings, attached as Exhibit D to P. Mot. Doc. No. 104 (hereinafter "Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5"), at ¶ 10; Declaration of Lourdes Rodriguez, attached as Exhibit E to P. Mot. Doc. No. 104 (hereinafter "Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6"), at ¶ 11; Declaration of Patricia Sedita, attached as Exhibit F to P. Mot. Doc. No. 104 (hereinafter "Sedita Dec., P. Mot Ex. F., Doc. No. 104-7"), at ¶ 7; Declaration of Elsie Craven, attached as Exhibit G to P. Mot. Doc. No. 104 (hereinafter "Craven Dec., P. Mot. Ex. G, Doc. No. 104-8"), at ¶ 11; Declaration of Krista Chacona, attached as Exhibit H to P. Mot. Doc. No. 104 (hereinafter "Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9"), at ¶ 7; Declaration of Daniel Smith of Travis County Jail, attached as Exhibit I to P. Mot. Doc. No. 104 (hereinafter "Travis County Jail Dec., P. Mot. Ex. I, Doc. No. 104-10"), at ¶¶ 2 - 4; Declaration of Laxman Sunder, M.D. of Harris County Jail, attached as Exhibit J to P. Mot. Doc. No. 104 (hereinafter "Harris County Jail Dec., P. Mot. Ex. J, Doc. No. 104-11"), at ¶¶ 2 - 4.

16.     Under Texas Code of Criminal Procedure article 46B, a defendant found incompetent to stand trial and not released on an outpatient commitment or committed to a jail-based competency restoration program shall be committed to a mental health facility "[f]or purposes of further examination and competency restoration services with the specific objective of the defendant attaining competency to stand trial…." TEX. CODE CRIM. PROC. art. § 46B.073(b); D. Ans. Doc. No. 98, at ¶ 37.

17.     For incompetency detainees not released on outpatient commitments or committed to one of the five jail-based programs, HHSC is the sole entity responsible for providing IST detainees the specialized competency restoration treatment that justifies their continued detention. TEX. CODE CRIM. PROC. art. 46B.0021.

18.     Unlike Texas jails (excluding the five with formal jail-based competency restoration programs), HHSC's mental health facilities have staff specially trained to provide competency restoration services and do provide these services.  April 15, 2019 Deposition of Michael Maples, attached as Exhibit B to P. Mot. Doc. No. 104 (hereinafter "Maples Dep., P. Mot. Ex. B, Doc. No. 104-3"), at 104:13-23; D. Ans. Doc. No. 98, at ¶¶ 58-59.

19.     The Texas Code of Criminal Procedure provides that where there is credible evidence of restoration of an incompetency detainee while they are awaiting a bed at an HHSC mental health facility, the court can have the individual re-evaluated.  If the individual is restored, the court withdraws the order for transport to an HHSC mental health facility and criminal proceedings resume against the defendant.  Thus, where an individual is restored while awaiting transport, he or she is never ultimately transported to an HHSC mental health facility.  TEX. CODE CRIM. PROC. art. 46B.0755.

### III.     Framework for Detention of NGRI Acquittees

20.     Texas Code of Criminal Procedure Article 46C sets forth the legal standard and process for a court's finding a person not guilty by reason of insanity ("NGRI").  P. Comp. Doc. No. 97, at ¶¶ 44-52; D. Ans. Doc. No. 98, at  ¶¶ 44-46, 48-52.

21.     At the conclusion of a criminal case, when a court determines a person is NGRI, he or she "stands acquitted of the offense charged and may not be considered a person charged with an offense." TEX. CODE CRIM. PROC. art. 46C.155(a).

22.     After a person is found NGRI, the only justification for the acquittee's continued confinement is to evaluate the acquittee to determine the appropriateness of continued confinement and treatment. Mag. R & R. Doc. No. 49 at 4-5 ("Given Texas law's stated purpose for their detention, this means the nature and duration of their confinement must bear a reasonable

relationship to their receiving…evaluative treatment."); Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. art. 46C.251 (entitled "Commitment *for Evaluation and Treatment*, Report" (emphasis added).

23.     Immediately upon a finding that a person is NGRI, the court must determine whether the offense for which the person was acquitted concerned "dangerous conduct" as defined in subchapter 46C.  Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. art. 46C.157.

24.     Under Texas Code of Criminal Procedure article 46C, when a defendant is acquitted as not guilty by reason of insanity of a crime involving dangerous conduct, the court "shall order the acquitted person to be committed for evaluation of the person's present mental condition and for treatment to the maximum security unit of any facility designated by [HHSC]." Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. § 46C.251(a); D. Ans. Doc. No. 98, at ¶ 2, 49.[3]

25.     Because the acquittee has not been convicted and is no longer charged, the court may order the acquittee detained in jail for no more than 14 days pending transfer to a maximum-security HHSC mental health facility.   Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. arts. 46C.160(a); 46C.251(a).

26.     Texas jails are not required to provide, nor do they provide, NGRI evaluation or treatment.   Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 11; Craven Dec. Ex. G, P. Mot., Doc. No. 104-8, at ¶ 11; Travis County Jail Dec., P. Mot. Ex. I, Doc. No. 104-10, at ¶ 5; Harris County Jail Dec., P. Mot. Ex. J, Doc. No. 104-11, at ¶ 5.

27.     HHSC is the sole entity responsible for providing NGRI acquittees the specialized NGRI evaluation and treatment mandated by the Code of Criminal Procedure. Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. art. 46C.0011.

---

[3] Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. § 46C.251(a) was amended by Acts 2019, 86th Leg., ch. 1212 (S.B. 562), § 17, eff. June 14, 2019, and now allows the "acquitted person to be committed for evaluation of the person's present mental condition and for treatment to the facility designated by [HHSC]."

28.     Unlike Texas jails, HHSC's mental health facilities provide evaluations and treatment for persons found NGRI.  Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 105:9-20; D. Ans. Doc. No. 98, at ¶¶ 58-59.

## IV.     HHSC and Texas's Mental Health System

29.     The HHSC Executive Commissioner has final authority for all matters related to the state hospitals.  D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, # 5, # 13.

30.     HHSC is responsible for overseeing state hospitals and behavioral health programs. Uncontested Facts and Issues of Law, Doc. No. 99 (hereinafter "Uncontested Doc. No. 99"), at Facts ¶ 1.

31.     HHSC has the authority to contract with private facilities for additional state-funded mental health beds for forensic and civil commitments and to provide funding to Local Mental Health Authorities to purchase additional mental health beds in local private facilities for forensic and civil commitments.  Declaration of Timothy Bray, attached as Exhibit A to Defendant's Response to Plaintiffs' Motion for Class Certification, Doc. No. 110 (hereinafter "Bray Dec., D. Resp. Ex. A, Doc. No. 110-1"), at 4.

32.     In 2016, HHSC had 2,998 inpatient mental health beds for forensic and civil commitments. Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 66:24 – 68:10.

33.     HHSC currently only has 2,870 inpatient mental health beds for forensic and civil commitments.  Uncontested Doc. No. 99, at Facts ¶ 14.

34.     This 2,870 beds is 128 less than HHSC had in 2016.  Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 66:24 – 68:10.

35.     HHSC's struggle to hire and retain sufficient staff and infrastructure concerns were the causes of the reduction of the available beds within the system. Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 73:23 – 78:24.

36.     Of the 2,870 inpatient mental health beds, 2,269 of those beds are state hospital beds. Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 68:18-23.

37.     The Texas Legislature has given HHSC the discretion to determine how to allocate the total number of HHSC state hospital beds between the forensic and non-forensic populations. Uncontested Doc. No. 99, at Facts ¶ 12; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 17:7 – 18:1.

38.     HHSC has no formal criteria for determining the allocation of forensic versus non-forensic beds, and any adult, general psychiatric bed in one of HHSC's state hospitals can be used for either population.  Uncontested Doc. No. 99, at Facts ¶¶ 11, 13; D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, # 2, # 13.

39.     Over the last twenty years, HHSC has used its discretion and shifted its allocation of state hospital beds between the forensic and non-forensic populations.  Forensic Waitlists for State Mental Hospitals: February 2006 – January 2016 attached as Exhibit L to P. Mot. Doc. No. 104 (hereinafter "Forensic Waitlists 2006 – 2016, P. Mot. Ex. L, Doc. No. 104-13"); Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 19:19-21.

40.     Of the current 2,269 state hospital beds, HHSC has designated 1,474 beds (approximately 65%) for forensic commitments and 794 beds (approximately 35%) for non-forensic commitments. Bray Dec., D. Resp. Ex. A, Doc. No. 110-1, at ¶ 2.

41.     For more than a decade, HHSC has failed to ensure consistent, sufficient forensic capacity within its mental health facilities (both contracted and state hospital beds) to admit every detainee found IST within 21 days of receiving notice of the detainee's commitment or to admit

every NGRI acquittee within 14 days of receiving the notice of the acquittee's commitment. "State Hospital Forensic Waitlist" Chart, attached as Exhibit M to Mot. for Class Cert., ECF No. 104 (hereinafter "State Hospital Forensic Waitlist, P. Mot. Ex. M, Doc. No. 104-14").

42.     To manage the flow of forensic commitments, which exceeded the number of beds HHSC designated "forensic" in its mental health facilities, HHSC made a deliberate choice in 2006 to create two waitlists, the Clearinghouse waitlist and the Maximum Security Unit Admission list ("MSU waitlist").  D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, #5.

43.     Defendant operates the Clearinghouse waitlist for persons who are found IST and committed by a criminal court to a non-Maximum Security Unit at an HHSC mental health facility. Uncontested Doc. No. 99, at Facts ¶ 5; D. Ans. Doc. No. 98, at ¶ 5.

44.     Defendant operates the MSU waitlist for persons found IST and committed to an HHSC MSU facility, NGRI acquittees committed to an HHSC mental health facility, and civil committees found "manifestly dangerous."  Uncontested Doc. No. 99, at Facts ¶ 7; D. Ans. Doc. No. 98, at ¶ 5.

45.     Only those individuals ordered by the court to an HHSC mental health facility are placed on HHSC's waitlists.  Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 48:13 – 49:4; Defendant's Objections & Answers to First Set of Interrogatories Related to Class Certification (2019), attached as Exhibit O to  P. Mot. Doc. 104 (hereinafter "Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16") # 3.

46.     HHSC does not place persons committed to outpatient competency restoration on its waitlists.  Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 48:13 – 49:2; Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 3.

47.     HHSC does not place persons committed to jail-based competency restoration on its waitlists.  Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 48:13 – 49:2; Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 3.

48.     HHSC requires all IST detainees ordered to an HHSC mental health facility to be placed on either its Clearinghouse or MSU waitlists.  Uncontested Doc. No. 99, at Facts ¶ 5; Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 23:12-15; *id.* at 112:13-16; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 28:3-15.

49.     HHSC requires all NGRI acquittees ordered to an HHSC mental health facility to be placed on its MSU waitlist.  Uncontested Doc. No. 99, at Facts ¶ 7; Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 23:12-15; *id.* at 112:13-16; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 28:3-15.

50.     Persons placed on the Clearinghouse waitlist are removed from the list and admitted to an HHSC mental health facility generally on a first-come, first-served basis.  Uncontested Doc. No. 99, at Facts ¶ 6; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 14:23-25; Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 7.

51.     In the six months before Bray's deposition on April 16, 2019, there were zero exceptions to first-come, first-served policy for detainees on the Clearinghouse waitlist.   Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 40:20 – 41:8.

52.     Persons placed on the MSU waitlist are removed from the list and admitted to an HHSC mental health facility generally on a first-come, first-serve basis.  Uncontested Doc. No. 99, at Facts ¶ 8; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 32:23 – 33:1; Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 7.

53.     In the six months before Bray's deposition on April 18, 2019, there were less than ten people out of over 700 people (or less than 1.4 percent) on HHSC's MSU waitlist who were admitted to hospitals as exceptions to the first-come, first-served policy.   Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 33:11 – 35:16; MSU Census Spreadsheet attached as Exhibit N to P. Mot. Doc. No. 104 (hereinafter "MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15") at 10.1.18 through 2.11.19.

54.     IST detainees placed on HHSC's Clearinghouse and MSU waitlists have already had individualized determinations to establish they are incompetent to proceed before Defendant ever places them on its waitlists. Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 23:12–15; at 112:13-16; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 28:3-15.

55.     NGRI acquittees placed on HHSC's MSU waitlist have already had their individual criminal trials or signed individual plea agreements that found they are not guilty by reason of insanity before Defendant ever places them on its waitlist. Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 23:12-15; at 112:13-16; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 28:3-15.

56.     Neither forensic waitlist includes or tracks whether an individual's court order contained a specific finding of dangerousness.  MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15 at 10.2.17 through 1.2.19.

57.     While on the waitlists, IST detainees and NGRI acquittees remain detained in more than 75 different county jails located across the state of Texas.  Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 111:20-22; at 112:10-12 and 112:17-25; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 28:11-25.

58.     If an individual on the MSU waitlist is not waiting in jail because he or she is, for example, bonded out, the MSU waitlist indicates that fact.  MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15.

59.     Of the thousands of individuals placed on the MSU waitlist between October 2017 and January 2, 2019, only 9 were bonded out and therefore remained on the waitlist, but were not in jail.  MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15.

60.     The number of individuals on both waiting lists has fluctuated since HHSC began using them to gate-keep access to its hospitals. "State Hospital Forensic Bed Capacity," attached as Exhibit P of P. Mot. Doc. No. 104-17.

61.     As explained in more detail in ¶¶ 62-69, HHSC has twice demonstrated that it is capable of curing the violations Plaintiffs seek to enjoin.  *See* D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, #8, #9; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 51:3-14; 2017 Declaration of Timothy E. Bray, Exhibit A to 2017 Defendant's Response to Plaintiffs' Motion for Class Certification Doc. No. 35 at ¶ 6.

62.     On February 2, 2012, Judge Naranjo entered a final judgment against Defendant in Cause No. D-1-GN-07-00087; *Floyd Taylor et al. v. David Lakey, M.D., in his official Capacity as Commissioner of the Texas Department of State Health Services,* In the 250th District Court of Travis County, Texas.  *Taylor et. al. v. Lakey*, 2012 WL 6840143 (February 2, 2012).

63.     In the final judgment in *Taylor et al. v. Lakey,* Judge Naranjo permanently enjoined the State from failing to make a bed available at an appropriate State Mental Hospital under its authority for an Incompetent Detainee no later than twenty-one days from the date the State receives notice of a criminal court's commitment order under Chapter 46B of the Texas Code of

Criminal Procedure. The Judge gave the State 120 days to comply with the order. *Taylor*, 2012 WL 6840143, at *1.

64.     On May 2, 2014, the Texas Third Court of Appeals overruled Judge Naranjo's Final Judgment. *Lakey v. Taylor* 435 S.W.3d 309, 323 (Tex. App.—Austin 2014, no pet.)

65.     In the interim, during Fiscal years 2012-2014, HHSC was able to ensure that persons committed to a non-MSU at an HHSC mental health facility waited less than 21 days on its waitlist. D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, #8; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 50:13-19.

66.     During Fiscal Years 2013-2014, HHSC was able to ensure that persons committed to an MSU at an HHSC mental health facility waited less than 21 days on its waitlist. D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, #8; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 50:20 – 51:12.

67.     The second time HHSC demonstrated that it is capable of curing the violations Plaintiffs seek to enjoin occurred when Plaintiff filed the instant action on July 29, 2016. At the time the Complaint was filed, persons on the Clearinghouse waitlist waited an average of 41 days. Plaintiffs' Original Complaint for Injunctive and Declaratory Relief Doc. No. 1, at ¶ 48.

68.     On or around August 2016, HHSC was again able to ensure that persons committed to a non-MSU HHSC forensic bed waited less than 21 days on its Clearinghouse waitlist. D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, #8; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 51:6-14.

69.     HHSC accomplished these temporary decreases in the average wait on its waitlists by prioritizing forensic commitments over non-forensic commitments, *i.e.*, shifting the bed allocation to designate more beds within the mental health facilities for forensic patients and fewer

for non-forensic, adding additional beds, and increasing staffing.  D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, #8, 9; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 54:23 – 55:20.

70.     The current waitlists demonstrate that HHSC will not voluntarily continue to timely admit IST detainees and NGRI acquittees absent court intervention. MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15.

71.     Since the creation of the waiting lists, the overall trajectory has been upward—with more and more people waiting on the lists longer than 21 or 14 days.  State Hospital Forensic Waitlist, P. Mot. Ex. M, Doc. No. 104-14.

72.     As of March 15, 2019, there were 771 individuals on HHSC's forensic waitlists, 81 percent of whom (625 individuals) remained incarcerated in county jails for more than 21 days from the day HHSC received the court order to the day it notified the jail that the person could be admitted to an HHSC facility.  Monthly Waitlist Update, attached as Exhibit Q to P. Mot. Doc. No. 104 (hereinafter "Monthly Waitlist Update, P. Mot. Ex. Q, Doc. No. 104-18").

73.     As of March 15, 2019, there were 453 detainees found IST or NGRI and placed on HHSC's MSU waitlist.  Of the 453 detainees on the MSU waitlist, 94.7 percent (429 individuals) remained incarcerated in county jails for more than 21 days from the day HHSC received the court order to the day it notified the jail that the person could be admitted to an HHSC facility. Monthly Waitlist Update, P. Mot. Ex. Q, Doc. No. 104-18.

74.     As of March 15, 2019, there were 318 detainees found IST and placed on HHSC's Clearinghouse waitlist.  Of the 318 detainees on the Clearinghouse waitlist, 58 percent (186 detainees) remained incarcerated in county jails for more than 21 days from the day HHSC received the court order to the day it notified the jail that the person could be admitted to an HHSC facility. Monthly Waitlist Update, P. Mot. Ex. Q, Doc. No. 104-18.

75.     As recently as May 20, 2019, Defendant admitted that "insanity acquittees who are required to be admitted to MSUs within 14 days frequently have to wait weeks or months for admission after the[ir] adjudication."  D. Ans. Doc. No. 98, at ¶ 4.

## V.     The Named Plaintiffs

76.     Plaintiff Joseph Ward was found incompetent to stand trial and ordered to be committed to an HHSC mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  D. Ans. Doc. No. 98, ¶¶ 10, 71; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 6.

77.     Rather than admit him into one of its mental health facilities within 21 days of his court order, HHSC placed Plaintiff Ward on one of its waitlists.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 6.

78.     HHSC admitted Plaintiff Ward to North Texas State Hospital-Vernon more than 21 days after he was found incompetent to stand trial.  He ultimately waited 58 weeks from the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities. Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 9; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 9.

79.     Plaintiff Ward spent the entirety of these 58 weeks on HHSC's waitlist in jail. Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 7.

80.     While Plaintiff Ward was in jail on HHSC's waitlist, he did not receive any competency restoration treatment.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 7.

81.     Plaintiff Ward has been diagnosed with schizoaffective disorder, epilepsy, asthma, and hypertension.  Harris County Jail staff noted that Plaintiff Ward has a history of neurocognitive

impairment and observed his confusion and inability to remember information such as street names, locations, and names of doctors.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 8.

82.     Plaintiff Ward has a long psychiatric history and previous incarcerations where he had been found incompetent to stand trial.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 8.

83.     While awaiting transfer to an HHSC mental health facility, Plaintiff Ward requested and voluntarily took his psychotropic mediations; however, he continued to report command auditory hallucinations throughout his incarceration.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 8.

84.     Plaintiff Ward suffered deterioration during his 58 week wait in Harris County Jail for admission to an HHSC mental health facility due to isolation and enforced idleness.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 12.

85.     Plaintiff Ward was also injured by his lengthy wait for admission to a mental health facility in that he was forced to remain confined in a jail without receiving the state-mandated competency restoration services while the criminal process against him was stayed.  This delay in treatment necessarily lengthened the time within which he could be tried once restored to competency.  This delay also unfairly prolonged his criminal case, making it difficult for his attorney to adequately represent him, identify witnesses, and to enter into plea negotiations. Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 12.

86.     Plaintiff Marc Lawson was found incompetent to stand trial and ordered to be committed to an HHSC mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  D. Ans. Doc. No. 98, at ¶¶ 11, 74; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 3.

87. Rather than admit him into one of its mental health facilities within 21 days of his court order, HHSC placed Plaintiff Lawson on one of its waitlists. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 3.

88. HHSC admitted Plaintiff Lawson to North Texas State Hospital-Vernon more than 21 days after he was found incompetent to stand trial. He ultimately waited 62 weeks from the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 6. Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 9.

89. Plaintiff Lawson spent the entirety of these 62 weeks on HHSC's waitlist in jail. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶¶ 4, 6.

90. While Plaintiff Lawson was in jail on HHSC's waitlist, he did not receive any competency restoration treatment. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 4.

91. Plaintiff Lawson has been diagnosed with an intellectual disability, pervasive developmental disorders, attention deficit hyperactivity disorder, bipolar disorder, conduct disorder, antisocial personality disorder, epilepsy/seizure disorder, and Hepatitis C. During Mr. Lawson's incarceration in Travis County Jail, jail personnel reported that he had obvious cognitive deficits and poor social skills. He was categorized as vulnerable, and jail personnel documented concerns over his being housed in a cell with other inmates due to his vulnerability. The Travis County Jail classified his mental health and medical needs as severe. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 5.

92. Plaintiff Lawson suffered deterioration during his 62 week wait in Travis County Jail for admission to an HHSC mental health facility, spending over two months housed in a single cell. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 5.

93.     Plaintiff Lawson was additionally injured by his lengthy wait for admission to a mental health facility in that he was forced to remain confined in a jail without receiving the state-mandated competency restoration services while the criminal process against him was stayed.  This delay in treatment necessarily lengthened the time within which he could be tried once restored to competency or have his charges dismissed after a determination that there is no substantial probability that, in the foreseeable future, he will regain competency to stand trial.  This delay also necessarily resulted in a delay of the statutorily required evaluation that is given to determine whether there is a substantial probability that, in the foreseeable future, Mr. Lawson would regain competency to stand trial.  This delay also unfairly prolonged his criminal case, making it difficult for his attorney to adequately represent him, identify witnesses, and to enter into plea negotiations.  Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 9.

94.     Plaintiff Jennifer Lampkin was found incompetent to stand trial and ordered to be committed to an HHSC mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  D. Ans. Doc. No. 98, at ¶¶ 12, 78; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 4.

95.     Plaintiff Lampkin's court order required the sheriff to transfer her to a state mental health facility.  D. Ans. Doc. No. 98, at ¶¶ 12, 78; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 4.

96.     Rather than admit her into one of its mental health facilities within 21 days of her court order, HHSC placed Plaintiff Lampkin on one of its waitlists.  Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 4.

97.     HHSC admitted Plaintiff Lampkin to North Texas State Hospital-Vernon more than 21 days after she was found incompetent to stand trial.  She ultimately waited 65 weeks from the

date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities. Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 9; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 7.

98.     Plaintiff Lampkin spent the entirety of these 65 weeks on HHSC's waitlist in jail. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 5.

99.     While Plaintiff Lampkin was in jail on HHSC's waitlist, she did not receive any competency restoration treatment. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 5.

100.     Plaintiff Lampkin is diagnosed with an intellectual disability and bipolar disorder. While incarcerated, she exhibited symptoms of and behaviors related to her mental health condition. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 6.

101.     Ms. Lampkin was housed exclusively in psychiatric housing in the Travis County Jail and, in July 2016, the jail counselor reported that she was "struggling due to isolation." While in jail, Ms. Lampkin deteriorated both mentally and physically. Over the course of her incarceration, Ms. Lampkin lost over thirty pounds. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 6.

102.     Plaintiff Lampkin suffered deterioration during her 65 week wait in Travis County Jail for admission to an HHSC mental health facility due to isolation and enforced idleness. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 13.

103.     Plaintiff Lampkin was additionally injured by her lengthy wait for admission to a mental health facility in that she was forced to remain confined in a jail without receiving the state-mandated competency restoration services while the criminal process against her was stayed. This delay in treatment necessarily lengthened the time within which she could be tried once restored to competency or have her charges dismissed after a determination that there is no substantial

probability that, in the foreseeable future, she will regain competency to stand trial. This delay also necessarily resulted in a delay of the statutorily required evaluation that is given to determine whether there is a substantial probability that, in the foreseeable future, Ms. Lampkin would regain competency to stand trial. This delay also unfairly prolonged her criminal case, making it difficult for her attorney to adequately represent her, identify witnesses, and to enter into plea negotiations. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 13.

104.    Plaintiff Kenneth Jones was found incompetent to stand trial and ordered to be committed to an HHSC mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial. D. Ans. Doc. No. 98, at ¶¶ 14, 82; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 4.

105.    Rather than admit him into one of its mental health facilities within 21 days of his court order, HHSC placed Plaintiff Jones on one of its waitlists. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 4.

106.    HHSC admitted Plaintiff Jones to Rusk State Hospital more than 21 days after he was found incompetent to stand trial. He ultimately waited 48 weeks from the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities. Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 9; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 6.

107.    Plaintiff Jones spent the entirety of these 48 weeks on HHSC's waitlist in Harris County Jail. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 5.

108.    While Plaintiff Jones was in jail on HHSC's waitlist, he did not receive any competency restoration treatment. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 5.

109.    Plaintiff Jones has a long psychiatric history and has been diagnosed with bipolar disorder and post-traumatic stress disorder. While incarcerated at Harris County Jail, Mr. Jones

requested and voluntarily took his psychotropic medications; however, he reported to jail staff that his medication was not working and that he had become suicidal. Mr. Jones medications were adjusted, but he continued to report visual hallucinations and delusions while he was awaiting transfer to an HHSC mental health facility. Mr. Jones also had several altercations with other inmates, resulting in at least three disciplinary charges. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 8.

110.    Plaintiff Jones suffered deterioration during his 48 week wait in jail for admission to an HHSC mental health facility. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 8.

111.    Plaintiff Jones was additionally injured by his lengthy wait for admission to a mental health facility in that he was forced to remain confined in a jail without receiving the state-mandated competency restoration services while the criminal process against him was stayed. This delay in treatment necessarily lengthened the time within which he could be tried once restored to competency or have his charges dismissed after a determination that there is no substantial probability that, in the foreseeable future, he will regain competency to stand trial. This delay also necessarily resulted in a delay of the statutorily required evaluation that is given to determine whether there is a substantial probability that, in the foreseeable future, Mr. Jones would regain competency to stand trial. This delay also unfairly prolonged his criminal case, making it difficult for his attorney to adequately represent him, identify witnesses, and to enter into plea negotiations. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶10.

112.    Plaintiff Julian Torres was found incompetent to stand trial and ordered to be committed to an HHSC mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial. D. Ans. Doc. No. 98, at ¶¶ 17, 87; Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 3.

113.    Rather than admit him into one of its mental health facilities within 21 days of his court order, HHSC placed Plaintiff Torres on one of its waitlists.  Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 3.

114.    HHSC admitted Plaintiff Torres to a non-MSU HHSC mental health facility more than 21 days after he was found incompetent to stand trial.  He ultimately waited 4 weeks from the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities.  Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 6.

115.    Plaintiff Torres spent the entirety of these 4 weeks on HHSC's waitlist in jail. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 4.

116.    While Plaintiff Torres was in jail on HHSC's waitlist, he did not receive any competency restoration treatment.  Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 4.

117.    Plaintiff Torres is diagnosed with schizophrenia.   His mental health had so deteriorated that he spent the first week of his incarceration on the acute psychiatric unit at the Travis County Jail.   Shortly before HHSC admitted him to one of its mental health facilities, he was transferred from the acute unit to a single-cell mental health pod where he spent twenty-two hours a day isolated in his cell. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 5.

118.    Plaintiff Torres suffered deterioration during his 4 week wait in Harris County Jail for admission to an HHSC mental health facility.  Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 5.

119.    Plaintiff Torres was also injured by his lengthy wait for admission to a mental health facility in that he was forced to remain confined in a jail without receiving the state-mandated competency restoration services while the criminal process against him was stayed.  This delay in treatment necessarily lengthened the time within which he could be tried once restored to

competency. This delay also unfairly prolonged his criminal case, making it difficult for his attorney to adequately represent him, identify witnesses, and to enter into plea negotiations. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 8.

120.    Plaintiff Mary Sapp waited more than once on HHSC's waitlists. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶¶ 4, 7.

121.    Plaintiff Sapp was found incompetent to stand trial and ordered to be committed to an HHSC mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial. D. Ans. Doc. No. 98, at ¶¶ 15, 84; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 4.

122.    Rather than admit her into one of its mental health facilities within 21 days of her court order, HHSC placed her on one of its waitlists. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 4.

123.    HHSC admitted Plaintiff Sapp to North Texas State Hospital more than 21 days after he was found incompetent to stand trial. She ultimately waited 8 weeks from the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities. Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 6.

124.    Plaintiff Sapp spent the entirety of these 8 weeks on HHSC's waitlist in Harris County Jail. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 5.

125.    While Plaintiff Sapp was in jail on HHSC's waitlist, she did not receive any competency restoration treatment. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 5.

126.    After Plaintiff Sapp was restored to competency, she was later found not guilty by reason of insanity and ordered to be committed to an HHSC maximum-security unit for evaluation

of her present mental condition and treatment.  D. Ans. Doc. No. 98, at ¶¶ 15, 84, 85; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 6.

127.     Rather than admit her into one of its mental health facilities within 14 days of her court order, HHSC again placed Plaintiff Sapp on its MSU waitlist.  Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 7.

128.     HHSC admitted Plaintiff Sapp to North Texas State Hospital-Vernon more than 14 days after she was found not guilty by reason of insanity.  She ultimately waited 27 weeks from the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities.  Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 9; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 10.

129.     Plaintiff Sapp spent the entirety of these 27 weeks on HHSC's waitlist in jail. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 8.

130.     While Plaintiff Sapp was in jail on HHSC's waitlist, she did not receive any evaluation or treatment services required under Texas Code of Criminal Procedure Article 46C. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 8.

131.     Plaintiff Sapp is 68 years old and has been diagnosed with schizoaffective disorder, COPD, diabetes, stage three chronic kidney disease, asthma, hypertension, osteoarthritis, and spinal degeneration.  She had a number of falls while incarcerated at Harris County Jail and was even sent to the infirmary in April 2017 due to her inability to care for her own activities of daily living.  Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 9.

132.     Plaintiff Sapp suffered deterioration during her 8-week and 27-week waits in jail for admission to an HHSC mental health facility.  Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶¶ 13, 15.

133.    Plaintiff Sapp was additionally injured by her lengthy wait for admission to a mental health facility in that she was forced to remain confined in a jail without receiving the state-mandated competency restoration services while the criminal process against her was stayed.  This delay in treatment necessarily lengthened the time within which she could be tried once restored to competency.  This delay also unfairly prolonged her criminal case, making it difficult for her attorney to adequately represent her, identify witnesses, and to enter into plea negotiations. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 13.

134.    Plaintiff Sapp was injured by her second, lengthy wait for admission to a mental health facility awaiting transfer to an HHSC mental health facility.  Her continued detention after 14 days punished her by forcing her to remain confined in a jail without receiving the state-mandated evaluation and treatment after she had been found not guilty by reason of insanity.  The delay in transfer for her treatment necessarily resulted in a delay of the statutorily-required evaluation that was given to determine whether she met the civil standard for commitment. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 15.

135.    Plaintiff Cecil Adickes was found not guilty by reason of insanity and was ordered to be committed to an HHSC mental health facility for evaluation of his present mental condition and for treatment.   D. Ans. Doc. No. 98, at ¶¶ 13, 81; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 8.

136.    Rather than admit him into one of its mental health facilities within 14 days of his court order, HHSC placed Plaintiff Adickes on its MSU waitlist.  Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 8.

137.    HHSC admitted Plaintiff Adickes to North Texas State Hospital-Vernon more than 14 days after he was found not guilty by reason of insanity.  He ultimately waited 13 weeks from

the date of HHSC's notification to the date HHSC made a bed available in one of its mental health facilities. Def. Ans. 2019 Int., P. Mot. Ex. O, Doc. No. 104-16, # 9; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 10.

138.    Plaintiff Adickes spent the entirety of these 13 weeks on HHSC's waitlist in the Travis County Jail. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 9.

139.    While Plaintiff Adickes was in jail on HHSC's waitlist, he did not receive any evaluation or treatment services required under Texas Code of Criminal Procedure Article 46C. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 9.

140.    Plaintiff Adickes was injured by the delay in transfer to an HHSC mental health facility. His continued detention after 14 days punished him by forcing him to remain confined in a jail without receiving the state-mandated evaluation and treatment after he had been found not guilty by reason of insanity. The delay in transfer for his treatment necessarily resulted in a delay of the statutorily required evaluation that was given to determine whether he met the civil standard for commitment. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 15.

## VI.    The Proposed Class Members

141.    As of April 2019, the average wait time on the Clearinghouse waitlist was 49 days, while the average wait time on the MSU waitlist was 263 days. Quarterly Reporting of Waiting Lists for Mental Health Services and of Mental Health Services for the former NorthSTAR Service Area (Apr. 2019), attached as Exhibit R to P. Mot. Doc. No. 104-19, at 22.

142.    From 2006 to the present day, the Clearinghouse waitlist for IST detainees has varied in size from approximately 100 to 400 detainees awaiting admission to HHSC mental health facility. Forensic Waitlists 2006 – 2016, P. Mot. Ex. L, Doc. No. 104-13.

143.     From 2006 to the present day, the MSU waitlist for NGRI acquittees and certain IST detainees has varied in size from approximately 76 to over 400 detainees awaiting admission to an HHSC mental health facility. Forensic Waitlists 2006 – 2016, P. Mot. Ex. L, Doc. No. 104-13.

### A.  The Proposed IST Class

144.     Plaintiffs have defined their proposed IST class with respect to the 21-day timeline that Defendant has already demonstrated it is capable of meeting for admission of IST detainees to its mental health facilities. P. Mot. Doc. No. 104, at 19; D. Ans. 2017 Int., P. Mot. Ex. K, Doc. No. 104-12, # 9; Bray Dep., P. Mot. Ex. A, Doc. No. 104-2, at 51:3-14; Bray Dec., D. Resp. Ex. A, Doc. No. 110-1, at ¶ 6.

145.     Named IST Plaintiffs and the proposed IST class were/are/will be committed to HHSC mental health facilities for the stated purpose under Tex. Code Crim. Proc. Art. 46B.073(b), which is for further examination and competency restoration services with the specific objective of the defendant attaining competency to stand trial. D. Ans. Doc. No. 98, at ¶¶ 10-12, 14, 15, 17, 71, 74, 78, 82, 84, 87; P. Mot. Doc. No. 104, at 19.

146.     Named IST Plaintiffs and the proposed IST class members were, are, or will be placed on either HHSC's Clearinghouse waitlist or MSU waitlist. Uncontested Doc. No. 99, at Facts ¶ 2; Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 3; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 6; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 4; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 4; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 4; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 3.

147.     While on HHSC's waitlists, the named IST Plaintiffs remained and the proposed class members remain or will remain in county jails where they did not/do not/will not receive

competency restoration services. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 4; Jennings

Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 7; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶

5; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 5; Craven Dec., P. Mot. Ex. G, Doc. No. 104-

8, at ¶ 5; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 4; P. Mot. Doc. No. 104, at 19.

148.    Named IST Plaintiffs and the proposed class members were or will be removed

from HHSC's waitlists and admitted to one of HHSC's mental health facilities on a first-come,

first-served basis. Uncontested Doc. No. 99, at Facts ¶¶ 6, 8; D. Ans. Doc. No. 98, at ¶ 5.

149.    HHSC has failed to accept transfer of individual IST Plaintiffs and other proposed

class members who have been found incompetent to stand trial for competency restoration services

within 21 days of their court orders. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 6; Jennings

Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 9; Rodriguez Dec. Ex. E, P. Mot., Doc. No. 104-6, at ¶

6; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 6; Craven Dec., P. Mot. Ex. G, Doc. No. 104-

8, at ¶ 7; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 6; P. Mot. Doc. No. 104, at 19.

150.    Plaintiffs' IST class includes an unknown number of future members who will be

adjudicated IST and detained in jail more than 21 days awaiting admission to an HHSC mental

health facility. P. Mot. Doc. No. 104, at 23.

### B.  The Proposed NGRI Class

151.    Plaintiffs have defined their NGRI class with respect to the 14-day timeline

established in state law, TEX. CODE CRIM. PROC. art. 46C.160(a), for Defendant to accept them

into its mental health facilities. P. Mot. Doc. No. 104, at 19.

152.    Defendant has refused to admit that it is required by state law (which informs the

substantive due process right provided by the constitution) to transfer all NGRI acquittees to an

MSU facility within 14 days.  Defendant's Response to Plaintiffs' Motion for Class Certification Doc. No. 110 (hereinafter "D. Resp. Doc. No. 110"), at 14.

153.    In 2017, based on partial data, there were at least 75 detainees found NGRI who remained incarcerated in county jails more than 14 days from the day HHSC received the court order to the day it notified the jail that the person could be admitted to an HHSC facility.  MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15, at 10.2.17, 11.3.17, 12.16.17, and 1.3.18.

154.    In 2018, there were 68 detainees found NGRI who remained incarcerated in a county jail more than 14 days from the day HHSC received the court order to the day it notified the jail that the person could be admitted to an HHSC facility.  MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15, at 1.3.18, 2.1.18, 3.5.18, 4.3.18, 5.7.18, 6.4.18, 7.3.18, 8.6.18, 9.4.18, 10.1.18, 11.5.18, 12.3.18, 1.2.19.

155.    In the first two months of 2019 alone, seven NGRI acquittees waited on the MSU list longer than 14 days.  MSU Census Spreadsheet, P. Mot. Ex. N, Doc. No. 104-15, at 1.2.19, 2.11.19.

156.    The number of NGRI acquittees on the MSU waitlist fluctuates over time as a simple function of the list.  Maples Dep., P. Mot. Ex. B, Doc. No. 104-3, at 113: 9-15.

157.    Named NGRI Plaintiffs and the proposed NGRI class were/are/will be committed to HHSC maximum-security mental health facilities for the stated purpose under Tex. Code of Crim. Proc. Art. 46C.251(a), which is for evaluation of the person's present mental condition and for treatment. D. Ans. Doc. No. 98, at ¶¶ 13, 16, 81, 85; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 7; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 8; P. Mot. Doc. No. 104, at 19.

158.    Due to HHSC's insufficient forensic capacity, the named NGRI Plaintiffs and the proposed class members were or will be placed on HHSC's MSU waitlist. Rodriguez Dec., P. Mot.

Ex. E, Doc. No. 104-6, at ¶ 7; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 8; P. Mot. Doc. No. 104, at 19.

159.　While on HHSC's waitlist, the named NGRI Plaintiffs remained and the proposed class members remain or will remain in county jails where they did not/do not/will not receive NGRI evaluative services. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 8; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 9; P. Mot. Doc. No. 104, at 19.

160.　HHSC has failed to accept transfer of individual NGRI Plaintiffs and other proposed class members who have been found not guilty by reason of insanity for evaluation and/or treatment services within 14 days of their court orders. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 10; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 10; P. Mot. Doc. No. 104, at 19.

161.　Plaintiffs' NGRI class includes an unknown number of future members who will be adjudicated NGRI and detained in jail more than 14 days awaiting admission to an HHSC mental health facility.  P. Mot. Doc. No. 104, at 23.

## VII.　The Jails Where Class Members Are Held Awaiting Admission at an HHSC Mental Health Facility

162.　A jail can provide competency restoration services only if it meets the requirements of Texas Code of Criminal Procedure articles 46B.090 and 46B.091.　Tex. Code Crim. Proc. arts. 46B.090, 46B.091; Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Class Certification, Doc. No. 112, at 9-10 ("hereinafter P. Reply Doc. No. 112");  P. Mot. Doc. No. 104, at 5.  As noted *supra* in ¶ 14, as of May 2019, only five jails have implemented a jail-based competency restoration program under these provisions

163.　Laxman Sunder, M.D, the Interim Executive Director of Health Services in the Harris County Jail facilities, who oversees the health care—including psychiatric and behavioral

health care—of prisoner patients incarcerated in Harris County Jail, confirmed that neither the Harris County Sheriff's Office nor the Harris Center (with whom the sheriff's office contracts to provide inmate mental health care) provides competency restoration services as defined by Article 46B.073 and 46B.091 of the Texas Code of Criminal Procedure in the Harris County Jail. Harris County Jail Dec., P. Mot. Ex. J, Doc. No. 104-11, at ¶ 2.

164.    The Harris County Jail is not a "mental health facility, residential care facility, or jail-based competency program" under Article 46B.073 of the Texas Code of Criminal Procedure and does not operate a jail-based competency program under Article 46B.091 of the Texas Code of Criminal Procedure. Harris County Jail Dec., P. Mot. Ex. J, Doc. No. 104-11, at ¶ 3.

165.    The Harris County Jail does not provide evaluation of the person's present mental condition or treatment pursuant to the provisions of Texas Code of Criminal Procedure Article 46C.251. Harris County Jail Dec., P. Mot. Ex. J, Doc. No. 104-11, at ¶ 4.

166.    Daniel Smith, LPC, the Director of Inmate Mental Health Programs for the Travis County Sheriff's Office who oversees psychiatric and behavioral health care of inmate patients incarcerated in the Travis County Correctional Complex, confirmed that the Travis County Sheriff's Office does not provide examination and competency restoration services as defined by Article 46B.073 and 46B.091 of the Texas Code of Criminal Procedure in the Travis County Correctional Complex. Travis County Jail Dec., P. Mot. Ex. I, Doc. No. 104-10, at ¶ 2.

167.    The Travis County Correctional Complex is not a "mental health facility, residential care facility, or jail-based competency program" under Article 46B.073 of the Texas Code of Criminal Procedure and does not operate a jail-based competency program under Article 46B.091 of the Texas Code of Criminal Procedure. Travis County Jail Dec., P. Mot. Ex. I, Doc. No. 104-10, at ¶ 3.

168.    The Travis County Correctional Complex does not provide evaluation of the person's present mental condition or treatment pursuant to the provisions of Texas Code of Criminal Procedure Article 46C.251.  Travis County Jail Dec., P. Mot. Ex. I, Doc. No. 104-10, at ¶ 4.

**VIII.    Harms suffered by proposed class members in addition to the continued, unconstitutional deprivation of their liberty**

169.    Acute psychosis, or the presence of severe, acute, and often florid psychosis, is by far the most common ground of incompetency to stand trial.  Such disorders are often treatable in relatively short order *if and only if* a defendant is (1) examined by a psychiatrist or similarly qualified provider, (2) prescribed appropriate medication, usually an antipsychotic, if needed, and (3) willing to take medication as prescribed.  In addition, such individuals *require* other appropriate forms of treatment such as individual and group psychotherapy and milieu therapy that takes place in a truly therapeutic environment.  It is also important that individuals be in a situation in which they feel safe, to prevent destabilization and/or regression.  Declaration of Joel A. Dvoskin, Ph.D. attached as Exhibit S to P. Mot. Doc. No. 104 (hereinafter "Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20"), at ¶ 11 (emphasis added).

170.    Many jails lack adequate psychiatric, psychological, social work, and nursing services, thereby decreasing the likelihood that prescribed medications will be appropriate, effective, and taken by the patient as prescribed.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(i).

171.    In fact, many jails provide no meaningful mental health treatment at all.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 17.

172.    Few if any jails are able to create a therapeutic environment in which an inmate feels like a patient.  The failure to create such a setting precludes the detainee from viewing the

health and mental health care professionals as doctors or nurses who care about them. Indeed, many jails specifically avoid trying to create such an environment because they need to focus on maintaining security, which they rightly view as their primary objective. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(ii).

173.    Effective psychiatric treatment must be individualized—a truth that is in direct conflict with correctional goals. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(iii).

174.    Jails are seldom seen as a safe place by inmates and detainees. Inmates' understandable fears for their own safety can make them loathe to accept psychotropic medication, which will tranquilize them and leave them less alert and less vigilant in the event they need to defend themselves. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(iv).

175.    Many jails are insensitive to the frequent minor disciplinary violations (e.g., being out of place, failing to obey a direct order) that usually accompany psychosis, treating such infractions as if they are intentional rule violations. As a result, inmates with serious mental illness commonly comprise a disproportionate number of inmates in lockdown settings such as administrative or disciplinary (punitive) segregation. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(vi).

176.    There is virtual unanimity among experts that segregation should be avoided for any inmate or detainee who suffers from acute symptoms of serious mental illness such as severe depression or psychosis. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(vii).

177.    Individuals with mental disabilities are frequently placed in segregation or solitary confinement where their liberty, freedom of movement, and social interaction are extremely limited and which, as an even more restrictive correctional setting, can accelerate decompensation. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶¶ 12(vi), 12(vii).

178.     Solitary confinement, or 22- to 23-hour per day lock-down, is not therapeutic and disproportionately impacts inmates with mental illness as the isolation only exacerbates their conditions.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶¶ 12(vi), 12(vii).

179.     The vast majority of American jails have grossly inadequate psychiatric and mental health services, causing inmates to decompensate rapidly.  These exacerbations of serious mental illness can cause defendants to harm themselves, to experience more severe hallucinations and delusions, and to disrupt the other inmates and detainees who sometimes respond with violence toward the person with mental illness.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 12(ix).

180.     Research has demonstrated that allowing patients to experience acute and untreated psychosis can have a long-term, and possibly permanent, negative effect on the trajectory of the person's illness; moreover, a long period of untreated psychosis is especially associated with worse long-term outcomes in people with first-episode psychosis.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 14.

181.     Psychotic pretrial detainees are likely to remain psychotic longer if housed in a jail than if housed in a modern, competently-run psychiatric hospital.  Accordingly, the standard of care for incompetent defendants who remain in custody in virtually all jurisdictions is transfer to a state forensic psychiatric hospital which provides a therapeutic environment and milieu, among other characteristics.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 13.

182.     The delay in detainees' receiving competency restoration treatment caused by their remaining in jail lengthens the time within which detainees can be tried once restored to competency or have their charges dismissed after a determination that there is no substantial probability in the foreseeable future they will regain competency to stand trial.  Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 9; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 12;

Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 13; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 10; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 13; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 9; Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at at ¶¶ 13-15, 20-21.

183.    The delay in competency restoration treatment prolongs the detainees' criminal cases, making it more difficult for their attorneys to adequately represent them after they are restored to competency, to identify witnesses, and to enter into plea negotiations.  Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 9; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 12; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 13; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 10; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 13; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 9.

184.    The delay in competency restoration treatment can lead to further deterioration in the mental health conditions of individuals in the IST class due to the isolation and enforced idleness.  Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶¶ 12(i)-(x) 13-14, 20-21; Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 9; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶¶ 8, 12; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶¶ 9, 13; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶¶ 8, 10; Craven Dec. Ex. G, P. Mot., Doc. No. 104-8, at ¶¶ 6, 13; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 5, 9.

185.    For NGRI acquittees, the delays in transfer to HHSC mental health facilities necessarily lengthens the amount of time they remain confined after being found NGRI before they can be evaluated to determine whether they meet the standard for civil mental health commitment or whether they can be discharged to an outpatient commitment or released outright. *See* Tex. Code Crim. Proc. art. 46C.253; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 15;

Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 15; Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶¶ 20-21.

186.     For NGRI acquittees, many of the same conditions described in paragraphs ¶¶ 170-180 will negatively affect their condition and treatment, which can result in decompensation and segregated confinement in jail, thereby unnecessarily prolonging their periods of confinement. Dvoskin Dec., P. Mot. Ex. S, Doc. No. 104-20, at ¶ 20; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at 15; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 15.

## IX.    The Next Friends

187.     Plaintiff Ward was represented by the Harris County Public Defender's Office in his criminal matter and Floyd Jennings has volunteered and agreed to serve as Plaintiff Ward's next friend.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at 1.

188.     Mr. Jennings is the Special Resource Counsel to the Mental Health Division of the Harris County Public Defender's Office.  He was previously the Chief of the Mental Health Division of the same office and has worked there since 2011.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 1.

189.     Mr. Jennings was admitted to the bar in 1996 and has focused his practice on mental health law.  Before becoming a lawyer, Mr. Jennings obtained his Ph.D. in clinical psychology and was in private practice.  For twenty years, he was also a clinical faculty member of the University of Texas Medical School-Houston.  Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶¶ 2, 5.

190.     Mr. Jennings is the author of over thirty-five publications in the area of mental health and law.  He has made numerous presentations to public defenders, prosecutors, and judges, and has specifically presented on issues raised in cases where individuals have been found

incompetent to stand trial or not guilty by reason of insanity. Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 3.

191.    The Mental Health Division of the Harris County Public Defender's Office is dedicated to representing persons with mental illness who have been charged with a misdemeanor or a non-capital felony. It represents all misdemeanants found incompetent to stand trial and defendants in the felony mental health courts. It is staffed with highly trained attorneys, social workers, and investigators in order to ensure that each defendant with mental illness receives quality representation. Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5, at ¶ 4.

192.    Krista Chacona, defense attorney for Plaintiff Lawson, has volunteered and agreed to serve as Plaintiff Lawson's next friend. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at 1.

193.    Ms. Chacona is a criminal defense attorney in private practice in Travis County who has been practicing criminal defense since 1998. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 1.

194.    Ms. Chacona is on the Mental Health Wheel for both Travis and Williamson Counties, which means she is on the appointment list in both counties to represent indigent felony defendants who are experiencing significant mental illness. Being on the Mental Health Wheel requires that attorneys have 18 hours of criminal law related CLE each year, including at least one hour of ethics relating to criminal law, six hours of mental health related CLE, and one hour of immigration law CLE. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 1.

195.    In addition to Ms. Chacona's work on the Mental Health Wheels, many of her retained clients also have mental health issues. She estimates she has represented over 100 clients found incompetent to stand trial and approximately ten clients found not guilty by reason of insanity. Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9, at ¶ 3.

196.     Elsie Craven, defense attorney for Plaintiffs Lampkin and Adickes, has volunteered and agreed to serve as Plaintiff Lampkin's and Plaintiff Adickes's next friend. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at 1.

197.     Ms. Craven is a criminal defense attorney in Travis County who has been practicing criminal defense since 1991.  Like Ms. Chacona, she is on the Mental Health Wheel for Travis County, which means she is on the appointment list in Travis County to represent indigent defendants who are experiencing significant mental illness and has completed yearly CLE requirements.  Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 2.

198.     Before the Mental Health Wheel was created, Ms. Craven was appointed to represent many clients with mental health diagnoses.  She estimates that she has represented hundreds of clients found incompetent to stand trial and a few clients found not guilty by reason of insanity. Craven Dec., P. Mot. Ex. G, Doc. No. 104-8, at ¶ 3.

199.     Patricia Sedita, defense attorney for Plaintiff Jones, has volunteered and agreed to serve as Plaintiff Jones's next friend. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at 1.

200.     Ms. Sedita is a criminal defense attorney in private practice in Harris County who has been practicing criminal defense since 1996.  Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 2.

201.     Ms. Sedita represents clients who participate in several mental health dockets dedicated to competency restoration, insanity acquittees, and those on intensive mental health probation.  She has been working with this unique population of clients for more than ten years. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 2.

202.     She attends numerous continuing education programs yearly focused on mental health criminal justice issues and is a local resource for other lawyers. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 2.

203.     Ms. Sedita estimates that she has represented hundreds of incompetent clients and approximately fifty clients who were found not guilty by reason of insanity. Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7, at ¶ 3.

204.     Lourdes Rodriguez, defense attorney for Plaintiff Sapp, has volunteered and agreed to serve as Plaintiff Sapp's next friend. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at 1.

205.     Ms. Rodriguez is a criminal defense attorney in private practice in Harris County. She has been practicing criminal law since 1991. She has been appointed to represent indigent defendants in federal court since 1993 and has been accepting appointments in the Harris County Mental Health Restoration Court since 2012. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶¶ 1, 2.

206.     Most of Ms. Rodriguez's clients are now in the Harris County Mental Health Restoration Court, which means they have been found incompetent to stand trial. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 2.

207.     Prior to becoming an attorney, Ms. Rodriguez worked for about ten years in community mental health in Florida, including directing a program designed to move patients out of the state mental health hospital in South Florida and into the community. Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6, at ¶ 3.

208.     Plaintiff Torres was represented by the Travis County Mental Health Public Defender's Office and Melissa Shearer has volunteered and agreed to serve as Plaintiff Torres's next friend. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 3.

209.     Ms. Shearer is the Director of the Travis County Mental Health Public Defender. Plaintiff Torres is represented by one of the Travis County mental health public defenders whom Ms. Shearer supervises. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at 1.

210.     Ms. Shearer has worked at the Travis County Mental Health Public Defender since 2007. The program is dedicated to representing persons with mental illness who have been charged with a misdemeanor, state jail, or third-degree felony. It is staffed with highly trained attorneys and social workers in order to ensure that each defendant with mental illness receives quality representation as well as help finding alternative options to jail, such as other available social services and treatment options in the defendant's community. Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4, at ¶ 2.

## X.     Class Counsel

211.     Beth Mitchell is the supervising attorney for the Institutional Rights and Civil Liberties team at Disability Rights Texas, a non-profit protection and advocacy organization that advocates and litigates on behalf of Texans with disabilities. She has credentials, experience, and expertise in disability and civil rights litigation and enjoys a good reputation in those areas. Declaration of Beth Mitchell, attached as Exhibit U to P. Mot. Doc. No. 104 (hereinafter "Mitchell Dec., P. Mot. Ex. U, Doc. No. 104-22").

212.     Ms. Mitchell has been practicing civil rights law (including disability law) for twenty-five years. She is a member in good standing of the Texas bar and is admitted to practice before the Fifth Circuit Court of Appeals and the United States District Courts of the Southern, Northern, Eastern, and Western Districts of Texas. Mitchell Dec., P. Mot. Ex. U, Doc. No. 104-22.

213. During Ms. Mitchell's time at Disability Rights Texas, she has litigated eight class action cases. Mitchell Dec., P. Mot. Ex. U, Doc. No. 104-22, at ¶ 1.

214. Peter Hofer is a senior litigation attorney and litigation coordinator at Disability Rights Texas. He has credentials, experience, and expertise in disability and civil rights litigation and enjoys a good reputation in those areas. Declaration of Peter Hofer, attached as Exhibit V to P. Mot. Doc. No. 104 (hereinafter "Hofer Dec., P. Mot. Ex. V, Doc. No. 104-23"), at ¶ 2.

215. Mr. Hofer has been practicing civil rights law (including disability law) for more than 26 years. He is a member in good standing of the Florida and Texas bars. He is admitted to practice before the U.S. Supreme Court, the Fifth and Eleventh Circuit Courts of Appeal, and the United States District Courts for the Southern, Northern, Eastern, and Western Districts of Texas and the Southern District of Florida. Hofer Dec., P. Mot. Ex. V, Doc. No. 104-23, at ¶ 3.

216. During his tenure at the Texas Civil Rights Project and Disability Rights Texas, Mr. Hofer has litigated numerous class action cases. Hofer Dec., P. Mot. Ex. V, Doc. No. 104-23, at ¶¶ 6, 12.

217. John Michael Gaddis is a partner at Winston & Strawn LLP whose practice emphasizes complex business litigation. He was admitted to the bar in 2009 and has over eight years' experience practicing complex litigation. Declaration of John Michael Gaddis, attached as Exhibit W to P. Mot. Doc. No. 104 (hereinafter "Gaddis Dec., P. Mot. Ex. W, Doc. No. 104-24"), at ¶ 3.

218. Mr. Gaddis is admitted to practice in the State of Texas, the U.S. Court of Appeals for the Fifth Circuit, and the U.S. District Court for the Northern District of Texas. Gaddis Dec., P. Mot. Ex. W, Doc. No. 104-24, at ¶ 3.

219. Mr. Gaddis has litigated two class action cases and presented the oral argument in the appeal of this case before the United States Court of Appeals for the Fifth Circuit. Gaddis Dec., P. Mot. Ex. W, Doc. No. 104-24, at ¶¶ 4-5, 7.

## CONCLUSIONS OF LAW

### I. Standing

1. Plaintiffs' claims are inherently transitory and are, therefore, not moot. *Ward v. Hellerstedt*, 753 Fed. Appx. 236, 242-43 (5th Cir. 2018).

2. Named Plaintiffs and putative class members have standing to assert their claims.

### II. Applicable Law

#### A. Substantive Due Process Framework

3. "[I]t is not necessary to decide the appropriate standard to employ on the merits in order to determine the appropriateness of class certification. In considering class certification the relevant question is whether the Plaintiffs' claim, under either [the deliberate indifference or reasonable relation] standard, will turn on common questions of fact or law." *Perry* 294 F.R.D. at 36.

4. However, the Fifth Circuit's ruling in *Hare v. City of Corinth*, 74 F.3d 633, 647–48 (5th Cir.1996) (en banc) articulates the standard to apply in cases brought by pretrial detainees. *Nerren v. Livingston Police Dept.,* 86 F.3d 469, 473 n. 25 (5th Cir.1996).

5. Cases brought by pretrial detainees may be brought as an attack on a "condition of confinement" or as an "episodic act or omission." *Hare,* 74 F.3d at 644–45.

*6.* When a plaintiff is challenging a condition of confinement, as Plaintiffs do in this case, this Court applies the test established by the Supreme Court in *Bell v. Wolfish. See id* at 646.

Only when a plaintiff is challenging an episodic act or omission does the deliberate indifference standard apply. *Id.* at 647–48

7. Since this case challenges general practices or polices of pretrial confinement, and not "a jail official's episodic act or omission," *id.* at 643, the applicable standard is whether the nature and duration of confinement is reasonably related to a legitimate governmental purpose. *See e.g. Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 941–44 (E.D. Ark. 2002)(the delay in transferring pretrial detainees to a mental health facility amounts to punishment as it is not related to any legitimate governmental purpose).

8. Under *Bell v. Wolfish*, a detainee's confinement violates substantive due process when it amounts to punishment. 441 U.S. 520, 536 (1979).

9. Detention amounts to punishment when "the nature and duration of commitment [does not] bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *see also Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) *citing Seling v. Young*, 531 U.S. 250, 265 (2001).

10. Punishment in the criminal justice system is reserved for criminal defendants who plead or are adjudicated guilty. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).

11. The stated purpose of confinement is determined by looking to the statute in question. *Zadvydas*, 533 U.S. 678, 696-99 (2001) (holding that the stated purpose of confinement is determined by looking to the statute in question); *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (court looked to sexually violent predator statute to determine purpose of confinement).

12. An incompetent detainee's or NGRI acquittee's continued confinement must be justified by progress toward the statutes' stated purposes. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

13.     The stated statutory purpose for the Named IST detainees' and the proposed IST class's continued confinement is "for further examination and competency restoration services with the specific objective of the defendant attaining competency to stand trial." Tex. Code Crim. Proc. art. 46B.073 (entitled "Commitment *for Restoration to Competency*" (emphasis added)); Mag. R & R. Doc. No. 49, at 4-5, ("Given Texas law's stated purpose for their detention, this means the nature and duration of [Plaintiffs'] confinement must bear a reasonable relation to their receiving restorative…treatment.")

14.     For Named IST Plaintiffs and the proposed IST class, where the *only* purpose for their continued detention after being found IST was/is for competency restoration services, and where their continued detention is in jail with no competency restoration services, the nature of their continued detention is not reasonably related to the purpose of their continued confinement.

15.     For Named IST Plaintiffs and the proposed IST class, where they wait an average of 263 days (MSU) or 49 days (non-MSU) after being found incompetent to stand trial before receiving competency restoration services at an HHSC facility, the duration of their continued detention is not reasonably related to the purpose of their continued confinement.

16.     The stated statutory purpose for the Named NGRI acquittees' and the proposed NGRI class' continued confinement "shall… be for… evaluation of the [acquittee's] present mental condition" to determine the appropriateness of continued confinement and treatment. Tex. Code Crim. Proc. art. 46C.251 (entitled "Commitment *for Evaluation and Treatment*, Report" (emphasis added)); Mag. R & R. Doc. No. 49, at 4-5 ("Given Texas law's stated purpose for their detention, this means the nature and duration of [Plaintiffs'] confinement must bear a reasonable relation to their receiving…evaluative treatment.").

17.     For Named NGRI Plaintiffs and the proposed NGRI class, where the *only* purpose for their continued detention after being found NGRI was/is evaluation of their present mental condition to determine the appropriateness of continued confinement, and where their continued detention is in jail without evaluation of their present mental condition, the nature of their continued detention is not reasonably related to the purpose of their continued confinement.

18.     For Named NGRI Plaintiffs and the proposed NGRI class, where they wait more than 14 days after being found NGRI before being evaluated at an HHSC facility, the duration of their continued detention is not reasonably related to the purpose of their continued confinement.

19.     Many courts, including courts within this Circuit, have also applied the "professional judgment" standard set forth by the Supreme Court in *Youngberg v. Romero* to cases with similar facts as the ones presented here.   457 U.S. 307, 321–22 (1982) (holding that substantive due process requires that restrictions or conditions imposed on pretrial detainees be the result of judgment exercised by a qualified professional); *see, e.g., M.D. v. Abbott*, 152 F. Supp. 3d 684, 698–700 (S.D. Tex. 2015); *Disability Law Center, et. al., v. Utah Dep't of Human Servs.*, 180 F. Supp. 3d 998, 1008 (D. Utah 2016); *Advocacy Center for Elderly and Disabled v. Louisiana Dep't of Health and Hospitals*, 731 F. Supp. 2d 603, 609–10 (E.D. La. 2010).

20.     Plaintiffs' and the classes' due process rights were/are violated when "the conditions and duration of confinement [did not/do not] bear some reasonable relation to the purpose for which [they] are committed." *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) *citing Seling v. Young*, 531 U.S. 250, 265 (2001); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

21.     Under the *Jackson* analysis, the "determination of constitutionally adequate medical treatment is not measured by that which must be provided to the general prison population, but by that which must be provided to those committed to for mental incompetency….The

treatment provided in jails is not designed to promote the defendant's speedy return to mental competence." *Stiavetti v. Ahlin*, No. RG15-779731, 2019 WL 2176240 at *15 (Cal. Super. April 19, 2019)*, see also* P. Reply Doc. No. 112, at 9 (sting cite).

22.     Incidental mental health services provided in jails that do not meet the standards of Texas Code of Criminal Procedure Article 46B.091 for formal jail-based competency restoration programs were not/are not competency restoration services sufficient to justify the continued detention of the IST Plaintiffs and the proposed IST class members.

### B. Plaintiffs Meet the Requirements for Class Certification Under Rule 23

23.     The classes sought to be represented are adequately defined and clearly ascertainable.

24.     In order to prevail under Rule 23(a) on their Motion for Class Certification, Plaintiffs must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and the representative parties will fairly and adequately protect the interests of the class [adequacy]." FED. R. CIV. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

#### 1. Numerosity

25.     Rule 23(a)(1) requires a showing that the class is so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1)  Factors affecting the practicability of joinder include the geographic dispersion of class members and the ease of identifying all members. *Ibe v. Jones*, 836 F3d 516, 528 (5th Cir. 2016).

26.     "Smaller classes are less objectionable where…the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members." *Jones v. Diamond*, 519 F.2d 1090.

27.     Poverty, disability, and isolation of individual class members are factors that inform the Court's analysis of practicability of joinder. *See Steward v. Janek*, 315 F.R.D. 472, 480 (W.D. Tex. May 20, 2016); *Armstead v. Pingree*, 629 F. Supp. 273, 279 (M.D. Fla. 1986)); *Barnes v. Board of Trustees, Michigan Veterans Trust Fund*, 369 F. Supp. 1327, 1333 (D. Mich. 1973).

28.     Where an alleged class also includes unnamed, unknown future members, as Plaintiffs' two classes do here, joinder is impracticable and satisfies Rule 23(a)(1).  *See Jack v. Am. Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974); *Pederson v. La. State Univ.* 213 F.3d 858, 868-69 (5th Cir. 2000) (Fifth Circuit found a district court abused its discretion when it decertified a class of only eight female LSU students plus future unnamed students bringing a Title IX discrimination claim).

29.     The numerosity of the IST class is uncontested.  D. Resp. Doc. No. 110, at 21, fn7.

30.     The IST putative class is sufficiently numerous such that joinder is impracticable given the 615 putative class members,[4] the unknown number of unnamed future class members, the inability to identify future class members, the putative class members' mental illnesses and impoverishment, their geographical dispersion, the impracticability in joining them to the suit, and the nature of the action.

31.     Plaintiffs have satisfied the requirements of Rule 23(a)(1) with respect to the IST class.

---

[4] Monthly Waitlist Update, P. Mot. Ex. Q, Doc. No. 104-18.

32.     The NGRI putative class is sufficiently numerous such that joinder is impracticable given the inherently fluctuating number of putative class members, the 75 and 68 members of the putative classes in the two preceding years, the unknown number of unnamed future class members, the inability to identify future class members, the putative class members' mental illnesses and impoverishment, their geographical dispersion, the impracticability in joining them to the suit, and the nature of the action.

33.     Plaintiffs have satisfied the requirements of Rule 23(a)(1) with respect to the NGRI class.

### 2.   Commonality

34.     After *Wal-Mart Stores, Inc. v. Dukes*, establishing commonality entails two showings: (1) there exists a common policy or practice (including an implicit one) that is the alleged source of harm for class members and (2) there are common questions of law or fact that will be dispositive of the putative class's claims.  *M.D. v. Perry*, 294 F.R.D. 7, 28-29 (S.D. Tex. 2013).

35.     The common practice identified to satisfy the commonality question does not have to injure every class member the same way or to the same degree; instead, Plaintiffs must establish only a common legal injury resulting from the common policy or practice.  *M.D. v. Perry*, 294 F.R.D. at 44-45; *see also Yates v. Collier*, 868 F.3d 354, 363-64 (5th Cir. 2017); *Steward v. Janek*, 315 F.R.D. 472, 482 (W.D. Tex. May 20, 2016).

36.     Plaintiffs have identified Defendant's practice of using waitlists rather than timely admitting them (within 21-days and 14-days respectively) to its mental health facilities for their court-mandated services as the common source of their continued, injurious deprivation of liberty.

37.     Where state law creates a broader liberty interest than does the federal due process clause itself, state law determines the actual liberty interests afforded persons in that state, and not the constitutional substantive due process clause. *Mills v. Rogers,* 457 U.S. 291, 303 (1982).[5]

38.     Texas law establishes 14 days as the relevant time limit after which the NGRI Plaintiffs and putative class's continued confinement awaiting admission to an HHSC mental health facility violates their substantive due process rights.   TEX. CODE CRIM. PROC. art. 46C.160(a).

39.     As a result of Defendant's policy or practice of using waitlists in lieu of timely admitting class members to its mental health facilities (i.e. within 21 and 14 days, respectively), Plaintiffs and the putative class members have suffered the same harm.

40.     The harm identified by IST Plaintiffs includes punishment by their wrongful continued confinement, injurious deprivation of liberty while the criminal processes against them were/are/will be stayed, and the prolonging of  their criminal cases, which negatively impacted/impacts/will impact their attorneys' abilities to adequately represent them, identify witnesses, and enter into plea negotiations.

41.     The harm identified by the NGRI Plaintiffs includes punishment by their wrongful continued confinement in a jail despite being found not guilty of their charged crimes and the delay in the statutorily-required evaluation to determine whether they meet the civil standard for continued commitment in a mental health facility or can be released.

---

[5] Although Plaintiffs have not asserted a state-created liberty interest, the Texas statute does meet the criteria of a state-created liberty interest insofar as it provides a mandatory objective rule for NGRI aquittees ("the court may order the defendant detained in jail…for a period not to exceed 14 days") and a violation of that rule would impose an atypical and significant hardship on an acquittee, remaining in jail without a conviction or charge. *See Sandin v Connor*, 515 U.S. 472, 484 (1995).

42.     Because Defendant places and removes people on the waitlists on a "first-come, first-served" basis, Defendant is not making individualized assessments but is acting or refusing to act on grounds that apply generally to each class.   Individualized assessments of each incompetent detainee are, therefore, not necessary to identify the harm caused them by Defendant or to remedy it with Plaintiffs' prayed-for declarations and injunctions.

43.     Plaintiffs' and the class members' detention absent conviction amounts to unconstitutional punishment where the nature of their confinement (being warehoused in jails) and the duration of their confinement in jail (more than 21 days and 14 days, respectively) is not reasonably related to the purpose of their confinement, which is to receive court-mandated competency or evaluation services at an HHSC mental health facility.

44.     Because variations in the extent of injury felt by individual class members as a result of the common policy or practice do not defeat commonality, *see Yates*, 868 F.3d at 362–65, the actual length of time class members are confined beyond 21 or 14 days does not impede the generation of common answers to the common questions of fact and law applicable to the classes.

45.     The common question of fact inherent in Plaintiffs' claim is

a.     whether HHSC has failed to accept in a timely manner (*i.e.*, within 21 or 14 days, respectively, from the date HHSC is notified of the court's order to the date HHSC makes a bed available) the admission of Plaintiffs and class members to its mental health facilities for competency restoration treatment or NGRI evaluation and/or treatment as ordered by criminal courts.

46.     The common questions of law inherent in Plaintiffs' claim include

a.     whether HHSC's failure to admit individuals determined incompetent to stand trial and NGRI acquittees ordered to HHSC's mental health facilities within a reasonably timely manner (*i.e*., within 21 or 14 days, respectively, from the date HHSC is notified of the court's order to the date HHSC makes a bed available), causing them to be warehoused in county jails, violates the Fourteenth Amendment to the United States Constitution; and

b.　　whether Plaintiffs and class members are entitled to the declaratory and injunctive relief they seek, including an order requiring HHSC to admit to its mental health facilities IST detainees within 21 days and NGRI acquittees within 14 days, respectively, from the date HHSC is notified of the court's order to the date HHSC makes a bed available.

47.　　These common questions of fact and law are not only relevant to, but determinative of, Plaintiffs' claims such that an answer to the proposed questions will resolve their Fourteenth Amendment due process claims in "one stroke."

48.　　IST Plaintiffs have satisfied their burden as to commonality under Rule 23(a)(2).

49.　　NGRI Plaintiffs have satisfied their burden as to commonality under Rule 23(a)(2).

### 3.　Typicality

50.　　The test for typicality asks whether the class representatives "possess the same interest and suffer the same injury" as the class members but does not require that the claims of the named plaintiffs be identical to the claims of the other class members. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

51.　　The generality of the Plaintiffs' asserted claims and their requested relief guides the typicality determination.

52.　　Plaintiffs have asserted a single claim generally applicable to each proposed class— that their Fourteenth Amendment rights are infringed by HHSC's overarching policy and practice of failing to timely admit IST detainees and NGRI acquittees (within 21 and 14 days, respectively) to its mental health facilities for their court-mandated competency restoration services or NGRI evaluation and treatment.  P. Comp. Doc. No. 97, at ¶¶ 89-109.

53.　　The relief they seek is correspondingly general—declarations that this policy and practice violates their rights to the extent they are required to remain incarcerated for more than

21 or 14 days after HHSC is notified of their commitment orders and injunctions barring this policy and practice from continuing.  P. Comp. Doc. No. 97, at 31-32.

54.     The Named Plaintiffs share the same characteristics as the proposed class members. The Named Plaintiffs have been found either incompetent to stand trial or not guilty by reason of insanity, have been court-ordered to an HHSC mental health facility for restoration services or evaluation and treatment, and remained in jail for more than 21 or 14 days after HHSC is notified of their commitment orders due to HHSC's self-imposed insufficient forensic capacity.

55.     The Named Plaintiffs have the *same interest* as the proposed classes, *i.e.*, avoiding being warehoused in jails without restoration or evaluation services for more than 21 or 14 days before HHSC admits them to one of its mental health facilities for those services.

56.     The Named Plaintiffs have also suffered the *same injury* as the proposed classes— incarceration without purpose for more than 21 or 14 days after HHSC was notified of their commitment.

57.     IST Plaintiffs' claims are, therefore, typical of the classes they seek to represent. IST Plaintiffs have satisfied the requirements of Rule 23(a)(3).

58.     NGRI Plaintiffs' claims are, therefore, typical of the classes they seek to represent. NGRI Plaintiffs have satisfied the requirements of Rule 23(a)(3).

### 4.  Adequacy

59.     To satisfy the adequacy element of Rule 23(a), two criteria must be met: (1) the class representatives must not have antagonistic or conflicting interests with the unnamed members of the class and (2) the attorneys representing the class must be qualified and competent.  *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 194 (W.D. Tex. 1998); *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir. 1978).

60. In determining the adequacy of class representatives, courts consider whether the interests of the Named Plaintiffs are sufficiently aligned with the other class members." *Neff*, 179 F.R.D. at 195 (quoting *Jenkins v. Raymark Indus., Inc.,* 109 F.R.D. 269, 273 (E.D. Tex. 1985), *aff'd,* 782 F.2d 468 (5th Cir.1986)); *see generally Gen. Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982).

61. "Differences between the proposed representatives and the class do not defeat adequacy unless they rise to the level of a conflict of interest." *Morrow v. Washington*, 277 F.R.D. 172, 195 (E.D. Tex. 2011) (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F3d 620, 625-26 (5th Cir. 1999)).

62. In the Fifth Circuit, courts additionally evaluate whether the class representatives "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation.'" *Steward*, 315 F.R.D. at 490–91 (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005)).

63. The mere fact that a named plaintiff's individual claim has been mooted does not preclude that plaintiff from adequately representing the class. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975).

64. The Named Plaintiffs and all members of both proposed classes have suffered, are suffering, or are at risk of suffering, the same injuries as a result of Defendant's policies and practices: waiting in county jails for more than 21 or 14 days for admittance to an HHSC mental health facility. The Named Plaintiffs and the unnamed members of the proposed classes share the same interest (prompt admission to Defendant's facilities for competency restoration treatment or NGRI evaluation and treatment services), share the same harm (continued confinement longer than 21 or 14 days after HHSC receives their commitment orders, in violation of their Fourteenth

Amendment rights), and seek the same relief (systemic change by declaration and injunction requiring admission within 21 or 14 days) for the classes as a whole.

65.     For both classes, the claims of the Named Plaintiffs are not presently or potentially in conflict with any members of the class.

66.     Named Plaintiffs' mental states limit their ability to protect their legal interests.  As such, next friends are necessary to represent their interests.

67.     Pursuant to Federal Rule of Civil Procedure 17(c)(2), all Named Plaintiffs are represented by next friends who share the same interests as the Named Plaintiffs and the class and do not have any conflicts between themselves and the proposed classes.

68.     Under Fifth Circuit law, a next friend representing a Named Plaintiff, who because of age or mental disability is unable to adequately represent his or her own interests in the litigation, can serve as an adequate class representative. *See Horton v. Goose Creek Ind. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982); *M.D. v. Perry*, 294 F.R.D. at 29, 46.

69.     The Named Plaintiffs' next friends are dedicated to the Named Plaintiffs' best interests, familiar with this litigation, understand why the Named Plaintiffs seek relief, and are willing and able to pursue this case on the Named Plaintiffs' behalf. *See* Shearer Dec., P. Mot. Ex. C, Doc. No. 104-4; Jennings Dec., P. Mot. Ex. D, Doc. No. 104-5; Rodriguez Dec., P. Mot. Ex. E, Doc. No. 104-6; Sedita Dec., P. Mot. Ex. F, Doc. No. 104-7; Craven Dec., P. Mot. Ex. G, Doc. No. 104-8; Chacona Dec., P. Mot. Ex. H, Doc. No. 104-9.

70.     The Named Plaintiffs and their next friends have no divergent interests and can fully and adequately represent the legal rights and seek the legal remedies to which all members of the putative classes are entitled.  Accordingly, the requirements of Rule 23(a)(4) are met.

71.     In determining the adequacy of class counsel, the trial court is to inquire into "the zeal and competence of the representative's counsel…." *Horton*, 690 F.2d at 484.  The factors that courts consider in determining the adequacy of counsel in class actions include the attorneys' professional skills, experience, and resources.  *See N. Am. Acceptance Corp. Sec. Cases*, 593 F.2d 642, 644 (5th Cir. 1979).

72.     Based upon the qualifications of attorneys Beth Mitchell, Peter Hofer, and John Michael Gaddis as well as non-profit Disability Rights Texas and Winston and Strawn LLP, it is clear Plaintiffs' counsel are well qualified to litigate this action and will prosecute it vigorously on behalf of the classes.  Plaintiffs' counsel command the necessary resources to competently represent the classes and they have no other professional commitments that are antagonistic to, or which would detract from, their efforts to seek a favorable decision for the classes in this case.

73.     The competency of class counsel is undisputed.  D. Resp. Doc. No. 110, at 8.

74.     There is no conflict of interest between the Named Plaintiffs and their counsel or between the unnamed, future class members and counsel.

75.     Disability Rights Texas has no conflict of interest that would prevent it from zealously advocating for the rights of the proposed classes simply because its mission includes protecting the rights of other, also-vulnerable populations.

76.     IST Plaintiffs have thus satisfied the adequacy requirements of Rule 23(a)(4).

77.     NGRI Plaintiffs have thus satisfied the adequacy requirements of Rule 23(a)(4).

### 5.  Rule 23(b)(2)

78.     In order to prevail on their Motion for Class Certification, Plaintiffs must also meet the elements for at least one of the three subsections of Rule 23(b).  In this case, Plaintiffs allege they have met the requirements set forth in Rule 23(b)(2), which applies when "the party opposing

the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." P. Comp. Doc. No. 97, at ¶ 20; Fed. R. Civ. P. 23(b)(2).

79.     Under *Wal-Mart*, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  564 U.S. at 360.

80.     In *Yates*, the Court recognized three requirements for Rule 23(b)(2) certification: "(1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; (3) the injunctive relief must be specific."  868 F.3d 354, 366-67 (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)).

81.     All members of both proposed classes have been harmed in essentially the same way.  Defendant's policy and practice of refusing timely admission to its mental health facilities universally affects each member of the two proposed classes equally—they all are warehoused in jail more than 21 or 14 days, respectively, after being committed to an HHSC facility for competency restoration education or NGRI evaluation and treatment.

82.     Plaintiffs' proposed 21-day and 14-day time limits for admission to an HHSC mental health facility constitute a reasonable remedy for their constitutional violations.

83.     The injunctive relief sought by Plaintiffs for each proposed class is specific, insofar as it would simply require Defendant to admit class members to its mental health facilities within a specified time frame (21 days or 14 days, respectively) after HHSC is notified of their being found either incompetent to stand trial or not guilty by reason of insanity.

84. Plaintiffs' proposed time limits therefore satisfy the concerns raised by the Fifth Circuit regarding the prior class certification order, which it found to be ambiguous because that order did not define "what period of time the district court considers to be extended." *Ward*, 753 Fed. Appx. at 246.

85. An injunction requiring Defendant to admit incompetent detainees to one of its mental health facilities within 21 days of receipt of the criminal court's order would provide systemic relief to each member of that class. Likewise, an injunction requiring that Defendant admit acquittees found not guilty by reason of insanity to one of its mental facilities within 14 days of receipt of a criminal court's order would provide systemic relief to each member of that class.

86. Since Defendant admits each class on a first-come, first-served basis, there is no need for different injunctions or declaratory judgments tailored to different individual class members, as a single injunction and declaratory judgment for each class provides an appropriate remedy for all class members.

87. Injunctive relief predominates in Plaintiffs' claims because the proposed class action seeks only declaratory and injunctive relief, and does not seek monetary damages.

88. IST Plaintiffs have, therefore, satisfied the requirements of Rule 23(b)(2).

89. NGRI Plaintiffs have, therefore, satisfied the requirements of Rule 23(b)(2).

90. Class certification is necessary to provide meaningful judicial review of Defendant's systemic denial of the due process rights of Plaintiffs and the members of the proposed classes.

### C. Federal Precedent from Identical Cases

91. Federal district courts in both Utah and Washington have, within the past few years, certified classes for incompetency detainees who had been ordered to the custody of those states'

equivalent of HHSC for competency-restoration treatment but remained housed in county jails. *See Disability Law Ctr., et. al. v. Utah*, No. 2:15-cv-00645, 2016 WL 5396681, at *8 (D. Utah, Sept. 27, 2016); *Trueblood et. al. v. Washington State Dep't of Soc. & Health Servs.*, W.D. Wash. No. 2:14-cv-01178, Docket No. 84, at 4 (October 31, 2014).

92.     Both courts found that the proposed classes for incompetency detainees, analogous to the putative classes in this case, met all the requirements for class certification under Rule 23(a) and (b).  *See Disability Law Ctr., et. al. v. Utah*, No. 2:15-cv-00645, 2016 WL 5396681, at *8 (D. Utah, Sept. 27, 2016); *Trueblood et. al. v. Washington State Dep't of Soc. & Health Servs.*, W.D. Wash. No. 2:14-cv-01178, Docket No. 84, at 4 (October 31, 2014).

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully submit that they have carried their burden to certify the requested IST and NGRI classes.

Respectfully submitted,

/s/ Beth Mitchell
BETH MITCHELL
State Bar No. 00784613
bmitchell@drtx.org
PETER HOFER
State Bar No. 09777275
phofer@drtx.org
LISA SNEAD
State Bar No. 24062204
lsnead@drtx.org
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758
(512) 454-4816 (Phone)
(512) 454-3999 (Fax)
bmitchell@drtx.org
phofer@drtx.org
lsnead@drtx.org

COTY MEIBEYER
State Bar No. 24085469
DISABILITY RIGHTS TEXAS
1500 McGowen, Suite 100
Houston, Texas 77004
(713) 974-7691 (Phone)
(713) 974-7695 (Fax)
cmeibeyer@drtx.org

JOHN MICHAEL GADDIS
State Bar No. 24069747
WINSTON & STRAWN LLP
2121 N. Pearl St., Suite 900
Dallas, Texas 75201
(214) 453-6500 (Phone)
(214) 453-6400 (Fax)
mgaddis@winston.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, a true and correct copy of the foregoing document was electronically filed using the Court's CM/ECF filing system, thus providing notice of electronic filing to the following:

Michael R. Abrams
Christopher D. Hilton
Thomas A. Albright
Assistant Attorneys General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

_____/s/ Beth Mitchell_____
BETH MITCHELL