1        **IN THE UNITED STATES DISTRICT COURT**
        **FOR THE WESTERN DISTRICT OF TEXAS**
2              **AUSTIN DIVISION**

3 JOSEPH WARD, MICHAEL ANDERSON,    ) AU:16-CV-00917-LY
  ISAAC LEMELLE, DISABILITY RIGHTS   )
4 TEXAS, CECIL ADICKES, MICHAEL GIBSON, )
  KENNETH JONES, MARY SAPP,          )
5                      )
     Plaintiffs,             )
6                      )
  V.                   ) AUSTIN, TEXAS
7                      )
  COURTNEY PHILLIPS,        )
8                      )
     Defendant.           ) NOVEMBER 19, 2019
9
         ************************************************
10       TRANSCRIPT OF CLASS CERTIFICATION HEARING
         BEFORE THE HONORABLE LEE YEAKEL
11         ************************************************

12 APPEARANCES:

13 FOR THE PLAINTIFFS:  COTY MEIBEYER
                   DISABILITY RIGHTS TEXAS
14                1500 MCGOWEN STREET, SUITE 100
               HOUSTON, TEXAS 77004
15
               JOHN MICHAEL GADDIS
16                WINSTON & STRAWN LLP
               2121 NORTH PEARL STREET, SUITE 900
17               DALLAS, TEXAS 75201

18                LISA SNEAD
               PETER HOFER
19               BETH L. MITCHELL
               DISABILITY RIGHTS TEXAS
20               2222 WEST BRAKER LANE
               AUSTIN, TEXAS 78758
21
  FOR THE DEFENDANTS:  MICHAEL ABRAMS
22               THOMAS A. ALBRIGHT
               CHRISTOPHER D. HILTON
23               KIM GDULA
               OFFICE OF THE ATTORNEY GENERAL
24              GENERAL LITIGATION DIVISION
               P.O. BOX 12548, CAPITOL STATION
25              AUSTIN, TEXAS 78711-2548

```
 1                         COREY DAVID KINTZER
                          CHRISTOPHER LOPEZ
 2                        TEXAS HEALTH AND HUMAN SERVICES COMMISSION
                          701 WEST 51ST STREET
 3                        AUSTIN, TEXAS 78751-2312

 4   COURT REPORTER:      ARLINDA RODRIGUEZ, CSR
                          501 WEST 5TH STREET, SUITE 4152
 5                        AUSTIN, TEXAS 78701
                          (512) 391-8791
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by computerized stenography, transcript

25   produced by computer.
```

| | | |
|---|---|---|
| 09:28:40 | 1 | (Open court) |
| 09:28:40 | 2 | THE COURT:  We're here this morning on a hearing on |
| 09:28:42 | 3 | the motion for class certification in *Ward*, and others, *v.* |
| 09:28:49 | 4 | *Smith*.  Let me get announcements, beginning with the plaintiff, |
| 09:28:53 | 5 | as to who is here and who you represent, please. |
| 09:28:56 | 6 | MS. SNEAD:  Yes, Your Honor.  Lisa Snead for Joseph |
| 09:28:59 | 7 | Ward et al., plaintiffs. |
| 09:29:03 | 8 | THE COURT:  All right. |
| 09:29:04 | 9 | MS. MITCHELL:  Beth Mitchell with the plaintiffs, |
| 09:29:05 | 10 | along with Peter Hofer, Coty Meibeyer, and Michael Gaddis. |
| 09:29:11 | 11 | THE COURT:  Okay.  Thank you-all. |
| 09:29:14 | 12 | And for the defendants? |
| 09:29:16 | 13 | MR. ABRAMS:  Good morning, Your Honor. |
| 09:29:17 | 14 | Michael Abrams for the defendant.  And joining me at counsel |
| 09:29:20 | 15 | table is Chris Hilton with the Attorney General's Office, |
| 09:29:24 | 16 | Corey Kintzer, who is in-house counsel with HHSC, Chris Lopez, |
| 09:29:27 | 17 | who is in-house counsel with HHSC, and Kim Gdula, who is an |
| 09:29:32 | 18 | attorney in the Attorney General's Office, and Tom Albright. |
| 09:29:35 | 19 | THE COURT:  All right.  Very good.  So did you-all |
| 09:29:38 | 20 | get together ahead of time to make sure it was six to five? |
| 09:29:42 | 21 | Well, we've got six over here now.  You're at the end.  I want |
| 09:29:46 | 22 | to make sure it's fair. |
| 09:29:47 | 23 | All right.  Well, here is what our order of march is |
| 09:29:49 | 24 | going to be today.  I've had a matter come up I need to tend to |
| 09:29:55 | 25 | over the noon hour, but that's not going to affect the time |

09:29:58  1    I've allocated you to do this.  What we're going to do this

09:30:02  2    morning is we will begin, and we'll go to about 11:15.  We'll

09:30:08  3    go straight through, and then we're going to break until 1:30.

09:30:11  4            I realize that's an inconvenience, but time is at a

09:30:14  5    premium now.  Write your senators and congressmen and get me

09:30:19  6    another federal judge here, preferably two, and this would go a

09:30:22  7    lot more expeditiously.

09:30:24  8            So first thing is I am granting and signing the order

09:30:33  9    on using the redacted materials, so you can consider that done.

09:30:44  10           Now, let me address this to the --

09:30:49  11           Ms. Oakes, here is this.

09:30:50  12           -- the plaintiffs:  Ms. Snead, are you going to

09:30:52  13   reserve some of your time to rebut?  How do you want to handle

09:30:56  14   your time?

09:30:56  15           MS. SNEAD:  Yes, sir.  If we get all the way to the

09:30:59  16   point where we only have 15 minutes left, I would like to

09:31:02  17   reserve that for rebuttal.  I anticipate I can finish before

09:31:05  18   then.  But if it does get to that point.

09:31:07  19           THE COURT:  Otherwise, I'm not going to worry -- I

09:31:09  20   won't surprise you with it and just tell you to sit down or

09:31:12  21   anything like that.

09:31:18  22           All right.  With that being said, we have allocated,

09:31:22  23   I think, adequate time to do this.  I have taken a look at what

09:31:25  24   you've filed.  I appreciate the proposed findings and

09:31:28  25   conclusions.  As I told you before, that's very helpful to the

09:31:31 1 Court, and you may proceed.

09:31:39 2        MS. SNEAD: Good morning, Your Honor. This case

09:31:47 3 concerns two classes of people who are punished by being

09:31:51 4 confined for lengthy periods of time in jails when they should

09:31:55 5 be promptly admitted to mental health facilities for the sole

09:31:57 6 purposes of court-mandated examination and competency

09:32:01 7 restoration services or NGRI evaluation and treatment.

09:32:06 8        By refusing to timely admit them for these services

09:32:09 9 that are the only purposes for their confinement, Defendant is

09:32:12 10 violating their substantive due process rights to have the

09:32:16 11 nature and duration of their confinements bear reasonable

09:32:19 12 relation to the purposes for which they are confined.

09:32:22 13        Defendant in this case is Dr. Courtney Phillips, who

09:32:26 14 has been sued in her official capacity as Executive

09:32:29 15 Commissioner of the Texas Health and Human Services Commission.

09:32:32 16 Because she has been sued in her official capacity, I use the

09:32:35 17 terms "defendant" and "HHSC" interchangeably.

09:32:39 18        We are here today to establish that Plaintiffs

09:32:43 19 satisfy their burden for class certification for both of their

09:32:46 20 proposed classes, the first consisting of incompetency

09:32:51 21 detainees who have been ordered to receive examination and

09:32:54 22 competency restoration services in Defendant's mental health

09:32:58 23 facilities and, yet, because of Defendant's self-imposed

09:33:01 24 insufficient forensic capacity, languish in jail more than 21

09:33:06 25 days after Defendant has received their commitment orders.

09:33:08  1          The second class consists of individuals found not

09:33:11  2     guilty by reason of insanity, or NGRI, who have similarly been

09:33:15  3     ordered into Defendant's mental health facilities for NGRI

09:33:20  4     evaluation and treatment and, yet, they too remain in jail

09:33:23  5     longer than the 14 days allowed by state statute, again,

09:33:27  6     because of defendant's self-imposed insufficient forensic

09:33:30  7     capacity.  The membership of these classes is over 600

09:33:34  8     individuals combined, not including unknown future members.

09:33:38  9          The evidence I am highlighting today has been filed

09:33:41 10     in the record in this case since July and was cited in

09:33:44 11     Plaintiffs' proposed findings of fact and issues of law.  With

09:33:48 12     the exception of the declarations attached to Plaintiffs' class

09:33:51 13     motion, the evidence I discuss today was produced by Defendant

09:33:53 14     in discovery in response to interrogatories, requests for

09:33:57 15     production, or during depositions.

09:33:59 16          I'll begin today with commonality of the classes,

09:34:03 17     followed by numerosity of the NGRI class, before turning to the

09:34:07 18     incompetency detainee class to briefly address their

09:34:11 19     numerosity, which Defendant has not challenged.  Next I'll

09:34:14 20     introduce the named plaintiffs and establish how their claims

09:34:17 21     are typical of the classes they seek to represent and then

09:34:19 22     address the adequacy of them, their next friends, and class

09:34:22 23     counsel.  I'll conclude by addressing the 23(b)(2) elements.

09:34:27 24          As noted by the Fifth Circuit in this case, citing

09:34:29 25     the *Yates* and *Walmart* cases, to satisfy Rule 23(a)'s

commonality requirement, the putative class claims must depend
upon a common contention which must be of such a nature that it
is capable of class-wide resolution. The *Walmart* case split
the inquiry in two elements that Plaintiffs must prove: the
first, that their exists a common policy or practice, including
an implicit one, that is the alleged source of harm for class
members and, two, that there are common questions of law or
fact that will be dispositive of the putative class's claims.

Plaintiffs have identified Defendant's practice of
capping its forensic capacity at a level insufficient to timely
admit incompetency detainees for the examination and competency
restoration services and the NGRI acquittees for the evaluation
and treatment that are the sole purposes of their confinements
as the source of their harms.

To manage the overflow of admissions created by their
insufficient forensic capacity, Defendant uses first-come,
first-served wait lists. Because Defendant refuses or has
failed to timely admit both class members to its facilities,
the class members languish in jail where they suffer harm.

To explain how Defendant's policy or practice has
harmed the incompetency detainee class, I'll start with a very
brief overview of 46B. Under the Texas Code of Criminal
Procedure Article 46B, all criminal proceedings against a
defendant who was incompetent are stayed until the defendant is
restored to competency and, most importantly, the code provides

that there are only two purposes for the detainee's continued
confinement: their examination and their receiving competency
restoration services.  This examination and these services must
be provided with the specific goal of having the defendant gain
competency to stand trial.

The standard for substantive due process for
involuntary confinement in this context comes from *Jackson v.
Indiana*, whether the nature and duration of the detention is
reasonably related to the purpose for their confinement.  Under
*Zadvydas*, courts determined the purpose for confinement by
looking at the language of the statute in question.

So in this case the ultimate inquiry will be whether
the nature and duration of the incompetency detainees'
confinements is reasonably related to their receiving the
examination and competency restoration services provided with
the specific goal of restoration.

Under 46B a criminal court can order the examination
and competency restoration services be provided to an
incompetent defendant in three settings.  The first is on an
outpatient basis as a condition of bail, the second is in a
jail-based competency restoration program, and the third is in
an HHSC mental health facility.

While the class members come exclusively from the
incompetency detainees who are ordered to HHSC mental health
facilities, because Defendant has made arguments about which

09:37:30 1 detainees go to outpatient commitments and jail-based programs,

09:37:34 2 I do want to address them briefly.

09:37:36 3 Looking to the first of two options, there are

09:37:42 4 several factors that limit a court's ability to release an

09:37:45 5 incompetency detainee to an outpatient commitment, including

09:37:49 6 but not limited to, the availability of an outpatient program,

09:37:52 7 whether the individual is a danger to others, and whether they

09:37:54 8 can be safely treated in the community.

09:37:57 9 Availability is the determining factor in many

09:38:01 10 places. Defendant, in its responses to Plaintiffs' 2017

09:38:04 11 interrogatories attached to Plaintiffs' motion as Exhibit K,

09:38:08 12 admitted that there are only eleven outpatient competency

09:38:11 13 restoration programs serving individuals incarcerated in only

09:38:14 14 35 counties in the entire state of Texas.

09:38:17 15 The second option, formal jail-based competency

09:38:23 16 restoration, is an option only where it is, quote, available

09:38:26 17 and appropriate for a particular detainee under 46B.073.

09:38:30 18 However, these programs are even less common. There are only

09:38:33 19 five jails in the entire state with a program that satisfies

09:38:37 20 the requirements of Code of Criminal Procedure 46B.091 to

09:38:43 21 be considered sufficient competency restoration services.

09:38:47 22 The majority of the individuals who are found

09:38:50 23 incompetent to stand trial are thus sent to HHSC mental health

09:38:53 24 facilities, including many who would qualify for outpatient

09:38:57 25 commitment or jail-based competency restoration programs, but

09:39:01 1 for the county their jail is located in.

09:39:03 2      For these incompetency detainees, HHSC is the sole

09:39:08 3 entity charged with providing them the specialized examination

09:39:11 4 and competency restoration services that are the sole purpose

09:39:14 5 of their continued confinement.  It is solely up to the

09:39:18 6 detainee's criminal court which of these three alternatives the

09:39:23 7 detainee is ordered to.  HHSC has no discretion over which

09:39:25 8 incompetency detainees criminal courts order into its mental

09:39:29 9 health facilities and which are sent to the other two programs.

09:39:32 10      The Code of Criminal Procedure provides that the

09:39:35 11 order committing the detainees to the HHSC mental health

09:39:39 12 facility must place them into the custody of the sheriff for

09:39:42 13 transportation to the program where they will receive

09:39:45 14 competency restoration examination and services.

09:39:48 15      This provision is written with the clear intent that

09:39:51 16 this transportation from jail to the HHSC mental health

09:39:55 17 facility will occur promptly; that their commitment into the

09:39:59 18 custody of the sheriff is not for them to remain confined for

09:40:02 19 lengthy periods in jail, but for transportation to occur.

09:40:06 20      Though prompt admission to HHSC mental health

09:40:09 21 facilities is the clear intent, this is not what is occurring.

09:40:12 22 Instead, according to the quarterly report for April 2019, the

09:40:16 23 average wait for detainees on the clearinghouse wait list is 49

09:40:20 24 days, and the MSU wait list, with 446 people on it, has an

09:40:26 25 average wait time of 263 days waiting in jail before HHSC makes

09:40:30   1   a bed available.

09:40:32   2          As Defendant agreed in the parties' statement of

09:40:35   3   uncontested facts and issues of law, the universe of beds that

09:40:40   4   HHSC has in state hospitals or has funded or has contracted at

09:40:43   5   private facilities currently equals 2,870 inpatient beds for

09:40:49   6   forensic and civil commitments.

09:40:51   7          2,269 of these, Deputy Executive Commissioner

09:40:57   8   Mike Maples identified --

09:41:00   9          THE COURT:  Let me ask you a question there.

09:41:02  10          MS. SNEAD:  Yes.

09:41:02  11          THE COURT:  Back up, if you would, to slide 13.

09:41:05  12          MS. SNEAD:  Yes, Your Honor.

09:41:05  13          THE COURT:  Explain what the clearinghouse is, if you

09:41:09  14   would.

09:41:09  15          MS. SNEAD:  Yes.  So I'm -- the clearinghouse list --

09:41:13  16   Defendant has divided their wait list into essentially two

09:41:16  17   waiting lists.  One is the clearinghouse wait list which

09:41:19  18   contains the individuals who are ordered into the non-maximum

09:41:23  19   security hospitals that Defendant operates.  The MSU wait list

09:41:30  20   stands for Maximum Security Unit Wait list.  And those are the

09:41:34  21   individuals that courts have committed to maximum security

09:41:37  22   units.

09:41:37  23          THE COURT:  All right.  So on -- tell me who can be

09:41:40  24   on either wait list.  On the clearinghouse wait list, can it be

09:41:45  25   individuals that are destined for outpatient, jail-based, and

09:41:51  1  HHSC treatment?

09:41:53  2          MS. SNEAD:  No, Your Honor.

09:41:54  3          THE COURT:  Okay.

09:41:54  4          MS. SNEAD:  The only people that go on the wait list

09:41:57  5  are those who are ordered into HHSC mental health facilities.

09:42:00  6          THE COURT:  All right.  So both of the wait lists

09:42:02  7  only apply to HHSC; is that right?

09:42:04  8          MS. SNEAD:  Correct, Your Honor.

09:42:05  9          THE COURT:  Okay.  Thank you.

09:42:06  10          MS. SNEAD:  So the parties agreed there are 2,870

09:42:19  11  beds total to serve both forensic, the incompetent to stand

09:42:23  12  trial and NGRI folks, and the nonforensic.  2,269 of those beds

09:42:29  13  Deputy Executive Commissioner Mike Maples identified in his

09:42:33  14  deposition, which was attached to Plaintiffs' motion as

09:42:35  15  Exhibit B as state hospital beds, which HHSC has the discretion

09:42:39  16  to allocate how it pleases between the forensic population and

09:42:43  17  the nonforensic.

09:42:44  18          As Defendant explained in its answers to the 2017

09:42:49  19  interrogatories, in 2006, forensic detainees ordered into HHSC

09:42:54  20  mental health facilities for examination and competency

09:42:58  21  restoration services began exceeding the cap that HHSC had set

09:43:02  22  for forensic commitments.  HHSC placed detainees who exceeded

09:43:07  23  the cap that they set on one of two wait lists that HHSC

09:43:10  24  created that year until a bed became available.  And those two

09:43:13  25  wait lists were the clearinghouse list and the MSU wait list

09:43:16  1  from the previous slide.

09:43:18  2          It is an uncontested fact that HHSC has no formal

09:43:22  3  criteria for determining this allocation of forensic versus

09:43:26  4  nonforensic beds and that any adult general psychiatric bed in

09:43:32  5  one of HHSC's state hospitals can be used for either

09:43:35  6  population.  And according to Associate Commissioner Bray's

09:43:39  7  declaration, which was attached to Defendant's response, HHSC

09:43:42  8  has currently capped forensic admissions to 65 percent of the

09:43:46  9  state hospital beds, or 1,474 beds.  The remaining 35 percent,

09:43:53  10  or 794 beds, are currently designated for nonforensic

09:43:57  11  admissions.

09:43:58  12          And, Judge, this gets to the question you were just

09:44:04  13  asking.  According to Associate Commissioner Bray and

09:44:08  14  Defendant's interrogatory responses, HHSC places only the

09:44:11  15  detainees ordered to their facilities onto these lists, and it

09:44:16  16  does not include individuals committed to outpatient or

09:44:18  17  jail-based competency restoration.  As both Deputy Executive

09:44:25  18  Commissioner Maples and Associate Commissioner Bray admitted

09:44:29  19  during their depositions in this case, taken in April of this

09:44:31  20  year, while on these wait lists, the incompetency detainees

09:44:36  21  remain in jails.

09:44:39  22          Now, these are the two wait lists that you asked

09:44:41  23  about a moment ago, Judge.  It is an uncontested fact that

09:44:45  24  these are the two wait lists that HHSC created.  The

09:44:47  25  clearinghouse wait list is for individuals found incompetent to

09:44:51 1  stand trial and committed to the non-maximum security units,

09:44:55 2  while the maximum security wait list is for the remaining

09:44:58 3  individuals found incompetent to stand trial, for individuals

09:45:01 4  found not guilty by reason of insanity, and a small number of

09:45:05 5  civil committees found manifestly dangerous.

09:45:08 6      HHSC has repeatedly admitted, and it is uncontested,

09:45:14 7  that HHSC places individuals on its two wait lists on a

09:45:19 8  first-come, first-served basis; that it admits detainees off

09:45:25 9  these lists in the same order, first-come, first-served; and

09:45:29 10  that it places all detainees who are ordered to its facilities

09:45:34 11  on these lists.

09:45:44 12      THE COURT:  And so to make sure I understood exactly

09:45:46 13  what you said, the individuals that go on the list remain in

09:45:49 14  county jail until they get to a high enough position on the

09:45:52 15  list to be placed with HHSC; is that right?

09:45:54 16      MS. SNEAD:  Yes, Your Honor.

09:45:55 17      THE COURT:  All right.

09:45:55 18      MS. SNEAD:  Until HHSC admits them.

09:45:57 19      THE COURT:  All right.

09:45:58 20      MS. SNEAD:  These wait lists are how HHSC has decided

09:46:03 21  to treat everyone the same and manage the problem they've

09:46:06 22  created with their insufficient capacity.  A review of the wait

09:46:11 23  lists provided to Plaintiffs and filed as sealed Exhibit N

09:46:14 24  proves that the time detainees spend on these lists exceeds 21

09:46:18 25  days and, in many cases, far exceeds it.  As I noted before,

09:46:22 1  the average wait for the clearinghouse in April was more than

09:46:26 2  twice this, at 49 days, and the MSU list more than 10 times

09:46:30 3  this, at 263 days.

09:46:32 4          Nor are there exceptions to Defendant's common policy

09:46:36 5  or practice.  During class discovery in this case in April

09:46:40 6  2019, Plaintiffs deposed Timothy Bray, Associate Commissioner

09:46:45 7  for State Hospitals.  In this position, Associate Commissioner

09:46:47 8  Bray is responsible for the operation of all state hospitals,

09:46:52 9  including oversight over the two waiting lists.

09:46:55 10         Associate Commissioner Bray noted during his

09:46:58 11 deposition that, if there have been deviations from the

09:47:00 12 first-come, first-served policy for either list, that as

09:47:04 13 associate commissioner he would have been aware of it.  With

09:47:07 14 this in mind, he stated under oath that in the six months

09:47:09 15 before his deposition, there were zero exceptions to HHSC's

09:47:13 16 first-come, first-served policy for detainees on the

09:47:17 17 clearinghouse wait list.  Similarly, he stated that in the six

09:47:21 18 months before his deposition, there were fewer than ten people

09:47:24 19 out of over 700 people on HHSC's MSU wait list who were

09:47:29 20 admitted to hospitals as exceptions to the first-come,

09:47:31 21 first-served policy.  The other more than 98.6 percent of

09:47:37 22 individuals were universally admitted first-come, first-served.

09:47:41 23         Defendant's practice has caused a common harm.  While

09:47:45 24 they wait in jails on HHSC's wait lists, incompetency detainees

09:47:50 25 do not receive the examination or competency restoration

09:47:54  1  services that are the sole purpose of their confinements

09:47:57  2  because jails, outside of the five with formal jail-based

09:48:00  3  competency programs, are not required by law to provide and do

09:48:04  4  not provide examination or competency restoration services.

09:48:08  5          Under the standard articulated in *Bell v. Wolfish*, a

09:48:14  6  detainee's confinement violates substantive due process when it

09:48:18  7  amounts to punishment, and detention amounts to punishment

09:48:20  8  when, under *Jackson*, the nature and duration of the commitment

09:48:23  9  does not bear a reasonable relation to the purpose for

09:48:26  10 confinement.

09:48:26  11         The proposed IST plaintiffs are thus harmed, and in

09:48:31  12 fact punished, under the standard articulated in *Bell* by being

09:48:35  13 confined in jails for lengthy periods of time without their

09:48:39  14 court-mandated examination and competency restoration services

09:48:42  15 that are the sole purpose of their continued confinement.  In

09:48:45  16 contrast, it is uncontested that HHSC's mental health

09:48:50  17 facilities, unlike local jails, have staff specifically trained

09:48:53  18 to provide the examination and competency restoration services

09:48:57  19 and do in fact provide these services.

09:49:01  20         As further proof that jails outside of the five with

09:49:03  21 formal programs do not provide examination or competency

09:49:07  22 restoration services, Plaintiffs have filed sworn declarations,

09:49:10  23 attached as Exhibits I and J to Plaintiffs' motion, from

09:49:14  24 Dr. Laxman Sunder, the Executive Director of Health Services

09:49:18  25 for Harris County Jail, and Daniel Smith, the Director of

09:49:21 1  Inmate Mental Health for Travis County Jail.  Both Dr. Sunder

09:49:25 2  and Director Smith declared under oath that their jails, two of

09:49:29 3  the largest in the state, do not provide any competency

09:49:34 4  restoration examination or services.

09:49:35 5       Now, Defendant argues that because some people

09:49:38 6  receive medications in jail and this can sometimes have a

09:49:42 7  beneficial effect, that medication alone can constitute

09:49:45 8  competency restoration services that are the sole purpose of

09:49:48 9  the detainee's continued confinement.

09:49:51 10       While this argument is most appropriately saved for

09:49:54 11  consideration of the merits of Plaintiffs' claim, because

09:49:57 12  Defendant has introduced this red herring here as an argument

09:50:00 13  against commonality is worth touching on briefly.

09:50:03 14       First, this argument ignores entirely that the

09:50:06 15  language of 46B provides that incompetency detainees shall be

09:50:11 16  confined for purposes of examination and competency restoration

09:50:16 17  services.  Medication alone clearly is not any kind of

09:50:19 18  examination, which is one of the mandated purposes of

09:50:22 19  confinement under 46B.  Second, this argument is conclusory.

09:50:26 20  Defendant has provided no evidence regarding how frequently

09:50:29 21  this spontaneous restoration occurs, relying only on the vague

09:50:33 22  statement of Dr. Faubion that it can happen.

09:50:36 23       Yet Dr. Faubion was identified in Defendant's

09:50:39 24  responses to both the 2017 and 2019 interrogatories as the

09:50:44 25  medical director at Kerrville State Hospital, he has only

09:50:49 1 recently been appointed to this position as chief of forensic

09:50:52 2 medicine, as this position still listed as open when Defendant

09:50:56 3 provided its last interrogatory responses.

09:50:57 4 The patients at his prior hospital in Kerrville do

09:50:59 5 not come straight from jail but, rather, are transferred from

09:51:03 6 other hospitals. It is, therefore, not clear how this

09:51:06 7 Dr. Faubion came to this conclusion, since he provides no

09:51:08 8 explanation or evidence outside of his conclusory assertion,

09:51:12 9 and his own most recent experience isn't with the incompetency

09:51:16 10 detainee population.

09:51:17 11 Third, Defendant's medication-alone argument is

09:51:22 12 disingenuous, as Defendant knows medications alone aren't

09:51:24 13 sufficient, as HHSC own programs within state hospitals do not

09:51:28 14 solely provide medications. As detailed by Dr. Faubion's own

09:51:32 15 declaration attached as Exhibit B to Defendant's response, the

09:51:36 16 competency restoration programs at the state hospital include

09:51:40 17 educational classes and psychosocial rehabilitation programs.

09:51:44 18 Defendant's argument that medication alone can be

09:51:46 19 sufficient competency restoration services is directly

09:51:50 20 contradicted by the Texas Legislature's statement of what

09:51:53 21 constitutes sufficient competency restoration services as well

09:51:56 22 as the declaration of Dr. Joel Dvoskin, provided as Exhibit S

09:52:01 23 to Plaintiffs' motion.

09:52:02 24 46B and Dr. Dvoskin both identify an exacting

09:52:06 25 standard, and services that do not satisfy these requirements

09:52:09 1 are not sufficient competency restoration services. These

09:52:13 2 requirements include, but are not limited to, providing

09:52:16 3 competency restoration services in a safe and separate space

09:52:20 4 away from the general population of inmates; providing

09:52:24 5 individualized services through a multidisciplinary team

09:52:27 6 similar to other competency restoration programs like HHSC's at

09:52:31 7 the state hospital; and providing these services, including the

09:52:36 8 educational component, to the same extent as would be provided

09:52:40 9 in an inpatient mental health facility.

09:52:42 10        It is clear that a county jail providing medication

09:52:56 11 to an inmate does not come close to meeting these standards,

09:52:58 12 even if it sometimes produces a benefit for some inmates who

09:53:02 13 take them, though it shouldn't be assumed that medications

09:53:06 14 always provide benefits. As noted in the sworn declarations

09:53:11 15 provided by their next friends, both Plaintiffs Ward and Jones

09:53:13 16 took medications in the jail while they waited for an HHSC

09:53:16 17 mental health bed, and yet both still remained incompetent.

09:53:20 18        Indeed, 46B.086, the provision that authorizes

09:53:25 19 court-ordered medication in jail under certain circumstances

09:53:27 20 for incompetency detainees provides that even court-ordered

09:53:31 21 medications in jail do not constitute the authorization to keep

09:53:35 22 the detainee in the facility under the guise of competency

09:53:38 23 restoration treatment.

09:53:42 24        If the objective is successful competency restoration

09:53:45 25 treatment, confining people in jail longer is actually more

likely to make their mental health illnesses worse, according to Dr. Dvoskin, meaning that keeping individuals in jail even with medications is not only not competency restoration services but is ultimately counterproductive to successful restoration.

Finally, for competency restoration services to be sufficient under 46B.073, the services must be provided, quote, with the specific objective of the defendant attaining competency to strand trial. While some jails do provide psychotropic medication, it is not done for purposes of competency restoration but, rather, to address a variety of other concerns, including satisfying minimum jail standards. This is why, in the declarations from Dr. Sunder and Director Smith, both men can say that their jails provide psychotropic medications and yet do not provide competency restoration services.

For plaintiffs in the proposed IST class, HHSC is thus the only provider of these services that are the purpose of their continued confinement, and they cannot receive these services until HHSC admits them to one of its mental health facilities.

Until then they wait in jail where they suffer additional harms on top of the harms to their liberty interests, including, as noted by the next friends in their sworn declarations, the delaying of their criminal cases by

09:55:10 1 over a year in some cases, which negatively impacts their

09:55:14 2 attorneys' abilities to adequately represent them, to identify

09:55:17 3 witnesses, and to enter into plea negotiations.

09:55:22 4 Further harms caused by being in jail for lengthy

09:55:25 5 periods of time rather than a mental health facility are

09:55:29 6 detailed in Dr. Dvoskin's declaration, Exhibit S, and include

09:55:32 7 the exacerbation of serious mental illnesses which leads to

09:55:35 8 detainees harming themselves, experiencing more severe

09:55:39 9 hallucinations and delusions, and disrupting other detainees,

09:55:43 10 leading to their becoming victims of jail violence -- harms, in

09:55:46 11 fact, experienced by several of the named plaintiffs, as I will

09:55:48 12 detail shortly.

09:55:50 13 The evidence that IST class members may be held for

09:55:54 14 different lengths of times, causing them to experience these

09:55:57 15 harms to different degrees, does not preclude class

09:55:59 16 certification. It is sufficient that Plaintiffs have

09:56:01 17 established a common injury resulting from a common practice.

09:56:05 18 Indeed, this was the conclusion in *Steward v. Janek*, where a

09:56:09 19 Western District of Texas District Court granted class

09:56:12 20 certification for individuals with intellectual disabilities

09:56:16 21 being held in Medicaid-funded nursing homes, despite the fact

09:56:20 22 that each individual member had different health needs and had

09:56:23 23 thus experienced harm in significantly different degrees.

09:56:27 24 This was also true in *M.D. v. Perry* after remand,

09:56:31 25 brought on behalf of classes of Texas foster children who had

09:56:33 1  all experienced harm from the insufficient foster care system

09:56:36 2  in unique ways, and *Yates v. Collier*, upheld by the Fifth

09:56:41 3  Circuit, which affirmed class on behalf of prison inmates who

09:56:43 4  all experienced harmed caused by high temperatures, even though

09:56:47 5  the degree of harm varied based on the medical conditions of

09:56:51 6  the individual inmates.

09:56:52 7        Now, Defendant harps on the idea of individualized

09:56:55 8  determinations being necessary before admission to its

09:56:58 9  facilities and this precluding class relief.  However,

09:57:01 10  Defendant itself treats all of the proposed plaintiffs the

09:57:05 11  same.  The evidence clearly shows that the putative class

09:57:08 12  members universally go on one of the two wait lists, they

09:57:11 13  universally are forced to wait in jails without the services

09:57:14 14  that are the only purposes for their confinement, and they

09:57:17 15  universally come off the list in order first-come,

09:57:21 16  first-served.  Individual determinations aren't occurring by

09:57:26 17  Defendant's own repeated admissions.

09:57:28 18        And Defendant's over-reliance on *Powell* does not

09:57:30 19  establish otherwise.  First, *Powell* is an outlier.  It is a

09:57:34 20  single Maryland state law case, which no other case has ever

09:57:37 21  cited for the proposition that Defendant uses it for, not even

09:57:41 22  in Maryland.  Further, contrary to Defendant's assertion,

09:57:46 23  *Powell* does not stand for the proposition that a court can

09:57:49 24  never define a *Jackson* due process violation with respect to a

09:57:53 25  time limit because an individualized inquiry is always

09:57:57  1  necessary.

09:57:57  2          What that court actually stated was that, given the

09:58:01  3  limited record in front of it, based on only four plaintiffs

09:58:04  4  who waited between only 12 and 36 days for transfers to a

09:58:08  5  mental health facility and with only three other potential

09:58:12  6  class members waiting, that it was not prepared to prescribe an

09:58:16  7  across-the-board rule for seven people.  *Powell* is no bar to

09:58:19  8  this Court granting class certification, and this Court should

09:58:22  9  frankly ignore it.  It has no precedential value and is easily

09:58:27  10  distinguished.

09:58:28  11          Looking to the second element for commonality under

09:58:31  12  *Walmart* and cited by the Fifth Circuit in this case, Plaintiffs

09:58:34  13  have also identified a common question of fact and common

09:58:38  14  questions of law, the answers to which will determine

09:58:41  15  Plaintiffs' claims in one stroke.

09:58:43  16          The common question of fact is whether HHSC has

09:58:46  17  failed to accept in a timely manner, i.e., within 21 days of

09:58:51  18  receiving the court's order, the admission of plaintiffs and

09:58:53  19  class members to its mental health facilities for the

09:58:55  20  competency restoration treatment as ordered by criminal courts.

09:59:00  21          The first question of law is whether this failure

09:59:03  22  which causes class members to be warehoused in county jails

09:59:06  23  without the examination and competency restoration treatment,

09:59:09  24  which is the purpose of their confinements, thus violates the

09:59:13  25  Fourteenth Amendment to the U.S. Constitution, and the second

09:59:15 1  is whether plaintiffs and class members are thus entitled to

09:59:18 2  the declaratory and injunctive relief they seek.

09:59:22 3       The answers to these question will determine

09:59:24 4  Plaintiffs' case in one stroke.  Therefore, Plaintiffs have

09:59:27 5  identified common questions that establish commonality of the

09:59:30 6  IST class and have carried their second burden under *Walmart.*

09:59:48 7       Turning to the NGRI class, similar to the

09:59:51 8  incompetency detainee plaintiffs, the NGRI plaintiffs have

09:59:54 9  identified Defendant's practice of capping its forensic

09:59:57 10 capacity at a level insufficient to admit NGRI acquittees

10:00:02 11 within 14 days for the NGRI evaluation and treatment that are

10:00:06 12 the purpose of their confinements as the source of their harms.

10:00:10 13 To manage the overflow of admissions created by their

10:00:13 14 insufficient capacity, Defendant uses first-come, first-served

10:00:16 15 wait lists.

10:00:17 16      Because the acquittee stands acquitted of the offense

10:00:20 17 charged, they may not be considered a person charged with an

10:00:23 18 offense.  And because they are no longer charged with an

10:00:26 19 offense, after a person is acquitted NGRI, the only purpose for

10:00:31 20 the NGRI acquittee's continued confinement is, quote, for

10:00:35 21 evaluation of the person's present mental condition to

10:00:39 22 determine the appropriateness of continued confinement and

10:00:41 23 treatment.

10:00:46 24      Immediately upon a finding that a person is NGRI, the

10:00:49 25 criminal court looks solely to whether the offense for which

10:00:52 1  the person was acquitted concerned dangerous conduct.  There is

10:00:56 2  absolutely no evaluation or consideration of the current

10:01:00 3  condition of the NGRI acquittee, much less a court hearing.

10:01:04 4  The criminal courts have no discretion.  If an acquittee is

10:01:07 5  acquitted of certain crimes, they must go to an HHSC mental

10:01:13 6  health facility for their NGRI evaluation that is the purpose

10:01:16 7  of their confinement, and HHSC must accept them.

10:01:21 8       46C itself provides a 14-day maximum time limit

10:01:25 9  during which the NGRI acquittee can be held pending transfer to

10:01:30 10  a maximum security HHSC mental health facility to receive the

10:01:34 11  NGRI evaluation that is the purpose for their of confinement.

10:01:38 12       However, rather than accepting those NGRI acquittees

10:01:41 13  within 14 days, HHSC likewise places these acquittees on its

10:01:44 14  wait lists, admitting in it's fifth amended answer filed

10:01:48 15  earlier this year that NGRI acquittees often wait weeks or

10:01:53 16  months before they are admitted to HHSC mental health

10:01:57 17  facilities.

10:01:57 18       While they wait for HHSC to finally make room for

10:02:00 19  them, these NGRI acquittees receive no NGRI evaluation.  Texas

10:02:04 20  jails are not required to provide it and do not provide this

10:02:08 21  service.  Only HHSC provides the evaluation that is the sole

10:02:12 22  purpose for the confinement of NGRI acquittees.

10:02:16 23       These class members have been acquitted.  Their

10:02:18 24  continued confinement in jail when they are not guilty and are

10:02:22 25  not receiving the evaluation that is the purpose of their

10:02:25 1 continued confinements is harmful and amounts to punishment

10:02:28 2 under *Bell*. The delays in transfer also harm NGRI acquittees

10:02:32 3 by necessarily prolonging their overall periods of confinement

10:02:37 4 before they may be eligible for outpatient commitment and

10:02:40 5 forces them to experience many of the same harms in jail

10:02:42 6 identified by Dr. Dvoskin, including decompensation, segregated

10:02:47 7 confinement, and possible victimization. NGRI Plaintiffs have

10:02:51 8 thus carried their burden by identifying Defendant's common

10:02:54 9 policy or practice as the source of their harms.

10:02:57 10 And as to the common questions of fact and law,

10:02:59 11 Plaintiffs have also satisfied this burden. The common

10:03:02 12 question of fact is whether HHSC has failed to accept in a

10:03:07 13 timely manner, i.e., within 14 days of receiving the court's

10:03:11 14 order, the admission of plaintiffs and class members to its

10:03:14 15 mental health facilities for NGRI evaluation, as ordered by

10:03:18 16 criminal courts.

10:03:18 17 The first question of law is whether this failure,

10:03:21 18 which causes class members to be warehoused in county jails

10:03:24 19 without the NGRI evaluation, which is the purpose of their

10:03:26 20 confinements, thus violates the Fourteenth Amendment to the

10:03:30 21 U.S. Constitution, and the second is whether plaintiffs and

10:03:33 22 class members are thus entitled to the declaratory and

10:03:36 23 injunctive relief they seek. The answer to these questions are

10:03:40 24 yes or no. The answers will thus resolve Plaintiffs' claims

10:03:44 25 with one stroke.

10:03:45  1          Plaintiffs have thus identified common questions that

10:03:49  2  establish commonality of the NGRI class and have again carried

10:03:53  3  their second burden under *Walmart*.

10:03:55  4          Turning to numerosity, I am going to stay with the

10:03:58  5  NGRI class first since this is the only class whose numerosity

10:04:03  6  is challenged.

10:04:04  7          Numerosity requires that the class members be so

10:04:07  8  numerous that joinder of all members is impracticable.  The

10:04:11  9  Fifth Circuit in this case cited *Ibe* in noting that factors

10:04:16 10  inform this decision include the geographical dispersion of the

10:04:20 11  class, the ease with which class members may be identified, the

10:04:22 12  nature of the action, and the size of each plaintiff's claims.

10:04:26 13          Other factors highlighted in case law, including

10:04:30 14  *Steward v. Janek* from this circuit, *Armstead*, and *Barnes v.*

10:04:34 15  *Board of Trustees*, include the class members' disabilities,

10:04:38 16  their poverty, and their isolation.

10:04:41 17          In the last approximately three years, the proposed

10:04:44 18  NGRI class has contained over 120 members who came from at

10:04:49 19  least 51 different jails dispersed across the state.

10:04:54 20  Specifically, while HHSC itself combines the NGRI acquittees

10:04:58 21  and incompetency detainees on the MSU wait list provided as

10:05:03 22  Exhibit N, a review of the lists establishes that, in 2017, the

10:05:07 23  year that Plaintiffs filed their original class motion, there

10:05:11 24  were at least 75 NGRI acquittees, based on partial data, who

10:05:16 25  remained incarcerated in county jails for more than 14 days.

1        The following year, in 2018, the year that Plaintiffs

2  argued the class certification order in the Fifth Circuit, out

3  of 81 total acquittees ordered to receive NGRI evaluation and

4  treatment at an HHSC mental health facility, 68 were confined

5  longer than 14 days.  And in the first six weeks of this year

6  alone, there were seven NGRI acquittees who waited longer than

7  14 days.

8        This was the last data Defendant provided to

9  Plaintiffs' attorneys before the discovery period closed.

10  Extrapolating this data, seven NGRI acquittees who waited

11  longer than 14 days within the first six weeks of 2019 yield a

12  total of 61 NGRI acquittees for the 52 weeks of 2019 as a

13  whole.  This number is consistent with the totals from the

14  previous two years.

15        In contrast, Defendants have asserted that the NGRI

16  class is now not numerous because it only had two members on

17  the day in July when Associate Commissioner Bray signed his

18  declaration.  However, this number is misleading.  Defendant

19  hangs its hat on a single static number on a single day in a

20  system that isn't static.  Deputy Commissioner Maples stated in

21  his deposition in April that the NGRI list, quote, comes and

22  goes and then immediately admitted that the list is growing

23  over time.

24        Returning to the standard articulated by the Fifth

25  Circuit and other courts, there are other factors that inform

10:06:48  1   numerosity that establish Plaintiffs have met their burden,

10:06:50  2   including the existence of future unnamed class members and

10:06:54  3   their disabilities, poverty, and isolation.

10:06:58  4        Plaintiffs' NGRI class specifically includes not only

10:07:01  5   those currently waiting in jail for more than 14 days but all

10:07:04  6   future NGRI acquittees who have not yet been found NGRI, but

10:07:11  7   once they have been, will be placed on HHSC's wait lists and

10:07:14  8   forced to stay in jail longer than statutory maximum without

10:07:18  9   receiving the NGRI evaluation that is the only purpose of their

10:07:21  10  confinement.

10:07:22  11       These class members are, by definition, unknown since

10:07:27  12  it is impossible to predict who will be acquitted not guilty by

10:07:30  13  reason of insanity until the day it happens.  And because they

10:07:34  14  can come from any of the 254 counties in the state, will be

10:07:37  15  geographically dispersed.  The not guilty by reason of insanity

10:07:43  16  class, both the current and former members, are all persons

10:07:44  17  with significant disabilities, largely impoverished, and

10:07:48  18  isolated in county jails.  The likelihood that they be able to

10:07:51  19  join this lawsuit individually or bring their own to vindicate

10:07:54  20  their rights is essentially nil.

10:07:57  21       Indeed, the original NGRI plaintiffs in this case

10:07:59  22  were not represented by next friends.  However, Defendant

10:08:03  23  challenged the ability of acquittees found NGRI to represent

10:08:06  24  their own interests in this suit, highlighting the inability

10:08:10  25  the of these class members to join this suit individually.

10:08:14  1          Courts have looked to all of these factors in

10:08:16  2   certifying classes, and Plaintiffs have cited many of these

10:08:19  3   cases in their motion for class certification.  In particular,

10:08:23  4   Plaintiffs' NGRI class is similar to the class in *Pederson v.*

10:08:27  5   *Louisiana State University*, where the Fifth Circuit held that a

10:08:31  6   district court abused its discretion by decertifying a class of

10:08:35  7   only eight identified female college students, all of whom were

10:08:40  8   on the LSU campus based on numerosity, largely because of the

10:08:44  9   existence of unnamed future members of the class consisting of

10:08:47  10  girls who might want to play intercollegiate softball or soccer

10:08:53  11  at LSU.

10:08:54  12          The cases cited by Defendant, *Garcia v. Gloor*,

10:08:59  13  *Trevizo v. Adams*, and *Jaynes v. United States* all concerned

10:09:01  14  class members whose identities were immediately ascertainable

10:09:05  15  because they did not bring classes on behalf of future class

10:09:09  16  members.  *Cooper v. Kliebert*, an unpublished case out of

10:09:12  17  Louisiana and relied upon by Defendant, both has no

10:09:15  18  precedential value as an unpublished case and is an outlier.

10:09:20  19          NGRI plaintiffs here have identified nearly three

10:09:23  20  times the number of known class members, and based on

10:09:26  21  historical data, future class members would become members of

10:09:29  22  this class at almost three times the rate class members would

10:09:33  23  have joined the Louisiana case.

10:09:35  24          Following Cooper here means, in essence, Plaintiffs

10:09:38  25  would receive a new name from defendant every four to five

10:09:42 1 days, have to travel to potentially far-flung jails across the

10:09:48 2 state, in addition to having to then contend with the

10:09:50 3 difficulties caused by acquittee's disabilities, poverty,

10:09:55 4 isolation, and have to coordinate with their criminal defense

10:09:58 5 attorney to become a next friend.  Under the facts here, it is

10:10:01 6 simply not practicable to join all of the NGRI current and

10:10:04 7 future class members into one lawsuit.

10:10:07 8        What the case law for numerosity establishes is that

10:10:09 9 the determination of whether a class is sufficiently numerous

10:10:12 10 is not a hard line.  As *Pederson* shows, sometimes a class of

10:10:17 11 eight with unknown future class members is sufficiently

10:10:20 12 numerous, while *Jaynes* shows that sometimes a class of

10:10:23 13 258 known members is not, because there are other factors

10:10:26 14 affecting the analysis of whether it is practicable to join the

10:10:30 15 class members, including the ease of identifying members, their

10:10:34 16 geographic dispersion, their disabilities, their poverty, and

10:10:39 17 their isolation.  Defendant has identified no published case

10:10:42 18 with future unknown members who numerosity wasn't satisfied.

10:10:47 19        In light of the data and other evidence, Plaintiffs

10:10:49 20 have established that the NGRI class is sufficiently numerous

10:10:52 21 such that joinder is impracticable and have satisfied their

10:10:56 22 burn under rule 23(a)(1).

10:10:58 23        Defendant does not challenge the numerosity of the

10:11:00 24 IST class, so I will not spend too much time on then.

10:11:05 25        On March 15th, 2019, HHSC provided their monthly

10:11:09  1  update to the legislature about the status of the wait lists,

10:11:12  2  which Plaintiffs provided as Exhibit Q.  This chart, excluding

10:11:17  3  the numbers to the far right, is a reproduction of HHSC's chart

10:11:21  4  with only the wait list for individuals waiting on civil

10:11:25  5  commitments removed.

10:11:26  6          According to HHSC's own chart, as of March 15th,

10:11:30  7  there were 771 individuals on HHSC's two forensic wait lists

10:11:36  8  combined, 80 percent of whom, or 615 individuals, remained

10:11:40  9  incarcerated in county jails for more than 21 days.

10:11:45  10         Now, HHSC's chart does include a small number of NGRI

10:11:49  11  acquittees.  According to the February 11th, 2019 wait list in

10:11:54  12  Exhibit N, which was about a month before this legislative

10:11:57  13  update, the number of NGRI acquittees who had waited more than

10:12:01  14  14 days for a bed was seven.  NGRI acquittees were all on the

10:12:05  15  MSU wait list.  So to get the number of incompetency detainees,

10:12:10  16  the number of NGRI acquittees needs to be subtracted from the

10:12:14  17  MSU wait list.  Even assuming a high estimate of 11 NGRI

10:12:19  18  acquittees a month later, on March 11th, this still leaves 418

10:12:24  19  people on the MSU wait list who were incompetency detainee

10:12:29  20  acquittees.

10:12:30  21         At the time Defendant provided this update to the

10:12:32  22  legislature in March, the clearinghouse list had no NGRI

10:12:36  23  acquittees on it because NGRI acquittees didn't go on the

10:12:40  24  clearinghouse list.  So, combining these two, this puts the

10:12:44  25  known incompetency detainee class members somewhere around 604

10:12:48 1  members, in addition to unknown, unnamed future class members.

10:12:54 2  Defendant's wait lists, provided as Exhibit N, prove

10:12:58 3  that these 600-plus detainees have waited in over 75 different

10:13:02 4  jails, dispersed across the state of Texas. These class

10:13:06 5  members all have significant disabilities that have caused them

10:13:09 6  to be incompetent to stand trial, and many are impoverished

10:13:15 7  having met the criteria for court-appointed counsel.

10:13:18 8  In light of these overwhelming numbers, their

10:13:20 9  geographic dispersion, their significant disabilities, and

10:13:25 10 their impoverishment, Plaintiffs have satisfied the

10:13:26 11 requirements for numerosity of the incompetency detainee class.

10:13:38 12 Turning to typicality, the Fifth Circuit articulated

10:13:44 13 the critical inquiry as whether the class representatives'

10:13:48 14 claims have the same essential characteristics as those of the

10:13:51 15 putative class. The court also noted in its opinion that, if

10:13:54 16 the claims of the named plaintiffs and putative class members

10:13:57 17 arise from a similar course of conduct and share the same legal

10:14:01 18 theory, typicality will not be defeated by factual services.

10:14:07 19 The plaintiffs who seek to represent the incompetency

10:14:10 20 detainee class through their next friends are Joseph Ward,

10:14:14 21 Mark Lawson, Jennifer Lampkin, Kenneth Jones, Mary Sapp, and

10:14:19 22 Julian Torres.

10:14:20 23 According to sworn declarations filed by their

10:14:23 24 criminal defense attorneys and next friends, each of these

10:14:26 25 individuals, like those they seek to represent, was found by

10:14:29  1   their criminal courts to be incompetent to stand trial; was

10:14:33  2   ordered into an HHSC mental health facility for the sole

10:14:37  3   purpose of receiving examination and services for the specific

10:14:40  4   objective of restoring them to competency to stand trial; and,

10:14:44  5   due to HHSC's self-imposed insufficient capacity, all of them

10:14:49  6   were placed on one of HHSC's wait lists rather than being

10:14:53  7   timely admitted to one of Defendant's mental health facilities.

10:14:58  8          It is undisputed that each and every plaintiff waited

10:15:01  9   more than 21 days on HHSC's wait lists.  According to

10:15:06  10  Defendant's own class interrogatory responses, Joseph Ward was

10:15:10  11  on HHSC's list for 405 days, Mr. Lawson for 435.

10:15:16  12  Jennifer Lampkin languished for 455 days while Mary Sapp waited

10:15:21  13  for 55 days.  Kenneth Jones was in jail for 335 days after

10:15:27  14  being found incompetent, before finally being transferred to an

10:15:31  15  HHSC mental health facility.  And, finally, Julian Torres

10:15:35  16  waited 28 days on Defendant's clearinghouse list before he was

10:15:38  17  transferred to a mental health facility.

10:15:40  18         None of the named plaintiffs, like the class they

10:15:43  19  seek to represent, was offered or received competency

10:15:46  20  restoration examination or services while they were in jail

10:15:51  21  because Texas jails, excluding the five with formal programs,

10:15:54  22  are not required to provide and do not provide these services,

10:15:57  23  as confirmed by their next friends.  While their details vary,

10:16:02  24  every single one of the incompetency detainee plaintiffs

10:16:05  25  suffered harm while they waited in jail for HHSC to make room

10:16:09  1  for them.

10:16:09  2         As attested by their next friends in their sworn

10:16:14  3  declarations, Mr. Ward voluntarily took psychotropic

10:16:18  4  medications, yet continued to hear command auditory

10:16:22  5  hallucinations.

10:16:22  6         Ms. Lampkin was noted to be struggling in jail due to

10:16:25  7  isolation and ultimately lost 30 pounds during her forced wait

10:16:29  8  in jail.

10:16:30  9         Mr. Lawson was noted to be vulnerable and was placed

10:16:33  10  in a single cell for over two months in order to keep him safe

10:16:36  11  from other inmates, despite the fact that the experts,

10:16:39  12  including Dr. Dvoskin in Exhibit S, note that segregation

10:16:42  13  should be avoided for detainees with acute mental illness

10:16:47  14  symptoms.

10:16:48  15         Mr. Sapp was so decompensated she spent a large

10:16:53  16  period of her confinement in an infirmary ward, as she was

10:16:53  17  unable to care for her own activities of daily living.

10:16:57  18         Mr. Jones also voluntarily took psychotropic

10:17:00  19  medications, yet reported that he was suicidal and that his

10:17:02  20  medications were not working.  And, even with the medications,

10:17:04  21  he reported hallucinations and delusions and got into

10:17:08  22  altercations which resulted in disciplinary charges, an outcome

10:17:12  23  Dr. Dvoskin noted was common in jails, as they often treat

10:17:16  24  incidents that result from psychosis as deliberate rule

10:17:19  25  violations.

10:17:20  1    Mr. Torres was so deteriorated that he spent his

10:17:24  2    first week of incompetency on the acute psychiatric unit of the

10:17:27  3    jail and the rest of his confinement on HHSC's waiting list in

10:17:30  4    a single-cell mental health pod, where he was isolated for 22

10:17:34  5    or more hours a day in his cell, again, a setting that experts

10:17:38  6    say is harmful to individuals experiencing acute symptoms.

10:17:41  7    More generally, every single one of these plaintiffs

10:17:44  8    was harmed by being punished by being held in a correctional

10:17:47  9    facility that was not rationally related to the examination and

10:17:50  10   competency restoration purposes of their confinement.

10:17:53  11   All of these named plaintiffs are represented by next

10:17:59  12   friends who were their criminal defense attorneys, who have

10:18:00  13   filed sworn declarations detailing the harms caused by

10:18:03  14   Defendant's practice of capping its forensic admissions at a

10:18:07  15   level insufficient to timely admit incompetency detainees for

10:18:12  16   the examination and competency restoration services that are

10:18:15  17   the purpose of their confinements.

10:18:17  18   These harms include the automatically lengthened

10:18:19  19   amount of time before they can be tried and restored and the

10:18:22  20   prolonging of their criminal cases, making it harder for their

10:18:25  21   attorneys to represent them, to identify witnesses, and to

10:18:27  22   enter into plea negotiations.

10:18:30  23   Plaintiffs thus have the same characteristics as the

10:18:33  24   proposed class members and have the same interest as the

10:18:36  25   proposed class: avoiding being warehoused in jail without the

10:18:40 1 competency restoration examination and services that are the

10:18:44 2 sole purposes of their continued confinement.

10:18:46 3 Plaintiffs have also suffered the same injuries to

10:18:49 4 their substantive due process rights as well as their criminal

10:18:52 5 cases.

10:18:53 6 The incompetency detainee plaintiffs' claims are thus

10:18:58 7 typical of the incompetency class they seek to represent.

10:19:01 8 Plaintiffs have satisfied Rule 23(a)(3), and Plaintiffs Ward,

10:19:06 9 Lawson, Lampkin, Jones, Sapp, and Torres should be named

10:19:10 10 representatives of the incompetency detainee class.

10:19:15 11 The putative NGRI class is represented by Mary Sapp

10:19:18 12 and Cecil Adickes, both of whom are also represented by their

10:19:21 13 criminal defense attorneys as next friends. Both of them, like

10:19:24 14 their fellow class members, were found not guilty by reason of

10:19:27 15 insanity for charges that required that they be committed to an

10:19:30 16 HHSC mental health facility.

10:19:33 17 Though the law required they be transferred to an

10:19:35 18 HHSC facility within 14 days of the order, due to HHSC's

10:19:39 19 self-imposed insufficient forensic capacity, HHSC instead

10:19:44 20 placed them on its wait list. HHSC's responses to the 2019

10:19:48 21 class interrogatories established that both waited much longer

10:19:52 22 than 14 days: 93 days for Mr. Adickes and 177 days for

10:19:58 23 Ms. Sapp.

10:20:00 24 The next friends declarations show that both Ms. Sapp

10:20:04 25 and Mr. Adickes, like those they seek to represent, were harmed

by being forced to wait. Each were punished by remaining in jail after having been acquitted of their charges, without receiving the services required by law.

The NGRI plaintiffs have thus established that they share the same characteristics as the proposed class members, have the same interests as their fellow class members -- avoiding being warehoused in jail without the NGRI evaluation that is the sole purpose of their confinement -- and they have the same injury to their substantive due process rights as those they seek to represent.

Accordingly, the NGRI plaintiffs have likewise satisfied their burden to Rule 23(a)(3) and Plaintiffs Sapp and Adickes should be named representatives of the NGRI class.

Looking to the adequacy of both classes, the standard articulated by the Fifth Circuit is that adequacy encompasses the following three inquiries: the zeal and competence of representatives' counsel; the willingness and ability of the representatives to take an active role and control of the litigation and to protect the interest of the absentees; and the risk of conflict of interest between the named plaintiffs and the class they seek to represent.

Looking to the plaintiffs themselves, the named plaintiffs, as well as the members of the classes they seek to represent, have all suffered, are suffering, or at risk of suffering the same injury to their liberty and rights as a

10:21:31 1  result of Defendant's practice of capping its forensic capacity

10:21:35 2  at an insufficient level.  They share the same interest in

10:21:39 3  prompt admission to HHSC's mental health facilities, share the

10:21:43 4  same harms, and seek the same relief in the form of systemic

10:21:48 5  change, by declaration and injunction, requiring they be

10:21:50 6  admitted between 21 and 14 days.

10:21:53 7       There is no conflict between members of the classes,

10:21:55 8  nor has Defendant articulated one.  Instead, Defendant

10:22:00 9  baselessly asserts that because the named plaintiffs are no

10:22:02 10 longer on the wait list in jail, which is not true for

10:22:05 11 Plaintiff Jones, who is incompetent to stand trial and on the

10:22:08 12 wait list again, they won't care enough to prosecute this case.

10:22:11 13      First, this is a gross assumption on the part of

10:22:14 14 Defendant to assume that someone harmed by its practices

10:22:16 15 wouldn't want to see others harmed in the same way.  Second, it

10:22:20 16 ignores the fact that at least three of the name plaintiffs did

10:22:24 17 find themselves on the wait lists more than once, demonstrating

10:22:26 18 that the claims of Plaintiffs are capable of repetition, giving

10:22:30 19 them an interest in not being re-injured by the defendant.

10:22:34 20      Both Mr. Ward and Mr. Jones have waited multiple

10:22:37 21 times on Defendant's wait lists.  Mr. Ward, as a person with

10:22:40 22 mental illness, has picked up criminal charges at least twice

10:22:44 23 and has been found incompetent on each of these charges,000

10:22:47 24 spending time on Defendant's wait lists each time.

10:22:50 25      Mr. Jones, on the other hand, is an example of the

| | |
|---|---|
| 10:22:54 | 1 |
| 10:22:57 | 2 |
| 10:23:00 | 3 |
| 10:23:04 | 4 |
| 10:23:08 | 5 |

1  other possibility, where a person found incompetent to stand

2  trial finally goes to the hospital, is restored, returns to

3  jail, and loses competency in that environment so that he is

4  again found incompetent to stand trial and finds himself back

5  on Defendant's wait lists.

6          Finally, Ms. Sapp was found incompetent to stand

7  trail, and when she returned to court was acquitted NGRI.  She

8  exemplifies the possibility of the incompetency detainee class

9  to become members of the second NGRI class and wait again on

10  Defendant's wait lists.

11          These three named plaintiffs have a real interest in

12  avoiding another lengthy wait in jail while on Defendant's wait

13  lists, as do their fellow named class members who may find

14  themselves in the same positions as Mr. Ward, Mr. Jones, or

15  Ms. Sapp.

16          Courts have found class representatives to be

17  adequate even when their individual claims have resolved.  It

18  is the law of the case that Plaintiffs' claims are inherently

19  transitory, and it is the hallmark of an inherently transitory

20  claim that it will resolve before litigation can conclude that

21  would address the violation.

22          In this case the inherently transitory nature of

23  Plaintiffs' claims mean that they have individually resolved

24  not only before the case could be decided, but before class

25  certified.  For inherently transitory claims, and for

10:24:12 1 Plaintiffs' claims specifically, under the Fifth Circuit ruling

10:24:15 2 the class certification order relates back to the filing of the

10:24:18 3 complaint.

10:24:19 4          There is abundant court precedent for granting class

10:24:25 5 certification and finding adequacy of named representatives in

10:24:28 6 cases brought by named plaintiffs whose individual cases have

10:24:30 7 resolved.  Like the Supreme Court in *Sosna v. Iowa*, a case

10:24:34 8 brought to challenge state laws regarding who could file for

10:24:37 9 divorce.  Though she had long since satisfied the

10:24:40 10 jurisdictional requirement and obtained her divorce, the court

10:24:43 11 found Ms. Sosna to be an adequate representative.

10:24:46 12          In *Gerstein v. Pugh*, a case brought by pretrial

10:24:47 13 detainees whose confinements could not be ascertained at the

10:24:51 14 outset, but whose claims would all certainly expire by the time

10:24:55 15 class litigation resolved, named members were adequate.

10:24:58 16          And in *Coll v. Hyland*, a man whose mental health

10:25:01 17 civil commitment had expired, yet he was an adequate

10:25:03 18 representative of the class challenging the commitment

10:25:06 19 procedures in New Jersey.

10:25:07 20          Each of the named plaintiffs is also represented by

10:25:12 21 next friends who share a current interest in having Defendant's

10:25:14 22 constitutional violations cease.  In the Fifth Circuit a next

10:25:20 23 friend can represent a named plaintiff who, because of age or

10:25:23 24 mental disability, is unable to adequately represent his or her

10:25:26 25 own interests in litigation and can be an adequate class

10:25:30 1 representative.

10:25:32 2      In this case the named plaintiffs are represented by

10:25:35 3 next friends, each of whom served as the criminal defense

10:25:38 4 attorney for their respective plaintiff. As attested to in

10:25:42 5 each of their sworn declarations, the next friends have over

10:25:45 6 137 combined years experience representing criminal defendants,

10:25:49 7 including hundreds of individuals found incompetent to stand

10:25:53 8 trial and numerous NGRI acquittees.

10:25:56 9      Plaintiff Ward's next friend, Dr. Floyd Jennings, was

10:26:00 10 previously chief of the Mental Health Public Defender's Office

10:26:03 11 for Harris County and has published over 35 papers in the area

10:26:08 12 of mental health and law. Before becoming a lawyer, he

10:26:11 13 obtained his Ph.D. in clinical psychology and, for 20 years,

10:26:15 14 was a clinical faculty member of the University of Texas

10:26:18 15 Medical School at Houston.

10:26:20 16      The next friends for Plaintiffs Lawson, Lampkin, and

10:26:24 17 Adickes, Criminal Defense Attorneys Krista Chacona and Elsie

10:26:27 18 Craven have many years of experience representing criminal

10:26:30 19 defendants with mental illness.

10:26:33 20      Plaintiff Kenneth Jones is represented in the suit by

10:26:35 21 Patricia Sedita, a criminal defense attorney in private

10:26:37 22 practice who has so much experience representing incompetency

10:26:42 23 detainees and NGRI acquittees that she is a local resource for

10:26:45 24 other attorneys.

10:26:48 25      Lourdes Rodriguez, next friend for Plaintiff

| | | |
|---|---|---|
| 10:26:50 | 1 | Mary Sapp, who was found both incompetent to stand trial and |
| 10:26:53 | 2 | NGRI, worked for nearly a decade in community mental health in |
| 10:26:58 | 3 | Florida before becoming an attorney.  Most of her clients now |
| 10:27:01 | 4 | come from the Harris County Mental Health Restoration Court for |
| 10:27:05 | 5 | individuals found incompetent to stand trial. |
| 10:27:07 | 6 | And, finally, Plaintiff Julian Torres is represented |
| 10:27:10 | 7 | in this suit by Melissa Shearer, the head of the Travis County |
| 10:27:14 | 8 | Mental Health Public Defender, an office where she has |
| 10:27:17 | 9 | dedicated the last 12 years of her career to representing |
| 10:27:20 | 10 | defendants with mental illness. |
| 10:27:22 | 11 | Case law in the Fifth Circuit is clear that a next |
| 10:27:25 | 12 | friend representing a named plaintiff who, because of age or |
| 10:27:28 | 13 | mental disability, is unable to adequately represent his or her |
| 10:27:32 | 14 | own interests in litigation, can serve as a class |
| 10:27:35 | 15 | representative.  This is clear in the *Horton* case cited by |
| 10:27:40 | 16 | Defendant as well as in *M.D. v. Perry*, the Texas foster case. |
| 10:27:45 | 17 | In *M.D.*, the foster children's next friends were |
| 10:27:48 | 18 | their attorneys ad litem, the attorneys appointed in the |
| 10:27:51 | 19 | underlying individual child welfare cases to represent the |
| 10:27:55 | 20 | interests of the children.  The Fifth Circuit found that the |
| 10:27:58 | 21 | children's next friends were adequate representatives after, |
| 10:28:01 | 22 | quote, considering the individual's familiarity with the |
| 10:28:05 | 23 | litigation, the reasons that move her to pursue the litigation, |
| 10:28:09 | 24 | and her ability to pursue the class on the impaired class |
| 10:28:13 | 25 | members' behalf. |

10:28:14 1        Thus, much like the next friends in *M.D.*, Plaintiffs'

10:28:17 2 next friends are the attorneys appointed to represent the named

10:28:20 3 plaintiffs in their underlying criminal cases.  They are

10:28:24 4 familiar with the litigation, with the problem of HHSC's

10:28:27 5 self-imposed insufficient forensic bed capacity, and with the

10:28:31 6 harms caused to Plaintiffs and future plaintiffs by this

10:28:34 7 practice.  They are motivated and able to pursue the case on

10:28:39 8 the named plaintiffs' behalf, and they have an ongoing interest

10:28:41 9 in seeing the long wait list shortened for their future

10:28:45 10 clients.

10:28:46 11        Defendant has offered nothing to contradict this

10:28:48 12 evidence and has simply and bizarrely argued that there is no

10:28:51 13 legal relationship between the criminal defendants and their

10:28:54 14 court-appointed counsel, in contrast to the legal relationship

10:28:57 15 between a foster child and their court-appointed counsel.

10:29:01 16        Taken to its logical end, Defendant would have this

10:29:03 17 Court order that no class action could ever be certified on

10:29:07 18 behalf of a vulnerable population who is incapable of

10:29:10 19 representing themselves, an outcome that is belied by the

10:29:13 20 plethora of class action cases brought by next friends and

10:29:16 21 Rule 17(c) itself.

10:29:17 22        Finally, looking to class counsel, the named

10:29:20 23 plaintiffs are represented in this lawsuit by attorneys from

10:29:23 24 Disabilities Rights Texas and Winston & Strawn LLP.  Defendants

10:29:27 25 have not challenged the credentials or qualifications which are

10:29:32 1  detailed in the declarations of Beth Mitchell, Peter Hofer, and

10:29:36 2  John Michael Gaddis, attached as exhibits to Plaintiffs' motion

10:29:39 3  for class certification.

10:29:40 4          What defendants have asserted, however, is the

10:29:44 5  outlandish argument that, because Disability Rights Texas's

10:29:46 6  mission as a nonprofit law firm includes protecting and

10:29:49 7  advocating for the rights of individuals with mental illness,

10:29:52 8  which would include individuals in state hospitals on civil

10:29:55 9  commitments, that we are conflicted from representing the named

10:29:59 10 plaintiffs here.

10:30:00 11         Defendant has cited no case law even remotely on

10:30:03 12 point for the suggestion that a hypothetical conflict with

10:30:06 13 unspecified persons whom we do not represent in any litigation

10:30:09 14 can preclude class certification.  Instead, citing the *Krim*

10:30:15 15 case, where the attorneys were currently litigating multiple

10:30:19 16 class action suits on behalf of individuals whose interests

10:30:22 17 might conflict and the attorneys had not informed any of the

10:30:26 18 clients about the other cases, the settlement offers, or

10:30:28 19 negotiations, which led to the appearance that some classes

10:30:32 20 were being favored over others.

10:30:34 21         Unlike the attorneys in *Krim*, Disability Rights Texas

10:30:37 22 has not filed a lawsuit on behalf of any other population,

10:30:40 23 though Defendant's reports to the Legislature provided in

10:30:44 24 Exhibit Q show that there are actually people on the wait list

10:30:47 25 for civil commitments.

10:30:48  1          It is rich for Defendant to suggest that Plaintiffs

10:30:51  2   are conflicted because they serve both forensically and civilly

10:30:54  3   committed individuals when HHSC is the one charged by state law

10:30:59  4   with timely providing mental health services to both, a duty

10:31:03  5   they are currently failing at with respect to forensic

10:31:06  6   committed individuals.

10:31:08  7          Contrary to Defendant's claims, Plaintiffs have not

10:31:11  8   asked the Court to impose a remedy that would expand the number

10:31:15  9   of beds for forensically committed individual at the expense of

10:31:19  10  nonforensic admissions.  All Plaintiffs have asked is that the

10:31:23  11  Court set a time limit for how long class members can

10:31:26  12  constitutionally remain confined without the services that are

10:31:29  13  the legislatively mandated purpose of their confinement and

10:31:32  14  leave it up to Defendant how HHSC can meet its legal

10:31:35  15  obligations to both forensic and nonforensic individuals.

10:31:38  16          THE COURT:  Let me ask you a question there.

10:31:40  17          MS. SNEAD:  Yes, Your Honor.

10:31:43  18          THE COURT:  You ask the Court to set a time limit on

10:31:46  19  how long the -- if classes are certified the class members can

10:31:49  20  be held?

10:31:50  21          MS. SNEAD:  Yes, Your Honor.

10:31:51  22          THE COURT:  Suppose the Court does that.

10:31:54  23          MS. SNEAD:  Yes.

10:31:55  24          THE COURT:  And suppose the Court -- and the time

10:32:00  25  limit passes.  What action occurs then?  Do the people get

10:32:05 1 released from confinement altogether, or are they held in some

10:32:10 2 temporary facility?  We have to look to see what would occur if

10:32:18 3 this Court renders an order and, for whatever reason, is not

10:32:22 4 complied with by the State.

10:32:24 5 MS. SNEAD:  I think at that point, Your Honor, we

10:32:26 6 would move to find the State in contempt.  As I'll explain

10:32:30 7 shortly --

10:32:30 8 THE COURT:  What happens to the individuals?  That's

10:32:32 9 what I'm concerned with, not what the next legal action would

10:32:36 10 be.  But let's suppose, rightly or wrongly or justly or

10:32:40 11 unjustly or because of lack of financing or lack of action by

10:32:45 12 the Legislature, an order of this Court that is final and

10:32:50 13 unappealable is not carried out.  I understand the legal

10:32:56 14 ramifications of that and what you might do and what this Court

10:33:00 15 might do.  But in the practical world, what happens to the

10:33:04 16 individual once the time expires?

10:33:07 17 MS. SNEAD:  So in the case of the incompetency

10:33:10 18 detainees, under 46B.05, when an incompetency detainee is

10:33:17 19 ordered into an HHSC mental health facility, they're ordered

10:33:19 20 into the custody of the sheriff for transportation.  So they

10:33:22 21 would remain in the custody of the sheriff; they would remain

10:33:25 22 in jails.  And so then, of course, as you noted, their

10:33:29 23 substantive due process rights would -- the violation would

10:33:31 24 occur, but, no, they would not get out.  Their criminal court

10:33:36 25 orders order them to be held pending transfer to an HHSC mental

```
10:33:39   1  health facility, and those individual court orders --
10:33:42   2            THE COURT:  So those orders remain in effect.
10:33:44   3            MS. SNEAD:  Yes.
10:33:44   4            THE COURT:  The individual's status doesn't change.
10:33:46   5  And that's when we come back into court and determine what
10:33:48   6  we're going to do on a potential contempt motion or what you
10:33:51   7  have.
10:33:52   8            MS. SNEAD:  Yes, Your Honor.
10:33:52   9            THE COURT:  Okay.  Thank you.
10:34:05  10            MS. SNEAD:  To conclude for adequacy, as with their
10:34:07  11  baseless argument regarding next friends, taken to its logical
10:34:10  12  end, finding that a nonprofit has a conflict of interest
10:34:14  13  anytime it brings a lawsuit on behalf of only one population it
10:34:17  14  serves would essentially close the door to class actions being
10:34:20  15  brought on behalf of indigent and vulnerable populations by
10:34:25  16  nonprofit law firms.  This cannot be the case.
10:34:28  17            The named plaintiffs, their next friends and the
10:34:31  18  class counsel are all adequate and have no conflicts of
10:34:34  19  interests that would prevent them from zealously seeing this
10:34:38  20  case through.  Both classes have, therefore, satisfied their
10:34:41  21  requirements as to adequacy.
10:34:43  22            Finally, both classes of plaintiffs have brought this
10:34:46  23  action under b(2), the key to which, according to the Fifth
10:34:49  24  Circuit in this case, is the indivisible nature of the
10:34:54  25  injunctive or declaratory remedy warranted, the notion that the
```

10:34:58  1  conduct is such that it can be enjoined or declared unlawful

10:35:00  2  only as to all of the class members or to none of them.

10:35:03  3       Citing *Yates*, the Fifth Circuit recognized three

10:35:08  4  elements that informed the rule 23(b)(2) certification.  First,

10:35:12  5  that class members have been harmed in essentially the same

10:35:14  6  way; second, that injunctive relief predominates over monetary

10:35:19  7  damage claims; and, third, the injunctive relief must be

10:35:22  8  specific.

10:35:23  9       Applying these to Plaintiffs' proposed classes, the

10:35:27  10 evidence establishes that Defendant has acted or refused to act

10:35:30  11 in the same way to the classes as a whole.  Defendant has

10:35:33  12 failed or refused to provide sufficient capacity at its mental

10:35:37  13 health facilities to timely provide the competency restoration

10:35:41  14 examination and services or the NGRI evaluation and treatment

10:35:45  15 that are the sole purposes of the incompetency detainees' and

10:35:49  16 NGRI acquittees' continued confinement.

10:36:04  17      As I established in detail previously, these actions

10:36:09  18 or refusals on the part of Defendant have grievously harmed,

10:36:11  19 and will harm, the liberty interest in criminal cases of the

10:36:14  20 members of the incompetency detainee class.  The NGRI class has

10:36:19  21 also suffered harm, and will suffer harm, to their liberty

10:36:22  22 interest as a result of Defendant's actions or refusals.

10:36:25  23      The injunctive relief sought by Plaintiffs for each

10:36:29  24 proposed class is both reasonable and specific, insofar as it

10:36:33  25 would simply require Defendant to admit class members to its

mental health facilities with a specified time frame -- 21 days

or 14 days, respectively -- after HHSC is notified of their

being found either incompetent to stand trial or not guilty by

reason of insanity.

        Indeed, history shows that the injunction Plaintiffs

have prayed for will work.  Looking to this chart produced by

Defendant and included as Exhibit M in Plaintiffs' motion, the

overall upward trajectory of both waiting lists over the last

10 years has been interrupted by two temporary decreases in the

number of individuals waiting for a bed in an HHSC mental

health facility.  These decreases correspond to time periods

when Defendant took deliberate steps to reduce the waiting

lists.

        This chart, Exhibit P, shows a smaller snapshot of

time.  This is the list from December 2010 through

December 2014.  This is the chart as Defendant produced it, and

you can see that in December 2011, HHSC made a deliberate plan

to reduce the wait list to 21 days or less.  This is the line

second from the left.  You can also see that on the right-hand

side of the chart, towards the middle of 2014, the wait list

begins to go sharply back up.

        Here is the same chart, except that Plaintiffs have

added three lines that correspond to the *Taylor v. Lakey*

litigation in state court.  The first line corresponds to the

district court hearing in November 2011.  It was immediately

10:38:05 1  after this hearing that, according to its own line, Defendant

10:38:09 2  began to reduce the wait list.

10:38:11 3          The second line corresponds to Judge Naranjo issuing

10:38:16 4  a final judgment against Defendant in February 2012.  At that

10:38:20 5  time Judge Naranjo ordered the defendant to abide by

10:38:23 6  essentially the same injunction the incompetency detainee

10:38:27 7  plaintiffs in this case have prayed for:  The defendant cannot

10:38:30 8  fail to make a bed available to an incompetency detainee later

10:38:35 9  than 21 days from receipt of the court order.

10:38:38 10         A little more than two years later, on May 12th,

10:38:42 11 2014, the Texas Third Court of Appeals overruled Judge

10:38:46 12 Naranjo's final judgment on a procedural matter.  As I noted

10:38:51 13 before, after the line representing the Third Court of Appeal's

10:38:54 14 ruling on the right, you see the right-hand side of the chart

10:38:57 15 almost immediately go back up.  Generally speaking, the faster

10:39:00 16 Defendant's wait lists are moving, i.e., the less time people

10:39:04 17 wait for a bed in an HHSC mental health facility, the fewer

10:39:08 18 people overall wait.

10:39:09 19         So, while Defendant denies the drop in the wait list

10:39:13 20 was caused by the *Lakey* order, the decreases of the number of

10:39:17 21 people waiting on the wait lists between February 2012 through

10:39:21 22 May of 2014 on this chart correspond to the time periods that

10:39:26 23 Defendant identified in its responses to the 2017

10:39:29 24 interrogatories as the time it just so happened that it was

10:39:32 25 admitting detainees and acquittees to its mental facilities

1   within 21 days.

2          Returning to the first chart, after 2014, the wait

3   list began to grow again until, after months of attempting to

4   resolve the high wait list times again without litigation,

5   Plaintiffs filed this case on July 19th, 2016.  At that time

6   persons on the clearinghouse wait list waited an average of

7   41 days, which was a decrease from several months prior, though

8   still nearly twice the 21-day limit proposed by Plaintiffs.

9          The evidence, specifically the responses to the 2017

10  interrogatories and Associate Commissioner Bray's deposition

11  testimony, shows that within a month of Plaintiffs filing this

12  suit in August of 2016, HHSC was again able to ensure that

13  persons committed to a non-MSU HHSC forensic bed waited less

14  than 21 days on its clearinghouse wait list.

15         An injunction requiring defendant admit to the

16  incompetency detainees to one of its mental health facilities

17  within 21 days of receipt of the criminal court's order would

18  provide systemic relief to each member of that class.

19  Likewise, an injunction requiring Defendant admit NGRI

20  acquittees to one of its mental health facilities within

21  14 days of receipt of the criminal court's order would provide

22  systemic relief to each member of that class.

23         Plaintiffs propose time limits therefore satisfy

24  concerns raised by the Fifth Circuit regarding the prior class

25  certification order, which it found to be ambiguous because the

10:41:07 1 order did not define, quote, what period of time the district

10:41:09 2 court considers to be extended.

10:41:12 3 Now, whether 21 or 14 days is the ultimate time limit

10:41:14 4 established at the end of the case is a question for the

10:41:17 5 merits. But, as history established in the *Lakey v. Taylor*

10:41:21 6 case, 21 days is an attainable deadline for Defendant. HHSC

10:41:25 7 has twice proven that it can take detainees within 21 days and,

10:41:29 8 when it did so, it cured the substantive due process violations

10:41:32 9 of the incompetency detainees.

10:41:34 10 Contrary to Defendant's assertion, since Defendant

10:41:37 11 admits each class on a first-come, first-served basis, there is

10:41:42 12 no need for different injunctions or declaratory judgments

10:41:46 13 tailored to different individual class members, as a single

10:41:49 14 injunction and declaratory judgment for each class provides an

10:41:52 15 appropriate remedy for all members.

10:41:55 16 In support of this proposition, though, Defendant

10:41:58 17 cites a conditions case that would have required relief

10:42:02 18 tailored to individual hospital patients. However, just

10:42:04 19 because a case concerns a hospital does not mean that the

10:42:07 20 required relief must be individually tailored.

10:42:09 21 Several courts in Oregon, Louisiana, and Washington

10:42:12 22 have been able to craft precisely the injunction that

10:42:15 23 Plaintiffs here seek, despite the fact that those claims also

10:42:18 24 concerned the admission of jail detainees to state hospitals.

10:42:23 25 Similarly, courts in Texas have not found the Texas

1   foster care system that serves over 12,000 children in *M.D. v.*

2   *Perry*, nor the Texas Medicaid system for thousands of

3   individuals with intellectual disabilities in nursing homes in

4   *Steward v. Janek*, to be too large for a single injunction to

5   work.

6        Classes like the one proposed here are precisely the

7   kind intended by Rule 23(b)(2) which is often used to vindicate

8   the civil rights of vulnerable groups. Indeed, courts in Utah

9   and Washington have within the past five years certified

10  classes under Rule 23(b)(2) for classes nearly identical to

11  those of the IST class. Both courts found that proposed

12  classes meet the requirements of rule 23(a) and Rule 23(b)(2),

13  as should this court as well.

14       In sum, unless the court has any further questions,

15  Plaintiffs have carried their burdens under Rule 23 to certify

16  the proposed classes for the incompetency detainees and the

17  NGRI acquittees.

18       Named Plaintiffs, therefore, ask the Court to certify

19  the two classes to name Joseph Ward, Mark Lawson, Jennifer

20  Lampkin, Kenneth Jones, Mary Sapp, and Julian Torres through

21  their next friends as class representatives of the incompetency

22  detainee class; to name Mary Sapp and Cecil Adickes through

23  their next friends as class representatives of the NGRI class;

24  and to appoint Disability Rights Texas and Winston & Strawn as

25  class counsel.

10:43:52    1            Plaintiffs reserve their remaining time for rebuttal.

10:43:55    2            THE COURT:  Thank you, Ms. Snead.  I have no further

10:43:58    3    questions at this time.

10:43:59    4            MS. SNEAD:  Thank you.

10:44:01    5            THE COURT:  Defendant may proceed.

10:44:11    6            And, Mr. Abrams, you'll have about 30 minutes, and

10:44:14    7    then we're going to break.

10:44:14    8            MR. ABRAMS:  I think we'll be done in 30 minutes,

10:44:17    9    Your Honor.

10:44:17   10            THE COURT:  Well, that will be a convenient time to

10:44:19   11    break, then.

10:44:19   12            MR. ABRAMS:  Perfect.

10:44:21   13            Good morning, Your Honor.  Because the plaintiffs

10:44:23   14    finished their presentation with the discussion of the Rule

10:44:26   15    23(b)(2) remedy, I thought it would make sense to start there

10:44:29   16    and, after discussing that, we'll move into the Rule 23(a)

10:44:33   17    factors.

10:44:35   18            And, as with our briefing, the bulk of our argument

10:44:37   19    in the Rule 23(a) analysis focuses on commonality, specifically

10:44:41   20    here, the idea that Plaintiffs are asserting as-applied

10:44:44   21    substantive due process claims that require a case-by-case

10:44:48   22    approach that does not lend itself to resolution on a

10:44:51   23    class-wide basis.

10:44:53   24            I'd like to start with the evidence that the Court

10:44:57   25    just heard and, importantly, what the Court did not hear.  At

10:45:01 1 no point in their presentation did Plaintiffs put on any

10:45:04 2 evidence or even allege that the state hospitals are not

10:45:09 3 providing exceptional services to their patients, which include

10:45:12 4 both forensic commitments, civil commitments, and voluntary

10:45:17 5 commitments.

10:45:18 6 The nine state hospitals, including one right here in

10:45:21 7 Austin, do wonderful work to serve these critical populations,

10:45:24 8 and Dr. Faubion's declaration, which is Exhibit B to our

10:45:28 9 response, goes into detail about the varied mental health

10:45:31 10 services that the hospitals provide. We treat patients with

10:45:35 11 mental illness, patients with intellectual disabilities,

10:45:38 12 patients who need to be restored to competency, patients who

10:45:42 13 are facing a psychiatric crisis, and others.

10:45:45 14 This case is not about inadequate services or in any

10:45:48 15 way about the refusal to provide services. It is instead about

10:45:53 16 the equitable allocation of the state hospital services and

10:45:57 17 resources to a lot of folks who need them. And on that front

10:46:04 18 HHSC is not unaware. In fact, HHSC is very aware of the issues

10:46:08 19 that Plaintiffs raise today, and that is why HHSC has taken

10:46:12 20 multiple, significant steps to reduce admission wait times,

10:46:16 21 both now and into the future, both for the clearinghouse and

10:46:20 22 the MSU wait list.

10:46:22 23 And some of those steps include -- and this is at

10:46:24 24 paragraph 11 in Timothy Bray's declaration -- reconfiguring

10:46:30 25 capacity at the maximum security unit hospital at North Texas

State Hospital to increase the number of persons with multiple disabilities served; establishing a 16-unit bed at Kerrville State Hospital; establishing a new 20-unit bed at Terrell State Hospital to serve forensic patients who have served in the Armed Forces; aggressive recruitment and staffing strategies.

And on that point, as Tim Bray noted in his declaration, some of our hospitals are in rural areas, which can propose a problem for recruitment. And so we're implementing the most aggressive strategies we can to recruit and retain talent.

The Legislature, importantly, has appropriated funds for a 70-bed maximum security unit at Kerrville State Hospital, 60 additional maximum security unit beds at Rusk State Hospital, and a 40-bed expansion at the San Antonio State Hospital.

Finally, the state hospital system is complex, and it's not just about more beds. To that end, HHSC is currently implementing Senate Bill 562 which passed in the last legislative session. And what Senate Bill 562 does is it gives HHSC more discretion in sending folks to an MSU facility or non-MSU facility.

So, as Plaintiffs' evidence demonstrated, the most significant wait times are with respect to the MSU list. The clearinghouse list, which is for the hospitals that serve non-MSU-bound patients generally moves a lot faster. And part

10:48:03 1  of the problem was that, under the prior version of the law,

10:48:07 2  HHSC had no clinical discretion to decide whether someone

10:48:11 3  should go to a maximum security unit or a non-maximum security

10:48:14 4  unit.

10:48:15 5      If someone was charged with an enumerated offense,

10:48:18 6  they were going to a maximum security unit.  And that wasn't

10:48:19 7  always necessary, because there could be times where someone

10:48:22 8  was not -- a clinician could determine that someone wasn't

10:48:25 9  dangerous and didn't need the extra security of a maximum

10:48:28 10 security unit.  Now HHSC has discretion to send someone to a

10:48:32 11 non-maximum security unit, if that's what a clinician

10:48:38 12 determines is appropriate.

10:48:40 13     And so what that does, or what we hope it will do, is

10:48:43 14 reduce the wait times on the maximum security unit list, which

10:48:45 15 is primarily what we interpret Plaintiffs' claims to be about.

10:48:49 16 I mean, they argue that this is about the clearinghouse and the

10:48:51 17 maximum security unit list, but this is really -- you know, the

10:48:55 18 way that they have pleaded and argued this case, this is really

10:48:58 19 about the maximum security units.

10:49:00 20     Now, Your Honor, all this goes directly to the

10:49:03 21 Rule 23(b)(2) analysis.  Plaintiffs have argued that they have

10:49:06 22 proposed specific time limits, and so that's enough to satisfy

10:49:11 23 their burden under Rule 23(b)(2).  And, by the way, it's worth

10:49:15 24 noting that those time limits are different with respect to

10:49:18 25 MSU -- or with respect to incompetent detainees and those found

10:49:23  1  not guilty by reason of insanity, and it's difficult to square

10:49:26  2  that with a single constitution.

10:49:28  3      But they don't explain how those time limits could be

10:49:31  4  imposed, justified, or effective at remedying the diverse harms

10:49:36  5  suffered by the class members.  Plaintiffs argued just now that

10:49:39  6  it is simple, that they are asking for a simple injunction.  It

10:49:42  7  would not be simple to comply with the injunction that the

10:49:45  8  plaintiffs propose.

10:49:46  9      The Fifth Circuit instructed the plaintiffs to put

10:49:49  10  forward injunctive relief that is specific and that describes

10:49:52  11  in reasonable detail the acts required, and they claim to have

10:49:57  12  done so with their 21-day and 14-day time frames.  But, again,

10:50:01  13  it is undisputed that HHSC is providing excellent services, and

10:50:06  14  so Plaintiffs haven't explained how that injunction would work

10:50:10  15  in practice.

10:50:11  16      Would it mean, as they appear to imply that they

10:50:14  17  are -- would like, to convert the entire state hospital system

10:50:18  18  into a forensic-only system, at the exclusion of several

10:50:22  19  commitments and voluntary commitments?  Would it mean moving

10:50:26  20  patients from maximum security units to non-maximum security

10:50:30  21  units even though HHSC has determined that they are most

10:50:33  22  appropriately served and, for the safety of both themselves and

10:50:38  23  the staff, they need to be at maximum security units?

10:50:41  24      We cannot ask doctors to speed up care to make room

10:50:48  25  for others.  Treatment --

10:50:49  1         THE COURT:  So what do we do?  We've got a situation

10:50:55  2   where a district judge has determined that an individual needs

10:51:03  3   treatment as opposed to additional punishment and that that

10:51:09  4   treatment comes in one of the three places, as outlined by the

10:51:14  5   Plaintiff.  If a jail has it, fine; if there's private care

10:51:23  6   available, fine; but most of it goes to HHSC.

10:51:29  7         I'm concerned about whether your argument is there's

10:51:38  8   just nothing that can be done but leaving the people in jail

10:51:41  9   regardless of the state court's order for whatever period of

10:51:47  10  time, the dates that we've heard here today and that are in the

10:51:52  11  proof that supports the request and the response.

10:51:57  12        Is your argument that we don't certify the class and

10:52:02  13  we just leave everything the way it is because, regardless of

10:52:06  14  what the statute says, we're doing the best we can do?

10:52:09  15        MR. ABRAMS:  A couple of responses to that,

10:52:11  16  Your Honor.  The first is that we don't control the district

10:52:14  17  courts who have ordered the individuals into treatment.  So it

10:52:20  18  could be -- you know, so we don't control whether they're

10:52:23  19  released on bail or not.  That is just something -- I think the

10:52:26  20  plaintiffs were arguing this is a confinement case, but we are

10:52:29  21  not confining the plaintiffs.

10:52:31  22        THE COURT:  No, you're not.  In fact, you're not even

10:52:33  23  there yet.

10:52:34  24        MR. ABRAMS:  That's correct.

10:52:35  25        THE COURT:  Because you don't -- they haven't come to

10:52:38  1   you yet.

10:52:39  2              MR. ABRAMS:  Exactly, Your Honor.  And so we are also

10:52:44  3   not saying that there is no possible remedy.  What we're saying

10:52:50  4   is actually what the Third Court of Appeals did in the prior

10:52:53  5   version of this case.  And it's actually a little bit of a

10:52:56  6   different issue because that involved a facial challenge rather

10:52:59  7   than, sort of, the class action issue here.

10:53:00  8              But what the Third Court of Appeals did with respect

10:53:03  9   to the same first-come, first-served policy is say:  This is

10:53:06  10  not facially unconstitutional.  It could be unconstitutional,

10:53:10  11  you know, as applied, depending on the circumstances, which we

10:53:13  12  don't dispute.  Under *Jackson* we don't dispute that there could

10:53:16  13  become a point at which there's a constitutional harm.  But

10:53:19  14  what we're saying is that this case is not amenable to the

10:53:23  15  specific relief that the plaintiffs are asking for here, which

10:53:26  16  is resolution of this on a class-wide basis with a single

10:53:30  17  injunction.

10:53:31  18             THE COURT:  But how else do you get the issue before

10:53:34  19  a court?  If the Legislature has said, once a district court

10:53:39  20  rules, this has to be done, how do we solve the problem of,

10:53:45  21  let's take the extreme, the 439 days before anything is done?

10:53:50  22  That's over a year.  Is your position that we've got to keep

10:53:55  23  doing it the way we're doing it because there is no way to

10:53:58  24  solve the problem?

10:54:00  25             MR. ABRAMS:  Again, several responses, Your Honor.

10:54:03  1  Some plaintiffs have pursued habeas relief.  So that is one

10:54:07  2  option that some plaintiffs have -- have done.  The second

10:54:12  3  option is, again, they can bring an as-applied challenge to

10:54:15  4  their specific claim, and they'd likely have support from the

10:54:19  5  Fifth Circuit on the argument about inherently transitory

10:54:23  6  claims there if they were to bring that claim in the future.

10:54:28  7         But the third thing, Your Honor, is that we are not

10:54:30  8  saying that we are just, you know, going to keep with the

10:54:35  9  status quo.  And that's why it was really important to go

10:54:38  10  through the specific acts that Tim Bray discussed in his

10:54:45  11  declaration.  And really what this is about, Your Honor, is a

10:54:48  12  complicated state hospital system that has to take into account

10:54:51  13  a lot of different factors.

10:54:52  14         So, for example, right now forensic patients take up

10:54:56  15  about 65 of the state hospital beds.  And contrary to what

10:54:59  16  Plaintiff said, that's not -- that's not ironclad.  It can

10:55:04  17  fluctuate depending on HHSC's discretion.  And about 35 percent

10:55:08  18  are reserved for civil commitments.

10:55:11  19         If you increase the forensic capacity, you're

10:55:18  20  necessarily decreasing the capacity for civil commitments.  And

10:55:22  21  so what we're saying is that HHSC is in the best position to

10:55:26  22  determine how to allocate its resources to deal with, you know,

10:55:33  23  this issue that there are a limited number of beds at the

10:55:36  24  moment.

10:55:37  25         And then the other thing is that the Legislature has

also recognized that we can build more beds to eventually drive the wait times down. But with respect to building more beds, especially with respect to maximum security units where you have to build a security apparatus enough to secure all the patients and the staff, that just takes time. I mean, building a hospital, putting the staffing in place, getting it up and running, that just takes time. And so what the plaintiffs are asking for is what HHSC is already doing. And the issue is just that it takes time to make these concrete steps that will work in the long term.

And so for all these reasons, Your Honor, there are serious problems with the Rule 23(b)(2) remedy that they propose. Now, the Fifth Circuit in *Yates v. Collier* emphasized that there have not been a lot of cases dealing with the specificity requirement, so there aren't a lot of cases in the Fifth Circuit that explain how specific is specific enough. But we'd argue that you have to look at the individual case and determine from there whether the proposed remedy is specific enough. And here we would argue they haven't done that, given that there is no argument that we are not providing outstanding services and given the complexity of the state hospital system.

With that, Your Honor, I'd like to move into the Rule 23 factors -- Rule 23(a) factors, rather. In its responsive brief, we devoted most of our briefing on commonality, and so I'd like to start there.

10:57:20 1          To satisfy this requirement, the class members'

10:57:22 2   claims must turn on a common contention that is capable of

10:57:25 3   class-wide resolution, which means that determination of its

10:57:29 4   truth or falsity will resolve an issue essential to the

10:57:35 5   validity of each of the claims in one stroke.  What matters for

10:57:38 6   class certification is the capacity of a class-wide proceeding

10:57:41 7   to generate common answers apt to drive the resolution of the

10:57:44 8   litigation.

10:57:45 9          The Fifth Circuit instructed in its opinion that the

10:57:48 10  court must examine commonality with an eye towards the claims,

10:57:52 11  defenses, relevant facts, and the substantive law as part of

10:57:57 12  its rigorous analysis.  And so here that means that the Court

10:58:01 13  must at least consider the nature of the plaintiffs' claims to

10:58:04 14  determine whether they are capable of class-wide relief.  And

10:58:09 15  here they are not.

10:58:10 16         We have to start with the claim that they have

10:58:12 17  pleaded.  In one sense, this is a straightforward case.  They

10:58:16 18  are alleging a substantive due process claim under the

10:58:19 19  Fourteenth Amendment that, based on *Jackson v. Indiana*, that

10:58:24 20  the nature and duration of their commitment does not bear some

10:58:26 21  reasonable relation to the purpose for which the individual is

10:58:30 22  committed.

10:58:30 23         And so, as Plaintiffs' recognize, that means that the

10:58:32 24  case that we start with in our analysis is *Jackson v. Indiana*.

10:58:37 25  And in *Jackson*, which dealt with a plaintiff who was being

10:58:40 1 detained and was unlikely to ever be restored to competency,

10:58:43 2 the court held that, at the least, due process requires that

10:58:47 3 the nature and duration of commitment bears some reasonable

10:58:50 4 relation to the purpose for which the individual is committed

10:58:54 5 and, shortly after that, that he cannot be held more than a

10:58:58 6 reasonable period of time necessary to determine whether there

10:59:01 7 is a substantial probability that he will obtain that capacity

10:59:06 8 in the foreseeable future.

10:59:07 9 Twice, in back-to-back paragraphs, the court used the

10:59:13 10 word "reasonable." The touchstone of the analysis is

10:59:17 11 reasonableness. And the court declined to prescribe arbitrary

10:59:21 12 time limits, citing a lack of evidence in the record and the

10:59:25 13 existence of differing state facilities and procedures.

10:59:28 14 THE COURT: Well, was *Jackson* talking about the time

10:59:35 15 period after treatment started or the time period of a delay

10:59:41 16 before the court-ordered treatment ever started?

10:59:44 17 MR. ABRAMS: In *Jackson* it was the end of the

10:59:46 18 process, where they were already in the state system. And this

10:59:49 19 is admittedly at the beginning of the process. And to that

10:59:52 20 point --

10:59:57 21 THE COURT: See, I see distinct different between

11:00:00 22 continuing to hold persons in jails without treatment before

11:00:05 23 they start getting the treatment that the court has ordered.

11:00:09 24 That's my concern, is that period of time.

11:00:11 25 MR. ABRAMS: Yes, Your Honor. And I think on that

11:00:13  1   point, that is something that the *Powell* court, which is out of

11:00:18  2   Maryland which, again, you know, we concede it's not binding

11:00:21  3   authority, but it's certainly helpful and probably the most

11:00:24  4   thorough opinion in addressing *Jackson* as it applies to these

11:00:28  5   type of situations.  The *Powell* court recognized that *Jackson*

11:00:32  6   involved the end of the process, whereas, you know, that case

11:00:35  7   and this one involved the beginning of the process.  But *Powell*

11:00:38  8   nonetheless recognized that that same standard applies, as the

11:00:42  9   plaintiffs appear to recognize.

11:00:44  10         So what the *Powell* court did is identify several

11:00:48  11  considerations as to when a plaintiff has a substantive due

11:00:51  12  process claim and when a delay is reasonable or not.  And that

11:00:55  13  includes the nature of the defendant's disorder, the

11:00:57  14  circumstances of the defendant's confinement at the pretrial

11:01:01  15  detention facility, and the treatment needs of the defendant.

11:01:06  16         And what the Maryland court recognized is that these

11:01:08  17  types of claims, very similar claims as to what the plaintiffs

11:01:11  18  are bringing here, are ill suited to a one-size-fits-all

11:01:14  19  approach, which necessarily means they are ill suited to

11:01:17  20  class-wide resolution.  And so if this Court is to interpret

11:01:21  21  *Jackson* in the way that *Powell* interprets and in the way that

11:01:26  22  we argue is the only correct way to interpret that case, when a

11:01:30  23  delay violates the due process clause will depend on the

11:01:34  24  individual circumstances, including whether they are receiving

11:01:37  25  stabilizing medication in jail.

11:01:40   1          And here I think it's important to turn to the

11:01:43   2   analysis in *Jackson*, which focused on the -- that the duration

11:01:50   3   of the commitment must bear a reasonable relation to the

11:01:53   4   purpose for which the individual is committed.  And that

11:01:56   5   doesn't necessarily have to be exactly the same thing as what

11:01:58   6   is stated under state law.

11:02:00   7          And so Dr. Faubion, who is the chief of forensic

11:02:03   8   medicine at HHSC, testified that the majority of forensic

11:02:07   9   patients who are adjudicated not competent to stand trial are

11:02:11  10   restored with treatment of their mental illness using

11:02:14  11   medication.  He also testified that, in his professional

11:02:17  12   experience, he has seen patients already restored to competency

11:02:21  13   through the provision of prior medical services.

11:02:24  14          Now, it's true that not all -- not all individuals

11:02:29  15   being held in jail are going to be receiving psychotropic

11:02:32  16   medication.  They're not all going to be receiving that

11:02:35  17   medication at the appropriate dosages.  They might not all be

11:02:37  18   receiving them for the appropriate amount of time.

11:02:40  19          But some -- some detainees will be.  And that's

11:02:45  20   what's important for purposes of the case at this juncture,

11:02:47  21   which is that, for class-wide resolution, you to have common

11:02:52  22   questions of law and fact that can be answered in one swoop.

11:02:56  23   And the fact that some plaintiffs are going to be receiving

11:02:59  24   medication in jail that puts them on the pathway to restoration

11:03:05  25   negates commonality.

11:03:08 1        And, Your Honor, on that point I would like to shift

11:03:11 2   to or at least discuss the other cases that the plaintiffs

11:03:14 3   cite.  So Plaintiffs cite two cases that certify similar

11:03:21 4   classes, but both are very distinguishable.  In the case out of

11:03:25 5   Utah, the court barely cited *Jackson* and didn't have the same

11:03:28 6   evidentiary record that the Court has before it today.

11:03:30 7        And in the Washington case the parties stipulated to

11:03:32 8   the -- to the agreed class, which the Fifth Circuit has said

11:03:37 9   that the court has to conduct a rigorous analysis even if the

11:03:41 10  parties don't challenge anything, which is why the plaintiffs

11:03:44 11  have to put on evidence of adequacy of their counsel even

11:03:46 12  though we didn't specifically challenge that.

11:03:48 13       And so those two cases actually don't support the

11:03:50 14  argument that these claims are amenable to class-wide

11:03:54 15  resolution.

11:03:54 16       In fact, the two arguably most analogous cases are

11:04:01 17  from state courts, the *Powell* case and the *Lakey* case.  The

11:04:03 18  *Powell* case stands for the proposition that the reasonableness

11:04:06 19  approach precludes a one-size-fits-all analysis, and the *Lakey*

11:04:10 20  case stands for the proposition the one -- the first-come,

11:04:17 21  first-served policy is not facially unconstitutional.

11:04:22 22       And so we'd argue that, if there's any case law out

11:04:23 23  there that's close on point, it actually supports HHSC's

11:04:26 24  position with respect to the current posture of the case that

11:04:30 25  we're in now.

11:04:31 1          Finally, I'd like to note that the standard of review
11:04:36 2  here matters and is an additional factor in demonstrating that
11:04:40 3  this case cannot be resolved on a class-wide basis.
11:04:44 4          Plaintiffs intend to make this a conditions of
11:04:46 5  confinement case, but this case is not about the conditions
11:04:49 6  that the plaintiffs are being held in jail in the traditional
11:04:53 7  sense and in the traditional way that those claims are brought.
11:04:56 8  They have not sued or brought in any of the jails as part of
11:05:00 9  their claims.
11:05:01 10         And so what this case is more appropriately governed
11:05:04 11 by is the shocks-the-conscience standard, which requires an
11:05:09 12 individualized inquiry into whether the government has been
11:05:11 13 deliberately indifferent to a known risk to the victim's health
11:05:15 14 and safety, which is something that can only be determined on a
11:05:18 15 case-by-case basis because it necessitates consideration of
11:05:22 16 each detainee, their circumstances, and HHSC's actions in
11:05:25 17 relation to those circumstances.
11:05:27 18         And, finally, I just have one final note on the
11:05:36 19 first-come, first-served policy:  It does generally apply to
11:05:40 20 incompetent detainees, with some limited exceptions, but NGRIs
11:05:44 21 are given priority to comport with Texas law.  So, to the
11:05:47 22 extent that this is a case about the first-come, first-served
11:05:50 23 policy, which is how the Fifth Circuit understood Plaintiffs to
11:05:53 24 be bringing their claims, the NGRI class is not even subject to
11:05:58 25 that policy in the same way that the incompetent detainees are,

| 11:06:01 | 1 | because they are given priority in order comport with Texas |

11:06:01  1  because they are given priority in order comport with Texas

11:06:05  2  law.

11:06:06  3          For all these reasons, Plaintiffs have not met their

11:06:09  4  burden of establishing common questions of law and fact that

11:06:10  5  can be resolved on a class-wide basis.

11:06:12  6          THE COURT:  Thank you.

11:06:16  7          MR. ABRAMS:  I'm going to address typicality.

11:06:18  8          THE COURT:  All right.  Go ahead and address

11:06:20  9  typicality.

11:06:21  10         MR. ABRAMS:  Well, with respect to typicality, we

11:06:24  11  don't have a lot more to say because the typicality analysis

11:06:29  12  typically merges with commonality.  And here there are no

11:06:33  13  common claims for the reasons that we've already argued, so

11:06:35  14  Plaintiffs claims cannot be typical of the class.  And, in any

11:06:39  15  event, the named plaintiffs -- with one exception,

11:06:42  16  Julian Torres -- were all committed to a maximum security unit

11:06:45  17  with a longer wait time than the majority of the class members

11:06:48  18  who have been committed to non-maximum security units.

11:06:51  19         The next area I'd like to focus on is the numerosity

11:06:58  20  requirement which we only address with respect to the NGRI

11:07:01  21  class even though Plaintiffs correctly note that the Court must

11:07:04  22  conduct a rigorous analysis with respect to both classes.

11:07:08  23         Among the factors that the Court must consider

11:07:10  24  include the class size, the geographic diversity of class

11:07:15  25  members, the ease or difficulty of identifying class members,

the nature of the action, and the ability of class members to institute individual lawsuits.  And so in our response we did vigorously contest numerously of the NGRI class, and as of July 15th, 2019, there are only two NGRI -- NGRI individuals on the wait list.

And, as we mentioned earlier, the NGRI individuals who have been committed to an HHSC facility are generally given priority to comport with the Texas Code of Criminal Procedure. Furthermore, NGRI plaintiffs generally have their own criminal lawyers who could bring individual claims.

And we argue this in our motion, so I won't belabor it too much, but there's precedent for this exact type of class being denied out of the Middle District of Louisiana, which found that, because the identity of the plaintiffs were readily ascertainable because Louisiana compiled information about them, it was -- there was no obstacle to joinder even though the population of the punitive plaintiffs was often in flux.

And the same thing is true here, Your Honor. Individuals can only become part of the proposed NGRI class once they are adjudicated not guilty by reason of insanity and a commitment order is issued.  HHSC maintains information from around the state that allows state hospital personnel to easily and readily identify all individuals who have a forensic order of commitment.  And so the NGRI class is not so numerous that joinder is impractical, and NGRI plaintiffs, again, could bring

11:08:50  1  their own as-applied challenges.

11:08:53  2         Finally, Your Honor with respect to adequacy of

11:08:55  3  representation, we don't dispute that Plaintiffs have competent

11:08:58  4  class counsel, but there are potential conflicts between

11:09:04  5  Disability Rights Texas when you look towards the end of the

11:09:08  6  case, the potential remedy.  And, frankly, there isn't case law

11:09:12  7  on point because this is a unique situation.

11:09:15  8         What they have said, and they said in their

11:09:17  9  presentation repeatedly, is that HHSC has a self-imposed limit

11:09:20  10  on forensic capacity.  And so what that means is that HHSC

11:09:25  11  limits the beds available to about 65 percent of the state

11:09:28  12  hospital beds so that 35 percent of the beds can be served for

11:09:32  13  people who are on civil commitments.  So those are folks with

11:09:35  14  court-ordered commitments to receive HHSC services and

11:09:39  15  voluntary commitments, those folks going through an acute

11:09:43  16  psychiatric crisis who need the state hospital system.

11:09:47  17         The potential remedy, which would -- to increase the

11:09:51  18  forensic capacity of the state hospitals, would mean decreasing

11:09:54  19  the capacity for civil commitments, and Plaintiffs acknowledge

11:09:59  20  that they are also charged with representing those civil

11:10:02  21  commitments.  And so that's where the potential conflict is,

11:10:06  22  which, you know, as part of its rigorous analysis the Court

11:10:08  23  must consider.  Even though the conflict might not be apparent

11:10:12  24  right now, it's certainly something that could happen later on

11:10:15  25  in the case.

11:10:16  1    Furthermore, we don't challenge that the law of the

11:10:19  2  case is that Plaintiffs' claims fit within the inherently

11:10:23  3  transitory exception to the mootness doctrine.  But mootness

11:10:29  4  doesn't absolve the Court of making an adequacy determination

11:10:33  5  with respect to the named plaintiffs, as the Fifth Circuit

11:10:36  6  recognized in the *Ward* opinion.  And, in fact, in a footnote

11:10:39  7  the Fifth Circuit recognized that the fact that the duration or

11:10:42  8  the time of their commitment can be so small raises some

11:10:46  9  complexity to the analysis.

11:10:49  10    Furthermore, the Court cannot simply assume that

11:10:51  11  these plaintiffs will once again be charged with committing a

11:10:54  12  crime such that they will again be subject to the first-come,

11:10:57  13  first-served policy.  And that's directly from a Supreme Court

11:11:01  14  case called *O'Shea v. Littleton*, which explained that it seems

11:11:05  15  that attempting to anticipate whether and when someone will be

11:11:09  16  charged with a crime and will be made to appear before a court

11:11:13  17  takes us into the area of speculation and conjecture.

11:11:17  18    Furthermore, given that none of them are currently in

11:11:20  19  the proposed class, in that they've all been admitted to a

11:11:24  20  state hospital, this at least raises a question of whether they

11:11:27  21  will be the vigorous advocate that the Fifth Circuit

11:11:31  22  envisioned.  So, again, we're not trying to make a categorical

11:11:36  23  claim.  What we're trying to do is address the analysis that

11:11:39  24  the Court raised and put the plaintiffs to their burden of

11:11:41  25  identifying each of the ways that they meet Rule 23(a)'s and

| | | |
|---|---|---|
| 11:11:45 | 1 | Rule 23(b)(2)'s analysis. |
| 11:11:47 | 2 | Your Honor, to conclude, on a surface level, we |
| 11:11:50 | 3 | recognize the appeal of Plaintiffs' argument in favor of class |
| 11:11:54 | 4 | certification.  There is a first-come, first-served policy; |
| 11:11:58 | 5 | they are proposing an injunction that, you know, has a specific |
| 11:12:01 | 6 | time frame.  But the Fifth Circuit required a rigorous |
| 11:12:06 | 7 | analysis, including an analysis of the substantive law, which |
| 11:12:10 | 8 | in this case involves a deep analysis and a deep dive into |
| 11:12:14 | 9 | *Jackson v. Indiana.*  And once that analysis is conducted, it |
| 11:12:18 | 10 | becomes clear that this case is not amenable to resolution on a |
| 11:12:23 | 11 | class-wide basis.  For these reasons, Plaintiffs' motion for |
| 11:12:25 | 12 | class certification should be denied. |
| 11:12:27 | 13 | If there are no further questions, we would submit |
| 11:12:30 | 14 | the motion -- or our response to the Court in our briefing. |
| 11:12:33 | 15 | THE COURT:  Thank you. |
| 11:12:37 | 16 | All right.  At this point we're going to be in recess |
| 11:12:40 | 17 | until 1:30 and then come back for the rebuttal by the |
| 11:12:44 | 18 | plaintiffs.  So at this time the court's in recess. |
| 11:13:13 | 19 | (Recess) |
| 13:29:17 | 20 | THE COURT:  Ms. Snead, you may proceed with your |
| 13:29:19 | 21 | rebuttal. |
| 13:29:19 | 22 | MS. SNEAD:  Beth Mitchell is doing the rebuttal, |
| 13:29:21 | 23 | Your Honor. |
| 13:29:21 | 24 | THE COURT:  Okay.  Ms. Mitchell, you may proceed with |
| 13:29:23 | 25 | rebuttal. |

13:29:24  1          MS. MITCHELL:  Thank you, Your Honor.

13:29:32  2          I'm going to address some of the points raised by the

13:29:35  3  defendant.  Hopefully this will be short and sweet.  I want to

13:29:37  4  start off where the defendant suggested that the purpose of

13:29:43  5  commitment is not found within the statute itself.  In fact,

13:29:49  6  the U.S. Supreme Court, and *Brown v. Taylor* just last year from

13:29:53  7  the Fifth Circuit, articulated that, yes, when you are looking

13:29:57  8  for the purpose of what a commitment is, you do look to the

13:30:00  9  statute itself.

13:30:01  10         And so if we do look at this statute, under the

13:30:05  11 incompetency to stand trial, it says there's a dual purpose for

13:30:11  12 the confinement of an individual after they've been found

13:30:20  13 incompetent to stand trial, and that dual purpose is either --

13:30:20  14 is examination and restoration services.  So it's not just

13:30:21  15 restoration, but it's examination and restoration.

13:30:21  16         And this is important because the defendant, you

13:30:25  17 know, suggests that individuals are receiving medication in

13:30:33  18 jail and, therefore, they are receive -- that that is

13:30:36  19 sufficient for the purpose of their commitment, the restoration

13:30:38  20 piece.  However, there is that dual purpose of examination.

13:30:40  21 Medications alone is not going to provide somebody with an

13:30:48  22 examination about whether or not somebody remains incompetent

13:30:50  23 to stand trial or not.

13:30:52  24         Additionally, there were four cases that -- similar

13:30:57  25 cases to the one that we have here that talked about whether or

13:30:59  1  not medication in a facility -- in a jail was sufficient for

13:31:04  2  competency restoration purposes, and that was:

13:31:11  3  　　　　　*Stiavetti v. Ahlin*.  In that case the court said that

13:31:13  4  jails are not designed to promote the defendant's speedy return

13:31:16  5  to mental competency, and so treatment is not sufficient;

13:31:19  6  　　　　　*Advocacy Center for Elderly & Disabled*, finding that

13:31:23  7  jail mental health services were insufficient to satisfy the

13:31:28  8  *Jackson* requirement;

13:31:30  9  　　　　　*Terry ex. rel. Terry v. Hill*, which also said that,

13:31:32  10  though the jail had psychiatrists and nurses and provided

13:31:34  11  special treatment to inmates with mental illness, continued

13:31:37  12  confinement awaiting transfer to a mental health facility still

13:31:42  13  violated the due process rights under *Jackson*; and

13:31:45  14  　　　　　*Trueblood* that said jails are not hospitals.  They

13:31:47  15  are not designed as therapeutic environments and they are not

13:31:51  16  equipped to manage mental illness or keep those with mental

13:31:55  17  illness from being victimized by the general population of

13:31:57  18  inmates.

13:31:57  19  　　　　　THE COURT:  And you've cited those cases in your

13:31:59  20  briefing; is that right?

13:32:00  21  　　　　　MS. MITCHELL:  Yes, Your Honor.

13:32:01  22  　　　　　THE COURT:  All right.

13:32:01  23  　　　　　MS. MITCHELL:  And, in addition, you know, if we go

13:32:03  24  back to slide 30, the Defendant's own expert, Dr. Faubion,

13:32:09  25  indicated that they don't -- you know, they talk about all the

13:32:14  1  wonderful services they provide at the state hospital, which,

13:32:16  2  of course, Plaintiffs don't contest; they do provide wonderful

13:32:20  3  services.  What Plaintiffs want is to get over to their

13:32:22  4  hospitals so they can receive these wonderful services.  But

13:32:25  5  they also say they don't provide just medication when they're

13:32:29  6  providing services for competency restoration.

13:32:32  7       What they indicate is they provide educational

13:32:33  8  classes that are meant to provide a mock courtroom environment,

13:32:36  9  psychiatric services that include adjunctive psychosocial

13:32:41  10  rehabilitation programs such as music shop, printing classes,

13:32:43  11  and some other treatment modalities, and all of those are

13:32:47  12  necessary and are used to provide competency restoration.

13:32:50  13       This is actually consistent with what the Legislature

13:32:54  14  also found is necessary to provide competency restoration.

13:33:00  15  When, two years -- two sessions ago, the Legislature determined

13:33:04  16  it was appropriate to begin to try jail-based competency

13:33:08  17  restoration, it didn't just say okay, jail, you can provide

13:33:11  18  jail-based competency restoration; it identified specific

13:33:15  19  criteria of what was necessary in order for a jail to provide

13:33:18  20  jail-based competency restoration.

13:33:21  21       And in slide 31, 32, and 33 of the PowerPoint are

13:33:26  22  the -- are the criteria that the Legislature said was needed in

13:33:31  23  order to provide competency restoration.  So it said that, in

13:33:36  24  order to do it, they had to operate in a designated space that

13:33:39  25  was separate --

13:33:40  1          Stay back on 31 for a minute.

13:33:42  2          Operate in a jail that has a designated space that is

13:33:46  3   separate from the space that is used for the general

13:33:48  4   population.  And this is consistent with Dr. Joel Dvoskin's

13:33:53  5   affidavit, which also said that in order for there to be

13:33:56  6   appropriate competency restoration, that it needed to take

13:33:59  7   place in a therapeutic and physically safe environment,

13:34:03  8   non-putative, and non-segregated environment.

13:34:07  9          The Legislature on the next slide, 32, went on to say

13:34:12 10   that they also needed to have a multidisciplinary team approach

13:34:16 11   that was directed towards the specific objective of restoring

13:34:20 12   competency to stand trial.  "Multidisciplinary team" doesn't

13:34:24 13   mean a psychiatrist prescribing a medication for one particular

13:34:28 14   illness, and that's it.  A multidisciplinary team approach is

13:34:35 15   psychiatrist, nursing, social worker.  It's a group of

13:34:37 16   professionals that help to provide what is necessary to ensure

13:34:41 17   that it is an individualized treatment to restore the person to

13:34:45 18   competency.  And, again, this was consistent with Dr. Dvoskin,

13:34:49 19   who also said it needed to be adequate psychiatric,

13:34:53 20   psychological, social work and nursing services, and

13:34:55 21   individualized treatment.

13:34:57 22          And, finally, the Legislature required on slide 33

13:35:01 23   that they -- that in order -- that the educational hours that

13:35:08 24   were necessary had to be consistent with what the state

13:35:12 25   hospitals already provided.  So the Legislature understood that

13:35:15 1 the state hospital did provide educational hours -- again, not

13:35:19 2 just medication, but educational hours, which could include

13:35:22 3 those mock courtroom hours -- and that those were also

13:35:24 4 necessary for competency restoration services. And, again,

13:35:28 5 Dr. Dvoskin, consistent with that, said it must include an

13:35:31 6 educational intervention.

13:35:33 7 And so, as we see from Defendant's own expert,

13:35:39 8 Plaintiffs' expert, as well as the Texas Legislature itself,

13:35:42 9 jail-based competency restoration is not medication alone. It

13:35:46 10 is a -- there are a lot of different components to that.

13:35:50 11 And, in fact, the Legislature, knowing that

13:35:52 12 medication was not sufficient alone, where it allowed for

13:35:56 13 court-ordered medication on slide 34, actually, specifically

13:36:03 14 said that, when you provide medication, it does not constitute

13:36:08 15 authorization to keep them in the facility for competency

13:36:13 16 restoration treatment.

13:36:14 17 So, again, Defendant's contention that medication

13:36:16 18 alone in the jail is sufficient for the purpose of competency

13:36:21 19 restoration is not accurate, and it also does not take into

13:36:25 20 account the dual purpose of the examination that is also

13:36:28 21 required.

13:36:29 22 I want to go to slide 13 and kind of go through this

13:36:35 23 wait list to kind of explain it a little bit more, these two

13:36:39 24 wait lists. There's a clearinghouse wait list and an MSU wait

13:36:43 25 list. The clearinghouse wait list is people who -- the law has

13:36:47  1  changed, but previously it was people who had a non-dangerous

13:36:51  2  crime.  And, if you had a non-dangerous crime, there are

13:36:55  3  twelve facilities across the state, state hospitals, that you

13:36:59  4  could go to.  And you could go to any one of those facilities.

13:37:02  5          If you were charged with a violent crime, then you

13:37:07  6  were considered manifestly dangerous, just the charge of the

13:37:14  7  crime, and you were placed on the MSU list, which only had you

13:37:16  8  go to two facilities in the state of Texas, Vernon State

13:37:19  9  Hospital -- actually, one facility plus one unit.  And Rusk

13:37:24  10  State Hospital has a single unit.

13:37:26  11          And so that's the way HHSC divides its lists.  The

13:37:31  12  clearinghouse list is only people -- currently, is only people

13:37:35  13  who are found incompetent to stand trial.  The MSU list

13:37:38  14  actually includes people who are incompetent to stand trial and

13:37:42  15  the few people who are found not guilty by reason of insanity,

13:37:46  16  because all people who are found not guilty by reason of

13:37:49  17  insanity, the only ones that go into a facility are the ones

13:37:53  18  charged with violent crimes.  They're also part of the MSU

13:37:56  19  list.

13:37:57  20          Plaintiffs' class combines those two lists and says

13:38:00  21  all people who are incompetent to stand trial.  So Plaintiffs'

13:38:03  22  class is a combination of those two lists.

13:38:06  23          Currently, the clearinghouse list, because there are

13:38:09  24  a lot of facilities, the average wait time on the clearinghouse

13:38:12  25  list is 49 days for people to get off that list.  For people to

13:38:16   1   get off of the MSU list the average wait time is 263.  As

13:38:22   2   Ms. Snead had previously indicated, some of the plaintiffs had

13:38:25   3   waited way over a year, but these are the average wait times.

13:38:29   4        With the new law that the defendant brought up pretty

13:38:33   5   quickly, the new law will now say:  It doesn't matter what your

13:38:37   6   crime is; you could go to any of the facilities.  And so all

13:38:42   7   that really means is that these two lists are going to -- there

13:38:48   8   are still going to be wait lists because there currently are

13:38:52   9   wait lists.  It's just that the divvying up of the average wait

13:38:54  10   time will change.

13:38:55  11        So now people who went to MSU could just go to the

13:38:58  12   clearinghouse list, but that means that that wait time is going

13:39:00  13   to increase and the MSU wait time might decrease.  But,

13:39:04  14   ultimately, we're going to end up somewhere in the middle, more

13:39:07  15   than likely.

13:39:08  16        THE COURT:  Well, do you think there will continue to

13:39:09  17   be two wait lists, or will it be merged in the one wait list?

13:39:13  18        MS. MITCHELL:  There will still be two wait lists

13:39:15  19   because MSU wait list is for -- it's still for people who

13:39:18  20   are -- that HHSC will determine might need a more secure

13:39:23  21   facility than the other state hospitals.  So there will still

13:39:27  22   be two wait lists.  But, right now, how that's going to turn

13:39:31  23   out is completely speculative.  That law just passed, and there

13:39:35  24   is no indication how it will change where we are at this point.

13:39:39  25        And then, so, the defendant also indicated that the

13:39:45  1  NGRI are prioritized over the incompetent to stand trial

13:39:50  2  individuals who are on the MSU wait list, which is great,

13:39:54  3  although they are still -- the NGRI are still remaining beyond

13:39:58  4  14 days.  But they never said that the -- even if they're

13:40:04  5  prioritized over the incompetent to stand trial, they never

13:40:07  6  argued that they still weren't going on a first-come,

13:40:09  7  first-served basis.  It's just that the NGRI go on a

13:40:12  8  first-come, first-served basis, and the IST go on a first-come,

13:40:16  9  first-served basis, which is the two classes that we have

13:40:18  10  proposed for this lawsuit.

13:40:24  11       Next I want to turn to the issue of habeas that the

13:40:30  12  defendant raised, and habeas really goes to the issue of

13:40:34  13  joinder.  You know, if everybody who ever had a claim could

13:40:40  14  bring a habeas action, you would have -- you know, currently

13:40:44  15  there's, what, 600 people on the wait list?  You would have 600

13:40:48  16  habeases across the state of Texas.  Big problem with that

13:40:51  17  because you could get varying decisions.  In fact,

13:40:54  18  Charlie Baird, an attorney here, recently filed a habeas for

13:40:57  19  one of his clients, and the court ruled that habeas means to

13:41:00  20  get somebody out.  And the individual didn't want to get out of

13:41:04  21  jail.  They wanted to get into the state hospital to start

13:41:07  22  receiving competency restoration services, so a habeas wasn't

13:41:10  23  the appropriate remedy to bring.

13:41:11  24       So, in fact, there are already courts that are saying

13:41:13  25  a habeas isn't appropriate.  There are probably other courts

13:41:16  1   that have said it is, but you're going to get a whole bunch of

13:41:19  2   different decisions across the state of Texas, which is why

13:41:22  3   joining everybody into a class action to have one decision that

13:41:25  4   provides one result is the best way to bring this -- resolve

13:41:29  5   this situation.

13:41:42  6          Next I want to talk about the joinder of the NGRI

13:41:47  7   class where the defendant alleged that, based on a similar

13:41:52  8   case, that the court had said they -- that the unnamed class

13:41:57  9   members were easily identifiable and so joinder was therefore

13:42:02 10   practical and numerosity wasn't satisfied.

13:42:04 11          I think, first of all, in that case there was a lot

13:42:07 12   less amount of people that were currently found not guilty by

13:42:11 13   reason of insanity, and few -- and the idea of future unknown

13:42:16 14   members was also going to be significantly less than what we

13:42:19 15   have here.

13:42:20 16          But the problem with that is that, although it's easy

13:42:23 17   for the State to identify who those unknown future people may

13:42:26 18   be, it's not going to be easy for anybody who wants to help

13:42:29 19   those future unknown people.  These are individuals who have

13:42:32 20   disabilities who are often -- who are in jail, who often are

13:42:36 21   isolated in 24-hour or 22 administrative segregation, so people

13:42:42 22   can't even get to them to know where they are, to talk to them,

13:42:44 23   to bring lawsuits on their behalf.  And so even though the

13:42:47 24   State may know who they are, the people who want to help them

13:42:51 25   would not know who they are.

13:42:56  1    And just a tidbit of information, and it's not --

13:42:58  2 it's new evidence, but they indicated that none of the

13:43:02  3 plaintiffs are adequate because they're not currently in jail,

13:43:06  4 and so they wouldn't have -- they wouldn't -- they're not

13:43:10  5 adequate because they're not there.

13:43:12  6    Actually, Plaintiff Jones is now back in jail.  So he

13:43:15  7 was found incompetent to stand trial; he went over to the state

13:43:19  8 hospital and received appropriate competency restoration

13:43:22  9 services and was found competent; got sent back to the jail

13:43:26 10 where he received the medications that the jail provides and

13:43:29 11 became incompetent again because medications are not sufficient

13:43:32 12 competency restoration services.  But he's now currently in

13:43:35 13 jail waiting to go back to the state hospital for competency

13:43:40 14 restoration treatment.

13:43:43 15    I also wanted to talk about the idea that HHSC should

13:43:48 16 be the one who comes up with how they want to fix this problem.

13:43:54 17 The issue with that is that this issue has been going on since

13:43:57 18 2006.  HHSC has known -- they started their wait list in 2006.

13:44:02 19 They've known it's been going on since 2006, and yet the wait

13:44:06 20 list has only increased.  So for the past -- they've had

13:44:10 21 13 years to try to fix this problem, and it has yet to be

13:44:12 22 fixed.  And, in fact, it's only gotten worse.

13:44:16 23    If we turn to slide 97, they talk about -- slide 97?

13:44:23 24 Yeah -- they talk about how they're getting new beds.  But,

13:44:28 25 yet, from 2016 to 2019, they actually eliminated 128 beds.

13:44:33  1    That's how they fixed the problem, by eliminating 128 beds.

13:44:38  2           They talk about how they're now looking at adding

13:44:41  3    additional beds, and in 2021 they're going to have all these

13:44:45  4    other new beds.  But, if we turn to slide 98, they actually

13:44:51  5    commissioned this CannonDesign consultant to come in to

13:44:54  6    determine what number of beds the State needed in order to

13:44:57  7    address the population that it has for state mental health

13:45:02  8    beds.

13:45:02  9           And in that report, which was in 2017, it determined

13:45:08  10   that it needed 1100 new beds and a 180 maximum security beds,

13:45:14  11   right?  With 1100 new beds, so from 2017 to now is five years

13:45:20  12   means they needed 500 new beds by 2021, which is when the

13:45:26  13   defendant is going to get all these new beds online.  But they

13:45:30  14   would have needed 500 beds.

13:45:31  15          But if we turn to slide 98 -- or 99, sorry -- Deputy

13:45:38  16   Commissioner Mike Maples specifically said that they aren't --

13:45:44  17   they're only going to have 350 beds, not 500 beds, and they

13:45:49  18   aren't going to have the 180 new maximum security beds that are

13:45:52  19   need.  So, although Defendant indicates they're going to get

13:45:55  20   all of these new beds, it's still not the number of beds that,

13:45:58  21   in 2017, a consultant that the Defendant brought in said they

13:46:02  22   needed.

13:46:09  23          And, lastly, I want to -- actually, going to the "any

13:46:16  24   kind of relief is going to hurt the civil population," one,

13:46:20  25   this is just speculative because twice now they've actually

```
13:46:23   1   reduced the wait list to 21 -- to less than 21 days, both when
13:46:30   2   Plaintiffs had brought lawsuits against them.  When that
13:46:32   3   happened, they didn't indicate that the civil beds rose.  In
13:46:36   4   fact, in their interrogatories they said that the way they
13:46:40   5   addressed it was by increasing new beds, by contracting with
13:46:45   6   private facilities for civil beds, and by increasing their
13:46:49   7   staffing so that a lot of their beds that were sitting on their
13:46:52   8   campuses empty because they didn't have staff to fill them they
13:46:55   9   used them so they could have staff fill those beds.
13:46:59  10           Additionally, civil -- people who are committed who
13:47:03  11   are on a civil commitment are in the community.  There's no
13:47:06  12   indication that they're being confined somewhere.  So their
13:47:10  13   harm is not the same, because they are already in the community
13:47:13  14   receiving services in the community.
13:47:22  15           I also want to address the standard of care raised by
13:47:29  16   the defendant where he suggested that the standard should be
13:47:31  17   the deliberate indifference standard.  Although I think it's
13:47:35  18   pretty clear from Hare v. City of Corinth, when you have a
13:47:43  19   conditions of confinement case that the -- that the standard is
13:47:47  20   rationally related to a legitimate government interest, whereas
13:47:50  21   when you have an episodic act case, that's when you use
13:47:54  22   deliberate indifference standard.
13:47:56  23           In this case we are looking at systemic conditions of
13:48:00  24   confinement case.  As Jackson suggests, it's about "reasonably
13:48:03  25   related to a legitimate government purpose."  That is the
```

13:48:06 1  standard in this case.  I don't think that the Court, it's even

13:48:10 2  necessary at this time to reach that, but, if it were, that

13:48:13 3  should be the standard.  But I did want to talk about, even if

13:48:18 4  it were a deliberate indifference standard --

13:48:21 5          THE COURT:  So *City of Corinth v. Hare* is the

13:48:23 6  standard you think the Court should apply if the court gets

13:48:26 7  there?

13:48:26 8          MS. MITCHELL:  Yes.  And *Hare* lists two standards.

13:48:29 9  It talks about the episodic acts and about a conditions case

13:48:32 10 and tells you which one applies.

13:48:34 11         THE COURT:  Okay.

13:48:35 12         MS. MITCHELL:  But, even if it were the deliberate

13:48:37 13 indifference standard, I think Plaintiff still meets that.

13:48:40 14 Under *M.D. v. Perry*, the court said that the deliberate

13:48:43 15 indifference standard is to show that there is systemic

13:48:47 16 deficiency that causes an unreasonable risk of harm and that

13:48:50 17 the defendants had actual or constructive knowledge of that

13:48:54 18 risk.

13:48:54 19         Well, when the defendant first came up here, his

13:48:56 20 first statement was HHSC knows that there is a problem.  So

13:49:00 21 they have actual knowledge.  They know there is a problem.

13:49:03 22 There is no -- nobody's contesting that they did not have

13:49:09 23 actual and constructive knowledge of this issue.

13:49:11 24         And there is a systemic deficiency, and they're aware

13:49:15 25 of that, too.  And that deficiency is causing harm to all of

13:49:19　1　the plaintiffs when they have to wait months, and potentially

13:49:22　2　years, in jail when they haven't been convicted of a crime or

13:49:26　3　when they've been acquitted of a crime and yet they still

13:49:29　4　remain day after day without any reason, because they're not

13:49:33　5　getting competency restoration or examination while they are

13:49:38　6　waiting in a jail.

13:49:39　7　　　　　And that is all I have unless you have any additional

13:49:42　8　questions, Your Honor.

13:49:42　9　　　　　THE COURT:  No.  I want to thank both sides for what

13:49:44　10　I think are extremely well-presented presentations.  And, of

13:49:50　11　course, where we are is we're not to the merits yet; we're

13:49:54　12　still deciding who is going to urge the merits.

13:49:58　13　　　　　I wish I could give you some good news and tell you

13:50:01　14　we'll have an opinion out tomorrow, but we won't.  As I

13:50:04　15　mentioned earlier, and I reiterate it -- and whenever you

13:50:07　16　appear in my court for probably the rest of my life, you're

13:50:11　17　going to hear me whine about this -- we are underwater in the

13:50:15　18　Austin Division of the Western District of Texas.  Don't ever

13:50:18　19　use "emergency" in my court because everything is an emergency.

13:50:21　20　We can't get to the emergencies timely.

13:50:25　21　　　　　But I think you've well presented this case.  It is

13:50:28　22　submitted, and we will work hard to get an opinion out on it as

13:50:32　23　quickly as possible.  So thank you again.  I mean it.  I

13:50:36　24　thought the presentations focused the Court right into what the

13:50:39　25　Court ought to look at.  I think you-all touched the topics

13:50:45  1   that the Fifth Circuit wanted touched.

13:50:48  2          We'll prepare an opinion, and then one of you

13:50:51  3   undoubtedly will want to go back to New Orleans with it.  So

13:50:54  4   we'll see how that works out at that point.

13:50:56  5          So at this time the court's in recess.  Thank you.

13:50:58  6        (End of transcript)

          7

          8

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1  **UNITED STATES DISTRICT COURT**        )

2  **WESTERN DISTRICT OF TEXAS**           )

3        I, Arlinda Rodriguez, Official Court Reporter, United

4  States District Court, Western District of Texas, do certify

5  that the foregoing is a correct transcript from the record of

6  proceedings in the above-entitled matter.

7        I certify that the transcript fees and format comply with

8  those prescribed by the Court and Judicial Conference of the

9  United States.

10       WITNESS MY OFFICIAL HAND this the 3rd day of

11  December 2019.

12

13                              /S/ Arlinda Rodriguez
                                Arlinda Rodriguez, Texas CSR 7753
14                              Expiration Date:  10/31/2021
                                Official Court Reporter
15                              United States District Court
                                Austin Division
16                              501 West 5th Street, Suite 4152
                                Austin, Texas 78701
17                              (512) 391-8791

18

19

20

21

22

23

24

25