**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| JOSEPH WARD, *by his Next Friend, Barbara Drumheller, et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>CECILE YOUNG, *in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission*,<br><br>Defendant. | AU:16-CV-00917-DAE<br><br>Austin, Texas<br><br>December 18, 2025 |

*******************************

BENCH TRIAL ON MERITS
VOLUME 3 OF 6 VOLUMES (AMENDED)
BEFORE THE HONORABLE JUDGE DAVID ALAN EZRA

*******************************

APPEARANCES:

For Plaintiffs:

Ms. Lisa A. Snead
Mr. Michael Singley
Mr. David Anthony James
Edwards Law
603 West 17th Street
Austin, Texas 78701
lisa@edwards-law.com
mike@edwards-law.com
david@edwards-law.com

- and-

Ms. Beth L. Mitchell
Mr. Peter Hofer
Disability Rights Texas
2222 West Braker Lane
Austin, Texas 78758
bmitchell@disabilityrightstx.org
phofer@disabilityrightstx.org

- and -

APPEARANCES (CONTINUED)

For Plaintiffs: Mr. Mike Gaddis
Mr. Kyle L. Dockendorf
Mr. Ryan Alexander Faulkner
Winston & Strawn LLP
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
mgaddis@winston.com
kdockendorf@winston.com
rfaulkner@winston.com

For Defendant: Ms. Kimberly Gdula
Mr. Ryan G. Kercher
Mr. William D. Wassdorf
Ms. Amy Snow Hilton
Office of the Attorney General of Texas
Post Office Box 12548
Capitol Station
Austin, Texas 78701
Kimberly.Gdula@oag.texas.gov
Ryan.Kercher@oag.texas.gov
Will.Wassdorf@oag.texas.gov
Amy.Hilton@oag.texas.gov

Court Reporter: Ms. April Balcombe, CSR, CRR, CRC
501 West 5th Street, Suite 4150
Austin, Texas 78701
(512) 391-8795
April_Balcombe@txwd.uscourts.gov

Also Present: Mr. Rudy Radic, Trial Technician for Plaintiffs

Mr. Nolan Oldham, Trial Technician for Defendant

09:09
09:09

Proceedings recorded by computerized stenography, transcript produced by computer.

09:09 VOLUME 3 (Amended)

09:09 Trial on Merits

09:09 December 18, 2025


| | Direct | Cross | V.Dire | PAGE | VOL. |
|---|---|---|---|---|---|
| Daniel Murrie, Ph.D. | Direct | Cross | V.Dire | | |
| By Mr. Kercher | 5 v3 | | | | |
| By Mr. James | 80 v3 | | | | |
| Jeffery Matthews, M.D. | Direct | Cross | V.Dire | | |
| By Ms. Gdula | 91 v3 | | | | |
| By Ms. Mitchell | | 134 v3 | | | |
| By Ms. Gdula | 159 v3 | | | | |
| Scott Schalchlin | Direct | Cross | V.Dire | | |
| By Ms. Gdula | 163 v3 | | | | |
| By Ms. Snead | | 212 v3 | | | |
| Reporter's Certificate .......................... | | | | 233 | 3 |


**ALPHABETICAL INDEX OF WITNESSES**


| | Direct | Cross | V.Dire |
|---|---|---|---|
| Matthews Jeffery, M.D. | 91 v3<br>159 v3 | 134 v3 | |
| Murrie Daniel, Ph.D. | 5 v3<br>80 v3 | | |
| Schalchlin Scott | 163 v3 | 212 v3 | |


**DEFENDANT EXHIBITS**


| | | | | |
|---|---|---|---|---|
| 137 | PowerPoint presentation that was shown to the Court during the direct examination of Dr. Murrie | 4 v3 | 5 v3 | Admitted |


* * * * *

09:09 P-R-O-C-E-E-D-I-N-G-S

09:09 DEPUTY CLERK: Court calls A-16-CV-1917, Ward et al. versus Young et al. for Bench Trial, Day 3.

09:09 MR. JAMES: And, Your Honor, before examination begins, I would just ask the Court to remind the folks in the gallery that the Rule is in effect.

09:09 THE COURT: Yes, I see the same people I think that I've seen every day. But in any event, anyone who is a prospective witness here with the exception of expert witnesses, please step outside.

09:10 MR. JAMES: Thank you.

09:10 THE COURT: All right.

09:10 MR. KERCHER: Your Honor, before I begin my examination, Defendant would offer Defendant Exhibit 137.

09:10 This was the PowerPoint presentation that was shown to the Court during the direct examination of Dr. Murrie. Under Rule 107(c), as the Court knows, where visual aids are used in court, they should, if practicable, be entered into the record, and so we offer 137.

09:10 *(Defendant's Exhibit 137 offered.)*

THE COURT: Any objection?

09:10 MR. JAMES: No objection.

09:10 THE COURT: All right. It'll be received.

09:10 *(Defendant's Exhibit 137 admitted.)*

09:10 MR. KERCHER: May I approach, Your Honor?

09:10 THE COURT: Sure.

09:10 **DANIEL MURRIE, Ph.D.,**

09:10 having been previously sworn, testified as follows:

09:10 **CROSS-EXAMINATION**

09:10 QUESTIONS BY MR. KERCHER:

09:10 Q Good morning, Dr. Murrie.

09:10 A Good morning.

09:10 Q My name is Ryan Kercher. I don't think we've met before this trial; is that right?

09:10 A I believe you're right, yes.

09:10 Q I've been looking forward to this conversation. My parents are psychologists, and my dad taught in the Criminal Justice Department at Sam Houston State, which happens to be where the Texas Prison System is.

09:11 A Yes. Yes, I've taught there as well and know the Kercher name.

09:11 Q Yeah. So I'm the least qualified in my family to be having this conversation today, but I've been looking forward to it.

09:11 I want to start today by talking about the first report that you were a part of in this case, the 2023 report, right?

09:11 A Sure.

09:11 Q And you've got two reports that we're going to be talking about, the 2023 report and the 2025 report, right?
09:11 A Right.
09:11 Q And so if I refer to them by year number, you'll know what I'm talking about?
09:11 A That works well. Thank you.
09:11 Q Let's talk about the 2023 report. That was put together by a group called Groundswell Services, right?
09:11 A Correct.
09:11 Q And that's a consulting group of which you are a contractor, true?
09:11 A It's a small -- it's a small group, yes.
09:11 Q And you've been working with that group for a little over 10 years at this point?
09:11 A Probably closer to 15 now.
09:11 Q Okay. But you're only one of several authors of that 2023 report, fair?
09:11 A One of four, correct.
09:11 Q You did not draft the entire thing?
09:12 A No, I did not write every word of that.
09:12 Q And as you sit here today, you cannot tell us with precision who drafted which portions of that 2023 report?
09:12 A No.

09:12 Q As with any co-authored document that's collaborative, it becomes really difficult to identify who -- who authored exactly which piece, correct.
09:12 A Uh-huh.
09:12 Q Additionally, the -- the four experts involved in drafting the 2023 report conducted a number of site visits in preparation for drafting that report, right?
09:12 A Correct.
09:12 Q You did not attend all of those site visits, true?
09:12 A Also correct.
09:12 Q You did not attend the Houston site visit, right?
09:12 A Right.
09:12 Q You did not attend the Lubbock or Vernon metro area site visit. Do I have that right?
09:12 A Also correct.
09:12 Q Okay. Let's talk a little bit about restoration services in Texas outside of HHSC.
09:12 A Sure.
09:12 Q Let's start by talking about what happens in a jail, for example. Okay?
09:13 A Sure.
09:13 Q One of your conclusions in this case is that Texas jails are not equipped to manage IST defendants for significant periods of time. Is that a fair summary?
09:13 A As a general rule, that's correct.

Q Well, what constitutes a "significant period of time" may vary from case to case or from jail to jail, true?
A To some degree.
Q For some it might be days, for others it could be months, depending upon the jail and depending on the case.
A I just want to clarify, when you say -- you're asking about the definition of "significant period of time" or --
Q As you have you used it in that context.
A Yes.
Q Yes. When you're talking about jails being unable to manage IST defendants for, in you words, "a significant period of time," that period of time can be from days to months, depending upon the jail facilities and the individual IST case, right?
A To some degree, yes. "Significant period of time" there means anything that starts to span beyond weeks.
But the exact degree to which a jail might be ill-equipped would certainly vary some on -- on that jail and that individual defendant.
Q On direct, you talked a little bit about basic mental healthcare services offered in jails; do you remember that?

09:14 A I do.
09:14 Q And you said, as I understood it, that that basic mental healthcare is not restoration care. Am I remembering that correctly?
09:14 A Correct, correct.
09:14 Q I think I understand the technical distinction that you're drawing, but I want to drill down on it a little bit and make sure.
09:14 There is some care -- some mental healthcare that is specifically designed for restoration, right?
09:14 A True.
09:14 Q It is also the case, though, that there are some IST patients who restore without getting that specifically tailored care, right?
09:15 A There is a small portion that do.
09:15 Q So we heard, for example, on the first day of trial from some of the Defense attorney witnesses that there is some portion of IST patients who restore on Court ordered medication, right?
09:15 A There is some small portion that do. Agreed.
09:15 Q So in your 2025 report, when you say "general psychiatric stabilization is not sufficient for competence restoration," that's maybe imprecise, right?
09:15 A No. That's a good succinct summary of what's true. You're -- you are pointing out exceptions that are

09:15 valid, but I -- I certainly wouldn't negate that
09:15 statement as a good summary.
09:15 Q But it's not a -- it is not a complete description
09:15 of the value of stabilization care and -- and basic
09:15 mental healthcare provided in the jail system, true?
09:15 A No. It's not meant to be a comprehensive
09:15 description of all of the value of those services.
09:16 Q And while we all agree that basic mental healthcare
09:16 in jails is not sufficient to resolve this restoration
09:16 problem, we also should not discount the fact that that
09:16 basic mental healthcare does some good, right?
09:16 A It certainly may. It certainly may. And it's
09:16 certainly better than none.
09:16 Q Let's talk now about JBCR programs. Now you and the
09:16 Groundswell crew all agree that JBCRs have their place,
09:16 right?
09:16 A We -- we do. We think that high quality JBCR may be
09:16 an appropriate part of a competent service system. Not
09:16 everyone's opinion, but --
09:16 Q And that's an important -- I'm sorry. I didn't mean
09:16 to cut you off.
09:16 A Yes. I want to make clear, that's not a universal
09:16 opinion. Some people see that as not viable. We would
09:16 say that done well, it -- it can be an appropriate part.
09:16 Q Yes. And your answer draws into relief two

09:16 distinctions that I want to make sure we're highlighting.
09:16 One, it's not enough to say there may be some kind of restoration services -- be it JBCR, be it private beds, be it a State hospital. What matters here is that we are talking about quality of care as well as quantity of care, true?
09:17 A Yes. We absolutely care about quality, not just quantity.
09:17 Q And the other thing that you pointed out -- and this is important too -- is that while you and the Groundswell crew are supportive of certain kinds of high quality JBCR programs, that is the subject of controversy within your field because there are certain -- there are certainly some experts who do not believe that restoration care should be attempted in jail.
09:17 A That's correct.
09:17 Q In fact, there are some states here in the United States that do not allow for JBCRs, true?
09:17 A Yes. They have not made that feasible. They don't seem to support them, yes.
09:17 Q And in Texas, as we've heard, there are at least some of those JBCR programs, right?
09:17 A There are some, yes.

09:17 Q And we agree that JBCR programs, while not right for everyone, could serve more people in Texas than they do, right?
09:18 A We think so. I think so.
09:18 Q But one of the barriers to JBCRs serving more people in Texas is that judges do not always take advantage of ordering patients into JBCRs, true?
09:18 A Under current arrangements, that's true, yes.
09:18 Q We agree that those judicial decisions are outside of HHSC control.
09:18 A As it is currently arranged in Texas, yeah. That may not be the only model. Other states do it different ways. It's not an insurmountable barrier, but it sounds like in the current model, it is necessary to have a judicial order to a JBCR.
09:18 Q When you say "in the current model," under present law, right, under the statute -- I'm not trying to make a lawyer out of you --
09:18 A Yeah.
09:18 Q -- but you understand that under the statutes of the State of Texas, that's how the law works right now?
09:18 A Right now, that's correct.
09:18 Q And I -- you know, I heard you talk about on direct a little bit about influence versus control that HHSC might exert over different stakeholders in the

09:19 restoration system, right?
09:19 A I did describe that, yes.
09:19 Q And you certainly want for HHSC to exert the
09:19 influence that it can exert on stakeholders outside of
09:19 its control, right?
09:19 A Certainly.
09:19 Q But you also agree that HHSC is doing good work in
09:19 judicial outreach and education, right?
09:19 A I think they are -- I think much of what they are
09:19 doing is good work. There is much to affirm. It may
09:19 not, at this point, have been sufficient to build the
09:19 capacity that's needed, but there's much to affirm.
09:19 Q Well, I mean, we all agree, right, that the waitlist
09:19 is long, and it needs to get shorter?
09:19 A Okay.
09:19 Q So we all agree that there is a problem that needs
09:19 to be addressed.
09:19 But my question is more specific than that. One of
09:19 the things that HHSC is doing to help address that
09:19 problem is judicial outreach and education, agree?
09:19 A I have seen some evidence of that, I do agree.
09:20 Q And when you were talking about this on direct, you
09:20 were saying -- one of the things you were saying is:
09:20 Well, HHSC can go to the judge and put together a
09:20 persuasive case and can exert influence that way, right?

A I may have said that about going to individual judges. I would also say that about going to the judiciary overall, going to lawmakers. Yeah, there's -- there's many levels of influence and incentivizing.
Q And while we agree that the restoration garden, if you will, requires the additional tending, HHSC is already involved in efforts like going to the judiciary, going to judges, and going to the Legislature, right?
A Well, they've started many good efforts, absolutely.
Q And we also agree that just because a party may put on their best case to a judge, they may not convince the judge to do the thing that they think is right?
A Yes.
Q Do you think we're going to win?
A Can you be more specific?
Q Do you -- well, I've got a series of lawyers here making our case to a judge. We're doing the best we can. Can you tell us --
THE COURT: You're asking the expert if he's going to -- if he thinks you're going to win this case?
MR. KERCHER: I'm asking whether he can predict what the Court will do, based on the efforts of the parties, yes.
THE COURT: That's an improper question.
MR. KERCHER: I'll withdraw it, Your Honor.

09:21 Q. (BY MR. KERCHER) Another barrier to JBCRs --
09:21 THE COURT: I don't know how he could answer that anyway, because I don't have an answer for it myself. I'm trying to listen to the evidence. I haven't heard all the evidence, and he hasn't, certainly, heard all of the evidence so how --
09:21 MR. KERCHER: And I think that's my point, Your Honor, is that exerting influence and doing the best we can in order to get judges to do the right thing doesn't guarantee that judges are going to do what we want for them to do.
09:21 I'll move on.
09:21 THE COURT: Okay.
09:21 Q. (BY MR. KERCHER) Another barrier to JBCRs is that some existing programs only serve limited populations with lesser charges, right, so that is going to limit the number of people a JBCR can help?
09:22 A True, uh-huh.
09:22 Q And there may be all kinds of reasons that a JBCR will have a limited number of -- of spots, a limited number of patients that they can help restore at a time, right?
09:22 A Of course, of course.
09:22 Q There may be policy differences at the local level about best ways to restore, right?

09:22 A Yeah, I'm not sure I track exactly what you mean there, but I -- I agree with the principle that there is always a limit to the amount of people the program can serve.
09:22 Q And, of course, there may be resource limitations at the county and the jail level about how many beds, how many staff they can put into a JBCR program, right?
09:22 A Yes, certainly. I want to be clear that JBCRs don't only require resources from the jails. Typically, they receive resources from the State Mental Health Authority that is tasked with restoration.
09:23 So when we talk about jails having limits, sure there's -- there's limits to space and size and things like that. There are certainly always bounds. But I -- I don't know if, as a general rule, it's accurate to place -- to emphasize so much of the limitations of a -- of a jail, because the resources for this, typically, come from a State mental health authority, an HHSC type agency.
09:23 Q Not exclusively, true?
09:23 A Any jail-based restoration is always some form of collaboration between the State and the jail. So, yeah, there are -- there are certainly limitations to what a jail can bring.
09:23 But the resources for JBCR aren't limited to

09:23 that jail. They're not contingent on the jail coming up
09:23 with those. They're, typically, supplied by the State
09:23 authority that's in charge of the restoration.
09:23 Q Well, when you say "typically," it may work that way
09:24 in other states, is what you're saying, true?
09:24 A Yes, I'm saying in the -- yes, that is -- that is
09:24 typical and normative that the agency responsible for
09:24 providing restoration services in the state is the one
09:24 that funds those restoration services, even in
09:24 jail-based settings and -- and certainly all places of
09:24 which I'm aware.
09:24 Q And you would agree that HHSC, as the State entity
09:24 in charge of restoration services, is supporting JBCR
09:24 programs in Texas, right?
09:24 A To some degree.
09:24 Q Your point is, you want more of that support, right?
09:24 A I don't know that my point is I want more. My point
09:24 is that is -- that is one way to increase capacity.
09:24 Q You don't have a specific recommendation for the
09:24 Court on how much more support of JBCR HHSC should
09:24 provide?
09:24 A Yeah. You'll probably never hear me identify a
09:24 particular dollar figure or number of beds on -- on a
09:25 question like that.
09:25 Q We agree HHSC already offers oversight and technical

09:25 assistance as well as funding to county level JBCRs, right?
09:25 A Oversight, assistance and some degree of funding, uh-huh.
09:25 Q In fact, your review of JBCR programs in Texas revealed no instance where HHSC failed to support county efforts to establish a JBCR, right?
09:25 A I think -- I think you're referring to a deposition question in which I was asked whether a jail ever came to HHSC, asking to start a jail-based restoration program, and HHSC rejected that offer, if I remember correctly.
09:25 And, of course, my answer is, no, I never saw any evidence of that kind of hypothetical happening.
09:26 Q And you heard testimony because you've sat through trial -- you heard Ms. Chacona say and Ms. Shearer testify that, for example, my home County of Travis had a working group of State and local stakeholders that considered implementing a JBCR program and, ultimately, recommended against adoption of a JBCR program here in a very populous county in Central Texas, right?
09:26 A Uh-huh. I heard that testimony as well, uh-huh.
09:26 Q That recommendation and the ultimate decision by the county not to implement a JBCR program was not HHSC's decision, true?

09:26 A Yes. Certainly, the decision of that workgroup was not from HHSC, as I understand it, uh-huh.
09:26 Q Let's shift gears a little bit and talk about OCR programs. Okay?
09:26 A Sure.
09:26 Q Texas was an early adopter of OCR programs, you agree?
09:27 A It was. It was in relatively early to permit and allow those, agreed.
09:27 Q And, again, you would like to see more OCR programs in Texas, right?
09:27 A Yes. I mean, I think this is less about what I would like to see and -- and more about discussing ways to increase capacity.
09:27 So you've -- you've certainly heard me mention throughout that that seems to be an underutilized resource, that there certainly could be more OCR capacity, more people who probably are a good fit for that.
09:27 Q Again, OCRs are largely operated not directly by HHSC but at the local level, right?
09:27 A Correct.
09:27 Q OCRs require a supportive local authority, like an LMHA, true?
09:27 A Yes. They require good local partners.

09:27 Q OCRs require a judge, again, to permit individuals, to order individuals into an OCR program, we agree.
09:27 A They do, they do.
09:27 Q HHSC, again, can encourage LMHAs and judges but does not control their decision-making.
09:28 A No. HHSC never orders an individual judge to do anything.
09:28 Q In fact, you spoke with a judge in Hopkins County who was aware of OCR programs and said he'd love to use them if they had one available, right?
09:28 A Correct. Correct.
09:28 Q So we know that judge, perhaps through HHSC outreach and education, was aware of OCR programs as a restoration option, right?
09:28 A He was aware.
09:28 Q But we also know that Hopkins County, for whatever reason, had not adopted a OCR program, correct?
09:28 A Yes.
09:28 Q And we also agree that we cannot pin Hopkins' County's failure to implement an OCR program on HHSC?
09:28 A Yeah. I don't -- I think you -- you drew a conclusion there that I think is, superficially, is true. Certainly, they weren't trying to start one and HHSC stopped one.
09:28 I wouldn't want to endorse the idea that HHSC

09:28 has no ability to incentivize, encourage, or facilitate that kind of program.

09:29 Q And -- and you've made a jump that may be equally superficial. Just because HHSC has the ability to influence and supervise doesn't mean that it was responsible for what Hopkins County, ultimately, decides to do, right?

09:29 A Oh, of course, yeah. You don't control any county. There is no doubt about that.

09:29 Q And you don't deny that HHSC is supportive of OCR programs, right?

09:29 A They are supportive in the sense that they have supported some, that they seem to think they're conceptually good. There are -- there are many ways in which they're supportive of OCR.

09:29 Q One of the ways HHSC is supportive of OCR, as we've described in the JBCR context, is judicial outreach and education, right?

09:29 A Yes. I've seen some evidence of that, certainly.

09:30 Q And we've heard you just now provide some praise for what HHSC is doing in the OCR context, but there is also this sort of underlying critique that HHSC could do more. Is that your view?

09:30 A So I -- I want to be -- yeah, let me -- let me be clear about this and take a moment to do so.

09:30 My primary point is not a critique that they could do more. But when I -- when I hear repeated emphasis on the -- on the limits on what they can't control, my response is that there's much that they -- and any agency -- any HHSC-like agency can do to incentivize, facilitate, collaborate on.

09:30 And so in a state the size of Texas with this number of defendants on the waitlist, I think there's -- I think there is plenty of room to expand there. I'm not so sure that's a critique. It's just a statement of fact. There are many, many, more people who could be served by OCR.

09:31 Q Well, again, there's a jump. There's a difference between there being more that HHSC could do right now than it is doing and there being more people who could be served, right?

09:31 A Yes. But those two things are very -- very related.

09:31 Q They absolutely are connected?

09:31 A Yes, sir.

09:31 Q But you're not here offering the Court any specific additional rules or efforts that HHSC should undertake regarding its support of OCR. You're just suggesting OCR could help more people?

09:31 A Yeah. My role here isn't to give very granular suggestions about starting OCR in particular places. My

09:31 question is more about overall capacity. And OCR tends
09:32 to be a way that states can most easily and efficiently
09:32 increase capacity.
09:32 Q So it sounds like we agree on step one which is:
09:32 OCR can be helpful in increasing capacity for
09:32 restoration, right?
09:32 A Fully agreed.
09:32 Q But as the Plaintiffs' sole testifying expert, you
09:32 have no opinions on what specifically HHSC can and
09:32 should do to expand OCR capacity?
09:32 Do I have that right?
09:32 A No.
09:32 Q You have repeatedly refused to give, as you say,
09:32 "granular opinions" about what specifically HHSC should
09:32 be doing regarding OCR.
09:32 A Correct. That's not the -- the question I've been
09:32 asked. That's not a question I was asked to address in
09:32 reports. You're welcome to ask that now if you'd like.
09:32 Q Well, I'm -- I'm addressing what you've told us so
09:32 far in your two reports, right? And there is no list in
09:33 either one of the two reports that you've submitted in
09:33 this case that says: Here are the things that HHSC
09:33 should do to increase OCR capacity in Texas.
09:33 A There is no list. There is a description and an
09:33 emphasis on ways that states can do that. HHSC included

09:33 can do that. And, you know, funding is certainly a large part of that. I mean, that's an easy, obvious answer that there -- more funding --
09:33 Q Well, let's look at that. "Funding is an easy, obvious answer." How much?
09:33 A Well, I think it depends on how much they want, like how many programs they want.
09:33 Q Well, if they want to reduce the list, how much?
09:33 A You know, I think -- there's not a particular dollar amount that answers your question because it depends on the exact number of people they want to serve, where they want to serve them, who they want to serve them with.
09:34 Q How many people should they want to serve through OCR programs?
09:34 A Well, I think they would determine that by a careful analysis of people that are eligible for those programs.
09:34 Q Is it your testimony that HHSC is not trying to make those determinations right now?
09:34 A I haven't seen any analysis of them describing that.
09:34 Q But you have seen efforts undertaken to support OCR programs, true?
09:34 A To some degree.
09:34 Q It's not as if HHSC is simply stagnant in the OCR space. They are undertaking efforts to develop OCR in

09:34 Texas, true?
09:34 A Well, I mean, they're stagnant in the sense that the
09:34 numbers don't seem to be growing, as you saw in my
09:34 recent report. So I think -- I think there is, in a
09:34 sense, in which it is stagnant, so --
09:34 Q I want to make sure I understand that part of your
09:34 answer.
09:34 A If I may -- if I may finish.
09:34 MR. JAMES: Objection. I ask that the witness
09:34 not be interrupted.
09:34 THE COURT: Yes. Let him finish his answer.
09:35 A I think you've equated "stagnant" with "not trying,"
09:35 and I don't think at any point anywhere I have accused
09:35 HHSC of not trying. But when you introduce the word
09:35 "stagnant" I would say, as I saw in my last report, that
09:35 the -- the number of OCR programs and people served
09:35 tends to be fairly stagnant.
09:35 Q. (BY MR. KERCHER) Well, and I don't want to beat a
09:35 dead horse, but I am a lawyer.
09:35 So it sounds like we agree: HHSC is working to
09:35 expand OCR capacity.
09:35 Do we -- do I have that part right?
09:35 A I believe they have made efforts, and I -- I trust
09:35 they continue to make efforts there.
09:35 Q And the opinion that you're here to offer the Court

09:35 is that, in order for those efforts to be more
09:35 successful, HHSC should invest some untold number of
09:35 additional dollars into OCR; is that right?
09:35 A I think that is one part of expanding OCRs is
09:36 investing more funding. There's no doubt about that.
09:36 Q So we've talked about jails. We've talked about
09:36 JBCRs. We've talked about OCRs. There are some other
09:36 kinds of programs that I want to walk through just
09:36 briefly.
09:36 A Sure.
09:36 Q There are also diversion programs that can help with
09:36 mental health -- with defendants experiencing mental
09:36 health challenges, true?
09:36 A True.
09:36 Q And you -- you believe in diversion programs;
09:36 they're great, right?
09:36 A High quality ones are -- are great ideas. They're
09:36 good for systems to adopt, certainly supportive of good
09:36 ones.
09:36 Q And they may not technically be a part of competency
09:36 restoration, but they can help sort of on the front end
09:36 in terms of how many people get funneled into the
09:36 competency cycle, if you will, right?
09:36 A Exactly, well said.
09:36 Q And it's important when we are evaluating this sort

09:36 of demand outstripping supply that we address how the
09:36 demand is created at the front end, how many people are
09:37 getting funneled into the restoration process, right?
09:37 A I fully agree. Fully agree.
09:37 Q Several counties offer programs -- diversion
09:37 programs in Texas, right?
09:37 A Correct, uh-huh.
09:37 Q You'd like to see more diversion programs?
09:37 A Again, it's not so much what I would like to see.
09:37 That's probably a good strategy.
09:37 Q Is it right to say that you would agree that you --
09:37 that it would be better to have more counties with
09:37 diversion programs and more diversion programs in
09:37 counties?
09:37 A Yeah. I think that's -- that's generally true.
09:37 That's likely to be a helpful part of addressing the
09:37 waitlist.
09:37 Q Another important way to address the inflow of
09:37 patients into competency restoration might be crisis --
09:37 mental health crisis centers, right?
09:37 A Correct. Much like diversion, that has some -- that
09:37 is likely to have some indirect and helpful impact.
09:37 Q You visited the South Texas Regional Advisory
09:38 Council, or STRAC, as part of your site visits to
09:38 San Antonio and Corpus Christi, right?

09:38 A I did. I did.
09:38 Q And this visit was, I think you -- as you previously put it, more tangential in that this health -- this mental health crisis center is not an HHSC function, right?
09:38 A Agreed. Agreed. Correct, uh-huh.
09:38 Q But as part of your assignment, you -- you needed to evaluate competency restoration in Texas, and so you were certainly interested in other aspects of the State system that would bear on competency services; is that fair?
09:38 A All true.
09:38 Q Because looking at pieces of the competency restoration system in isolation is less useful to figure out how to resolve competency than a holistic approach. Do you agree with me on that?
09:38 A Yes. Resolving this issue requires a holistic approach.
09:39 Q And the way a -- a mental health crisis center like STRAC can bear on the Texas competency restoration in a meaningful way is that it can deflect mental health patients before they make contact with the criminal justice system, right?
09:39 A Exactly.
09:39 Q So, in other words, you know, you maybe heard my

09:39 example to Ms. Shearer, where you've got Mom and Dad, and their child is having some sort of mental health break, a mental health crisis center may be an opportunity to call somebody other than the police, other than law enforcement, to help deal with what is at that point a mental health problem rather than a criminal problem.

09:39 A Fully agreed. Fully agreed, uh-huh.

09:39 Q And the program that you saw in STRAC struck you as unique, at least in its scope, is that right?

09:39 A Yeah. Yeah, I had a -- we had very positive reactions to that.

09:39 Q That's an example of ways that the Texas competency system and its tangents are innovating to meet this challenge. Would you agree with me?

09:40 A Yes. I don't -- I mean to be clear, STRAC wasn't developed as an innovation to improve the competent system, as your question seemed to imply, but it's a great resource. It's impressive.

09:40 MR. KERCHER: Nolan, could we please bring up Plaintiffs' Exhibit 10?

09:40 *(Mr. Oldham complies.)*

09:40 MR. KERCHER: And if we could go to Page 25, please.

09:40 *(Mr. Oldham complies.)*

MR. KERCHER: Is that? Thank you. And if we could go to --
Q. (BY MR. KERCHER) Doctor, you recognize the "State Courts Leading Change" exhibit that you looked at on direct examination, right?
A I do. I do.
MR. KERCHER: Let's go to Page 25, Nolan.
*(Mr. Oldham complies.)*
MR. KERCHER: Thank you, sir. And if you could enlarge the recommendation section there in the center.
*(Mr. Oldham complies.)*
Q. (BY MR. KERCHER) Do you recall looking at Page 25, the "Recommendation" section of Plaintiffs Exhibit 10 on direct examination?
A I do.
Q And you went through some of this with my friend on the other side, right?
A I did.
Q This recommendation is addressed to courts and communities, true?
A True. True.
MR. KERCHER: All right, thank you, Nolan.
Q. (BY MR. KERCHER) Dr. Murrie, let's switch gears again and talk a little bit about the Intercept model.

Okay?
A Okay. Sure.
Q Tell me if I'm getting this right. Intercept happens before subjects enter the criminal justice system; is that true?
A Yeah. So I -- just for context, I think you're talking about the sequential Intercept model, this sort of map of various places in the sort of community-to-incarceration process in which stakeholders can intervene, right? You're talking about that series of steps?
Q (Nodding head.)
A Okay. Just for context, so you're asking a question about Intercept 0, that initial point where the person is in the community.
Q And that's before the person has contact with the criminal justice system, right?
A Correct. Correct.
Q So this is community-based care that we're talking about with Intercept 0; is that true?
A Intercept 0 is the community. So community-based care is one -- one thing that can happen at Intercept 0, that's right.
Q And HHSC, as with the other facets or stakeholders in restoration care that we've described, will have some

09:43 influence on the context of Intercept 0, but not
09:43 control, agree?
09:43 A Sure. They don't control everything that happens in
09:43 a community. No doubt about that.
09:43 Q Intercept one is sort of the initial contact with
09:43 law enforcement with the criminal justice system, right?
09:43 A Right.
09:43 Q So in the example of Mom and Dad have a child with
09:43 a -- having a mental health break, the child may be
09:43 seeing a psychiatrist or on medication for mental health
09:43 challenges. That might be Intercept 0. Intercept 1 is
09:44 maybe where Mom and Dad have to call the police and say,
09:44 My child is having a mental health break, and I need
09:44 help.
09:44 Do I have that right?
09:44 A Yes, that might be an example. If you have a visual
09:44 you'd like to show, I'm happy to follow along there,
09:44 but...
09:44 Q You have not been asked to opine on whether HHSC is
09:44 exerting enough influence in Intercept 0, true?
09:44 A That certainly was not a specific question I was
09:44 given, no.
09:44 Q You have not been asked to opine on whether HHSC is
09:44 exerting enough influence in Intercept 1, true?
09:44 A That was not a specific question either.

09:44 Q Intercept two is more or less where a patient gets to court, right?
09:44 A I believe so.
09:44 Q And we talked about HHSC outreach and education for judges, right?
09:44 A We did, uh-huh.
09:44 Q But here again, HHSC can exercise influence but not control in the Intercept 2 space, true?
09:45 A Yeah. Influence, incentives, resources, even personnel in some states. But do they have control? Of course not.
09:45 Q And you have not been asked to opine whether HHSC is exerting enough influence on the Intercept 2 space, correct?
09:45 A Correct. That, again, was not a specific referral question; although, you know, as you point out, many of these are relevant to the competent service system.
09:45 Q Of course, you're not here to offer a legal opinion on the limits of HHSC's authority or -- in the -- or control in the judicial space?
09:45 A I'm certainly not, no.
09:45 Q Intercept 3 is the competency evaluation, right?
09:45 A Correct.
09:45 Q And in Texas, HHSC does not conduct the competency evaluation?

09:46 A As currently arranged, that is true.
09:46 Q When you say "as currently arranged," you mean: Under the existing legal framework as you understand it, HHSC does not conduct the competency evaluation?
09:46 A Correct. Under current laws and procedures, that is true.
09:46 Q Intercept 4, finally, is where HHSC exerts not just influence but control, right?
09:46 A Yes, I believe so.
09:46 Q Intercept 4 is where the patient is now in the custody of HHSC for restoration services.
09:46 Do I have that right?
09:46 A Yeah. When we're speaking about Intercept 4 for people who have been found incompetent, yes. Yes. And I believe that's -- that's the -- the premise of your question, right?
09:46 Q And while you have concerns about the quantity -- the availability of the restoration care from HHSC, you do not have criticisms of the quality of HHSC restoration care, except that not enough people have access to it, right?
09:47 A I think you've oversimplified my -- my positions a bit. So if -- if I may, I think I have been asked repeatedly about the quality of care in the hospital restoration programs and have repeatedly conveyed my --

09:47 my -- my impression that it's -- it's good. You know, as best we can tell, it is good quality restoration care.

09:47 As we move outside to the hospital, to other restoration sites -- jail based, OCR -- I think the picture varies much more. I think quality is -- is -- varies widely across those programs, as best we can tell. And I think that's -- that's evident in many ways.

09:47 And so it's probably an oversimplification to say I have no concerns about the quality of restoration services. I think it's more accurate to say that I saw the hospital restoration services, specifically, as -- as generally of good quality. I believe that's been my writing and testimony throughout.

09:48 Q So it sounds like what you're saying is that you have no criticisms of the quality of restoration care that HHSC controls, but you have concern about the quality of restoration care where HHSC only exerts influence?

09:48 A So HHSC is responsible for restoration.

09:48 Q I'm going to ask for a "yes" or "no" to my question before we get to an explanation.

09:48 Is it fair to say -- so that we're clear, is it fair to say that you do not have criticisms of the

09:48 restoration -- of the quality of restoration services in HHSC's control, but only of the quality of restoration services over which HHSC exerts influence?

09:49 A So I don't -- I don't think I can be accurate with a yes-or-no answer there because I -- I think you -- your premise is not making sense to me, and I'd be happy to kind of go back and forth and --

09:49 Q That's fine.

09:49 THE COURT: I think we may be drifting away from what this case is really about. The Plaintiffs have really not made a direct attack on the quality of services. This case is about the timing of services.

09:49 It is whether your clients are placing people in the appropriate state-mandated facilities within an appropriate time. This case is not about the quality of services being provided once they get there. That's another case.

09:49 MR. KERCHER: I agree, Your Honor, that the Plaintiffs are making a particular argument about timing. Part of the problem and part of our defense and part of the record that we'll need to make in this trial is that if we only think about timing, and we do not also consider quality, and we do not also consider the availability of care outside of HHSC's control, then we will not be able to seriously address the timing issue.

09:50 THE COURT: Well, you know, that is a circuitous argument. Do you know why? Because each patient is different. The quality of care on any particular day is going to be -- I don't know any court can answer that question, quite frankly.

09:50 MR. KERCHER: Agreed.

09:50 THE COURT: Unless -- unless the care was so abhorrent, and I had that in a case I handled in Hawaii involving their mental health services.

09:50 I ended up having to appoint a special master, and it took several years, but we finally did get the place -- and by the way, all of the staff at the hospital agreed with my ruling because they themselves were appalled by what was going on there.

09:51 But the question here is: Does the State want to put the resources out to put together greater numbers of beds so that all people who are mandated under State law, as well as the Constitution, to be treated are treated, not -- you know, you could say, well, we only have one facility here, and we're providing the Cadillac of care to these people and, therefore, we can't handle anybody else, so everybody else has to stay in jail for years?

09:51 MR. KERCHER: Except, Your Honor, while that is a very good recitation of Plaintiffs' argument, that

09:51 is not the entirety of the case.

09:51 THE COURT: No, that is not a recitation of Plaintiffs' argument, sir. I beg to differ with you. That is their -- that is -- that is the end result of the argument you're trying to make.

09:52 The argument you're trying to make to me is: We provide such fabulous care to these people that we cannot take more people in because we provide such fabulous care.

09:52 MR. KERCHER: No. That's not our argument, Your Honor.

09:52 THE COURT: Well, I -- then what are you doing asking him these questions?

09:52 MR. KERCHER: Because you cannot change the capacity without affecting the quality, at least without sufficient time. And what the expert has opined is that right now the --

09:52 THE COURT: Well --

09:52 MR. KERCHER: What the expert has opined is that this is a very complicated system that has a number of stakeholders and that any change you make to one piece will affect another piece.

09:52 And in order to address, in order to ensure not just more care but more quality care, which is something this witness has emphasized, we have to look

09:53 not just at timing but at the availability of resources.
09:53 If this were simply a question of throwing
09:53 more money at the problem, then this problem would have
09:53 been resolved because even this expert will acknowledge
09:53 that HHSC has repeatedly been to the Legislature and is
09:53 already working to get more money, more funding, more
09:53 beds, better salaries for staff.
09:53 THE COURT: Okay. I wouldn't disagree with
09:53 anything that you have just said, except that doesn't
09:53 answer the problem. The problem is that under -- and
09:53 I'm not prejudging the case. I haven't really heard all
09:53 of the evidence yet.
09:53 But if you want to go to the Plaintiffs'
09:53 argument, now, I'll state the Plaintiffs' argument is:
09:53 That HHSC has a duty and responsibility under both State
09:53 law and the Constitution -- and this goes for all
09:53 agencies that are involved in the process -- all Texas
09:53 State agencies who play a role in this, which means the
09:54 prison system, the jail system, all of those agencies
09:54 play a role in it -- have an obligation to within, even
09:54 under your interpretation of the rule and the law, place
09:54 people who have been determined to not -- should not be
09:54 in jail but should be in some sort of restorative
09:54 service, in that service within a reasonable period of
09:54 time.

09:54 And you can't answer that question by throwing up your hands and saying: Well, we're doing the best job we can with what we have, because we want to provide excellent care.

09:54 I -- this -- this witness has testified -- and I think his testimony on this -- in this regard is quite credible -- that the State of Texas is doing a pretty darn good job with the people they do get.

09:54 The problem is they haven't been given all the resources. By your own argument, they keep going to the State Legislature, asking for more resources because they can't do their job.

09:55 MR. KERCHER: Part of the problem, Your Honor --

09:55 THE COURT: Listen to that -- just a minute. Stop for one second.

09:55 Why are they going to the State Legislature if they don't have a shortage of beds, if they don't have a shortage of resources, if they are just thrilled to death with all of the resources they have? They're not going to go to the State Legislature, as you said, repeatedly asking for more resources.

09:55 MR. KERCHER: We agree that there's a scarcity of resources, and that's why supply is out -- does not meet the demand. But as the Court points out, if what

09:55 we want to do is shorten the amount of time on the
09:55 waitlist, an important part of answering that question
09:55 is how do we do it?
09:55 THE COURT: You know --
09:55 MR. KERCHER: And whether HHSC is meeting its
09:55 constitutional obligations in order to make progress on
09:55 that, and I understood one of the Court's questions to
09:56 Mr. Gdula during opening statements to be that the Court
09:56 wanted to hear information about how to make the list
09:56 shorter, how to make the wait times go down.
09:56 In order to do that, we have to not only
09:56 talk about, in broad strokes, how much money that might
09:56 take, we also have to talk about how to do that in a way
09:56 that continues the quality of care.
09:56 THE COURT: Okay. I would hope -- I would
09:56 hope that neither the Plaintiff, nor the Defendants in
09:56 this case, believe that the way to shorten the time is
09:56 to provide substandard care or -- and/or rush people in
09:56 and out of treatment. I don't think that's the
09:56 Plaintiffs' argument. I don't think it's the
09:56 Defendant's argument, unless I'm mistaken. But your
09:56 argument --
09:56 MR. KERCHER: It may not be a Plaintiffs'
09:56 argument. It may be the danger of the relief they are
09:56 seeking.

09:56 THE COURT: They're seeking an injunction to
09:56 compel that services be made available, which means --
09:56 quite frankly, to be honest with you, if the State -- if
09:57 HHSC and the State agencies -- the Executive department
09:57 of the State, not the Legislature, but the Executive
09:57 department of the State under Governor Abbott -- if they
09:57 want to see that happen, then they should be thrilled
09:57 with this lawsuit. They should want the Court to enter
09:57 an injunction which compels more resources to be put
09:57 toward the process.
09:57 MR. KERCHER: I hope the Court will listen to
09:57 all of the evidence before making that decision.
09:57 THE COURT: You know, I don't know quite what
09:57 to say to that. That was about as good a statement to
09:57 make to me as asking the witness to make a ruling on how
09:57 I should rule. I've been a Federal Judge for 37 years.
09:58 I have handled these cases all of that time, on and off.
09:58 I never make a decision without listening to
09:58 all of the evidence. I made that statement earlier.
09:58 But when you make an argument to me that this case is --
09:58 hinges -- what you're saying to me is:
09:58 Judge, you know what, we're trying our best,
09:58 we don't have all of the resources we need. We know the
09:58 Constitution requires -- and I would hope you would
09:58 agree with this -- that people who are found to need by

09:58 the Courts restorative services are entitled to get those restorative services, but you should deny the injunction because we don't have the resources to do it.

09:58 Is that what you're arguing to me? "Yes" or "no"? You wanted a yes-or-no answer. I'm asking you, "yes" or "no"? Is that what you're asking me to do?

09:59 MR. KERCHER: It is not.

09:59 THE COURT: Okay. Then what I'm saying is you need to focus your argument. Okay? That's what I'm saying. And insulting the Court doesn't help. You're lucky that in all of my years as a lawyer and a judge, I never take things personally.

09:59 You're an advocate. I understand that. I am not in any way, shape, or form unhappy with you. But if it was another judge and you made the statement you made, it wouldn't go well.

09:59 If Judge Sam Sparks was sitting here, you would have not been standing where you're standing to continue your argument.

09:59 MR. KERCHER: Your Honor, Judge Sam Sparks swore me into the Western District 18 years ago, and when he did, he told everyone there that sometimes being a zealous advocate means saying things that are uncomfortable. In fact, he said --

10:00 THE COURT: Accusing --

10:00 MR. KERCHER: -- he was held in contempt four times.

10:00 THE COURT: -- the Court -- accusing the Court in a nonjury trial of not listening to all the evidence and making up their mind is not what I would call appropriate zealous advocacy. What it is is very counterproductive.

10:00 I will tell you again, I have no intentions of taking that against you personally or against your client, because I don't do that. I've been a lawyer for 55 years. That's longer than most of the people in this courtroom that have been alive.

10:00 I understand what the rules are. I understand my role. If anybody -- you know, the Austin Bar didn't give me their Lifetime Achievement Award for being fair and genuine because I'm known for being a hothead from the bench and taking things out on lawyers. I don't do that. I never have, and I won't in this case. But you need to temper what you say.

10:01 Listen, have you ever watched an argument before the Fifth Circuit?

10:01 MR. KERCHER: I have.

10:01 THE COURT: Have you ever seen Judge Jones?

10:01 MR. KERCHER: I have.

10:01 THE COURT: Okay. She -- she's -- can be

10:01 pretty sharp. She's a brilliant judge, and I have great respect for her, but I wouldn't make this kind of argument in front of her.

10:01 MR. KERCHER: Do I -- I want to make sure I understand --

10:01 THE COURT: Why don't you continue -- why don't you continue on with your examination. We'll just move past this. Okay?

10:01 MR. KERCHER: Understood.

10:01 Q. (BY MR. KERCHER) We agree, Dr. Murrie, that the supply-versus-demand issue for competency restoration services is a nationwide problem, right?

10:02 A It is common in many states.

10:02 Q In fact, it's been described as a crisis across the country, true?

10:02 A Certainly true.

10:02 Q Can we agree that, for example, COVID had an outsized effect on competency restoration supply across the country, right?

10:02 A Correct.

10:02 Q You were talking a moment ago about how you would like to see more -- or how you believe that more OCR programs in the state would help increase capacity, right?

10:02 A Yes. That's certainly one of many ways to increase

10:02 capacity for restoration.
10:02 Q We heard from Ms. Shearer and from Ms. Chacona that, in their experience, in Travis County the OCR program did not have much of an effect in the waitlist.
10:02 Did you hear that testimony?
10:02 A Yes. I think that was their impression there, and I think that makes sense probably statewide, given the -- given the numbers.
10:02 Q But that doesn't mean that we should do less in the OCR space or that counties should be disincentivized from adopting OCR programs, right?
10:03 A Of course. Of course.
10:03 Q In fact, you'd like to see OCR programs adopted as the default for in -- competency restoration?
10:03 A To some degree, yes. There are states that identify outpatient as the default place and inpatient reserved only when necessary, and that's -- that's a really reasonable strategy.
10:03 Q To your knowledge, though, the Texas Legislature has not shifted to an OCR as default policy, true?
10:03 A True. True. That is not law at present, uh-huh.
10:03 Q Let's move to Intercept 5 now. That's discharge from competency restoration, right?
10:03 A Correct, yes.
10:03 Q And the discharge decision in Texas is not made by

HHSC, right?
A HHSC hospitals certainly determine whether somebody is clinically ready for discharge. I -- I think you're -- it sounds like you're referring to the judicial decision that somebody has been restored and that the restoration is complete?
Q Right. The clinical decision that HHSC might make is not determinative of whether the patient remains in their care, true?
A It's -- it's not the final legal determination.
Q Again, we're talking about influence versus control, aren't we?
A Yeah. I don't -- I don't think that dichotomy works as -- as well in a lot of these discussions. But I will -- I agree with you, of course, that HHSC does not make the final legal determination about whether someone is restored.
Q Is it right to say that HHSC does not control the number of patients coming into their care or when the patient can exit their care?
A They do not fully control every aspect of that, yes.
Q Let's talk, specifically, about how to reduce wait times for IST defendants in Texas.
A Sure.
Q You have not been asked to opine on what relief the

10:05 Court should order if it finds in the Plaintiffs' favor, true?
10:05 A True, true.
10:05 Q You opined on direct that there was no clinical reason justifying the duration of Texas competency waitlist, right?
10:06 A True. There's certainly no clinical reason or justification for that.
10:06 Q And clinical reasons are important because these IST defendants are human beings, right, they're not just numbers?
10:06 A Certainly true.
10:06 Q And we are trying to evaluate how best to serve these individual human beings' needs?
10:06 A I hope so, yes.
10:06 Q But our desire to best serve the interests of those individual human beings can't ignore the external factors, the administrative challenges, the economic challenges that maybe bear on their well-being, right?
10:06 A Other factors are -- are involved here. I'm not sure if I agree with the statement with the way you've -- you've phrased it.
10:06 Q Well, so for example, there may be important administrative reasons that calls a wait to grow longer, right?

10:06 A There can be many reasons that cause a wait to grow longer.
10:07 Q And some of those might be administrative?
10:07 A They can be anything. Reason -- I'll say "reason," I don't know that I'm saying good reason. I want to be clear. I'm saying, there are all sorts of things happen. I'm not agreeing they're necessarily good reasons, if that's the implication.
10:07 Q And I don't mean to suggest that all reasons are good reasons. I do mean to suggest, though, that simply because it is not a clinical reason doesn't mean it is a bad reason.
10:07 A We've talked some about there being legitimate logistical needs, such as transportation. Those, I think, are relevant here, sure.
10:07 Q So I want to make sure we put a bow on that: Legitimate, logistical needs are relevant in evaluating the reasonableness of the waitlist?
10:08 A Well, I'm saying this with respect to timeline, really. I mean, this is why no state has a -- almost no state has a zero-day timeline -- is because there is a concession that there's -- some logistics are necessary to move somebody into restoration. That's -- that's the -- I think that's the only point I made with respect to logistics.

10:08 Q So perhaps it was a more concrete example we talked about, the way that COVID had increased wait times for restoration services across the country, right?
10:08 A Yes.
10:08 Q There are many reasons for that, but one of them was there was a reduction of workforce in the restoration space, right?
10:08 A That was certainly true.
10:08 Q The fact that restoration services across the country suddenly have fewer staff didn't change the best clinical decision about how to treat a patient, but it might have had logistical effects on how to treat -- on how the patient was treated?
10:08 A It was a -- it was a tremendous challenge and barrier, yes.
10:08 Q You acknowledge that wait times between your 2023 report and your 2025 report decreased, right?
10:09 A You're talking about wait times on the Texas waitlist?
10:09 Q Yes.
10:09 A Yes, yes.
10:09 Q That doesn't mean the problem is solved, obviously?
10:09 A Right, right.
10:09 Q But it is a positive development, you agree?
10:09 A Absolutely, absolutely.

10:09 Q HHSC in that regard is trending in the right direction?
10:09 A HHSC in a particular window of time was trending in the right direction.
10:09 MR. KERCHER: Nolan, could we please bring up Plaintiffs' Exhibit Number 9.
10:09 *(Mr. Oldham complies.)*
10:09 Q. (BY MR. KERCHER) You recognize your 2025 report, right?
10:09 A I do.
10:09 MR. KERCHER: Nolan, can we please go to Page 7?
10:09 *(Mr. Oldham complies.)*
10:10 MR. KERCHER: And if you can please enlarge that chart there in the middle.
10:10 *(Mr. Oldham complies.)*
10:10 Q. (BY MR. KERCHER) All right. Dr. Murrie, can you see that chart from your 2025 report?
10:10 A I can. I appreciate the zoom.
10:10 Q According to your 2025 report, there's been a reduction of better than 15 percent in both the wait time and number of patients on the Texas non-MSU waitlist. Do you agree with that?
10:10 A In -- in the window of time reported here, yes.
10:10 Q And according to your 2025 report, there's been a

10:10 reduction of some 50 percent of both the wait time and number of patients on the MSU waitlist, right?
10:10 A That is true in this window of time.
10:10 Q You described those changes as "significant net changes," right?
10:10 A I did. I did.
10:10 Q But on the next page --
10:10 MR. KERCHER: Nolan, if we can go to Page 8.
10:11 *(Mr. Oldham complies.)*
10:11 Q. (BY MR. KERCHER) You suggest that the meaningful reduction is "the result of a one-time increase in capacity," right?
10:11 A That certainly seemed to be the main driver of that decrease, was the increase in capacity that occurred in that time, particularly in that -- that first window of time we see there.
10:11 MR. KERCHER: Nolan, if you can blow up the second paragraph there.
10:11 *(Mr. Oldham complies.)*
10:11 Q. (BY MR. KERCHER) As a result of that increase that you're crediting for -- the increase in capacity that you're crediting for the reduction in wait times, you're suggesting that we can't rely on those decreases in the last two years as being predictive of the next few years, right?

A Yes. There's no reason to believe they will continue at the same rate, because, as best we can tell, beds are not coming online at the same rate.
Q The one-time increase that you're describing there was an increase of about 150 beds.
A No. I think I -- I think it was much more. I -- I would refer to my other chart in this report if -- if you'd like to talk specifics about that.
Q You'd agree with me that HHSC is, right now, building 450 beds worth of capacity to come online by 2027?
A My understanding is that they are building beds. It is hard for me to know the exact number based on -- on what's been reported. I -- I think the estimate, as best we can tell, is somewhere in that range. I want to be real careful about endorsing specifics, though, just because there has been ambiguous and conflicting information.
MR. KERCHER: Nolan, can we please go to Page 10, and blow up the chart on Page 10?
*(Mr. Oldham complies.)*
Q. (BY MR. KERCHER) Dr. Murrie, this is data provided in your 2025 report about the number of beds coming online from HHSC between now and 2029, correct?
A This was a good-faith effort to document the -- the

10:13 discovery related to construction, yes.
10:13 Q And based on your good-faith effort, you calculate 538 beds coming online by 2029.
10:13 A Yes, 538 promised. I think there are -- there are some ways this -- this table could -- the true number, I think, could vary quite a bit, basically, is what I'm trying to say, based on some discrepancies on the information provided, timelines that change, and so forth.
10:14 Q So the Court should or should not rely on the 538 beds that were the result of your good-faith effort?
10:14 A As an estimate. I think it's -- I think it's a good-faith estimate. I'm not going to try to defend 538 versus 539, but I think that is a good-faith general estimate, based on what the State has provided.
10:14 Q It's your view that increasing beds is a necessary part of any solution to reducing the waitlist, true?
10:14 A Here in Texas, that is -- that is true, yes.
10:14 Q You do not provide an opinion to the Court on the number of beds HHSC would need to bring online?
10:14 A No, I'm not giving a specific number because that certainly varies on -- based on what other restoration sites are -- are being used and are coming online. So any -- any estimate has to be some sort of package. But you certainly -- certainly need enough capacity that the

10:15 inflow is not so greatly outpacing the outflow.
10:15 Q So if asked, How many more beds does HHSC need to reduce the wait time, your answer is: You don't know?
10:15 A My answer is: It depends.
10:15 Q Is it correct to say that you cannot give a number?
10:15 A It's correct to say that HHSC hasn't provided the information that would allow any of us to give an exact number.
10:15 Q Then there's no way for you to derive that number yourself?
10:15 A You'll see some efforts here to anticipate what is coming. The exact number, as I said, will depend on the combination of efforts.
10:16 Q You have -- when talking about trying to derive how many beds -- trying to figure out how many beds we should calculate HHSC will need to meaningfully reduce wait times in Texas, that it's kind of a complex algebra problem, right?
10:16 A It's certainly a complex algebra problem, right.
10:16 Q And it's -- you're going to have to weigh factors like: What is the current capacity, right?
10:16 A Yes.
10:16 Q Utilization rates, right?
10:16 A Correct.
10:16 Q You'll also have to consider average length of

10:16 stays?
10:16 A Also true.
10:16 Q You'll also have to consider rate of referrals,
10:16 right?
10:16 A True.
10:16 Q So you have to have a meaningful and ongoing
10:16 understanding of how many people are coming into the
10:16 system and how many people are leaving the system and
10:16 how fast all of that is happening, right?
10:16 A That's exactly what HHSC needs, yes.
10:16 Q And, of course, all of those things may change from
10:16 month to month, year to year?
10:16 A Yes, they do. This is a dynamic system. They
10:16 change. It requires really close monitoring, and that's
10:16 really the only way for states to stay on top of their
10:17 need, is that kind of close monitoring.
10:17 Q Additional factors that you'd have to weigh in order
10:17 to figure out how many more beds, if we were going to
10:17 build our way out of this problem, would be things like
10:17 the number of short-term patients who turn into
10:17 long-term patients, right?
10:17 A It's one factor, sure.
10:17 Q And in some sense, restoration beds can silt up in
10:17 terms of their availability because not everybody who
10:17 comes into the system leaves the system, right?

10:17 A True, true.
10:17 Q Another factor that HHSC or you or whoever was trying to do this algebra problem, would be adding beds -- how adding beds might incentivize other actors and stakeholders in the space, right?
10:17 A True.
10:17 Q If folks out there suddenly learn that there are 1,000 new beds online, local law enforcement might -- might be more willing to just throw people into the criminal justice system, rather than referring folks to crisis centers, right?
10:17 A Yeah. I mean, I don't know that I'm endorsing that particular hypothetical. But you're right that this is a complex problem, and there can be unintentional incentives.
10:18 Q We don't want to accidentally disincentivize counties from implementing JBCR and OCR programs?
10:18 A No. You want HHSC to encourage, facilitate, help that to happen.
10:18 Q Well, you want HHSC to encourage it, but you also don't want to disincentivize it through taking other action, right?
10:18 A Yes, both are true.
10:18 Q Neither you nor the other folks at Groundswell undertook to solve that algebra problem for this case,

10:18 true?
10:18 A That's true, yeah. We just -- to do that, we would
10:18 need info from HHSC that's not available, info that I --
10:18 I do hope or suspect they track, but that wouldn't be
10:19 available to answer that precisely.
10:19 And, of course, the referral question here was
10:19 never: Give us an exact number of beds. It was a
10:19 question about how adequate the services are, and it's
10:19 clear there's a significant shortfall even if -- even if
10:19 we can't identify a particular number of beds as part of
10:19 that analysis.
10:19 Q And, of course, building beds is not the only way to
10:19 increase capacity. You can contract with third parties,
10:19 right?
10:19 A Exactly, yes. We've said so throughout.
10:19 Q And contracting with third parties required not just
10:19 finding third-party beds, but ensuring those beds are
10:19 also providing quality care.
10:19 A True, true.
10:19 Q Would you believe me if I told you -- or maybe
10:19 you've learned this in your -- your research for this
10:19 case -- that contract costs something like 5 or 6 times
10:19 what State beds cost?
10:19 A Yes. It can be an expensive proposition.
10:20 Q And, of course, HHSC, even if it wants to go out and

10:20 contract with more beds, doesn't -- it can't build
10:20 third-party beds, right, it does not control the supply
10:20 of third-party beds?
10:20 A Correct.
10:20 Q And HHSC cannot force third parties to contract with
10:20 them, right?
10:20 A No, there, too, they incentivize. They pay well.
10:20 They can do all sorts of things that make that more
10:20 likely. But, yeah, I don't -- I don't think there's any
10:20 forcing.
10:20 Q And I don't want to turn you into a technocrat, but
10:20 you understand that when you're dealing with the State
10:20 you have procurement and allocation procedures and that
10:20 even the idea of contracting for more beds takes not
10:20 just more money, but it takes time?
10:20 A Yes. I mean, just to respond generally to this line
10:20 of questioning, of course, this is complicated. Of
10:20 course it is hard. I will -- I will never say anything
10:20 other than that. And to the extent that I've said there
10:20 are many, many options to HHSC, I've never claimed this
10:21 is simple or easy.
10:21 This problem is always challenging. It always
10:21 takes time. States never do this immediately. I don't
10:21 think I or anybody has an expectation that any of this
10:21 could happen immediately. So, yeah, just to sort of

10:21 preemptively address this line of question: There is no dispute from me that this is expensive and complicated.

10:21 Q We agree, don't we, that beds alone are probably not the answer to reduce wait times in Texas?

10:21 A No. It -- it takes a broad strategy, of which beds are a key part. But, again, I've never argued that beds alone are the answer.

10:21 Q Let's talk about some of the other components that are going to be important. Because, of course, just having space for patients is not sufficient. You have to have the right kind of people who are going to care for them, right?

10:21 A Absolutely.

10:21 Q And so we're talking about staffing, true?

10:21 A True. True.

10:21 Q For example, HHSC right now has beds it cannot fill with patients because it doesn't have sufficient staff.

10:22 A True. That's my understanding, yes.

10:22 Q And you probably know that the operation of those beds costs more than constructing the beds, right?

10:22 A I think it depends on how -- yeah, I think that's a generality that probably gets pretty technical, and I think it depends on how you define and operationalize that.

10:22 Q I mean, the fact that there are beds online -- there

10:22 are beds that are empty because of a staffing problem indicates that there is a delta. There is some difference between just having the number of beds and having care, right?
10:22 A Oh, of course, yes.
10:22 Q And, of course, that care component, the staffing component, costs money, right?
10:22 A Of course.
10:22 Q So if we're only looking at the number of beds, it's kind of like that Cosby Show episode where he's talking to Theo about money and he says: You haven't eaten yet. You can build the beds, but you still have to pay for the staff. Right?
10:22 A Yes, absolutely.
10:23 Q My Cosby Show references are falling quieter and quieter as time goes on.
10:23 A As time goes on.
10:23 Q You say in your 2025 report that staffing shortages are presumably due to low salaries.
10:23 A I do say that, yeah. And by that I mean, salaries that weren't sufficient to attract staff to that particular role in that particular place.
10:23 MR. KERCHER: Nolan, if we could go to Page 11, please.
10:23 *(Mr. Oldham complies.)*

10:23 MR. KERCHER: And if we could bring up the second-to-last paragraph.
10:23 *(Mr. Oldham complies.)*
10:23 Q. (BY MR. KERCHER) This is where you say "presumably due to noncompetitive salaries," correct?
10:23 A I'm sorry. Just give me a moment to read.
10:23 Yes.
10:24 Q. (BY MR. KERCHER) Your parenthetical notation that difficulty in meeting staffing needs is presumably due to noncompetitive salaries, then provides a footnote, right?
10:24 A Yes, though, I cannot read that.
10:24 Q Let's pull that up. I wouldn't ask you to squint at that.
10:24 MR. KERCHER: Nolan, can we please bring up Footnote 13.
10:24 *(Mr. Oldham complies.)*
10:24 Q. (BY MR. KERCHER) So this is your --
10:24 MR. KERCHER: That's 12. Can we see 13, sorry.
10:24 *(Mr. Oldham complies.)*
10:24 MR. KERCHER: You see that okay, Dr. Murrie?
10:24 THE WITNESS: Yes.
10:24 MR. KERCHER: Excuse me.
10:24 Q. (BY MR. KERCHER) Your citation for your presumption

10:24 about noncompetitive salaries only points to data about the number of beds offline due to staffing. It doesn't point to salary data, true?
10:25 A True.
10:25 Q You don't know what the salaries are for these kinds of staff?
10:25 A I certainly could not tell you that right now, no.
10:25 Q And this is sort of on the nose for me because I have to deal with filling State positions and salaries and that sort of thing.
10:25 You don't tell the Court where to find information about what these salaries are and how they compare to private sector salaries, correct?
10:25 A Correct. I haven't provided that in the report, no.
10:25 Q You don't refer to the State salary schedule, right?
10:25 A No.
10:25 Q You don't refer to the State job descriptions to explain to the Court what kinds of staff we're talking about here, right?
10:25 A No. I certainly don't attempt that for all the staff that would be involved in those beds.
10:25 Q And you don't have an opinion as to what the HHSC staff salaries should be, right?
10:25 A No. I'm certainly not prescribing particular salaries for any of your staff.

10:26 Q In fact, you don't even have a ballpark estimate for what those salaries should be?
10:26 A I'm not attempting any estimate of what anyone's salary should be, no.
10:26 Q This presumption that staffing is a function of noncompetitive salaries sort of suggests that HHSC could fix this problem if it would just throw more money at staffing, right?
10:26 A It suggests that HHSC might be more successful in staffing the needed positions with greater compensation. It suggests that because that's a -- a general principle that has held true in many similar situations in other State hospitals and other places.
10:26 Q But in fairness, you're not an economist. You haven't undertaken a labor market analysis to determine the availability of staffing, even assuming the salaries were up to snuff?
10:27 A I -- correct. I'm not an economist. We're agreed on that.
10:27 Q And so you provide zero analysis of mental health workforce shortages in the state of Texas, true?
10:27 A True, true. Yeah, other than to -- to concede that there may be some. But, yes, certainly I have not attempted that.
10:27 Q You do acknowledge, though, that HHSC has been

successful in raising salaries for its staff, right?
A I do. I do.
Q You -- you characterize that as HHSC addressing that barrier, right?
A Yeah. That certainly shows an effort to address that barrier. I think it also is further support for the presumption I made, that some of the staffing challenges were related to compensation.
Q You have not compared HHSC salaries to their counterparts in other states for this case, right?
A No. There is no specific analysis there, no.
Q But your analysis did show that HHSC salary increases were a good effort and a good step. Do you agree with that?
A I do. I do.
Q You agree with me that Texas does not have a myopic view of inpatient capacity, right?
A Yeah. I believe you're quoting something. I'd -- I'd welcome you to share more there.
Q Well, do we agree that expanding inpatient capacity would be just one part of what it would take to reduce wait times for IST defendants in the state?
A It is one strategy. It's a strategy that, as we looked at earlier, HHSC has shown works, you know -- or certainly works up to the point.

10:28 So, yeah, it is one strategy, and I -- I sure would never recommend that to the -- as the sole or only strategy.

10:29 Q I'm sorry if I'm jumping around here. We were talking about contracting for third-party beds.

10:29 You don't offer a specific number of third-party beds that you think HHSC should contract for; is that true?

10:29 A True. The answer there, too, is it depends, right? The specific numbers for any one strategy depend on the numbers for other strategies.

10:30 Q We've talked a little bit about this -- this challenge of the waitlist having something to do with how many patients are being referred into the competency cycle, right?

10:30 A Right.

10:30 Q And some of that has to do with the fact that referrals into the competency restoration cycle are going up?

10:30 A Yeah. The court orders for restoration are increasing over the years.

10:30 Q And you don't have an opinion as to why that's happening?

10:30 A No. There's probably many reasons. That's common in most or all places with which I'm familiar, and the

10:30 consensus is there's probably many reasons for that.
10:31 Q Yeah. There are a number of theories about why that's happening all over the place, right?
10:31 A Uh-huh, correct.
10:31 Q And you did not, as a part of your work in this case, try to determine how to reduce commitment orders in Texas, right?
10:31 A Correct. That wasn't a specific referral question.
10:31 Q So I want to talk a little bit about -- a little bit more, I should say, about timing.
10:31 A Sure.
10:31 Q There's sort of two timing questions that we're talking about in this case. First is, obviously, how long IST defendants are waiting to get services, right?
10:31 A Right.
10:31 Q And the second timing question is about how long it should take HHSC to reduce that wait time to whatever the reasonable number we ultimately decide is, right?
10:31 A Right. I'm tracking, yes, uh-huh.
10:32 Q We agree that getting to a place where we are shortening the wait times for IST defendants will not be instantaneous, right?
10:32 A Right.
10:32 Q In fact, I think you walked through some other examples from other states. You talked about Oregon,

10:32 for example. They have a hard deadline in terms of how
10:32 long it should take for an IST defendant to get into the
10:32 State restoration services there, right?
10:32 A Oregon was one example we discussed, yes.
10:32 Q And Oregon is now meeting that deadline as you
10:32 understand it, or do you know?
10:32 A No. I mean, to get into the nitty gritty of that
10:32 example, Oregon was for a year, and then sort of exceeds
10:32 it a bit now. So I think they're -- they ran something
10:32 like 10 to 18 days this year in -- in the face of a
10:33 seven-day timeline.
10:33 Q And that -- that shortfall or that overtime, if you
10:33 will, comes 22 years after the Court initially
10:33 instituted a deadline in that -- excuse me, in that
10:33 Oregon case, right?
10:33 A Yes. That particular figure -- I'm not doing the
10:33 math as quickly as you've done it -- but that particular
10:33 figure comes many years after that litigation began.
10:33 Q And to take another example, California. California
10:33 had a very long waitlist. It had lots and lots of
10:33 people on it, right?
10:33 A Right.
10:33 Q They had -- I think by a consent decree, right, they
10:33 instituted a deadline, right?
10:33 A I -- it may have been a judicial order. I'm not

10:33 sure what it is. I would have to refresh of whether it is a consent decree or not.
10:33 Q There has also been, though, since the institution of that deadline, legislative action in California, right?
10:34 A There's been a lot of legislation in California. Do you have more specifics in mind?
10:34 Q Yeah. Let me ask you a better question.
10:34 There has, in the time since the Court-ordered deadline for the waitlist in California --
10:34 A Yes.
10:34 Q -- there has been legislative action to help reduce the wait time?
10:34 A There's been a good bit of legislation related to competence in California, yes.
10:34 Q And California is, I think you said, now meeting its deadline, right?
10:34 A Yes. They're -- the 2021 ruling prescribed a 28-day deadline, and they are now admitting within 5 days.
10:34 Q And that's some three years after the institution of that deadline, true?
10:34 A Yes, uh-huh.
10:34 Q And we have talked about the number of beds anticipated to be available, simply by construction in

10:34 Texas within the next two years, right?
10:34 A We've -- we've referenced some that'll be there in
10:35 2027, or promised to be there in 2027, some up to 2029
10:35 was the figure I used in my report.
10:35 Q And while your reports talks about what other states
10:35 have done in terms of instituting mandatory cutoffs or
10:35 mandatory maximum wait time, it does not address what
10:35 happens, if anything, to the quality of care upon the
10:35 institution of those wait times?
10:35 A No. My report didn't address that. I would be
10:35 happy to discuss that, if you'd like.
10:35 Q If we'd had the opportunity for me to question you
10:35 about it before, that might have been useful, but you
10:35 haven't put that information in your report, true?
10:35 A That's true. That was -- that was not in there, no.
10:35 Q One of your opinions in this case is that you're not
10:36 optimistic about rapid improvement in the wait times on
10:36 the Texas waitlist without a substantial increase in
10:36 capacity; is that fair?
10:36 A Yes. That's a fair summary, uh-huh.
10:36 Q Building beds, we agree, takes time, right?
10:36 A Right.
10:36 Q Hiring staff takes time?
10:36 A Some time, sure.
10:36 Q Contracting for additional beds takes time?

A Sure.
Q None of these changes, in fairness, happen quickly; we agree on that?
A They each take varying degrees of time. Yeah, some strategies have an impact more quickly than others.
Q We agree that HHSC is making progress in the meantime, even if we maybe disagree about how much progress, fair?
A They're making -- they've made great efforts. We've seen the fruit of some of those efforts. I -- I'm not sure it's -- I want to be careful about how I say "making progress." They are -- they are doing good work.
I don't know that the waitlist is decreasing at this moment. I want to be -- I want to be careful how I operationalize progress, but they've certainly made many -- many good efforts.
Q Another statement that you make in your report -- and we can pull up the page if you want to see it -- but that, as best you can tell, HHSC has not explicitly articulated a time necessary to complete satisfactory reduction in the waitlist.
Is that a fair summary?
A Yes. I have not seen any such analysis or projection or estimate from HHSC.

Q And -- and I don't want to make a lawyer out of you again, but you understand Plaintiffs have the burden of proof in this case, right?
A I do, yes.
Q You suggest that historical data from 2013 to 2016 suggests that, with adequate bedding, Texas can meet wait times similar to those adopted in other states?
A Are you referencing the testimony yesterday about the --
Q Well, you certainly talked about it yesterday. It's also on Page 24 of your 2025 report, if you'd like to see it?
A Yes, if you can bring that up, it's helpful to me.
MR. KERCHER: Nolan, can we please go to Page 24 and bring up the next full paragraph?
*(Mr. Oldham complies.)*
A Thank you. I appreciate that.
Yeah, so in the context of talking about how long the logistics might require from a restoration order to admission, yes, I mentioned the period when they were complete --
I'm sorry. The screen just changed as I was reading.
Yes, I mentioned that that period historically when they were at 19 days, 19 days, 21 days, and then a

10:39 bit more.
10:39 Q. (BY MR. KERCHER) But we agree, don't we, that 2013 to 2016 was before what has repeatedly been described as a competency restoration crisis in this country, right?
10:39 A It's certainly before that. I don't know that that means the logistics of moving somebody from jail to hospital have -- have changed. If anything, you have more restoration settings now than you did then, and so I'm not sure that that --
10:39 Q Well, but having more -- sorry.
10:39 A I'm not sure that that would change the logistics. So -- so as relevant to this particular discussion, I certainly agree this is -- this is a decade later. I'm just not sure I see the relevance for this particular paragraph.
10:39 Q Well, I want to make sure that we don't oversimplify what you're saying here, because I'm worried that somebody might read this conclusion in your report and take away that you think that we can simply -- if we just build enough beds, then we can solve this problem.
10:40 That's not your conclusion in this case, is it?
10:40 A That's not -- no. That sort of statement is not what I've conveyed in any report, nor do I think this statement necessarily conveys that.

10:40 Q And in terms of whether or not the logistics have changed, from 2013 to 2025, I guess my point is, we are talking about a growing number of Court-ordered referrals of restoration patients into the restoration system that was not present in 2013, right?
10:40 A Yeah. The volume of orders is --
10:40 MR. JAMES: Sorry. I was too slow to stand up.
10:40 I think that that fact is not in evidence, so objection.
10:40 THE COURT: Sustained.
10:40 Q. (BY MR. KERCHER) Dr. Murrie, do you agree -- let me ask you this: We talked earlier about the growing number of Court-ordered referrals into the restoration system in Texas in 2025, right?
10:41 A Yes.
10:41 Q That growth is higher now -- tell me if I'm wrong -- is higher now than it was in 2013; do you know?
10:41 A The volume of orders is much higher.
10:41 Q And so that volume of orders will change the logistics of how those orders are addressed by the system, right?
10:41 A No.
10:41 Q We don't need to change -- make any changes in capacity in order to address the higher demand now?

10:41 A You do need to make changes in capacity, but that's not the question you just asked me.
10:41 Q Well, I guess what I'm asking is: The ratio between available services and demand for those services in 2013 is not the same as the ratio between the demand and the supply in 2025?
10:41 A I haven't calculated that ratio. You began this with a discussion of logistics, which I want to make clear are a different issue. When we're talking about that 28-day timeline and the logistics necessary to effectuate the movement, that is a different issue.
10:42 And so it -- in your -- sort of changing questions there, I'm struggling to keep up. I'd be happy to try to answer or clarify further.
10:42 Q Your 2025 report discusses four factors related to improving competency restoration in Texas, increasing forensics beds versus civil beds.
10:42 Do you agree with that?
10:42 A Not as you framed it. If I may, the -- I think when you say "four factors," you mention there are -- you're suggesting that I reported that there are maybe four strategies that are sort of simpler places to start or places that HHSC may have started already.
10:43 Is that the discussion you're referencing?
10:43 Q Let me -- let me try to frame the issue differently.

10:43 One factor you identify that HHSC could, in your view, address or address better to reduce wait times in Texas is increasing the ratio of forensics versus civil beds or changing that ratio.
10:43 A No. I don't -- I don't think I said that at all.
10:43 Q Okay.
10:43 A I think I know what you're trying to refer to, but your description is certainly not what I conveyed.
10:43 Q There is some -- one of the challenges to increasing restoration progress in Texas is that there is some tension between the availability of beds because some of them are civil commitment beds and some of them are forensic beds; is that fair?
10:44 A That's -- yeah, that's true in Texas, as in other places.
10:44 Q And that would be a factor that will have to be taken into consideration as Texas attempts to address the availability of restoration care, true?
10:44 A Sure. Sure.
10:44 Q You also described -- and we talked about this generally, but just to kind of give you a framework of what I'm talking about now -- higher staff salaries or staff salaries will be a factor to consider as we try to increase restoration capacity in Texas, true?
10:44 A I'm sure those will be relevant as you -- as you

10:44 work on this.
10:44 Q And, likewise, increased contracting with third parties and expanded JBCR facilities, right?
10:44 A Yes. Those are all potential strategies I identified, yes.
10:44 Q And we agree that HHSC is already doing something in all of these spaces, at least, to some degree?
10:44 A Yes. To some degree, certainly.
10:44 Q And you -- in fact, you referred to HHSC's ongoing work in these spaces as, quote, efforts of good leadership, right?
10:44 A Yes. There's -- there's many ways in which I have been impressed with -- with the leadership and their understanding of this as a broad, complex problem that requires multiple strategies. Fully agree there.
10:45 Q And you have no desire to give specific numbers or figures or percentages for any element of the Texas competency restoration project?
10:45 A No. I think, again, you've mischaracterized what I've said.
10:45 Q Has that always been your testimony?
10:45 A Pardon?
10:45 Q Has that always been your testimony?
10:45 A Has what always been my testimony? Have you --
10:45 Q Let's refresh your recollection.

10:45 MR. KERCHER: Nolan, could you please show -- not publish -- but can you please show Dr. Murrie his 2025 deposition, Page 40, Line 7 through 23.

10:45 *(Mr. Oldham complies.)*

10:46 Q. (BY MR. KERCHER) Dr. Murrie, can you see Lines 7 through 23 and you're on Page 40 of your 2025 deposition?

10:46 A Yes.

10:46 Q Take a moment to review those quietly, and let me know when you have.

10:46 A I have, yeah.

10:46 Q You have no desire to give specific numbers or figures or percentages for any element of the Texas competency restoration project?

10:46 A Yes, I think once again you've -- you have -- you have phrased things differently on your discussion.

10:46 Here is what I'm saying. I --

10:46 Q My question is: That's your testimony, true?

10:46 MR. JAMES: Excuse me, Your Honor, I'd like the witness to be able to finish his answer.

10:46 THE COURT: No, you can ask him a question on redirect.

10:46 Q. (BY MR. KERCHER) We talked about a number of different stakeholders and the competency restoration --

10:47 A Did you -- did you want me to answer that?

10:47 Q You've answered the question, sir.
10:47 We've talked about a number of different stakeholders in the competency restoration system in Texas. We agree that those stakeholders and the roles that they play are all interconnected, right?
10:47 A Yes.
10:47 Q JBCRs, OCRs, deflection programs, diversion programs, HHSC's care, right?
10:47 A Yes.
10:47 Q And all of those will have a role to play in reducing wait times, do you agree with that?
10:47 A Of course.
10:47 MR. KERCHER: Pass the witness.
10:47 THE COURT: Okay. We'll take our morning recess at this time.
10:47 You can step down and use the restroom if you need to --
10:47 THE WITNESS: Thank you.
10:47 THE COURT: -- and get a refreshment.
10:47 I want to see you and you in my chambers now.
10:47 *(Recess taken at 10:47 a.m.)*
10:54 *(Open court, commencing at 11:17 a.m.)*
11:16 THE COURT: Please be seated.
11:17 All right. The courtroom is full now,

Counsel. We can proceed.

**REDIRECT EXAMINATION**

QUESTIONS BY MR. JAMES:

Q Good morning, Dr. Murrie.

A Good morning.

MR. JAMES: I'd like to publish Page 40 of Dr. Murrie's deposition that was previously shown to the witness, Mr. Radic.

*(Mr. Radic complies.)*

Can you please show me lines 20 through 24.

*(Mr. Radic complies.)*

Q. (BY MR. JAMES) Dr. Murrie, you were asked in your deposition:

"QUESTION: There are many things that you believe can be done together to address the problem, and you cannot say what any one of those pieces should look like; is that accurate?"

What was your answer?

A My answer at that time was: "No, I disagree with that statement as phrased."

I think what I can say is that I'm not in a position and have no desire to give specific numbers or figures or percentages for any element because all of these are interconnected, right?

And the amount of one -- the amount of one

11:18 portion to grow is to some degree contingent on the other strategies that HHSC is adopting.
11:18 Q I want to turn to another topic of the cross-examination. In your opinion, is the current number of people on HHSC's waitlist for competency restoration services explained solely because of the impact of the COVID pandemic?
11:18 A No, no. At this point, certainly not.
11:18 Q Why not?
11:18 A Well, many years have passed. There has been opportunity for intervention and change since then. COVID had a big impact everywhere. There is no doubt about that. There are ways in which states still struggle with that.
11:19 But, of course, at this stage, COVID is not the sole cause of any list.
11:19 Q Have any other states been able to recover from a backlog in their waitlist for competency restoration services after the COVID pandemic?
11:19 A They have. You know, again, that -- that California example we've referenced so much, that timeline was actually imposed in 2021. Orders peaked at 6,000 in -- in 2023 but -- but have recovered, and essentially have a minimal waitlist and a 5-day wait.
11:19 Q And I want to turn to another topic on the creation

11:20 of a -- a new JBCR program in Texas. In your review of this case, what has HHSC's role generally been in that process?

11:20 A What has their role been in creating a new JBCR?

11:20 Q Correct.

11:20 A I think, you know, as best I can tell, they certainly do collaborate. They certainly do work together with that site. They have provided funding in most cases for that.

11:20 Q Do you know whether HHSC's oversight of JBCR programs includes the -- the threshold for which detainees would be eligible for that JBCR program?

11:20 A Yes. It looks like you're asking if -- if they set the eligibility criteria in terms of who is accepted into that program? Am I hearing that question right?

11:21 Q That was my question. Thank you.

11:21 A Okay. Yeah. They don't -- they do not set that, to my knowledge.

11:21 Q And what is their role in -- if any, in the -- in the process of deciding what JBCR program is going to have what eligibility criteria in Texas?

11:21 A I believe those programs set those criteria.

11:21 Q Okay. Is that part of what is in the collaborative process you were talking about, or is that solely up to local authority?

11:21 A Well, it could be a collaborative decision. Again, states vary in this. In some the -- the HHSC-like entity operates the JBCR, and they -- they determine who goes there versus the hospital.

11:21 This Texas model, as it stands now is -- is different. I mean, there certainly is collaboration, but it's -- there are -- there are many elements the JBCR decides on their own.

11:22 Q Do you recall testimony earlier in this trial that the Travis County had -- had a working group that did not recommend creation of a JBCR in Travis County?

11:22 A I -- I do recall that, yes.

11:22 Q Do you recall the discussion about one of the concerns was the type of space that would be available in the facilities for the JBCR in Travis County?

11:22 A Yes. I -- I heard a reference to there needing to be a unit for that.

11:22 THE COURT: You know, we -- we've had a lot of testimony about JBCR. I know what JBCR is. You do. Most of the people in this courtroom do, but other people are going to be looking at this transcript.

11:22 So do you want to elucidate what "JBCR" means?

11:22 MR. JAMES: Absolutely. Absolutely.

11:22 Q. (BY MR. JAMES) Dr. Murrie, could you, for the

11:22 record, just spell out what JBCR stands for?
11:23 A Yes, Jail-Based Restoration Program -- Jail-Based Competence [sic] Restoration Program.
11:23 Q Thank you.
11:23 THE COURT: Thank you.
11:23 Q. (BY MR. JAMES) Have you ever experienced, as part of your -- your work in other states, money being used to renovate part of a jail to make it suitable for jail-based competency restoration programs?
11:23 A Sure, that certainly happens. That -- that often has to happen to develop a space. It's just better for education and treatment.
11:23 Q Do you know anything that would have prevented HHSC from offering funds to address the Travis County working group's concerns about the type of space available in the Travis County Jail?
11:23 A I don't -- I don't know of any reason why that's not possible. I certainly wasn't involved in any of those discussions, of course, but I don't know of any reason why that's not plausible.
11:23 Q And, likewise, if there was a barrier due to adequate medical staff at a jail for a JBCR, do you -- are you aware of anything that would prevent HHSC from offering funds to support additional treating providers for the purposes of jail-based competency restoration

11:24 in -- in the development of a new program?
11:24 A No. I don't know of any conceptual barriers to that. That's -- that's certainly how some states work, where they might hire a -- a different private company to do those services. So, conceptually, I know of no reason that's not possible.
11:24 Q Are you familiar with working where -- in other states on their competency systems where the locality that runs the jail, like the equivalent of the county in Texas, has to agree before a jail-based competency restoration program can be started for that jail?
11:24 A Yeah. I think -- if I hear your question right, that's always the case. Jails always have to be willing -- willing partners and that willing host.
11:25 Q We touched on this yesterday, but is -- is the requirement of the buy-in of the local authority a unique constraint on solving the wait times for competency restoration services in Texas, compared to those states that have reduced their wait times?
11:25 A No, no, no. That kind of collaboration and partnership is always -- is always necessary. Sometimes challenging, no doubt, but always -- always necessary.
11:25 Q Have -- have you worked in other states where an outpatient competency restoration program, or OCR, requires the involvement or approval of the locality's

11:25 mental health authority, so the equivalent of a Texas local mental health authority or an LMHA?

A Yes. That's a common arrangement. It's not the only arrangement, but it's -- it's common. Virginia's system is -- is based on that, you know, statewide outpatient competence restoration with their community mental health centers delivering services.

Q And it has that constraint on services in Virginia, or other states that have a similar structure, impeded those states from managing their wait times to be less than 21 days?

A No. I mean, the -- the Virginia example you mentioned has a much briefer wait time and relies on that kind of outpatient competency restoration programming statewide.

Yeah, just generally, that is -- that is always a partnership that needs worked through and, you know, states that have those programs have figured out how to do that.

Q And there was some discussion about the pay disparity between providers in -- in a private hospital providing competency restoration services or other related services, like civil commitment services, compared to the same services in a public hospital.

Do you remember that testimony from earlier today?

11:27 A I remember a discussion of staffing and -- and salaries, generally.
11:27 Q Do you know if -- in your work with other states, have you observed that contracting with a private hospital or a third party is more expensive than a public hospital?
11:27 A It often is, yeah. That's my impression.
11:27 Q So if -- assuming that there is a pay disparity or a cost disparity in Texas, is -- would that be a unique constraint compared to other states that have managed to reduce their wait times down below 21 days?
11:27 A No. I think that dynamic is -- is common. I don't see that it's unique to Texas.
11:27 MR. JAMES: And, Mr. Radic, if we can please return to the -- the slide show from the direct and go to Slide 19.
11:28 *(Mr. Radic complies.)*
11:28 Q. (BY MR. JAMES) We discussed -- you discussed briefly this morning about the concerns about understaffing.
11:28 Do you recall that testimony, Dr. Murrie?
11:28 A I do. I do.
11:28 Q In your work on this case, do you know whether HHSC's contract inpatient beds are experiencing the same degree of understaffing as the public hospital inpatient

11:28 beds for competency restoration services?
11:28 A Yes. Based on these data that HHSC has provided in their census figures, the -- the contract hospitals don't seem to experience that degree of staffing shortage or that staffing gap.
11:28 Q Does that relate in any way to your opinion about the feasibility of resolving the staffing deficit you identified in your direct with -- for State hospital beds?
11:29 A Well, again, I think -- I think it just -- it suggests it is not impossible to fully staff facilities. It may be challenging, but these contract places have -- have found ways to do that.
11:29 So it's -- it's a hopeful note, you know, suggesting that closer to full staffing looks viable in a -- in a variety of places in Texas.
11:29 Q Based on your experience in other states and your work investigating Texas in this case, given adequate financial resources and time, is HHSC capable of reducing the wait time for competency restoration services to under 21 days without resorting to inadequate quality competency restoration services?
11:30 A Yeah. I think it's -- I think it's important that your question said "with adequate resources and time." This certainly requires resources, and it does require

11:30 time. No -- no state has done this immediately.

11:30 But can it be done with those elements in ways that do not compromise care? Absolutely. There is nothing about an imposed timeline that -- that requires poor care or overcrowding. I have not seen that in any state. I have not read of that in any of the literature or the reporting on this.

11:30 I just don't -- I do not see that that is a common outcome -- or an outcome, frankly, that I've ever seen of an imposed timeline. One outcome is that states take a while to meet those timelines, but I've not seen them resort to poor care, poor quality, overcrowding.

11:31 To the contrary, it often has spurred more programs with more individualized care across the continuum of care, more specialized care, many of the things we associate with good quality, not bad quality.

11:31 Q Clinically, when considering a detainee who has a commitment order to have their competency restored, does the fact that they may be housed in a jail with superb psychiatric stabilization services or general mental health services, does that provide a reason to delay the beginning of competency restoration services for that detainee?

11:31 A No. There's never a clinical reason to -- to delay restoration services or -- or to be complacent about

11:32 long waits for restoration services.
11:32 There is never a clinical reason to do that, because that jail -- jail care, which is -- which is typically, you know, more of a matter of emergency care or stabilization, is never the same as restoration care or restoration treatment.
11:32 Q Thank you.
11:32 MR. JAMES: Mr. Radic, you can take down the slide show.
11:32 *(Mr. Radic complies.)*
11:32 MR. JAMES: I pass the witness.
11:32 MR. KERCHER: No additional questions, Your Honor.
11:32 THE COURT: Thank you. You can step down.
11:32 THE WITNESS: Thank you.
11:32 THE COURT: I think we have time to start the next witness.
11:32 MR. JAMES: At this time the Plaintiffs would want to call Kristy Carr.
11:32 We understand she's on bereavement leave, so we want to hold our case open to call her.
11:32 THE COURT: The Court will permit -- I discussed this yesterday with counsel. The Court will permit the Plaintiffs to keep their case open in light of Ms. Carr's unavailability.

11:33 At this time, we will allow the Defense to begin their case. I should note that in keeping the case open, this also preserves the Defense option, should they choose to do so, of filing appropriate motions once the case for the Plaintiff has closed.

11:33 MS. GDULA: Thank you, Your Honor. And, Your Honor, just to make sure I'm keeping an eye on the clock, is the Court's intention that we break at noon for lunch?

11:33 THE COURT: Yes, thank you.

11:33 MS. GDULA: Thank you.

11:33 At this time, the Defense would call Dr. Jeffery Matthews.

11:33 *(Witness sworn.)*

11:33 JEFFERY MATTHEWS, M.D.,

11:33 having been first duly sworn, testified as follows:

11:33 **DIRECT EXAMINATION**

11:34 QUESTIONS BY MS. GDULA:

11:34 Q Dr. Matthews, would you please introduce yourself to the Court?

11:34 A My name is Dr. Jeffery Matthews, I'm the chief medical officer for the Texas State Hospitals.

11:34 Q And what does it mean to be the chief medical officer of the Texas State Hospitals?

11:34 A I'm responsible for the oversight and -- and the

11:34 clinical care patients receive at the Texas State Hospitals.
11:34 Q How long have you been the chief medical officer with HHSC?
11:34 A Right at 5 years.
11:34 Q It would be December of 2020?
11:34 A I started December 14th, 2020.
11:34 Q And would you tell the Court a little bit about your educational background?
11:34 A I completed my undergraduate degree at the University of Oklahoma in microbiology in 1982. I did a year of graduate school in microbiology until I attended the medical school at the University of Oklahoma.
11:35 After graduating from medical school, I moved to Texas and did my psychiatry residency at UTMB in Galveston. I completed that in 1995. And then from 1995 to 1997, I completed a research Fellowship at the National Institute of Mental Health.
11:35 Q I heard a few degrees in there. Do you specialize in a particular field?
11:35 A Psychiatry.
11:35 Q Are you Board certified?
11:35 A Yes.
11:35 Q In what and for how long?
11:35 A American Board -- yes, American Board of Psychiatry

and Neurology, and I've been Board certified since 1997.
Q You said that you've been the chief medical officer with HHSC since December of 2020. What were you doing before that?
A Immediately prior to joining HHSC -- or rejoining, I was the chair of psychiatry at the University of Texas Health Science Center at Tyler. Now it's UT Tyler. I was at UT Tyler from 2013 to 2020.
Prior to that, I was a psychiatrist at the Hill Country LMHA for about a year, and from 20- -- or 2006 to 2012, I was a staff psychiatrist at Kerrville State Hospital.
Prior to that, I was a faculty member at UTMB in Galveston from 1998 to 2006, and then in private practice in Galveston for about a year immediately following my Fellowship.
Q Dr. Matthews, do you understand that you've been designated by HHSC as an expert in this case?
A Yes.
Q Based on your knowledge, skill, experience, training and education, are you able to testify about the clinical aspects of competency restoration?
A Yes.
Q Based on your knowledge, skill, experience, training and education, are you able to testify about HHSC's

11:37 admission, treatment, and discharge policies and procedures for competency restoration?
11:37 A Yes.
11:37 Q And would that also include whether those policies and procedures meet applicable standards?
11:37 A Yes.
11:37 MS. GDULA: At this time, Your Honor, we move to tender Dr. Matthews as an expert with regards to the clinical aspects of competency restoration and HHSC's admission, treatment, and discharge policies and procedures around competency restoration.
11:37 MS. MITCHELL: No objection.
11:37 THE COURT: Will be received.
11:37 MS. GDULA: Thank you.
11:37 Q. (BY MS. GDULA) Before we start talking about some of the specifics, I want to make sure that we have the terminology correct. What is a State hospital?
11:37 A A State hospital is a State-owned and operated facility that cares for individuals who have psychiatric illness.
11:38 Q And how many State hospitals are there in Texas?
11:38 A We currently have ten State hospitals plus one residential treatment center for youth in Waco.
11:38 Q And how -- what is the capacity of those State hospitals right now?

11:38 A On December 1st, we had a temporary capacity or current capacity of 2,147 individuals.
11:38 Q And I just realized that "capacity" may have different meanings. So when you say "capacity," would you tell the Court what you mean?
11:38 A The number that we deem that we are currently able to provide appropriate care for.
11:38 Q We've been using -- or other people have used the term "contracted beds" throughout this trial. Can you explain what a "contracted bed" is?
11:38 A Currently, UT or the health -- or HHSC contracts for 310 psychiatric beds from different facilities across Texas, so we are essentially paying other entities to care for individuals that -- on our behalf.
11:39 Q And the capacity that we've just been talking about, is that a capacity that has remained relatively steady within HHSC State hospitals?
11:39 A It's grown dramatically -- or I guess it's -- it's really grown over the last five to seven years.
11:39 Q We have been talking about the kinds of patients that HHSC treats, but I'm not sure that we have really talked about what those patients -- what that means, so would you explain what a "forensic patient" is?
11:39 A A forensic patient is an individual who's under a forensic commitment. Either they've been found

11:39 incompetent to stand trial or not guilty by reason of insanity.

11:39 There is a corollary for children and adolescents, which would be Chapter 55, which are equivalent to those commitment types.

11:40 Q And then that's a forensic patient, what is a "civil patient"?

11:40 A Someone who's not a forensic patient. They're either under a civil commitment, or they're in the hospital voluntarily.

11:40 Q Do you know what the current patient split is between forensic and civil in the State hospitals right now?

11:40 A At the State hos- --

11:40 MS. MITCHELL: Object. This is outside the scope of his designation.

11:40 *(Sotto voce discussion between Plaintiffs' counsel.)*

11:40 MS. MITCHELL: If you want to limit it to the end of the -- June, which was the end of the discovery period, instead of forward?

11:40 MS. GDULA: Your Honor, if it would help, why don't I put up an exhibit that Dr. Matthews can look at.

11:40 THE COURT: All right. We'll see what it is.

11:40 MS. GDULA: Nolan, could you put up

11:40 Exhibit D-6, which has already been admitted.
11:41 *(Mr. Nolan complies.)*
11:41 THE WITNESS: I see it.
11:41 Q. (BY MS. GDULA) What is the time range on Exhibit D-6?
11:41 A It starts in 2006 and goes through 2003.
11:41 Q And this chart, showing the forensic versus civil patients, what has the ratio at HHSC been over this time period?
11:41 A It's grad- -- or it's shifted from primarily civil to primarily forensic.
11:41 Q And what, in fiscal year in 2023, approximately was the ratio between forensic and civil?
11:41 A According to this graph, in 2023, 36 percent of individuals were under a civil commitment, and 64 percent of individuals were under a forensic commitment.
11:41 Q And based on the knowledge that you have obtained as the chief medical officer of HHSC's State hospitals, is that ratio consistent today?
11:41 A It's continued -- we've continued to gradually increase the number of forensic commitment individuals under forensic commitment.
11:42 Q Why this change, this flip between forensic and civil?

11:42 A That's where the need is. That's where we have people waiting to get into the hospital.

11:42 Q Well, Dr. Matthews, I know you've been listening to the testimony in this trial, and so you understand that we are talking about that waitlist.

11:42 If HHSC's State hospitals are still serving around 30 percent of patients being civil, why hasn't they reduced the number even lower to allow more forensic patients in?

11:42 A Probably a number of reasons for that. One of the largest reasons is, is that we have a number of individuals that have been in the State hospital for years, where there's no other place for them to receive care.

11:42 There are some individuals, by statute, that we're required to admit to our hospitals from our Texas Civil Commitment Office, or TCCO, who treats sexually violent predators. If those individuals require State hospitalization, by statute they would come to the State hospital until they're able to resume their treatment.

11:43 There's other groups, like individuals who walk into our hospitals. You know, EMTALA laws, if someone walks into the State hospital from the community, the State hospital has the obligation to assess, triage, and refer out or transfer. Oftentimes,

11:43 there is no other appropriate place for those patients to transfer to, so they're admitted to the State hospitals.
11:43 Q When I say "IST," can we agree that that is the Incompetent to Stand Trial designation?
11:43 A Yes.
11:43 Q Are you familiar with the process by which somebody may be declared IST?
11:43 A Yes.
11:43 Q How are you familiar with that process?
11:43 A Just through my work at Kerrville State Hospital and at Tyler, and in my current position, I've become very familiar with their system around those 46B, or incompetent to stand trial commitments.
11:44 Q Have you ever treated patients who've been declared IST?
11:44 A Yes.
11:44 Q What does it mean when an individual is declared incompetent to stand trial?
11:44 A That means that they have legal charges that are pending, but cannot move forward because they lack the ability or the capacity to face those legal charges.
11:44 Q Is a finding of incompetent to stand trial a clinical diagnosis?
11:44 A No, that's a -- a judicial determination.

11:44 Q How is HHSC involved in the process that leads an individual to be declared incompetent to stand trial?
11:44 A The State hospitals start that process when a person is declared incompetent to stand trial and committed to the care of the State hospital.
11:44 Q Does HHSC have a role in the evaluation that the Court relies on to declare somebody incompetent to stand trial?
11:45 A No.
11:45 Q Do you know who does those evaluations?
11:45 A From what I see, it's -- it's the individual court's contract with an appropriate evaluator professional to do those evaluations.
11:45 Q When in the process -- the criminal process -- is the -- somebody's competency brought into question?
11:45 A It could be anytime from their arrest even, I think, into their trial. But anytime during that judicial process, either the Defense, the prosecution, the Court, family, interested parties can bring into question someone's competency.
11:45 Q And what happens when an individual is declared by a court to be incompetent to stand trial?
11:45 A A competency assessment is ordered, and a hearing to determine if that competency assessment occurs.
11:45 Q And then if the Court at that hearing finds somebody

11:46 is incompetent, what happens next?
11:46 A It's really up to the Court's discretion. There are a number of things that could happen. They could be committed to a State hospital. There are options that they could go into a jail-based competency restoration program, JBCR, or an outpatient competency restoration, OCR.
11:46 Q If a person is found incompetent to stand trial, do they have to be ordered to a competency restoration program?
11:46 MS. MITCHELL: Objection. This is outside the scope of his designation.
11:46 MS. GDULA: Your Honor, Dr. Matthews is also a fact witness in this case, not just an expert, and he's also --
11:46 THE COURT: Objection's overruled. He can testify as a fact witness also.
11:46 MS. GDULA: Thank you, Your Honor.
11:46 THE WITNESS: Can you repeat the question?
11:46 MS. GDULA: Yes, I can.
11:46 Q. (BY MS. GDULA) When somebody is found incompetent to stand trial, is the court required to order them to competency restoration in your experience?
11:46 A My understanding is, yes.
11:46 Q How long is -- if a person is found incompetent to

11:47 stand trial, how long are they committed?
11:47 A For the initial competency commitment, it depends on the charges. For a Class B or Class C misdemeanor, it's 60 days. For a Class A misdemeanor or a State jail felony or a felony, it's 120 days.
11:47 Q And can that period be extended at all?
11:47 A If the treating facility believes that they could likely be restored in the next 60 days, they can request a 60-day extension from that initial commitment.
11:47 Q What happens if, after the initial commitment and any extension, the person is still not restored to competency?
11:47 A There is another competency hearing. They return to court, and the options would be to have a long-term commitment for up to one year.
11:47 Q Is it HHSC's decision on whether an individual gets a long-term commitment for competency restoration?
11:48 A That would be a judicial decision.
11:48 Q I've been using the term "competency restoration," and I have not yet asked you: What does that mean? What does competency restoration involve?
11:48 A To me, the basic term, "competency restoration," is someone who's been declared not competent becomes competent.
11:48 Q And what does that process entail? What does

11:48 competency restoration look like?
11:48 A I would say that if someone is restored to competency, whatever factors that led to that -- whether it be time, medications, treatment, education, whatever factors that were necessary for that individual to be restored to competency has been effective and -- and now they are competent.
11:48 Q You mentioned education. What does education in competency restoration mean?
11:48 A If someone doesn't really understand the legal system, they -- you know, especially if someone has an underlying cognitive difficulty or -- or mental illness, having them better understand that system would be one type of education to help people restore to competency.
11:49 Q You also mentioned treatment. Now, earlier you said that incompetent to stand trial was not a clinical diagnosis. So when you say "treatment," what are you talking about?
11:49 A If someone's not competent due to their mental illness, effective treatment of that mental illness is usually necessary for them to regain that competency.
11:49 Q And what would -- might that treatment look like?
11:49 A There's a whole spectrum of treatment, continuum from just medications or time or environment, all the way through to more, you know, intensive competency

11:49 restoration services that would include a program geared
11:49 specifically to help someone restore competency.
11:50 Q Is there a difference between "competency
11:50 restoration" and "competency restoration services"?
11:50 A I have not seen it, but when you present that
11:50 difference, to me it means competency restoration is
11:50 just someone that is restored to competency.
11:50 Where competency restoration services would be
11:50 specific treatment and a program that would be designed
11:50 specifically for that competency restoration.
11:50 Q Is there a difference between a competency
11:50 restoration service and a mental health service?
11:50 A Competency restoration services generally require
11:50 mental health services. But mental health services is
11:50 really to treat someone's underlying illness and, along
11:50 the way, someone might be restored to competency. But
11:51 that competency restoration is not equal to mental
11:51 health services.
11:51 Q From a clinical perspective, where can somebody
11:51 restore to competency?
11:51 A Anywhere where those criteria are met that they're
11:51 able to get whatever that individual needs to become
11:51 competent.
11:51 Q Also, clinically, where can competency restoration
11:51 services be provided?

11:51 A It would be that program. So the ones that I'm familiar with are State hospitalization or our contracted beds, jail-based competency restoration programs or outpatient competency restoration programs.
11:51 Q What treatment -- not competency restoration services -- but what treatment may be provided in jails that may go towards --
11:51 MS. MITCHELL: Outside the scope of his designation and facts -- as a fact witness.
11:52 MS. GDULA: Again, Your Honor, the witness has testified that he is familiar with the process for somebody being declared incompetent to stand trial, has treated incompetent-to-stand-trial individuals.
11:52 THE COURT: Objection's overruled.
11:52 Q. (BY MS. GDULA) Dr. Matthews, what treatment that may go towards restoring someone's competency may occur in a jail?
11:52 A Most commonly what I see is prescription of psychotropic medications -- or administration of psychotropic medications.
11:52 Q If somebody is in jail and is refusing to take their medication, is there any recourse for the jail?
11:52 A The jail does have the option to request Court compelled medications.
11:52 Q Can any county do -- do that, request compelled

11:52 medication?
11:52 A Yes. That option is available to them.
11:52 Q Are there any particular requirements that have to
11:52 be in place for them to do that?
11:52 A They would have to have a treating psychiatrist or
11:53 someone to petition the Court to compel those
11:53 psychotropic medications.
11:53 The individuals would have to meet certain
11:53 criteria, such as having a mental illness; and due to
11:53 mental illness, have an impairment to be able to qualify
11:53 for that compelled medication order.
11:53 Q What about in an outpatient program, what treatment
11:53 can an individual receive in an outpatient program that
11:53 might lead them to be restored to competency?
11:53 A The same. They could get medications, education,
11:53 take -- general psychiatric treatment, and education or
11:53 other competence -- competency restoration services.
11:53 Q In your experience in the time as the chief medical
11:53 officer for the State hospitals, have you seen State
11:54 competency restoration services provided anywhere other
11:54 than a jail or a State hospital?
11:54 A Very unusual circumstances, but, yes, we have a case
11:54 where the State hospital staff went to a nursing home to
11:54 provide that care for an individual that was in jail.
11:54 I've seen individuals that are in

11:54 medical-surgical hospitals that are receiving some care -- I'm not sure if they were restored to competency in those settings; but in a nursing home, I did see someone restore competency.

11:54 Q When HHSC is providing competency restoration services, what are the possible outcomes for that individual?

11:54 A Either they're restored to competency or they're not.

11:54 MS. GDULA: Your Honor, I'm about to start a new section. And I'll note it's 11:54. Would the Court like me to proceed, or would you like to take a break now?

11:54 THE COURT: We can take our lunch break now.

11:55 MS. GDULA: Thank you, Your Honor.

11:55 THE COURT: You may step down, Doctor.

11:55 THE WITNESS: Thank you.

11:55 *(Lunch Recess taken at 11:55 a.m.)*

11:55 *(Open court, commencing at 1:35 p.m.)*

01:35 THE COURT: Please be seated.

01:35 All right. The Court would note the presence of counsel as well as the parties, and are you ready to proceed?

01:36 MS. GDULA: Yes, Your Honor.

01:36 THE COURT: Okay. And you just remain under

01:36 oath. You understand that?
01:36 You may.
01:36 MS. GDULA: Thank you, Your Honor.
01:36 Nolan, will you please pull up
01:36 Exhibit D-106, which has previously been admitted.
01:36 *(Mr. Nolan complies.)*
01:36 Q. (BY MS. GDULA) Dr. Matthews, will you tell the
01:36 Court what this document is?
01:36 A This is our internal operating procedure for
01:36 forensic competency services. It's a forensic treatment
01:36 parameters and we number it 03108.
01:36 Q And we have another witness who is going to talk
01:36 about the admissions process. So what I'd like to do is
01:36 actually go to Page 3 of Exhibit D-106 and go to
01:36 Number 10 at the bottom.
01:37 What are expedited admissions, Dr. Matthews?
01:37 A Expedited admissions are someone who is in jail and
01:37 there's been a request to expedite their admission or
01:37 move them to the front of the line.
01:37 Q Why might HHSC get a request for an expedited
01:37 admission?
01:37 A Typically, it's there is a concern that continued
01:37 stay in the hospitalization is going to lead to
01:37 deterioration or some harm.
01:37 Q Who can make that request of HHSC for an expedited

01:37 admission?
01:37 A It really is broad. It could be a family member,
01:37 the jail staff, the defense attorney, the Court, the
01:37 prosecution, anyone that's involved or a stakeholder in
01:37 this person's care.
01:37 Q Is there a particular way that they have to make
01:37 that request to HHSC?
01:37 A They communicate it to our -- to the HHSC. We have
01:37 a form for that, but we don't necessarily require
01:37 someone to use the form. The form just really helps us,
01:38 you know, pull the information that we're going to need
01:38 to make that determination.
01:38 Q So once HHSC has received a request for an expedited
01:38 admission, how does it go about evaluating that request?
01:38 A We will have an initial clinical review where we
01:38 will pull information from the jail, any information
01:38 that may be relevant to that, medical history,
01:38 treatment, things of that nature that would really help
01:38 us determine whether that expedited admission is
01:38 warranted.
01:38 And then that review will go to our director
01:38 of forensic medicine or chief of forensic medicine who
01:38 will have a second level review and then make that final
01:38 recommendation to the associate commissioner for State
01:38 hospitals.

01:38 Q So how many steps are there in the review process, then?
01:38 A Three steps.
01:38 Q How long does it take to move through that process on -- generally?
01:38 A Usually, around a week. It depends -- as long as we get the information. Once we have all of the information we need, we can, typically, do that within a week.
01:39 Q When a request for an expedited admission is granted, what happens to that individual?
01:39 A They're -- we notify the Court that they're moved to the top of the list and we admit them to the first available bed that is appropriate for that individual.
01:39 Q About on average how many requests for expedited admission does HHSC get in, let's say, a year?
01:39 A It's grown over the last few year. Since Fiscal Year '25, we had 104 expedited -- 104 expedited admission requests.
01:39 Q And about how many -- well, in Fiscal Year '25, how many of those were approved?
01:39 A Fifty-three.
01:39 Q So it's about 50 percent?
01:39 A Just over.
01:39 Q Would you say that that's a pretty standard approval

01:39 rate over the years that you have been the Chief Medical Officer?
01:39 A I haven't looked at it very closely, but it's roughly on the same lines.
01:40 MS. GDULA: Nolan, could you pull up Exhibit D-77, which has also been previously admitted.
01:40 *(Mr. Nolan complies.)*
01:40 Q. (BY MS. GDULA) Dr. Matthews, what is an MSU waiver?
01:40 A MSU stands for maximum security unit. Those are individuals that are deemed most physically dangerous. So a waiver is someone who is slated to go to the maximum security unit is waived to go to a non-maximum security unit bed or a regular State hospital bed.
01:40 MS. GDULA: And, Mr. Nolan, could you pull up D-107, which has also been admitted.
01:40 *(Mr. Nolan complies.)*
01:40 Q. (BY MS. GDULA) How does somebody request an MSU waiver?
01:40 A Similarly, anyone along -- that's a stakeholder would make that request to HHSC to consider someone, but prior to that, typically, we review everyone on the MSU list to kind of make that review regardless of whether someone's recommended it to try to move people out of the MSU that would be appropriate or safe to admit to a non-MSU State hospital bed.

Q And what is HHSC looking for in determining whether somebody can be waived from an MSU bed to a non-MSU bed?
A We're primarily looking at, is it safe for us to provide that level of care for this individual. So someone who is -- you know, had appropriate behavior in jail, that they've been treated in jail. Sometimes people are out on bond and they've returned to jail and they didn't have any problem when they were out on bond.
Sometimes someone's been previously in our hospital, determined not manifestly dangerous, and then return to jail where they are put back on the MSU waitlist.
Q And I probably should have started with this: How does somebody get put on the MSU waitlist to begin with?
A It's determined by their index charge.
MS. GDULA: And, Nolan, if you can go to the bottom of Page 2 onto Page 3 of Exhibit D-107.
*(Mr. Nolan complies.)*
Q. (BY MS. GDULA) Do you see that on your screen, Dr. Matthews?
A Can you repeat where I'm looking?
*(Mr. Nolan complies.)*
MS. GDULA: The top -- thank you, Nolan.
Q. (BY MS. GDULA) Do you see the zoomed in part?
A Yes.

01:42 Q Would you describe to the Court what the process is for evaluating an MSU waiver?
01:42 A So, basically, is that we'll look at a clinical review and here it is within one business day of receipt of the complete commitment packet.
01:42 So all the information that we would need, we would do a clinical review, and after that review, we would recommend an MSU or not to our chief of forensic medicine. In a similar way that we do with our expedited admissions, we'll also review that information and make a recommendation to the associate commissioner.
01:43 Q And if an MSU waiver is granted, what happens to that individual?
01:43 A They are moved from the MSU waitlist to the forensic waitlist which is the non-MSU waitlist. They are put in based on the date on that -- the commitment order. So they would be put into place where they had been based on that commitment order to date.
01:43 Q So unlike the expedited admission, they don't go to the front of the line?
01:43 A No.
01:43 MS. GDULA: Nolan, can you go back to Exhibit D-106, at Page 3.
01:43 *(Mr. Nolan complies.)*
01:43 MS. GDULA: If you could zoom in on Subpart B.

01:44 *(Mr. Nolan complies.)*
01:44 Q. (BY MS. GDULA) Dr. Matthews, I'd like to talk to you about what happens when a person comes into a State hospital for competency restoration. First, how often does HHSC screen that individual for competency?
01:44 A We start with, initially, within the first 60 hours, we will do an initial screen and the recovery team will review that when they have their initial meeting within that first week of admission. And then each time the recovery team has a scheduled meeting, they will do a competency screening.
01:44 But in addition to that, anytime during the hospitalization that the recovery team believes that the individual is likely competent, they'll request or order that screening -- or complete the screening.
01:44 Q How often does the recovery team have planned meetings?
01:44 A They meet as stated here, they'll meet in the first week, they meet at the 14 day, 30 day, and then 90 days. And then each 90 day afterwards or, you know, again, if someone between those visits are deemed appropriate for competency, they will do that at the screening.
01:45 Q Is there a standard amount of time that it takes to restore somebody to competency?
01:45 A It's really individual based. There's not a stated,

01:45 this is how long this person is going to take to become
01:45 competent.
01:45 Q What factors might influence how long it takes to
01:45 restore somebody to competency?
01:45 A The seriousness of their illness, their intellectual
01:45 functioning, if they have any impairments in reasoning
01:45 or impairments of intellectual functioning, perhaps
01:45 their background, their experiences.
01:45 Q Have you noticed any impact on the time it takes to
01:45 restore somebody to competency based on services that
01:45 they have been receiving before they come into the State
01:46 hospital?
01:46 A I think it's a clinical belief of mine and has been
01:46 my observation is if someone is completely untreated
01:46 when they come to the hospital, it's going to take
01:46 longer for that treatment to become effective.
01:46 If they have received some treatment, even
01:46 medications in the jail, they're going to have kind of a
01:46 head start on that process.
01:46 Q What happens when HHSC determines that somebody has
01:46 been restored to competency?
01:46 A We inform the Court.
01:46 Q After you inform the Court that you believe somebody
01:46 has been restored to competency, what happens next?
01:46 A We anticipate within a week or two that the Court

01:46 will come and pick up the individual and return to court for a competency hearing.
01:46 Q And you said in about a week. Is that the standard amount of time?
01:46 A That's what we anticipate or expect. Sometimes it really -- it's up to the Court when they come. So there may be times where the Court doesn't come within that short time frame.
01:47 Q What circumstances in your experience have you seen make that time last longer?
01:47 A At times the finding of competency is challenged. It's often challenged by the Defense. So at that time, the Defense may disagree or say the individual is not competent. They may request the Court to allow them to send their own competency evaluator, which would take time.
01:47 Q And if there is a challenge, if somebody challenges a person has been restored to competency, how does that get resolved?
01:47 A Well, competency, again, it's a judicial determination, so if, you know, that information would go to the Court and the Court would have a competency hearing.
01:47 Q Is HHSC involved in that process, where a dispute over whether somebody has been restored to competency is

01:48 resolved?
01:48 A I mean, they're under our care so we're involved with that aspect. We -- you know, if the Court orders or the Defense sends an independent evaluator, we would make the individual available for that evaluation and help facilitate that evaluation.
01:48 Q Does HHSC go and tell the Court, hey, I think this person is competent now?
01:48 A We do our competency assessment and we base our recommendation to the Court based on our competency assessment.
01:48 Q Is there a set length of time for HHSC to determine that somebody is unlikely to restore to competency?
01:48 A When we do the competency evaluation, part of the evaluation itself is to opine whether the individual is likely to be restored in the foreseeable future.
01:48 Q And so is there a set time by which if somebody has not restored to competency, you just say, they're not going to restore?
01:49 A Not exactly a set time. There is a lot of factors that go into it, as, how well they have responded to treatment, do they have any underlying factors that would make restoring to competency more challenging for them such as a dementia or intellectual disability, traumatic brain injury?

01:49 Q When HHSC determines that somebody is unlikely to restore competency, what is your next step?

01:49 A Well, we inform the Court. We usually start with reaching out to the Court and really asking their openness or whether they would consider an alternative disposition, such as some supported setting that's appropriate for that individual in that community.

01:49 So if the Court says, yes, I would entertain it, show me what you have, or, you know, we would start working with our local mental health authority and community to develop an individualized plan for that individual to be able to be safe and receive appropriate care outside of the hospital in a community setting.

01:50 Q If the Court doesn't choose to look at those alternative placement options, where would the individual go?

01:50 A They would either be recommitted or charges dropped.

01:50 Q If somebody is unlikely to restore and is recommitted or the Court commits them to the State hospital, how long can that commitment last?

01:50 A The longest that they could be committed is the maximum time they would have received had they been convicted of the index charge.

01:50 Q So for somebody who has been charged with murder --

01:50 A Ninety-nine years.

01:50 Q -- presumably that could be their entire life. Can the Court just commit them for their entire life?
01:50 A No, each commitment is for a maximum of one year. So at the end of that year, there would be another commitment hearing to determine what happens next.
01:50 MS. GDULA: Okay. Nolan, would you put up Exhibit D-108, which has been previously admitted.
01:51 *(Mr. Nolan complies.)*
01:51 Q. (BY MS. GDULA) Dr. Matthews, what is this document?
01:51 A This is our internal operating procedure 05-02, the "Forensic Discharges to Community-Based Care."
01:51 MS. GDULA: Okay. And if we can go to Page 3 of this exhibit.
01:53 *(Mr. Oldham complies.)*
01:51 Q. (BY MS. GDULA) Do you see at the top where it says, "Patients incompetent to stand trial and deemed unlikely to restore to trial competency"?
01:51 A Yes.
01:51 Q What is the process that's described in this policy here?
01:51 A Well, they start with -- the recovery team or the treatment team determines if the patient's psychiatrically and medically appropriate for some other setting.
01:51 So, in other words, they're stable enough that

01:51 there is a potential that someone in the community could safely manage them. Then the social work -- the hospital social worker or someone on that recovery team would reach out to the Court, the District Attorney's Office, and/or the defense counsel, and then they would gauge whether the Court is willing to consider that alternative disposition.

01:52 Q So this is that process you were describing when you talk to the Court informally before you submit the packet?

01:52 A Yes. And if the Court is open, we would develop a more detailed outpatient management plan and then present that to the Court in writing.

01:52 Q Why would you have an informal discussion with the Court before you go through that process?

01:52 A It really requires a lot of resources to put together that plan and before doing that, it really does make sense that we're going to determine whether that's a viable option for this individual.

01:52 Q In your experience, are Courts generally receptive to those plans?

01:52 A It depends on the Courts. Depends on a number of factors. One of the factors is often the severity of the index charge.

01:52 MS. GDULA: Nolan, would you put up Exhibit

01:52 D-89 for me.
01:53 *(Mr. Oldham complies.)*
01:53 MS. GDULA: Okay.
01:53 Q. (BY MS. GDULA) Dr. Matthews, these look like some
01:53 instructions for a "Patient Discharge Needs."
01:53 What is that?
01:53 A A Patient Discharge Needs is a form that we
01:53 developed in order to gather information on what
01:53 individuals would need to, potentially, leave the
01:53 hospital successfully.
01:53 Q Why would you gather that kind of information?
01:53 A We have long held that there may be several -- or
01:53 many individuals in the hospitals that are there because
01:53 of their psychiatric conditions -- they continue to have
01:53 psychiatric symptoms, but there's a potential that
01:53 somewhere outside the hospital would be able to manage
01:53 them safely.
01:53 But identifying what resources are needed in
01:53 those individuals, we found that this form is a helpful
01:53 way to kind of explore both what this individual needs
01:53 as well as what settings or what resources outside of
01:54 the hospital would be necessary to develop or at least
01:54 make available to this individual.
01:54 MS. GDULA: Nolan, would you pull up
01:54 Exhibit D-90, which has previously been admitted.

01:54 *(Mr. Oldham complies.)*
01:54 Q. (BY MS. GDULA) Is this the form that you were
01:54 talking about?
01:54 A This is a screenshot of what a person entering the
01:54 form would see in our electronic medical record.
01:54 Q So where does this form live?
01:54 A It lives in our electronic medical record.
01:54 MS. GDULA: Could you zoom in on, Nolan, on
01:54 the very top of that?
01:54 Q. (BY MS. GDULA) So what is the first question that
01:54 the person filling out this form needs to answer?
01:54 A "Does the patient need continued inpatient
01:54 hospitalization if appropriate support and monitoring
01:54 were available outside of the hospital?"
01:54 Q And so if the answer to this question is yes, what
01:55 happens?
01:55 A There is a text field that the person completing the
01:55 form would enter giving a justification of why this
01:55 individual needs continued hospitalization.
01:55 Q Do they fill out the rest of the form?
01:55 A No, then they're finished.
01:55 Q Okay. So if somebody answers this question, no, it
01:55 would go to the next question?
01:55 A Yes.
01:55 MS. GDULA: Nolan, would you expand that next

01:55 question.
01:55 *(Mr. Oldham complies.)*
01:55 A The next -- well, the next page --
01:55 Q. (BY MS. GDULA) Yes.
01:55 A -- really starts exploring what settings this individual may be appropriate for. The first one is independent living. And if the individual says, yes, they could be independent living, it would prompt or require a field to say what kind of supports would they need in the community to live independently.
01:55 MS. GDULA: And, Nolan, if you can go to the next page.
01:55 *(Mr. Oldham complies.)*
01:56 Q. (BY MS. GDULA) So what are the options that are identified on this page, on this form?
01:56 A On this page would be an unlocked group home such as a 24/7 staffed -- in the community it's called Home and Community Based Services Adult Mental Health. It's a program -- it's entitled "Program" -- that would have that level of care or supervision support be safe.
01:56 We also have developed step-down pilots to help individuals transition from the State hospital to the community and they provide that level of support and monitoring as well.
01:56 Q And what are the next two options on the list?

01:56 A The next one is a locked group home that's 24/7 staffed and individuals with a serious mental illness that might live in the setting similar to our SSLCs.
01:56 Q Do all of the options, the needs that are listed on the patient discharge needs form exist in Texas today?
01:57 A No, no, no, they do not.
01:57 Q So why would you include them on this form?
01:57 A This is, again, an information gathering tool. I believe it would be helpful for HHS to know how many individuals are they there, if this option existed, would be able to transition appropriately or be successful in that setting.
01:57 For example, a locked group home is very limited. The only one I really can think of is a locked nursing home or locked memory care that a guardian would place someone into. But outside of that, that really doesn't exist in Texas.
01:57 Q How is the information that you gather by filling out this form shared?
01:57 A In a number of ways. We share it with -- across our agency, interested stakeholders. We can pull aggregated data as far as individual data that is, of course, governed by privacy laws, but aggregated data that's de-identified we can share with other agencies, other

01:58 stakeholders.

01:58 At times the Legislature has made inquiries that we were able to use this data to help answer those legislative information requests.

01:58 Q Dr. Matthews, are you aware that the Plaintiffs are asking this Court to enter an injunction that would require HHSC to admit anybody declared IST within 21 days of that commitment order?

01:58 A I am.

01:58 Q First, is there a clinical reason for that 21-day deadline?

01:58 A I'm not aware of one.

01:58 THE COURT: I didn't hear you, Doctor.

01:58 A I'm not aware of a clinical reason why someone would need 21 days to have any specific relevance.

01:58 Q. (BY MS. GDULA) Under clinical standards and your experience as the Chief Medical Officer of the State hospitals, is there a specific deadline clinically by which somebody has to be admitted to a State hospital for competency restoration?

01:59 A We do not have --

01:59 MS. MITCHELL: You're asking for -- objection. You're asking for an opinion related to a timeline that is outside the scope of his designation.

01:59 MS. GDULA: Your Honor --

01:59 MS. MITCHELL: He specifically said he had no opinion as to whether or not 21 days was a sufficient timeline or not during his deposition.
01:59 MS. GDULA: Your Honor, I am asking this question clinically.
01:59 We have established that there are other factors that may come into play as to that deadline. I am merely asking a clinician whether clinically there is a reason for that deadline.
01:59 THE COURT: The objection is overruled.
01:59 MS. GDULA: So, the question --
01:59 THE COURT: You will have a chance to cross-examine him, and you can ask him about those differences.
01:59 A Can you repeat --
01:59 Q. (BY MS. GDULA) And I apologize. I'm not sure if I heard your answer.
01:59 But under clinical standards, is there a specific deadline by which somebody who has been declared IST must be admitted for inpatient treatment?
02:00 A No, there is not.
02:00 Q Why isn't there?
02:00 A Each individual is an individual case, so I don't think we know.
02:00 THE COURT: So, Doctor, what you're saying is

02:00 that in some cases it might be 21 days. In some cases, it might be two days. In some cases, it might be 30 days.

THE WITNESS: Yes, sir.

THE COURT: Okay.

Q. (BY MS. GDULA) When you said it's individualized, what kind of things would you be looking for to help you from a clinical perspective to determine whether somebody is -- needs to be admitted for competency restoration treatment?

A It's the severity of their current symptoms, their underlying medical conditions, their dangerousness to themselves, dangerousness to others, how much of a crisis it is.

Q If somebody is in jail waiting for admission to a State hospital and is exhibiting some of those symptoms that you've described, is there a way for them to address that with HHSC?

A Could you repeat that question?

Q Sure. Well, and I guess, what does the term "decompensating" mean? We've heard that a few times, but what does that mean as a clinician?

A Someone who -- their level of functioning decreases.

Q Okay. If an individual is decompensating while they are in jail waiting for admission, is there a way for

02:01 them to address that with HHSC?
02:01 A They could make an expedited admission request.
02:01 Q Okay. If the Court were to require that HHSC admit
02:01 everybody who was on the waitlist within 21 days, what
02:02 impact would that have on the competency restoration
02:02 services that the State hospitals provide?
02:02 A It would depend on what time frame and when that
02:02 would occur. If it would occur immediately, that would
02:02 be, I think, an overwhelming challenge for the State
02:02 hospitals.
02:02 Q When you say "an overwhelming challenge," can you
02:02 explain what you mean by that?
02:02 A If we were to admit everyone on the waitlist now
02:02 with our current resources and capacity, we would
02:02 overcrowd our hospitals and the level of care -- the
02:02 quality of care that we currently would provide would go
02:02 down and our safety in both to our staff, our
02:02 individuals that we serve, and the individuals coming in
02:02 would be at a greater risk.
02:02 Q What is the current restoration rate? So for people
02:02 who are declared IST and who are admitted to a State
02:03 hospital for competency restoration services, what is
02:03 the rate at which HHSC is able to restore their
02:03 competency?
02:03 A Again, it's -- each individual case is different.

02:03 From my understanding is if someone is on that initial 46B.073 commitment, the likelihood of them restoring is greater.

02:03 It's the individuals that are newly into that system, they have -- this is -- as time goes on, if someone is not restored, the likelihood of them being restored decreases because the factors that lead them not to be competent are kind of driving that.

02:03 So currently if someone is admitted on a 46B.073 initial commitment, about 91 percent of those individuals are restored to competency in around 90 to 100 days.

02:04 Q And that initial commitment, was that the 60 days and the 120 days that could be extended up to 60 days?

02:04 A Yes.

02:04 Q Okay. And how long, on average, for those people who are on their initial commitment who are in the 91 percent likely to restore, how long does it, typically, take HHSC to restore those individuals?

02:04 A For those 91 percent who are restored, it would be between 90 and 100 days.

02:04 Q I will admit, math is not my strong suit. But for every 100 people who are admitted to the State hospital, under those numbers, those percentages, about 9 percent of them, then, would not restore during that initial

02:04 commitment period?
02:04 A Yes.
02:04 Q What happens to those nine people in my hypothetical
02:04 who did not restore?
02:05 A Then they would have a recommitment hearing to
02:05 determine whether they would have that longer commitment
02:05 hearing. That would be for up to a year.
02:05 Again, the longer it takes someone -- you
02:05 know, they're not able to be restored in that initial
02:05 period, the chances of subsequently restoring to
02:05 competency decreases.
02:05 So the longer someone's in the hospital, we
02:05 really end up selecting out the individuals that are
02:05 unlikely to restore to competency.
02:05 Q So once you have the 99 people -- I'm sorry,
02:05 91 people out of that 100 who have exited the State
02:05 hospitals and you bring in another 100 patients, you
02:05 still have the nine from the original one?
02:05 A Yes.
02:05 Q Over time, as those nine people from every group of
02:05 100 are staying, what would the effect on the State
02:05 hospital system be?
02:05 A Eventually, we will be increasing the percentage in
02:06 the number of people there with longer lengths of stay
02:06 and decreased bed availability for new people to come

02:06 into our hospital.
02:06 Q If HHSC is ordered to admit everybody on the waitlist or everybody who is declared incompetent to stand trial within 21 days of that commitment order, what effect do you think that would have on the rate of restoration that we have been talking about?
02:06 A Again, it would determine how quickly that was done. If we did it without enough time and resources, it would go -- it would go up. It would become more difficult to get people competent because we would have less resources to dedicate towards that.
02:06 Q So that 91 percent rate would go down?
02:06 A I think so, yes.
02:06 Q In your time -- your five years that you have been the Chief Medical Officer, has HHSC ever refused to admit a person who is declared incompetent to stand trial for competency restoration?
02:07 A I'm not aware of any time that we've refused to admit people. There are rare circumstances where someone has medical concerns or problems, that we are unable to provide that level of medical care in the hospital, so they would -- they would need to improve medically before we would be able to admit them to a psychiatric hospital.
02:07 Q Well, Dr. Matthews, a State hospital is a hospital.

02:07 What kind of patients would it be unable to medically care for?
02:07 A Let me give you an example.
02:07 The last few months ago, we had an individual that was in a university hospital -- or a hospital, and they were in the ICU on a ventilator, and they were on the ICW waitlist -- I'm sorry, the forensic waitlist.
02:07 So I made the determination that, at this time, we are unable to provide for their medical care. I had a Teams meeting with the medical treatment [sic] that's providing that medical care.
02:08 And we talked about this individual, what it is that they need, what -- you know, how are they progressing, you know, really trying to gauge at what point would we be able to provide that level of medical care.
02:08 Q In your time as the Chief Medical Officer for the State hospitals, do you believe or have you seen a commitment by HHSC to minimizing the amount of time that people have to wait to be admitted for competency restoration services?
02:08 A I lost you there for a moment. Can you please repeat that?
02:08 Q Absolutely.
02:08 In the five years that you have been the

02:08 Chief Medical Officer for the State hospitals, have you seen a commitment by HHSC to minimize the amount of time that people have to wait to be admitted for competency restoration services?
02:08 A Yes.
02:08 Q What have you seen that leads you to believe that?
02:08 A Well, the development of the patient discharge needs form that we talked about earlier is really a way to identify people that could potentially leave and what they do need to leave.
02:09 So the more people that are in the hospital that we are able to successfully discharge opens up that bed. We've also started increasing our efforts at transition review panels and really looking at our individual -- individuals in the hospital and what their barriers are, and have meetings with the community, LMHA, the Court, any community stakeholder, really trying to look at this individual, what are their barriers and how can we overcome those barriers?
02:09 We have been able to develop a number of step-down programs, which is transitional housing or living treatment, that people could enter into in order to bridge that gap between inpatient and outpatient.
02:09 I'm aware that our forensic services team has also been working with jails for increasing our jail

02:09 in-reach to support both outpatient competency restoration and jail-based restoration programs.

02:10 So it's really a number of issues that are looked at even before admission -- promoting jail diversion, et cetera -- really to help identify individuals that may be able to leave the hospital and really think about what resources people need to be outside of the hospital.

02:10 So it's the front door while they're in the hospital and then the backdoor.

02:10 MS. GDULA: Your Honor, I will pass the witness.

02:10 THE COURT: Okay.

**CROSS-EXAMINATION**

02:10 QUESTIONS BY MS. MITCHELL:

02:10 Q Good afternoon, Dr. Matthews.

02:10 A Good afternoon.

02:11 Q So originally when I took your deposition, you testified that you knew this lawsuit was about people waiting an excessive period of time in jail before they got into a hospital for competency restoration.

02:11 Do you recall that?

02:11 A Yes.

02:11 Q And when I asked whether you agree that a wait -- that the current wait time was an excessive period in a

02:11 time in jail before they get to a hospital for
02:11 competency restoration, you answered "yes," correct?
02:11 A Yes.
02:11 Q And you talked about your current credentials. But
02:11 you did not complete a forensic fellowship, did you?
02:11 A No, I did not.
02:11 Q Okay. And you are not Board certified in forensic
02:11 psychiatry, are you?
02:11 A No, I am not.
02:11 Q And since becoming the Chief Medical Officer, you
02:11 have not treated any patients directly, correct?
02:11 A No, I have not.
02:11 Q And you've actually never worked in a jail-based
02:11 competency restoration or outpatient competency
02:11 restoration setting; is that correct?
02:11 A That is correct.
02:12 Q And you also had testified that you did not have
02:12 enough information to offer a clear opinion about what
02:12 mental health services are being provided in Texas
02:12 jails; is that correct?
02:12 A I don't know across the state of Texas each jail and
02:12 what their individual jails are providing.
02:12 Q So you -- so, again, do you have an opinion about
02:12 what type of mental health services are being provided
02:12 in the Texas jails?

02:12 A Not comprehensively.
02:12 Q And you said previously during your deposition that you had no opinion whether waiting 21 days or any length of time to begin competency restoration treatment is appropriate, correct?
02:13 A I don't recall that exact question.
02:13 MS. MITCHELL: Okay. If we can pull up your deposition, Page 120.
02:13 You've got it?
02:13 Your Honor, can I go back over there because I can't see that far away. Can I go back over to my computer to be able to see because this one does not work.
02:13 THE COURT: Yes.
02:13 MS. MITCHELL: Thank you. Now, can you move to Page 120?
02:14 *(Mr. Radic complies.)*
02:14 MS. MITCHELL: Hold on. That's fine. I'm sorry. If you can look at 129, Line 2.
02:16 *(Mr. Radic complies.)*
02:16 Q. (BY MS. MITCHELL) Can you read Line 2 through 7, please?
02:16 A Question by Ms. Mitchell: "I agree. I'm just asking if you have an opinion about whether or not waiting 21 days or more -- or waiting any length of time

02:16 to begin competency restoration treatment is appropriate."
02:16 "Ms. Gdula: Objection; form."
02:16 "Answer: Yeah. I have no opinion."
02:16 Q And so you had told me here that you had no opinion on this topic, correct?
02:16 A Yes.
02:16 Q Okay. And this is the only time I was able to talk to you before trial, correct?
02:16 A Yes.
02:16 Q Okay. And do you agree that because you told me that I have no way now of knowing of these opinions you now seem to have?
02:17 A What opinion?
02:17 Q Well, you indicated that you did have an opinion about whether or not 21 days was an appropriate length of time for somebody to be waiting.
02:17 MS. GDULA: Your Honor, I'm going to object as mischaracterizing the witness's testimony. He was specifically asked if there was a clinical reason for the 21-day deadline.
02:17 THE COURT: The objection is sustained, but he did say apparently in his deposition that he thought 21 days was excessive or the current amount of time they are waiting is excessive.

02:17 MS. GDULA: Yes, I believe -- the latter, yes, Your Honor.
02:17 THE COURT: The current amount of time that patients are having to wait is excessive, I believe was his testimony.
02:17 MS. GDULA: Right. But he did not opine on the 21 days. My question was about the clinical --
02:17 THE COURT: He didn't opine on 21 days in his deposition.
02:17 MS. GDULA: Correct.
02:17 THE COURT: He said he didn't have an opinion on that. The current time was excessive.
02:17 MS. GDULA: Right.
02:17 THE COURT: And the objection she just made to your earlier question is overruled -- or to his -- yeah.
02:18 I am sorry. What did I just say? Did I say overruled?
02:18 I sustained your objection.
02:18 MS. GDULA: Yes. Thank you.
02:18 THE COURT: I didn't overrule it.
02:18 Q. (BY MS. MITCHELL) And you also testified that there are currently no policies that you are aware of about how long somebody should wait for competency restoration treatment by HHSC before coming to the hospital, correct?
02:18 A Yes.

02:18 Q Okay. And at the time we talked, you indicated that you do get daily waitlist numbers about how many people are waiting currently in jail for a hospital bed, correct?
02:18 A Yes.
02:18 Q For competency restoration services?
02:18 A Yes.
02:18 Q Okay. And at that time, you testified that there were 468 people waiting in the MSU beds; do you recall that?
02:18 A I'm going to have to take your word for that.
02:18 Q Okay. And the total people waiting was 1,758. Do you recall that?
02:19 A I don't recall the exact number, but that's the ballpark.
02:19 Q Okay. And you've never evaluated the number of beds that it would actually take to bring the waitlist down so that people could be admitted within 21 days, correct?
02:19 A I have not.
02:19 Q Okay. And no one in HHSC leadership has asked you how to reduce that waitlist to ensure people could move into the State hospital quicker, correct?
02:19 A I think it's implied with my job that I want to function and help the agency do its best job, which

02:19 would include bringing down the waitlist. I haven't been asked to do it, but, you know, as part of delivering care to our hospital, we all take that very seriously and have been working towards it.
02:20 Q And -- but you -- but HHSC hasn't literally asked you to come up with a plan on how to do that, correct?
02:20 A No, they have not.
02:20 Q Okay. And HHSC has ways to report competency at discharge, correct?
02:20 A I'm sorry. Can you repeat that?
02:20 Q HHSC has a way to report competency restoration at discharge, correct, how many people are restored to competency when they are discharged, correct?
02:20 A Yes, yes.
02:20 Q And you had said that about 92 percent of those people are restored within 90 to 100 days if I recall correctly, right?
02:20 A That's my understanding, yes.
02:20 Q Okay. And when we previously spoke, you indicated that it was Dr. Torres and Dr. Wright that review the MSU waivers and that you don't approve that process?
02:21 A I -- typically not. If -- when Dr. Torres was here, when he was out, I would cover for him and now that Dr. Wright is here, when she's out, I cover for her. So I'll do them when they're not available.

02:21 Q Okay. And when you review those MSU waivers, you indicated the individual just moves from their commitment order date on the MSU list to where they would fall under the commitment order date on the non-MSU list, correct?
02:21 A That is correct.
02:21 Q So there is no clinical decision about whether somebody should move up or down on the waiting list during that MSU waiver process?
02:21 A That is correct.
02:21 Q And now, you spoke about the expedited admission process, correct?
02:21 A Yes.
02:21 MS. MITCHELL: And if we can show Defendant's 104 -- Exhibit 104 that's already been admitted.
02:22 *(Mr. Radic complies.)*
02:22 Q. (BY MS. MITCHELL) And then -- and tab, Fiscal Year to Date '25 and do you see Line 11 where it says: The number added under MSU HHSC was 730 people?
02:22 A I see that.
02:22 Q And that was in the -- just the first nine months of Fiscal Year '25, correct?
02:22 A It appears so. Wait, no, it's the six months. It would be -- Fiscal Year '25 would start September 1st

02:22 through March 31st.
02:22 Q So that would be six months, correct?
02:22 A Yes.
02:22 Q Yes. Okay. So we had 730 people that were admitted
02:23 in six months, and -- added to the waitlist, sorry.
02:23 And then similarly, it also indicated that there has
02:23 been 2,328 people added to the non-MSU waitlist in that
02:23 same first six-month period of Fiscal Year '25?
02:23 A I'm not familiar with this data so I'm having to
02:23 trust you. I don't know where it came from and I'm not
02:23 familiar where it said forensic.
02:23 Q Okay. It was previously admitted and it's a JCAFS.
02:23 Do you know what JCAFS is?
02:23 A Yes.
02:23 Q So can you tell the Court what JCAFS is?
02:23 A Joint Commission of something Forensic Service --
02:23 Access to Forensic Services.
02:23 Q Okay. And this is information that HHSC by statute
02:23 is required to provide to this committee, correct?
02:23 A To my understanding, yes.
02:23 Q Okay. So we can pretty much assume that this
02:23 information is accurate, correct?
02:23 A Yes, I just don't know exactly what they mean when
02:24 they say "forensic" in this table.
02:24 Q So can we assume that the total number of -- if we

02:24 added those two together, over 3,000 people were added to the list for admission in the last nine -- six months of Fiscal Year 2025?
02:24 A If -- if that's what "forensic" means, is the non-MSU waitlist, it would be just over 3000.
02:24 Q Okay. And you said that 104 expedited admission requests were -- were provided in Fiscal Year 2025, correct?
02:24 A One hundred and four expedited admission requests were made.
02:24 Q Right. For Fiscal Year 2025 --
02:24 A Yes.
02:24 Q -- right?
02:24 Okay. So that would probably mean less than 3.4 percent of the people -- this is only for six months. So based on six months instead of the entire year -- because for the entire year, it was the 104 you were giving me, correct?
02:25 A Yes.
02:25 Q So -- so even with -- even if we offered that, that 3,000 was for an entire year. The requests made for an entire year of -- in Fiscal Year 2025 would have only been 3.4 percent of people who are actually added to the waitlist, correct?
02:25 A I'm not that quick to do the math in my head. It

02:25 would be roughly 105 or 104 out of just over 6,000, so...
02:25 Q So less than --
02:25 A I'd have to get a calculator.
02:25 Q Okay. Well, and that was the ones that were just requested. You then went on to say that, of those requested, only 53 were granted --
02:25 A That's correct.
02:25 Q -- correct?
02:25 So out of the 6,000 people that were on the list, only 53 were actually granted an expedited admission request?
02:26 A Only 53 requests were made and it was granted, yes.
02:26 Q Okay. Out of that 6,000 people that were actually waiting to get into an inpatient --
02:26 A Yes.
02:26 Q -- bed?
02:26 Okay. I'd also like you to take a look at P-27, native form.
02:26 So if we scroll all the way up to the top, do you know what this document is?
02:26 A It appears to be a tracking form of individuals that have made a request for expedited admission.
02:26 Q Okay. So we talked about Fiscal Year '25. I want to look at Fiscal Year '23. If you scroll to the bottom

02:27 of Fiscal Year '23, can you tell me how many total
02:27 requests were made that year?
02:27 A If this is that document, it would be 76.
02:27 Q Right. And how many were approved?
02:27 A Forty-seven.
02:27 Q Okay. And if we go to 2022 and scroll down to the
02:27 bottom.
02:27 And how many were requested that year?
02:27 A Thirty-five.
02:27 Q And how many were approved?
02:27 A Eighteen.
02:27 Q So people who are requesting expedited admissions
02:27 are a very, very, very small portion of the total
02:27 waitlist.
02:27 Would you agree?
02:27 A Yes.
02:27 Q Okay. And the number who are granted is even
02:27 smaller than those that are being requested, correct?
02:27 A Yes.
02:27 MS. MITCHELL: Okay. And you can take that
02:27 down now. Thank you.
02:27 *(Mr. Radic complies.)*
02:27 Q. (BY MS. MITCHELL) And so you had talked about all
02:27 of these people who make these expedited admission
02:27 requests, correct?

02:27 A Yes.
02:27 Q You said jails make them, family make them, Courts make them, correct?
02:28 A Yes.
02:28 Q Are HHSC and the jails making those requests themselves?
02:28 A The jail sends them to us. I'm not aware that HHSC goes through and looks for them.
02:28 Q Okay. Thank you.
02:28 A Now, there are times when I've done an MSU request and looking at it, says, does this person maybe need an expedited admission request as well, but that's a very limited number.
02:28 Q And when you were speaking about the admissions policy -- do you recall speaking about the admission policy?
02:28 A Yes.
02:28 Q And in that admission policy when you had testified before, you said that admission policy is evidence based, correct?
02:28 A Yes.
02:28 Q Okay. And that policy requires first come/first served, correct?
02:28 A Yes.
02:28 Q Okay. And when we spoke during your deposition, you

02:29 indicated that you could not say whether that admission
02:29 process policy reduced the length of time somebody was
02:29 in the hospital, correct?
02:29 A I'm sorry. You have to repeat that.
02:29 Q Yes.
02:29 You indicated that based on that policy, you weren't
02:29 able to determine whether or not it reduced the wait
02:29 time for somebody to get into the State hospital,
02:29 correct?
02:29 A I don't remember that. I'm a little confused on the
02:29 context.
02:29 Q So you have an admission policy for the State
02:29 hospitals, correct?
02:29 A Yes.
02:29 Q Does that have any bearing on the people waiting in
02:29 jail to get to a State hospital, that policy?
02:29 A I'm having a little trouble understanding where
02:29 you're coming from.
02:29 Q Does that policy apply to anybody in the State
02:30 jails?
02:30 A Yes.
02:30 Q Say --
02:30 A Yes.
02:30 Q It applies to people in the jails?
02:30 A Yes.

02:30 Q How does it apply to people in the jails?
02:30 A People in the jails are admitted when, you know, the available bed comes up. So they're in the waiting list. And when their number comes up, we admit them to the hospital.
02:30 Q So it doesn't apply until they get to the State hospital?
02:30 A That's correct.
02:30 Q Okay. And you agree that some people do decompensate or deteriorate while waiting in jail for a State hospital bed, correct?
02:30 A Yes.
02:30 Q Okay. And I think previously when Counsel was talking to you, you indicated that when somebody is admitted to a State hospital, competency restoration services should start upon admission to the hospital or the next business day, correct?
02:31 A Yes. We start the initial assessments and evaluations at admission, would be the first.
02:31 Q That's because they are admitted for a reason to actually begin competency restoration treatment, so they should start that right away, correct?
02:31 A They are admitted to a State hospital for psychiatric care. That begins immediately. Within the first 60 hours, we will do a competency assessment to

02:31 kind of understand where they are in that process.
02:31 Q And then begin competency restoration services,
02:31 correct?
02:31 A Yes. I mean, they may not go to a competency class
02:31 the next day, but we'll move them and start providing
02:31 them a comprehensive array of services.
02:31 Q And then you testified that if care were delayed,
02:31 there could potentially be harm from delaying that care
02:31 for somebody that needs it, correct?
02:31 A Yes.
02:31 Q And you also said -- stated during your deposition
02:31 testimony that you don't see a reason why you would
02:31 delay that care, correct?
02:32 A Correct.
02:32 Q So I wanted to talk a little bit about -- so when we
02:32 spoke during your deposition, you said that you do not
02:33 review the workforce capacity dashboard, correct?
02:33 A I do not review?
02:33 Q The workforce capacity dashboard that HHSC
02:33 publishes?
02:33 A Not routinely, no.
02:33 Q Okay. And you testified that you do not have an
02:33 opinion about whether or not State hospitals currently
02:33 have sufficient staff for the funded beds at the State
02:33 hospital, correct?

02:33 A I don't remember that part of the deposition.
02:33 Q Okay. Standing here today, do you believe that you have an opinion about whether or not the State hospitals have sufficient staff for the funded beds that they have?
02:33 A For the current capacity, yes. But my understanding, even in this trial and before this, that we have some beds that are offline that might be part of our total capacity, but for our current capacity, that's -- that's the staff we have to take care of the individuals that are current temporary capacity.
02:34 Q Okay. But you don't have -- so -- but you don't have an opinion about whether or not there is enough staff for the funded capacity, not the actual current capacity, correct?
02:34 A My understanding is that's why they're offline, is because we don't have the --
02:34 Q Okay.
02:34 A -- staffing -- the staffing for that larger number of the funded capacity. So there are some beds offline because of staffing.
02:34 MS. MITCHELL: I'd like to turn back to your deposition on Page 179.
02:34 *(Mr. Radic complies.)*
02:34 Q. (BY MS. MITCHELL) And if you look at Lines 4

02:34 through 11.
02:34 A Do you want me to read this?
02:34 Q Yes.
02:34 A Question: "Okay. So you don't have an opinion
02:34 about whether or not the State hospitals have sufficient
02:34 staff for the funded beds at the State hospitals?"
02:35 "Ms. Gdula: Objection; form."
02:35 Answer: "No, I don't. I don't really.
02:35 That's not part of my job, is to know what our funding
02:35 is, and my job is really -- to really assure that we
02:35 provide appropriate care to individuals under our care."
02:35 Q And then if you go further down to 12 through 18,
02:35 talking about offline beds, can you read what you
02:35 previously provided during your testimony?
02:35 A Question by Ms. Mitchell: "Okay. Do you know
02:35 whether or not there are currently beds that are offline
02:35 due to not having enough staff to serve patients that
02:35 would be -- that would occupy that bed?"
02:35 Answer: "I have heard in passing that there
02:36 are, but I do not know where, when, and these patterns.
02:36 That's not something that would be part of my job."
02:36 MS. MITCHELL: Thank you. I'll take that
02:36 down.
02:36 *(Mr. Radic complies.)*
02:36 Q. (BY MS. MITCHELL) So Counsel had spoken to you

02:36 about who opines on whether or not somebody is
02:36 incompetent to stand trial, correct?
02:36 A Yes.
02:36 Q And you had indicated that was the Courts, correct?
02:36 A We opine whether someone -- we believe someone is
02:36 competent or not. We present that to the Court, yes.
02:36 Q Okay. So it is the State hospital that does
02:36 evaluate to determine whether or not they believe
02:36 somebody is competent to stand trial, correct?
02:36 A Yes.
02:36 Q And, in fact, and then you also talked about --
02:37 sorry.
02:37 You also spoke about once somebody has been found
02:37 incompetent and unlikely to restore, correct?
02:37 A Yes.
02:37 Q And, at that point, there was a decision that's made
02:37 whether or not they would continue on to an extended
02:37 commitment for restoration, correct?
02:37 A We don't make that decision, but the decision is
02:37 made by the Court, yes.
02:37 Q But in order for the Court to make that decision,
02:37 you're aware the Constitution requires there be a
02:37 psychiatric evaluation opining whether or not that
02:37 individual is appropriate for or not appropriate for
02:37 that continued inpatient care?

02:37 A My understanding is it is statutory, but, yes.
02:37 Q Okay. And so it is the State hospital that does those assessments and sends them to the Court when they believe that person is ready --
02:38 MS. MITCHELL: Or let me take that back.
02:38 Q. (BY MS. MITCHELL) You actually do those assessments every year as required by the statute?
02:38 A Yes.
02:38 Q Okay. And then Counsel had talked about how 9 percent who don't restore remain for long periods of time in the hospital, correct?
02:38 A Those 9 percent that are not restored potentially would remain. Again, it would be up to the Court's decision.
02:38 Q And there are times that the Court does release those individuals based on the evaluations provided by the State hospital, correct?
02:38 A They may be released. I think the evaluations just tell them whether -- our opinion of whether that individual is competent or not. But other factors that may decide whether they would release, charges dropped, accept outpatient commitment.
02:39 Q Or they no longer meet commitment criteria, correct?
02:39 A That's possible.
02:39 Q Sitting here today, you don't know how many of that

02:39 9 percent do have charges dropped or dismissed or who no longer meet commitment criteria and then are released?
02:39 A I do not, no.
02:39 Q Okay. And during your testimony previously, you indicated that you believe more community discharge options would help with the waitlist, correct?
02:39 A Yes.
02:39 Q Okay. And that was the patient discharge -- the patient needs the discharge form that you developed which was to help identify what those community barriers to discharge would be, correct?
02:40 A Patient Discharge Needs Form, yes.
02:40 Q I keep getting that mixed up.
02:40 MS. MITCHELL: And can we show Plaintiffs' Exhibit 50?
02:40 *(Mr. Radic complies.)*
02:40 Q. (BY MS. MITCHELL) Are you familiar with this slide?
02:40 A Yes.
02:40 MS. MITCHELL: If we can move down to Slide 6.
02:40 *(Mr. Radic complies.)*
02:40 Q. (BY MS. MITCHELL) Can you tell me what that slide shows?
02:40 A This is a question that asks: "Does patient need continued inpatient hospitalization if appropriate support and monitoring were available outside of the

02:40 hospital?"

02:40 So of the people who have the form completed by the recovery team, 375 said, no, or 30 percent, where 876 were, yes, 70 percent.

02:41 Q And so the 375, if there were appropriate discharge alternatives, could be moved to the community, correct?

02:41 A It would depend. The majority of those are under forensic commitment, so it would require a judge's approval for that moving, but if it were available to them potentially they could, yes.

02:41 MS. MITCHELL: So, yes, let's go to the next slide.

02:41 *(Mr. Radic complies.)*

02:41 Q. (BY MS. MITCHELL) This slide just shows that out of the 374, that it was 372 that are adults, correct? I want to make sure we're talking about the correct numbers.

02:41 A It would be out of the 379, 372 were adults.

02:41 Q Right. Correct.

02:42 MS. MITCHELL: Okay. And the next slide. You can scroll that.

02:42 *(Mr. Radic complies.)*

02:42 Q. (BY MS. MITCHELL) And so this slide says that of those 372, 11 of them are voluntary, correct?

02:42 A Yes.

02:42 Q There is no Court approval necessary for voluntary patient to be discharged, is there?
02:42 A That is correct.
02:42 Q So that -- the reason they're here is because there is no community alternative that's available to them, correct?
02:42 A Yes.
02:42 Q Okay. And then there is the civil commitment that is 89 people are on civil commitment, correct?
02:42 A Correct.
02:42 Q And, again, the Court is not required to make any determination about whether or not they remain in the hospital, correct?
02:42 A That is correct.
02:42 Q Okay. So, again, the only reason that they're remaining in the hospital is because there is no appropriate community-based placement alternative, correct?
02:42 A For them, yes.
02:42 Q Okay. And so -- and then we get to the 46Bs which are the incompetent-to-stand-trial population, correct?
02:43 A Yes.
02:43 Q Okay. And that says there's 203 people that are currently in the hospital, correct?
02:43 A Correct.

02:43 Q And they're currently in the hospital at this point because they're waiting -- also, like the voluntary and the civil, for an appropriate community-based alternative, correct?
02:43 A Not entirely. They're there for competency restoration. The reason that -- do they require a psychiatric hospitalization at this point to -- due to their psychiatric symptoms, the answer is if they had the appropriate monitoring and supervision outside of the hospital, they could be safely transitioned, but those forensic charges are still there and that's why they were admitted to the hospital, was for competency restoration.
02:43 Q Right. But at this point that a person moves over to what we call the 46B.102 or the extended commitment, correct?
02:44 A These are a mix of all of the 46B commitments together.
02:44 Q So you don't know what percentage are --
02:44 A No, I do not.
02:44 *(Overlapping speakers.)*
02:44 Q. (BY MS. MITCHELL) -- on these now?
02:44 A This does not show that.
02:44 MS. MITCHELL: Okay. And can you pull up Defendant's 117, please?

02:44 *(Mr. Radic complies.)*
02:44 MS. MITCHELL: Can you go to Slide 19?
02:45 19. Sorry.
02:45 *(Mr. Radic complies.)*
02:45 MS. MITCHELL: Can you scroll down.
02:45 *(Mr. Radic complies.)*
02:45 MS. MITCHELL: Sorry, Slide 33, one more down from that one.
02:45 *(Mr. Radic complies.)*
02:45 MS. SNEAD: Oh.
02:45 MS. MITCHELL: There we go.
02:45 Q. (BY MS. MITCHELL) And so based on this slide, it indicates that if there were appropriate step-down units, that would be part of some of the community-based alternatives, correct?
02:46 A Sorry. Can you repeat that?
02:46 Q So, in this slide, it talks about step-down homes. Are step-down homes part of that community-based alternatives?
02:46 A Let me look at the slide. I'm not familiar with it.
02:46 Q You're not familiar with step-down --
02:46 A I'm not familiar with the slide, so I just need to read it.
02:46 Q Oh, I'm sorry.
02:46 A (Witness reviewing document.)

02:46 Now, I'm sorry, thank you.
02:46 What was your question?
02:46 Q Sure. So, basically, does this slide suggest that if there were 30 additional -- well, can you explain what a step-down home is?
02:46 A A step-down home is a program that we developed -- or the LMHAs have developed with our collaboration to provide transitional housing and support between inpatient and outpatient.
02:47 Q So that would be a community alternative, correct?
02:47 A Correct.
02:47 Q Okay. And so does this slide suggest that if there were 30 more of those step-down homes, that the HHSC could save 6.6 million annually?
02:47 A It does.
02:47 MS. MITCHELL: Okay. Thank you.
02:47 No more questions.
02:47 MS. GDULA: Very briefly.

**REDIRECT EXAMINATION**

02:47 QUESTIONS BY MS. GDULA:
02:47 Q Does HHSC restrict the number of expedited admissions requests that can be made?
02:47 A No.
02:47 Q Would you expect that somebody who believes that they are suffering in jail to request expedited

02:47 admission?
02:47 A The individual themselves?
02:47 Q I'll rephrase. That's an excellent point.
02:48 Would you expect that a request would be made on behalf of somebody who was suffering in jail for expedited admission?
02:48 A I don't know.
02:48 Q Okay. I want to clarify something about the competency exams and the process with the Court.
02:48 How does HHSC determine whether somebody that it has been treating with competency restoration services is competent?
02:48 A Well, we have a process in place that we do a competency screening. It's usually someone that is familiar with the individual that screens to see what is the likelihood that they would pass or be found competent.
02:48 Then we assign a competency assessor which by statute is someone that is either a psychiatrist or a psychologist with appropriate training to do those assessments and we have someone who is not treating that individual. So it's someone from outside of the current treatment.
02:48 Q And if that assessment indicates that the individual
02:49 is competent, what does HHSC do next?

02:49 A They inform the Court.
02:49 Q What, in your experience, does the Court do with that information?
02:49 A They come -- they get the patient and they have a competency hearing.
02:49 Q Does HHSC perform that examination for the Court -- competency examination, I apologize, for the Court?
02:49 A We give their opinion, whether the Court wants to set one or not. Usually, the Court accepts the opinion that we give, but there are times where, for one reason or another, they want a second opinion or an outside opinion.
02:49 Q And where would that second opinion or outside opinion come from?
02:49 A Typically, it would come from the Court or from the defense. It may occur while they're still in the State hospital or it may occur when they return to jail.
02:49 Q And I'm sorry, it was a bad question on my part.
02:49 Who would be performing that assessment to determine -- to give the second opinion on competency?
02:50 A Whoever the Court decides, but it would not be HHSC.
02:50 MS. GDULA: Okay. I pass the witness, Your Honor.
02:50 THE COURT: Anything else?
02:50 MS. MITCHELL: No, Your Honor.

02:50 MR. KERCHER: Nothing further.
02:50 THE COURT: Okay. You can step down.
02:50 MS. GDULA: Your Honor, unless the Court would like any delay, we are ready to call our next witness.
02:50 THE COURT: We can start and then we'll take our afternoon recess about 3:30.
02:50 MS. SNEAD: Your Honor, my apologies. I will be the one objecting and I do need five minutes. I am so sorry.
02:50 THE COURT: That's okay. We'll take our recess now.
02:50 *(Recess taken at 2:50 p.m.)*
02:50 *(Open court, commencing at 3:07 p.m.)*
03:06 THE COURT: Please be seated.
03:07 So before we get started. This is off the record. We don't need to put this on the record.
03:07 *(Discussion off the record.)*
03:09 MS. GDULA: Your Honor, the defendant calls Scott Schalchlin.
03:09 THE COURT: Okay.
03:09 *(Witness sworn.)*
03:09 THE COURT: And Mr. Schalchlin -- is it "Mr. Schalchlin"?
03:09 THE WITNESS: Yes.
03:09 THE COURT: All right. Would you just make

03:09 sure that you adjust the microphone so you're speaking
03:09 into it. It makes it much easier for everyone to hear
03:09 you.
03:09 As I'm saying that, I need to do my own
03:09 here.

03:09 **SCOTT SCHALCHLIN,**

03:09 having been first duly sworn, testified as follows:

03:09 **DIRECT EXAMINATION**

03:09 QUESTIONS BY MS. GDULA:
03:09 Q Mr. Schalchlin, would you introduce yourself to the
03:09 Court?
03:09 A My name is Scott Schalchlin. I'm the Deputy
03:10 Executive Commissioner for the Health and Specialty Care
03:10 System with HHSC.
03:10 Q And what does it mean to be the Deputy Executive
03:10 Commissioner for Health and Specialty Care?
03:10 A I oversee the State hospitals and the
03:10 State Supported Living Centers.
03:10 Q How long have you been in that role with HHSC?
03:10 A Since late August 2021.
03:10 Q And how long have you worked for HHSC overall?
03:10 A Well, I first started in 1987 in direct care at Rusk
03:10 State Hospital.
03:10 Q And what was -- what were you doing at Rusk?
03:10 A I was a direct care worker.

03:10 Q After Rusk, where did you go?
03:10 A I went from Rusk to the Lubbock State -- what was called the Lubbock State School at the time which is within our system, but it's one of the State Supported Living Centers.
03:10 Q And when did you come back to HHSC?
03:10 A So I came to -- I went to work for the criminal justice system for a while. I came back in 2001 working at the Waco Center for Youth and then came to State office that same year.
03:11 Q Okay. What is exactly is the Health and Specialty Care System?
03:11 A That is the division within HHSC that operates the State hospitals and the State Supported Living Centers.
03:11 MS. GDULA: And I am going to put up -- Nolan, if you could pull up Exhibit D-88, which has been previously admitted. That's Slide 2.
03:11 *(Mr. Nolan complies.)*
03:11 Q. (BY MS. GDULA) How many State hospitals are there in Texas?
03:11 A We have -- this reflects nine on there, but we actually have ten because recently the North Texas State Hospital System was split between -- on here, it lists Vernon and Wichita Falls campus.
03:11 But now it's the Vernon State Hospital in

03:11 Wichita Falls. So we have ten hospitals and we have one
03:11 residential treatment center.
03:11 Q So instead of North Texas State Hospital Vernon
03:12 campus, it's just Vernon State Hospital?
03:12 A Yes.
03:12 Q And the same, instead of North Texas State Hospital
03:12 Wichita Falls Campus, it's just Wichita Falls State
03:12 Hospital?
03:12 A Correct.
03:12 Q Are there any other State-owned facilities other
03:12 than these State hospitals in the state of Texas?
03:12 A Yes, we own the -- you'll see on the map, the John
03:12 S. Dunn Behavioral Sciences Center. We own that
03:12 hospital and it's operated by UT Health Houston. And
03:12 then we are getting ready to open the hospital in
03:12 Dallas, which we also own.
03:12 Q I know -- and you did point out this map, I believe,
03:12 is from 2022. Other than splitting the North Texas
03:12 State Hospital into two distinct State hospitals, has
03:12 the number of State hospitals in Texas fluctuated over
03:12 time?
03:12 A It has not.
03:12 Q Are there plans to add any State hospitals other
03:12 than the Dallas facility that you've just mentioned?
03:12 A Yes.

03:12 Q And what are those plans?
03:13 A We are building a new hospital in Amarillo, the Panhandle Hospital there. We're also building a new 50-bed maximum security hospital in Lubbock. We're building -- we're expanding the Rio Grande State Center by 50 beds with a maximum security unit there.
03:13 And I think that's it.
03:13 Q Are there any other expansions of existing State hospitals that are planned?
03:13 A Well, we're doing rebuilds at Terrell State Hospital as well as Wichita Falls and -- oh, we're also expanding by 40 beds the San Antonio State Hospital maximum security unit there.
03:13 MS. GDULA: Nolan, would you please put up Plaintiffs' Exhibit 70.
03:13 *(Mr. Oldham complies.)*
03:13 Q. (BY MS. GDULA) Do you know what this document is, Mr. Schalchlin?
03:13 A Yes.
03:13 Q What is it?
03:13 A It's what we often call the Cannon report.
03:14 Q And what is the Cannon report?
03:14 A It was a report that was directed by the Legislature for the Department of State Health Services who was operating the State hospitals at the time to do an

03:14 analysis of the State hospital system and identify what needs there may be in the future.
03:14 Q Do you know why the Legislature directed this report be commissioned?
03:14 A I don't know the specifics. I do know that they wanted to look at the current infrastructure because we have very old buildings and also I wanted to look at what future needs there would be for the state.
03:14 Q And we're going to talk about what is in the Cannon report. But is this a plan that HHSC follows?
03:14 A It's -- well, they're consultants, and so it's guidance. So what they did is they did an analysis of the building, infrastructure, things like that. They also looked at population trends and other things to give guidance to the agency on what we might want to consider for the future to bring before the Legislature.
03:15 MS. GDULA: Nolan, would you please go to Page 43 of this exhibit?
03:15 *(Mr. Oldham complies.)*
03:15 MS. GDULA: Could you zoom in on Exhibit 5-3, that table in the middle?
03:15 *(Mr. Oldham complies.)*
03:15 MS. GDULA: Thank you.
03:15 Q. (BY MS. GDULA) How many additional beds did the Cannon report determine HHSC would need by 2024?

03:15 A One-thousand-eight-hundred-and-forty-nine.
03:15 Q And what was the total number of beds that would be needed?
03:15 A Four-thousand-seven-hundred-and-sixty-eight.
03:15 Q Has HHSC met the goal of 4,768 beds?
03:15 A We have not.
03:15 Q Why not?
03:15 A I think there is several reasons. One is, whenever we started bringing things to the Legislature -- and even before I was in this position, the previous leadership, there were two things I needed to address. One is we had facilities that needed to be rebuilt. I already mentioned, you know, that we're doing that at Wichita Falls and Terrell, but also Austin, San Antonio, and Rusk, in order to make sure that those facilities did not go offline, because, obviously, if you're building a new hospital, but then Rusk is in such bad shape you have to close it, then you would lose those beds. And so the Legislature really focused on let's figure out which ones need to be rebuilt.

03:16 In addition to that, they did start on expansion as well, like with the Dunn Center, adding that hospital, and now we have hospitals that we're in the process of building as well.
03:16 Q How far off is HHSC from the number of beds that

03:16 Cannon believed would be needed?
03:16 A I think once all of the hospitals are complete,
03:16 we're going to be about 315 beds short of that number.
03:16 Q And when you say when all of the hospitals are
03:16 complete, what timeline is that?
03:17 A 2027.
03:17 Q Okay. So by 2027, you believe HHSC will be how many
03:17 beds short of the Cannon recommendation?
03:17 A It's about 315. And the reason I'm kind of
03:17 qualifying that is because one of the things that is
03:17 included in this analysis was local hospitals that are
03:17 serving people. Some of those are third-party payor,
03:17 but some are indigent, and I don't think -- this chart
03:17 seemed to indicate they did not anticipate any increase
03:17 in those, so if those had grown, then that number would
03:17 be smaller.
03:17 Q You said when you were talking about the Cannon
03:17 report, that the Legislature was -- wanted a forecast of
03:17 anticipated need. Was the focus of Cannon the forensic
03:17 population that the State treats?
03:17 A No.
03:17 Q So what was Cannon looking at?
03:17 A Cannon was looking at indigent care. They were
03:18 looking at, you know, State-operated beds,
03:18 community-operated beds, so much broader than just

03:18 people that are on a criminal commitment.
03:18 MS. GDULA: I want to do -- as much as I hate to do this -- a little math with you.
03:18 Nolan, could you pull up Defendant's Exhibit 88, which has been previously admitted?
03:18 *(Mr. Oldham complies.)*
03:18 MS. GDULA: If I forget just tell me. Thank you.
03:18 Q. (BY MS. GDULA) And this is Slide 9 of Exhibit 88. Do you see that list of facilities there, Mr. Schalchlin?
03:18 A Yes.
03:18 Q Okay. So what does this slide represent?
03:18 A At the point in time this was done, this slide was showing the number of beds that each of the hospitals had available and then the number of beds that were online at that time.
03:18 Q And what is the distinction between a funded bed and an online bed?
03:18 A Well, a funded bed would be a bed that's there for serving people, but if it's offline, for example, if there is construction or maintenance issues, if we're short staffed and don't have those beds available, then the online beds reflects our actual number of people we can serve at any given time.

03:19 Q So I've used the term "capacity" before. What does the term "capacity" mean to you?
03:19 A It would be the funded beds.
03:19 Q So going down this list, it says that Austin State Hospital has 263 funded beds as of this point in time.
03:19 Is that an accurate number?
03:19 A It's an accurate -- well, at the time this was done, that number is now 240. The new rebuild was a 240-bed hospital.
03:19 Q For Big Spring State Hospital, the number of funded beds in this chart is 144. Is that currently an accurate number?
03:19 A Yes.
03:19 Q For El Paso Psychiatric Center, the number of funded beds is 71. Is that an accurate number?
03:20 A Yes.
03:20 Q For Kerrville State Hospital, the number of funded beds is 220. Is that a current accurate number?
03:20 A No. We have added a 70-bed maximum security unit there, so it would be 290.
03:20 Q And this one does refer to the two campuses of North Texas, but what is now the Wichita Falls State Hospital has, in this chart, 268 beds. Is that still the current number?
03:20 A Yes.

03:20 Q For the Vernon State Hospital, it has 262 funded beds. Is that the current State number?
03:20 A Yes.
03:20 Q What is Vernon South?
03:20 A It's an adolescent unit.
03:20 Q Does this hospital serve any adult patients?
03:20 A No.
03:20 Q What is the Rio Grande -- I'm sorry, the Rio Grande State Center has 52 funded beds. Is that the current number?
03:21 A No. It's now 55.
03:21 Q And what about Rusk? Rusk has listed 288 funded beds. Is that accurate?
03:21 A I believe so.
03:21 Q San Antonio State Hospital has 262 funded beds listed. Is that still an accurate number?
03:21 A No. It's now 300.
03:21 Q The Terrell State Hospital, it has 305 beds listed. Is that still accurate?
03:21 A Yes.
03:21 Q And then what is the Waco Center for Youth?
03:21 A It's a residential treatment facility for youth.
03:21 Q It would not treat adult patients?
03:21 A Correct.
03:21 Q So Vernon South and Waco Center for Youth, if the

03:21 class members are adult patient -- forensic patients who have been found incompetent to stand trial, they would not go to Vernon South or Waco Center for Youth?

03:22 A That is correct.

03:22 Q So if we add together -- and this is the math -- 240 beds from Austin State Hospital, 144 beds from Big Spring, 71 from El Paso, 290 from Kerrville, 268 from Wichita Falls, 262 from Vernon, 55 from Rio Grande, 288 from Rusk, 300 from San Antonio, 305 from Terrell, and then I left it out here at the bottom. We have got Dunn Behavioral Health Sciences Center that has 104 funded beds. Is that still an accurate number?

03:22 A No. It's 168.

03:22 Q And then the 168 beds from Dunn, we get 2,391 beds.

03:22 Does that sound right?

03:22 A Sounds about right.

03:22 Q And those all exist right now?

03:22 A Yes.

03:22 Q You mentioned some construction projects that are either ongoing or will be completed by 2027. The first one that I believe you mentioned was the Dallas facility. Can you tell me what that project is?

03:23 A Yeah, that's going to be a 292-bed hospital, 200 of which serve adults.

03:23 Q And then the Panhandle, I believe it was the -- or

03:23 the Amarillo facility, what's that?
03:23 A It's going to be a 75-bed facility. And just to be clear about Dallas, it's going to open much sooner than 2027. But the Amarillo one is -- I'm sorry, 75 beds.
03:23 Q And, actually, while we're talking about this.
03:23 MS. GDULA: Nolan, would you go ahead and put up Defendant's Exhibit 87, which has previously been admitted?
03:23 *(Mr. Oldham complies.)*
03:23 Q. (BY MS. GDULA) I think some of these names might appear on that and may help you remember them.
03:23 So you said Amarillo is going to have 75 beds?
03:23 A Seventy-five, yes.
03:24 Q And then you also mentioned a facility in Lubbock.
03:24 A That is correct. That's going to be a 50-bed maximum security unit.
03:24 Q And you also mentioned, I believe, some expansion in existing facilities. What are those?
03:24 A The Rio Grande State Center is adding 50 maximum security beds and the San Antonio State Hospital is adding 40 maximum security beds.
03:24 Q You had mentioned that both Terrell and Wichita Falls are undergoing rebuilds right now.
03:24 What will the result of those rebuilds be on the number of beds that they have?

A The Terrell hospital is going to be a 275-bed facility, and the Wichita Falls one is going to be 250, I believe.
Q Now, on this document, Terrell State Hospital is showing that it will be 250 anticipated beds. Has that changed then?
A Yes, that has changed. When we constructed it, we've gotten better at being more efficient and we were able to add 25 additional beds to that one and on Wichita Falls, it's going to be 225 -- I said 250, but it's 225.
Q So what would the net result to Terrell be when that construction is done?
A It's going to be 30 beds smaller.
Q And what about Wichita?
A It will be 43 beds smaller.
Q Okay. So if we add together the 292 beds from Dallas, the 75 beds from Amarillo, the 50 from Lubbock, the 40 from San Antonio, the 50 from Rio Grande, and then subtract the 30 from Terrell and the 43 from Wichita Falls, we will end up with about 434 new beds?
A That sounds about right, yes.
Q For all of that construction -- or the projects that we are talking about, when do you expect those projects to be completed?

03:25 A In 2027, the final date. As I said, Dallas, for example, is going to be opening sooner, but overall 2027.
03:26 Q Now, I know that the -- while this lawsuit may be focused on adult inpatients, the Cannon design report you said was focused on overall mental health.
03:26 Are there going to be any changes to those adolescent facilities that we talked about, I believe it was Vernon South, Waco, and I believe there is a mention of one in Terrell as well?
03:26 A There is -- yes, there is also going to be a 30-bed facility in Terrell that is for serving children through -- without placement that are in the DFPS conservatorship and those are going to remain the same.
03:26 Q And so will there be any -- so, Vernon South, I believe in our previous slide was 32 beds and Waco Center for Youth was 74. Those are staying the same?
03:26 A Yes.
03:27 Q Okay. You were not in here earlier to hear the discussion. But what are contracted beds?
03:27 A So contracted beds are beds that we -- just as it implies by name that we contract out for competency restoration services generally. Almost all of them are CR beds or competency restoration. And so that's where we would contract directly with the provider to provide

03:27 those services.
03:27 Q How many contracted beds does HHSC have? And I
03:27 believe we can use this exhibit that is up right now to
03:27 talk about some of those.
03:27 Let's start -- well, let's start in the note.
03:27 Do you see that -- where it says "note" in the
03:27 bottom left of the map?
03:27 A Yes, and this is a little blurry. I don't know if
03:27 it can be --
03:27 Q Can you zoom in on the note to make it a little
03:27 clearer?
03:27 A Or just the whole thing if it can be just slightly
03:28 bigger.
03:28 *(Mr. Oldham complies.)*
03:28 MS. GDULA: We'll start with the note.
03:28 A That's a lot bigger. Yes. So we have -- the
03:28 Legislature funded us to add 150 contracted competency
03:28 restoration beds and we have done that, as well as
03:28 16 geriatric beds. I know here it says they're in the
03:28 preplanning stages, but it is -- this is an older
03:28 document.
03:28 Q. (BY MS. GDULA) And so there were 150 contracted
03:28 competency restoration beds that have been added?
03:28 A Yes.
03:28 Q Is that map a little clearer for you zoomed in?

03:28 A Not really, but I can see it well enough.
03:28 Q Okay. I apologize.
03:28 A That's okay.
03:28 Q If you look in the southeastern part of the state, what is Beaumont Baptist Hospital?
03:28 A Okay. So that is part of -- the Legislature also gave us funding to provide grants to private hospitals and also counties to be able to build additional facilities and then we will be contracting beds out of those facilities for competency restoration. So you will see Beaumont Baptist, there's going to be 72 new beds.
03:29 Victoria County, there's going to be up to 60. The Rio Grande Valley grant down at the bottom, up to 100 new beds. And then we're adding at Montgomery County an additional 100 beds to the ones that they currently have. We also have contracted beds already with Montgomery County just to be clear.
03:29 Q How many contracted beds are there with Montgomery County currently?
03:29 A Ninety-four.
03:29 I do want to clarify one thing on the 150 competency restoration beds. Some of those are part of that Montgomery County number, so I don't want to accidentally count that twice. So I will clarify that

03:29 in a second.

03:29 We also have a contract with Palestine
03:29 Regional Hospital for 31 beds and 11 of those are also
03:30 part of the 150, and so just to be clear on that. And
03:30 then on the Montgomery County, we have got a handful of
03:30 beds there that are part of that 150 as well.

03:30 We also have U.T. Northeast Tyler where we
03:30 have 44 beds under contract there. Those aren't
03:30 competency restoration beds, but they are serving people
03:30 that Rusk had -- it's kind of an extension of Rusk for
03:30 people that have more medical issues and that allowed us
03:30 to open up additional beds at Rusk for competency
03:30 restoration. And then we're going to be adding 44 more
03:30 beds at U.T. Tyler.

03:30 Q So you said that of the 150 that we talked about in
03:30 the note of contracted competency restoration beds,
03:30 14 of those went to --

03:30 A Fourteen are at Montgomery County and 11 are at
03:30 Palestine.

03:30 Q So there are 125 other beds --

03:30 A Yes.

03:30 Q -- that were contracted just throughout the
03:31 community?

03:31 A Yes, we -- what we did was we targeted the counties
03:31 that had the largest number of people on the waitlist to

03:31 see if we could get some contracts there because that would help hit those numbers and we worked through the local mental health authorities to contract those.

03:31 So we have Travis County, Tarrant County, and I don't remember where the others are. I think one is in Harris County and maybe one in Bexar County.

03:31 Q So in terms of the number of contracted beds, either current or planned for the future, we've got 125 from that note.

03:31 You said there were 72 at Beaumont Baptist. There were 60 planned for Victoria. 100 planned for the Rio Grande valley. There are currently 94 in Montgomery County and another 100 are anticipated?

03:31 A Yes.

03:31 Q There are currently 44 in Tyler and another 44 anticipated?

03:31 A Yes.

03:31 Q There are 31 in Palestine. And I did want to mention in the note, there is a reference to 600 -- I'm sorry, 16 geriatric beds. What are those?

03:32 A Those are kind of similar to the U.T. Tyler beds. There -- what we did is we're contracting to have people that are currently in State hospitals that can be served in that environment and it is for elderly people and, again, that just helps expand our capacity and we're

03:32 also looking -- we have a request to LBB right now, the
03:32 Legislative Budget Board, that we are anticipating will
03:32 be approved pretty soon, possibly even in the next week
03:32 or two, to contract 40 additional beds in the Permian
03:32 Basin.
03:32 Q Okay. So if we take to -- all of those numbers, the
03:32 125, the 72, the 60, the 100, the 94, 100, 44, 44, 31,
03:32 and 16, we are going to get to, I believe, 686
03:33 contracted beds, but you said there may be 40 more that
03:33 are coming?
03:33 A Yes.
03:33 Q Which would put us about 726?
03:33 A Yes.
03:33 Q What does "BHS" stand for?
03:33 A Behavioral Health Services.
03:33 Q And how do they fit into the HHSC system?
03:33 A They do contracting for community beds -- I mean,
03:33 they do more, but that's what they do in terms of this.
03:33 Q And how do those contracts help with State hospital
03:33 capacity?
03:33 A If people can be served in those beds, then,
03:33 obviously, they wouldn't have to come to a State
03:33 hospital. So that allows us -- number one, it allows
03:33 the agency to have people served closer to home, and be
03:33 able to get services they need, but also helps divert

03:33 some people that might have come to a State hospital to be served in those settings.
03:33 Q Do you know approximately how many contracted beds BHS has?
03:33 A I think it's a little over 800.
03:33 Q And so when you add up all of those beds: Current, future, and the contracted beds, that's how you get to the difference between Cannon's recommendation and where HHSC currently is?
03:34 A Yes.
03:34 Q Now, some of these construction projects I know are not done yet so there may be some question about whether or not those beds will actually come online. I'd like to go through some of these projects so we can talk about that.
03:34 MS. GDULA: Nolan, will you please put up D-105, which has previously been admitted?
03:34 *(Mr. Oldham complies.)*
03:34 Q. (BY MS. GDULA) Do you recognize this document, Mr. Schalchlin?
03:34 A I do.
03:34 Q What is it?
03:34 A This is a construction and renovation status update that we do to track our construction projects.
03:34 Q What is the date of this document?

03:34 A August 2025.
03:34 Q Okay. So just about four months ago?
03:34 A Yeah.
03:34 Q Okay. So let's run through these projects to see the status of them and how HHSC is doing in getting them completed.
03:35 A Okay.
03:35 Q What is the first project that listed?
03:35 A The first one actually is the new central kitchen at Rusk, but the rebuild at Rusk is done and they have occupied it.
03:35 MS. GDULA: Can you go to the second project for me?
03:35 *(Mr. Oldham complies.)*
03:35 A This is the Dallas State Hospital. So we reached substantial completion of that building in September and we are scheduled to have substantial completion of the pediatric unit done in April.
03:35 Q. (BY MS. GDULA) Do you know when this facility will start treating patients?
03:35 A I don't have an exact date yet. We are anticipating it's going to be sometime, hopefully, in June. We're working with the Legislative Budget Board on who's going to operate that hospital. Once we have that approval, if UTSW takes it, which was the original plan, they have

03:35 given us a June date as an estimate.
03:35 MS. GDULA: Could you go to the next project?
03:35 There we go.
03:36 *(Mr. Oldham complies.)*
03:36 A So this is the replacement at Terrell. That is underway. We have broken ground. Construction is happening and that's running on time.
03:36 Q. (BY MS. GDULA) And when is the anticipated completion date of that project?
03:36 A I believe it is in June of 2000 -- I'm sorry, it's in 2027. I don't know the exact month.
03:36 Q And this was the one that the result will reduce Terrell by 30 beds?
03:36 A That is correct.
03:36 Q Why would HHSC have a rebuild project that reduces the number of beds at a facility?
03:36 A That's a good question. So when we were working with the Legislature, they were trying to determine -- because they've spent 2.85 billion on all of these construction projects, they were trying to determine the best way that we could maximize the dollars.
03:36 And so one of the things they looked at is maybe bringing Terrell and Wichita Falls down a little bit to use that additional money, for example, to build the Lubbock hospital. The Lubbock hospital wasn't even

03:37 an original request.
03:37 But we negotiated, kind of, let's bring these down, save a little money, that way we can build in Lubbock. It also freed up money for the grants that I mentioned to build -- to have those other hospitals expanding.
03:37 So, really, they were looking at the whole system. It wasn't how big is Terrell, how big is Wichita Falls. It is what can we do overall to add beds to this system.
03:37 It also helps us with staffing because anytime -- especially if you get more rural areas, you are always going to have challenges, you know, with the size of the hospital because you have only got a workforce so large.
03:37 So this allowed us to kind of, you know, shrink that down and have buildings elsewhere so that we would be able to staff more effectively.
03:37 MS. GDULA: We can go to the next project.
03:37 *(Mr. Oldham complies.)*
03:37 A And this is the Wichita Falls replacement, again, this one is running on time as well.
03:37 Q. (BY MS. GDULA) It looks like this completion is anticipated in 2027?
03:37 A Correct.

03:37 Q This is another one that will reduce the number of beds?
03:38 A At that hospital, yes.
03:38 MS. GDULA: If you could go to the next project, Nolan?
03:38 *(Mr. Oldham complies.)*
03:38 A This is a new Panhandle hospital in Amarillo. It's also -- they're constructing now. It's running on time.
03:38 Q. (BY MS. GDULA) And what is on time?
03:38 A 2027.
03:38 MS. GDULA: If you could go to the next project?
03:38 *(Mr. Oldham complies.)*
03:38 A This is the new maximum security at Lubbock, also construction is occurring. It's also scheduled for 2027 to be complete.
03:38 Q. (BY MS. GDULA) Will this be solely an MSU facility?
03:38 A Yes.
03:38 MS. GDULA: You can go to the next project.
03:38 *(Mr. Oldham complies.)*
03:38 A The Rio Grande expansion, the same thing. It's running on time. We expect 2027 as well and it is also -- it is 50-bed maximum security.
03:38 Q. (BY MS. GDULA) Does Rio Grande have any maximum security beds at the moment?

03:38 A They do not.

03:38 MS. GDULA: If you could go to the next project.

03:38 *(Mr. Oldham complies.)*

03:38 A This is the expansion at San Antonio. This one is going to be a little bit earlier because it's, basically, taking an existing unit and restructure -- renovating it in order to be a maximum security unit, and so we're expecting it, I believe, in 2026, this coming year.

03:39 Q. (BY MS. GDULA) So when all of this construction is done between now and 2027, will there be more or less beds in the State hospital system?

03:39 A There will be more.

03:39 Q We looked at the Cannon report. It came out in 2014 and it had a projection going forward 10 years to 2024. It said back in 2014 that the State needed more State hospital beds, so why were these construction projects that we are talking about not started sooner?

03:39 A I think part of it -- working with the Legislature, obviously, we had the Cannon report as a guide, and so we brought that -- or the people before me brought it to the Legislature to explain to them what the needs were, and, again, part of it is you've got -- you're putting a huge investment and so we needed to really kind of stage

03:40 out what that was going to look like.

03:40 In part, it was rebuilding hospitals that are, 03:40 you know, crumbling infrastructure and then the other 03:40 was building new hospitals. So it -- that process takes 03:40 time. The Legislature meets every two years.

03:40 The approach they took originally was when the 03:40 need was presented to them, they would fund it the first 03:40 biennium for preplanning, planning.

03:40 And, basically, what that is, is buying the 03:40 property, getting an architecture and engineering firm, 03:40 getting the cost all settled out, figuring out what it's 03:40 going to cost, so then you can come the next session and 03:40 say, this is what it costs to build a hospital, because 03:40 at that time, you know, you're making your best guess, 03:40 but you haven't actually brought that firm in to build.

03:40 And so because of that, if you came in 2015 03:40 and got the money for that, then you would come back in 03:41 2017 to get the funding to actually build that hospital, 03:41 and then that would start after, you know, you get your 03:41 money, and it takes about four to five years -- four to 03:41 five years to build a hospital. So it is a lengthy 03:41 process. It takes time.

03:41 Q You mentioned -- and I apologize earlier -- that 03:41 there were some hospitals that needed to be rebuilt 03:41 because of crumbling infrastructure. I think one of

03:41 them that you referenced was the Austin State Hospital. When was the Austin State Hospital initially built, if you know?

03:41 A I know it was the 1800s. I don't have the actual date in front of me.

03:41 Q We talked about these existing contracted beds that BHS has, that I believe you said it was around 800. Do you have any knowledge about that number growing in the future?

03:41 A Not personally, no.

03:41 Q Okay. Earlier you said that once all of the construction projects that we talked about are complete, that there will be about a 350-bed shortage, although you mentioned something about locally-funded beds.

03:42 A So --

03:42 Q Do you have any numbers -- go ahead. I'm sorry.

03:42 A So it's 315, not 350. But that wasn't counting the 40 beds that we're probably going to get at Permian Basin. So if you factor those in, it is actually 275.

03:42 What I meant about the local, is when Cannon did this assessment, what they did is they looked at all that was available to indigent people in Texas and they included that there are local, like, counties and cities and things and also -- it is usually counties that also

03:42 fund psychiatric beds.
03:42 When they did the needs assessment, they used those as part of the total package, but then when they said how many they thought the State needed to -- or that they recommended the State build, they did not assume that there would be any growth on those local ones.
03:43 So although 275 is kind of the number I'm looking at, I don't know if that local footprint has also grown because if it has, that would also eat into that number.
03:43 Q Is that information that HHSC tracks?
03:43 A Not that I'm aware of. I know my area doesn't, but I'm not sure if we track that anywhere, to be honest.
03:43 Q Well, let's talk about -- assume that there is a 275-bed difference. Are there -- does HHSC have plans in place to bridge that gap?
03:43 A So I don't know if I like the word "gap." It implies that we're short and we don't really know that. The Cannon report -- which is a really good report, but it was written 11 years ago, so it's a little stale.
03:44 What we're trying to do now is, as we build beds, as we add -- get staff on, as we add things, what does the trend look like now? And so what we would do is continue to look --

03:44 For example, the waitlist, you know, dropped significantly over the last few years, whenever we increased our staffing and got additional beds online. So as these come on as well, we'll be able to project, is this going to meet our needs or do we still need more?

03:44 Obviously, if we felt we needed more, then we would inform the Legislature of that and make that need known.

03:44 But what I don't want to do is bring the Legislature an 11-year-old report and say, I need more beds because this report says it. We need data that's current data that shows what our need is.

03:44 Q Since we're talking about the Legislature, I'd like to discuss: How does HHSC get its funding?

03:44 A It's through the General Appropriations Act.

03:44 MS. GDULA: Nolan, could you pull up Exhibit D-120, which has already been admitted?

03:45 *(Mr. Oldham complies.)*

03:45 Q. (BY MS. GDULA) Mr. Schalchlin, what is this document?

03:45 A So this is an exceptional item request schedule. Just to kind of clarify what that is, every session, before we go into session, the agency presents to the State -- to the Legislature a couple of things.

03:45 One is our base budget. That's just what our budget is. And then exceptional items are any additional things that we're asking for over what our current base is.

03:45 And so that's where you get things where -- for example, if we have additional needs and in this particular case, I think --

03:45 MS. GDULA: Can we go to Page 7?

03:45 A Thank you.

03:45 This is a good example. So, in this case, one of our exceptional items was to expand State hospital capacity. And so that's where we put in that request to the Legislature.

03:45 It's initially submitted in the summer. That's why you see a date on here of August of 2022. It's originally given during the summer and that gives the Legislature time to start looking at it and analyzing it.

03:46 We will then work with the legislative -- either their staffers or with the legislators themselves. We often have private meetings with them. During session they'll hold hearings and other things for us to really figure out, you know, what they're going to fund.

03:46 MS. GDULA: Nolan, if you can pull up

Exhibit D-118, which has previously been admitted?

*(Mr. Oldham complies.)*

Q. (BY MS. GDULA) What is this document?

A So this -- so as I said in August -- or in the summer we present the original exceptional items request or the full legislative appropriations request which includes those exceptional items.

Then in January, we update that and that can be based on conversations that we're having with the Legislature. It could be based on new projections by the comptroller on how much money is available and so they may come back to us and say, you know, we want to know about this. And it also helps us to refine our numbers, to be more clear about what our needs are.

MS. GDULA: Nolan, could you go to Page 6 of that exhibit?

*(Mr. Oldham complies.)*

A So --

Q. (BY MS. GDULA) So if you would explain what Exceptional Item Number 4 is.

A Yes. So this is the item we were discussing earlier. So this is one of the things where we were asking, you know, that we want to continue the work initiated by the Legislature in 2017 to replace and expand the State hospital system.

03:47 This particular one talks about operational and ramp up funds for Dallas as well as the Dunn Center, as I mentioned to you earlier. It went from 102 to 168.

03:47 This was us getting those additional funds for -- to support that, and then funding the increased construction costs because construction -- at any given time when you give an estimate, things can impact the cost of building. And so sometimes we have to go back and say, hey, we were short or whatever.

03:48 Q When the Legislature allocates funds to HHSC, how does that work?

03:48 A So what they will do is in the General Appropriations Act, it will tell us how much money we get and what that money is intended for, so it's appropriated for a purpose.

03:48 Q If HHSC believes that the funds should be spent in a different way than how it's set out in the General Appropriations Act, does HHSC have the authority to change it?

03:48 A Not without legislative approval.

03:48 Q How does HHSC open new facilities?

03:48 A We're funded by the Legislature to do that.

03:48 Q And how does HHSC add new beds?

03:48 A The same thing, legislative funding.

03:48 Q What kind of funding has HHSC received from the

Legislature in the last several years to add additional beds?
A 2.85 billion has been vested in us constructing new hospitals.
Q Would those be those projects that we covered earlier?
A Yes. I'm not exactly positive if the grants for the private hospitals is part of that 2.85 billion so it may be a little bit more, but, yes, it's generally what it is. That does not include operational funds. That's just construction.
Q What are operational funds?
A So operational funds are, once you're open, you obviously have to operate. You have to pay staff, medication. All of the things it takes to run a hospital.
And so after they approve building a facility, then we come back and ask for funding to operate that facility.
Q How do the operational costs compare to the construction costs for a facility?
A So up front, the construction costs are higher, but after just a few years, the operational costs are significantly higher.
Q What other funds other than the construction and

03:50 operational costs has HHSC received from the Legislature that goes towards growing capacity?
03:50 A Well, we received funding to contract beds. We received the funding, again, to -- for the grants to build new hospitals and then we received additional funding for staff pay increases when we were having issues there.
03:50 MS. GDULA: Let's actually go ahead and put up D-82, which has been previously admitted.
03:50 *(Mr. Oldham complies.)*
03:50 MS. GDULA: Can we zoom in on that graph?
03:50 *(Mr. Oldham complies.)*
03:50 MS. GDULA: Thank you.
03:50 Q. (BY MS. GDULA) What is this document showing?
03:50 A This is a document that is tracking the number of filled positions at the State hospitals over time.
03:50 Q And can you read the first year on that graph?
03:50 A Yes. It starts with September 30th, 2017.
03:50 Q And where does it end, this particular graph?
03:50 A October 31st, 2023.
03:51 Q Can you explain to the Court the trend that we're seeing in this graph?
03:51 A Yes. So, you will see the red line that's marked COVID-19. That's when COVID first came into Texas and what we saw shortly after and as you can see down into

03:51 2022 was a huge decrease in the number of filled positions that we had.

03:51 MS. GDULA: And if we could go ahead, Nolan, and put up Exhibit D-88.

03:51 *(Mr. Oldham complies.)*

03:51 MS. GDULA: Go back to D-88, I believe, and go to Slide 5.

03:51 *(Mr. Oldham complies.)*

03:51 Q. (BY MS. GDULA) Would you explain to the Court what impact the pandemic had on State hospital staffing.

03:52 A Sure. So it really hit us in two ways. One is, we lost a lot of people. It was either staff retiring -- it was staff not wanting to --

03:52 You know, there was a lot of fear during that time, as you can -- if you remember, people were wiping groceries down, things like that. And so for a lot of staff, they really didn't want to work in that institutional setting.

03:52 But in addition to that, we were losing staff to other entities -- for example, other states were paying nurses to come in -- you know, huge rates to get traveling nurses and things like that, so we got a large decrease in the number of staff. But we also had a lot of staff that had COVID. And so if you got COVID, you would be out for at least two weeks.

03:52 And so during that period, not only did we have a lot of staff -- a lot fewer staff, but also fewer staff available even of those, due to COVID, and so that really put us in a tough position where we had to take beds offline.

03:52 Q And is that what the "Capacity" section of this exhibit --

03:52 A Yes.

03:52 Q -- is referring to?

03:52 A Uh-huh.

03:52 Q So explain how the loss in staffing impacts the State hospital capacity.

03:53 A So if you -- obviously, if you don't have direct care, nursing, doctors, care, whatever, then you have to serve fewer patients because you can't safely serve people if you don't have enough staff to serve them.

03:53 MS. GDULA: I won't make Nolan go back to the graph, but you had indicated where the number started to go up, that was because of some pay increases.

03:53 If we could go actually to Slide 6 of Exhibit D-88.

03:53 *(Mr. Oldham complies.)*

03:53 Q. (BY MS. GDULA) Can you explain how HHSC responded to that loss of staffing that happened after the pandemic -- or during the pandemic?

03:53 A Yes. And so we had several things going on. The first thing we did is we started doing recruitment bonuses. That was something that is pretty common in the private sector, but we don't do a lot with the State. And so we started trying to get creative and find ways that we could really attract people.

03:53 And so we focused on nursing and psychiatric nursing assistants, which often you'll hear them called "direct care staff" because that's where we were -- those positions are the ones that are most impactful for keeping beds online. So we started doing a lot of recruitment bonuses to get the word out, you can come sign on, you get money immediately, and, you know, try to get people in.

03:54 MS. GDULA: Nolan, if you could go to the next slide.

03:54 *(Mr. Oldham complies.)*

03:54 Q. (BY MS. GDULA) What about the salary increases?

03:54 A So, we had -- well, I want to talk about the merits as well, which is just above that, if you don't mind. So we really had two things that we had to do --

03:54 THE COURT: There is really nothing pending in terms of a question. He's kind of just going off on a narrative, which is okay if you ask the right question, but there is no question.

03:54 MS. GDULA: Well, my apologies. I asked him about the salaries and I skipped over a point, so I will go back and ask.

03:54 Q. (BY MS. GDULA) What are one-time merit bonuses?

03:54 A So what we did because we were losing staff, we were really taking two approaches. As I mentioned, the sign-on bonuses. But we also wanted to retain staff.

03:55 And so we started giving out one-time merits and, basically, they're very similar. It's a bonus to the staff in order to encourage them to stay and we tried to stage it out at different times so that people knew -- for example, if you got a merit in April and you knew that more were coming in December, then, hopefully, you know, if you were kind of thinking about leaving in October or November, you would stay because you knew you were getting that merit as well.

03:55 And so we gave out about 11 -- 15 -- about $16 million in those merit bonuses and that was for retention purposes. In addition --

03:55 Q And so we'll go back to the graph, but it looks like there was two separate salary increases that HHSC did.

03:55 Let's start with the March 2022. What were those salary increases?

03:55 A So what we did with the ones in 2022, we had lapse funds because, obviously, if we didn't have staff, then

03:55 we weren't paying those salaries.
03:55 And so we started using those lapse funds for the merits, but also we did a smaller salary increase to try to stabilize our staffing. And we targeted particular positions, again, more of those direct care type positions to really see if we could get nurses, try to keep them in.
03:56 And so those increases did have an impact. If you look at the graph, you'll see that big decline from COVID balanced out, but what it didn't do is it didn't result in us increasing the number of staff. So then we did a huge pay raise after that to really try to get the market.
03:56 Everybody was chasing it. We were seeing everything from, you know, Buc-ee's to Dairy Queen, or anybody was paying a lot of money at that time. So we did a large increase across the board at our facilities that had beds offline.
03:56 Q Let me ask you this. These are broken down into two periods. One is in March of 2022 and one is in 2023. Why wouldn't HHSC just do a big salary increase right away in 2022?
03:56 A There are two reasons. One is we weren't quite sure what market we were targeting. We were trying to figure out -- because we only had so much money. And so in

03:57 order to stay within our budget and within our appropriation, we gave as much as we could and also was hoping that that would be enough to support, you know, getting staff in.

03:57 When we saw that was enough to stabilize but not enough to bring new people in, then we had to go back and have discussions with the Legislature about getting additional funding to be able to do that second increase.

03:57 Q And what additional funding did you get from the Legislature for that second increase?

03:57 A It was, I think, about 275 million.

03:57 MS. GDULA: And if we could go back to D-83.

03:57 *(Mr. Oldham complies.)*

03:57 Q. (BY MS. GDULA) After the 2023 pay increase went into effect, what did you see in terms of staffing trends?

03:57 A We saw a huge increase in the number of staff.

03:58 As you can see on the graph immediately, our numbers started to go up. Our retention efforts were working. So turnover was going down, but also people coming in was rising pretty significantly.

03:58 Q And this chart ends -- at the end of October 2023.

03:58 MS. GDULA: If we could go to Exhibit D-73.

03:58 Q. (BY MS. GDULA) What is this document?

03:58 A So this is the entire Health and Specialty Care System. So this would be both the State hospitals and the State Supported Living Centers.

03:58 But it, basically, is, again, this long-term trend of the filled FTEs and how successful they have been. And it also includes -- and I can't quite see the small boxes, but I think it has probably our fill rates.

03:59 MS. GDULA: Is it possible to zoom in on these small boxes? I'm not sure how clear it will be.

03:59 *(Mr. Oldham complies.)*

03:59 MS. GDULA: Not very clear.

03:59 Q. (BY MS. GDULA) That's okay. My question for you is about the trend line that we see from this June 2025 dashboard. What are we seeing in terms of the staffing trend?

03:59 A That we're sustaining. We were able to increase the staff and work to about a 94 percent fill rate, 94 to 95, which is very good. It's probably the highest we've ever been. And in addition to that, our turnover is low. But what it's showing you is that we're sustaining that number.

03:59 Q If HHSC is at a 94 percent fill rate for its staff, why are there still beds that are offline?

03:59 A So, one of the issues that we had when we built the new hospitals, especially, there was a belief at the

04:00 time that we would need fewer staff for those hospitals because of the way they were designed. We didn't know until we moved in, that really wasn't the case.

04:00 So we actually needed additional staff, but we had such a large -- if you look at how many vacancies we had back during that session, it didn't seem -- we weren't quite sure at the time how many FTEs we needed because we had so many vacancies.

04:00 Once we got the positions filled, then we started looking and realized, oh, we need more people because we are at a good fill rate, but we still have these beds offline. So we did get 414 additional FTEs from the Legislature just this past September.

04:00 And we have started, of course, once you get them, you have to get them posted and all those things and staff trained and hired, but we have seen that those positions are filling now.

04:00 In fact, in Austin, they're getting ready to open a unit that has been closed for a while. And so we're going to see that continue to go up as we get those positions on.

04:01 MS. GDULA: Nolan, could you go to Page 3 of D-73?

04:01 Q. (BY MS. GDULA) This is the State hospital daily census for Fiscal Years 2020 through 2025. Can you

04:01 explain how this -- first, what is a daily census?
04:01 A So, as it implies, the average daily census is the average number of people we're serving at any given point in time.
04:01 Q Can you explain why you would have a chart showing the daily census in a staffing dashboard?
04:01 A Yes. Because the reason that we were targeting staffing was to increase the number of people we're serving. That was the goal. So, one is how you get from one to the other. And so what you'll notice here is the trend line looks very similar because when Covid hit and we started losing staff, we also had to start taking beds offline.
04:02 Once we stabilized the staff and then started increasing it, we were able to bring those beds back online; therefore, serving more people. And you can see that it went from a low of around 1420 to 1951 which is over 500 -- well, about 530 additional people being served every single day.
04:02 Q You mentioned in the last session that the Legislature funded new FTEs.
04:02 What kind of funding did HHSC receive in terms of the salaries that it's paying current employees?
04:02 A So we did ask the Legislature -- because we had to take that money, you know, in the middle -- right toward

04:02 the end of that biennium. They did fully fund the pay increases, so we had that money going forward as well.
Q Right now, there are about 1,700 -- let's use a round number -- people on the waitlist. How many beds would HHSC need in addition to what they already have existing to bring that waitlist, at least temporarily, down to zero?
A Well, if you were going to immediately bring it to zero, it would have to be 1,700.
Q Just for discussion, let's say we're trying to immediately bring it down to zero. What would that cost HHSC?
A Well, if we built hospitals, that would be probably about 4-and-a-half to $5 billion of construction.
Q Can you explain how you get to that number?
A Yeah. So if you -- let's say an average hospital is 200 beds. So you're looking 1,700 -- you're looking at eight to nine additional 200-bed hospitals.
And so using a rough estimate of about half a billion dollars -- it is about 450 million right now to build a new hospital, but that doesn't count property acquisition.
So once you add that in, you're looking at getting close to about half a billion per hospital. And, again, that's now. If you wait a year, you wait

04:04 two years -- we usually average -- estimate about a 7 percent per year increase in construction costs. And so --
04:04 Q And how long does a typical construction project take?
04:04 A About four years -- four-and-a-half years, up to five sometimes. But I would say four is a solid number.
04:04 Q That 4-and-a-half to 5 billion, does that include the operational costs?
04:04 A No, that would just be construction.
04:04 Q You said if the solution to getting the 1,700 beds was to build more hospitals, that would be the costs. Is there another way to get 1,700 new beds?
04:04 A Well, I mean, we can look at contracting. I don't know if there is 1,700 beds out there to contract with because it -- we have to look and see what, you know, who would be interested in doing that. But if we did, that would be one approach, would to be to try to contract them.
04:05 Q How does HHSC quantify the costs of a contracted bed?
04:05 A We do it as a bed day rate --
04:05 MS. SNEAD: Objection, Your Honor. He's testified that he has no knowledge about contracts that are done by BHS --

04:05 THE COURT: Sustained. The objection is sustained.
04:05 Q. (BY MS. GDULA) Mr. Schalchlin, do you -- in your role as the executive commissioner, are you involved in the financial aspect of operating the State hospital system?
04:05 A Yes.
04:05 Q Are you aware of what the different pieces of the State hospital system cost?
04:05 A Yes.
04:05 Q Are you aware of what the cost of a contracted bed is?
04:05 A Yes, because we contract with them.
04:05 MS. SNEAD: Objection. Again, Your Honor, he's testified to two different kinds of contracts. So to the extent --
04:06 THE COURT: The objection is sustained.
04:06 Q. (BY MS. GDULA) For a contracted bed through the Health and Specialty Care System, not BHS, those are the contracted beds that are within your area, correct?
04:06 A Yes.
04:06 Q What is the cost of those beds?
04:06 A So those are the competency restoration beds that we contract now. Our bed day rate right now is $837. We have been told by some of our contractors they're

04:06 probably going to want more going into next session, so I would say about 850 bed day rate.
04:06 Q I'm not going to try to do that math of 850 times 1,700 beds. But would that be the daily cost to add 1,700 contracted beds under the State hospital system?
04:06 A Yes, it would be about 1.5 million a day.
04:07 Q We've talked about the amount of money that the Legislature has -- actually, before I ask that question, I wanted to go back to our discussion about MSU and non-MSU beds. Of the projects that are currently under construction, how many MSU beds will be added?
04:07 A Well, I know the 50 in Lubbock and the 50 at Rio Grande. I think that's it because the others are rebuilds and they have the MSU beds, but it's at a facility that already has MSU beds, so I would say 100 new ones.
04:07 Q So, if in the future HHSC determined that what it actually needed was more non-MSU beds, does HHSC have the ability to convert those beds?
04:07 A We have the ability to convert beds currently within our system. However, some of the new construction, the Legislature actually specified that it was going to be an MSU bed, so, in those cases, we would go back and ask the Legislature -- and actually we plan on doing that this session -- going back and asking for flexibility to

04:08 be able to do those back and forth if we need to.
04:08 Q HHSC has gone back and forth with the Legislature a lot it sounds like in investing into the State hospital system.
04:08 Do you anticipate that once this lawsuit is over, those investments are going to stop?
04:08 A No.
04:08 Q Why not?
04:08 MS. SNEAD: Objection, Your Honor. Calls for speculation.
04:08 MS. GDULA: Your Honor, he has testified about his great involvement with the legislative process. I am merely asking based on that experience if he thinks he'll continue to get that kind of investment.
04:08 THE COURT: That is speculation. Anybody who has any involvement with any Legislature or Congress knows that nobody can predict what's going to happen tomorrow and he certainly is no exception. That is speculation.
04:09 Unless he can testify that he's been promised by somebody and it's going to happen. If he can't do that, then it's speculation.
04:09 Q. (BY MS. GDULA) Mr. Schalchlin, you mentioned that there was a facility that HHSC didn't ask for. What was that facility?

04:09 A That was the Lubbock maximum security unit.
04:09 Q Do you know why the Legislature decided to allocate HHSC funds for a facility in Lubbock?
04:09 A I do.
04:09 Q Why?
04:09 A When we were talking about the expansion of the hospital system in general -- again, this kind of went back to shrinking Terrell and Wichita Falls and looking at other options, it was decided -- they asked us for information on how many maximum security beds we felt we needed, and then in that discussion, they also determined that they wanted to put one in Lubbock. And so that's kind of how that rolled out.
04:10 Q What is the impact that State hospitals have on the areas where they are built?
04:10 A It's -- well, it's financial. It's jobs. It's investment in the community. It's more people that are spending money in local businesses.
04:10 So it -- there is a big impact. In fact, at many of our locations, we're one of the largest employers in that legislator's district, if not the largest employer.
04:10 MS. GDULA: I'll pass the witness, Your Honor.
04:10 THE COURT: Okay.

**CROSS-EXAMINATION**

QUESTIONS BY MS. SNEAD:

Q Hello, Mr. Schalchlin.

A Hi.

Q You and I have met before, but I think it's been a couple of years. I am Lisa Snead, of course, representing the Plaintiffs in this case.

MS. SNEAD: Rudy, if we can pull up Defendant's 118. I probably need to press something on this, but I don't know what. Oh, someone handled it.

MS. MITCHELL: I think she helped it.

MS. SNEAD: Great. I'm sorry. Actually, I'd like to start with Defendant's 120 -- apologies -- but we will be going there next.

*(Mr. Radic complies.)*

MS. SNEAD: And if we can go to Page 7.2.

Q. (BY MS. SNEAD) And, Mr. Schalchlin, I know that's a little blurry.

MS. SNEAD: Rudy, if you can zoom in on the -- those numbers that said -- I can see, 36,467,000, the two sets there. Excellent.

Q. (BY MS. SNEAD) So, Mr. Schalchlin, you discussed this earlier. It is Page 7 of Defendant's 120. This was your exceptional item request for expanding State hospital capacity.

04:12 You recall looking at that earlier, correct?
04:12 A Yes.
04:12 Q Okay. Great. How much money did HHSC ask the State Legislature for in its initial exceptional item request towards expanding State hospital capacity?
04:13 A The -- can you shrink that back down so I can see the title of it.
04:13 *(Mr. Radic complies.)*
04:13 A So it would be the 82.6 million, basically.
04:13 Q. (BY MS. SNEAD) And just to confirm --
04:13 A I'm sorry. I think that's by year, so it would be the 36-and-a-half almost, plus the 82.6.
04:13 Q And that is what I was going to ask. And the danger of doing math in public on the spot, that is somewhere over -- not too much more than 100 million or 110 million? Would you agree with that? And if not, I can pull the calculator up.
04:13 A Yes, yes.
04:13 MS. SNEAD: Okay. Great. And then if you can zoom back out, Rudy, there under the description and justification.
04:13 *(Mr. Radic complies.)*
04:13 Q. (BY MS. SNEAD) Do you see that, Mr. Schalchlin, on your screen?
04:13 A I do.

04:13 Q Okay. Can you just take a second to familiarize yourself with that language.
04:13 A (Witness complies.)
04:14 Okay.
04:14 Q Okay. So the 110-or-so million that HHSC asked the Legislature for in the exceptional item request was to actually start operating Dunn. That was one of the requests, correct?
04:14 A To fully -- yes, to get it fully operational, yes.
04:14 Q Okay. And then another were to start some of the ramp up funds to operate the Dallas hospital which you've testified not yet open, correct?
04:14 A Correct.
04:14 Q Okay. And then maintain some of the contracted beds that are under your jurisdiction, I suppose?
04:14 A Purview, yeah.
04:14 Q Yeah, better word. So, yeah, the beds under your purview?
04:14 A Yes.
04:14 Q Okay. And then here it says, "Planning and land acquisition" for the hospital in the Panhandle, correct?
04:14 A Yes.
04:14 Q Okay. And do you know why HHSC thought the Panhandle was a place that needed some additional capacity for a State hospital?

04:15 A It was one of the recommendations from Cannon, but we also -- I mean, that's a large area that did not have -- the closest State hospital is Big Spring and Wichita Falls. And so, also, in terms of just geographically, that's a good place to, you know, try to have people served closer to home.
04:15 Q Sure. And I -- that was perhaps a bad question. I guess, my point was that that's one of the areas that Cannon affirmed that HHSC needed some additional capacity, correct?
04:15 A It was one of their recommendations, yes.
04:15 Q And then this 110-ish million was also going to be preplanning and planning for the Terrell and Wichita Falls replacements, correct?
04:15 A Yes.
04:15 Q Okay.
04:15 MS. SNEAD: If we can go to the next page?
04:15 *(Mr. Radic complies.)*
04:15 MS. SNEAD: And, Rudy, if you can zoom in on what would be about the three to four paragraphs there at the top of the page.
04:15 *(Mr. Radic complies.)*
04:16 Q. (BY MS. SNEAD) I believe you said this earlier, Mr. Schalchlin, but this document was created in August of 2022 for the legislative session that started in

04:16 January 2023, correct?
04:16 A Yes, yes.
04:16 Q Okay. So to confirm, in January 2023, HHSC was still pointing the Texas Legislature to the CannonDesign report as evidence of the need for additional inpatient capacity, correct?
04:16 A Yes.
04:16 Q Okay. And, in fact, was still specifically telling the Legislature that it had been told by CannonDesign that it needed to add 1,100 beds by 2024, correct?
04:16 A Yes, yes.
04:16 Q Okay. And then in that next paragraph, one of the things that HHSC apparently thought the Texas Legislature really needed to know when deciding whether or not to expand hospital capacity, there is in that third paragraph -- yes, third paragraph -- of course, you -- HHSC mentioned to the Texas Legislature that "the forensic waitlist had surpassed 2,000 people," correct?
04:17 A Correct.
04:17 Q Okay. And in that last sentence there, HHSC informed the Texas Legislature that beds were necessary to, quote, "reduce the waitlist and admit patients in desperate need of care sooner," correct?
04:17 A I don't see where you're at.
04:17 Q It is the last sentence of the paragraph that

04:17 starts, "As of December 2021."
04:17 A There it is. Yes, it does say that.
04:17 Q And those are HHSC's words to the Texas Legislature, correct?
04:17 A Yes.
04:17 Q Okay. Great.
04:17 MS. SNEAD: And then if we can go to Defendant's 118 again.
04:17 *(Mr. Radic complies.)*
04:17 MS. SNEAD: Slide 6.
04:17 *(Mr. Radic complies.)*
04:17 Q. (BY MS. SNEAD) So Mr. Schalchlin, Ms. Gdula talked with you about this and this is that same exceptional item that we just looked at, but this is now the -- about four months later, correct, January?
04:18 A Yes.
04:18 Q Okay. So just to confirm, in August, HHSC asked the Texas Legislature for only about $110 million, but then once the session started and the Texas Legislature made clear that it was willing to have some additional funds, the Texas Legislature gave HHSC $243.3 million, correct?
04:18 A That was our request.
04:18 Q Okay. And you did actually receive that, did you not, or do you know?
04:18 A I'm -- I don't know the exact dollars.

04:18 Q Was the number that HHSC received closer to the 110 million or closer to the 243.3 million?
04:18 A Well, we received a lot more. So it actually was probably more than this 243.
04:18 Q Okay. So the Texas Legislature gave HHSC more than it asked for in order to expand capacity?
04:18 A Yes.
04:18 Q Okay. And I apologize. I may have missed this earlier on your history, so you may need to remind me.
04:19 Do you recall or were you with HHSC when the ASH redesign process started?
04:19 A I was not with the State hospital system. I may have been -- I was over the State Supported Living Centers during that time.
04:19 MS. SNEAD: Okay. Rudy, if you can go to Plaintiffs' 69.
04:19 *(Mr. Radic complies.)*
04:19 MS. SNEAD: Sorry, I opened Defendant's 69 on my own screen. Give me a second.
04:20 Q. (BY MS. SNEAD) Mr. Schalchlin, do you -- I realize, this is not your document from January 2015, but generally, is the State hospital system or HHSC supposed to create long-term plans?
04:20 A Yes, I think we've got the wrong exhibit up here.
04:20 MS. SNEAD: Yeah, no, sorry. Rudy, I was

04:20 commenting I was accidentally looking at Defendant's 69. I do want Plaintiffs' 69.
04:20 A Okay. Can you repeat the question, please?
04:20 Q. (BY MS. SNEAD) Yes. And it will probably make more sense now.
04:20 Is HHSC or the State hospital system generally required periodically to create something called a "long-term plan"?
04:20 A I don't know if they're required to periodically. This clearly was required in the General Appropriations Act because it reads there on the face.
04:20 Q That works.
04:20 A Okay.
04:20 Q So the document in front of you is the result on its face of the Texas Legislature directing HHSC to give it a long-term plan for State hospitals. Would you agree with that?
04:21 A Yes. It was the Department of State Health Services, but, yes.
04:21 Q And I think this is clear in this case, but just in case. The State hospital system in 2015 up to at least a few years after that was operated or -- operated under the auspices of the Department of State Health Services, correct?
04:21 A Correct.

Q Okay. And that's now under Health and Human Services, correct?
A Correct.
Q Okay. And is it accurate to say that but for the switch perhaps for the name, there's not been -- there was no significant change to the State hospital system as a result of moving from DSHS to HHSC?
A Yeah, I think that's fair.
Q Okay. And do you remember, Mr. Schalchlin -- we can bring it up if we need to or I can tell you -- when the CannonDesign report was dated?
A I believe it was 2014.
Q I agree with you. Excellent. So 2014. And this of course is January 2015 so shortly thereafter. So probably it would not surprise you that in January of 2015, HHSC was pointing to the CannonDesign report in their long-term care plan, correct?
A Yes.
Q And I apologize, I've lost my page number.
Here we go.
MS. SNEAD: Can we go to -- it's Page 4 of the document, but it's 8 of the PDF.
*(Mr. Radic complies.)*
MS. SNEAD: And then that last paragraph.
*(Mr. Radic complies.)*

Q. (BY MS. SNEAD) So there in the last portion of this in particular, HHSC -- well, DSHS, State hospital system, in January 2015 informed the Texas Legislature that the CannonDesign had told HHSC that the "need for private- and publicly-funded beds was 5,425 in 2024" [sic] as of the date report, and ten years in the future, it would be 6,032, correct?
A Yes.
Q And I saw you hesitate. I do want to acknowledge, this includes private psychiatric facilities, ones that, for example, in the state of Texas take people with private insurance, correct?
A Yes.
MS. SNEAD: Okay. And if we can go to that next page?
*(Mr. Radic complies.)*
MS. SNEAD: And then that just top section.
*(Mr. Radic complies.)*
Q. (BY MS. SNEAD) Okay. Again, HHSC is pointing to the Cannon report -- State hospital system is pointing to the Cannon report to the Texas Legislature -- HHS -- I am going to keep doing it, I apologize. DSHS informed the Texas Legislature at the time that it had 2,463 beds, correct?
A Yes.

04:24 Q Okay. And when you testified previously you said you weren't sure whether or not Cannon at the time had looked at contracted beds that were then available.
04:24 Am I remembering your testimony?
04:24 A No, I don't think I said that.
04:24 Q Okay.
04:24 A I know they looked at contracted beds. So if I did, that was a misstatement.
04:24 Q And I may have misunderstood. But the point being here at least is that HHSC is telling -- again, sorry -- DSHS is telling the Texas Legislature at the time that the State was contracting for 456 beds, correct?
04:24 A Correct.
04:24 Q Okay. And that would include -- if you look at that paragraph -- that would include both HHSC direct contracts as well as money given to the LMHAs to contract through -- you were mentioning it earlier -- through the BHS, Behavioral Health Services, correct?
04:25 A Yes.
04:25 Q Okay. And in that next section -- and really just this top paragraph. Mr. Schalchlin, at the time the Cannon report came out in November of 2014, CannonDesign identified that Texas had 570 fewer psychiatric beds than it needed for the then-current demand; is that right?

04:25 A That's correct.
04:25 Q Okay. And to be clear, those are typically -- well, not typically. If you recall, the 570 beds, when Cannon identified them, did they indicate that those were primarily beds that would be needed to treat the indigent or forensic population?
04:25 A Indigent.
04:25 Q Okay. So the indigent population.
04:25 So this wasn't, we need 570 beds for people with insurance. This is, we need 570 beds for people who can't otherwise access them, correct?
04:25 A Correct.
04:26 Q Okay.
04:26 MS. SNEAD: And we can take that down and go to Plaintiffs' 71.
04:26 *(Mr. Radic complies.)*
04:26 Q. (BY MS. SNEAD) We have now switched to HHSC so I should stop making that mistake when I ask my questions.
04:26 Mr. Schalchlin, have you ever seen Plaintiffs' 71, which has already been admitted into evidence?
04:26 A I have.
04:26 Q Okay. And what is Plaintiffs' 71?
04:26 A It is a plan that was required by the Legislature that was submitted by HHSC on a -- the plan for State-funded inpatient mental health services.

04:26 Q And do you recall what specifically the Legislature
04:26 said, tell us about the State-funded inpatient mental
04:26 health services, what they wanted to know?
04:26 A I do not.
04:27 MS. SNEAD: Okay. If we can go to -- Page --
04:27 it's 4 of the PDF, 2 of the document, second to the last
04:27 paragraph at the bottom.
04:27 *(Mr. Radic complies.)*
04:27 Q. (BY MS. SNEAD) And, Mr. Schalchlin, if you can just
04:27 read that to yourself quickly.
04:27 A Okay.
04:27 Q And so it is, again, accurate to say that in
04:27 August 2017, HHSC is again telling the Texas Legislature
04:27 that CannonDesign is -- gave them these particular
04:27 recommendations that HHSC is trying to follow about --
04:27 here, it's talking about hospital replacement, correct?
04:27 A Correct.
04:27 Q So would you agree that HHSC was representing to the
04:27 Texas Legislature that the CannonDesign was an
04:27 authoritative and reliable estimate? At least as to --
04:27 I realize this paragraph -- so at least as to
04:28 replacement of those hospitals?
04:28 A Yes.
04:28 Q Okay. That last paragraph or that last sentence of
04:28 this paragraph, so in addition to replacing hospitals,

04:28 HHSC was directed by the Texas Legislature "to expand or establish partnerships with health-related, State-sponsored institutions of higher education and other health care entities to educate and grow the mental health workforce and improve service delivery," correct?

04:28 A Yes.

04:28 Q Would you agree with me that in 2017, HHSC was already aware that staffing State hospitals was difficult?

04:28 A Yes.

04:28 Q Okay. And so one of the things that the Texas Legislature, in fact, had given money to HHSC to do was to try to expand that workforce by encouraging institutes of higher education to -- well, to expand the workforce, correct?

04:29 A Yes.

04:29 Q Okay. What -- briefly, do you know what that looked like, how HHSC followed that directive?

04:29 A Not in totality. I know that we, for example, worked with U.T. here in Austin on the ASH -- development of that campus.

04:29 I think we worked with U.T. San Antonio with the design around the San Antonio hospital. Of course, we're working with UTSW on the Dallas one. So I know

04:29 those portions. I don't know if there were other pieces that may be outside of my area.
04:29 Q Okay.
04:29 MS. SNEAD: And if we could go to Plaintiffs' 72.
04:29 *(Mr. Radic complies.)*
04:29 Q. (BY MS. SNEAD) This has also already been admitted into evidence. Mr. Schalchlin, do you recognize this document?
04:29 A Yes.
04:29 Q Okay. And what is this document?
04:29 A Well, it's an addendum to the other document.
04:30 Q So it's an addendum to the one we just looked at --
04:30 A Yes.
04:30 Q -- Plaintiffs' 71?
04:30 A Yes. Okay.
04:30 Q And what is the date on this one?
04:30 A January 2021.
04:30 MS. SNEAD: Okay. If we can go to Page 4 of the PDF, Page 2 of the document, the first paragraph.
04:30 Q. (BY MS. SNEAD) And so if you want to read that, Mr. Schalchlin, not out loud. I'm going to ask you a question about it and I want to give you an opportunity to read it.
04:30 A Yes.

04:30 Q Okay. So, again, in 2021, HHSC is representing to the Texas Legislature, CannonDesign, reputable, reliable enough to cite to the Legislature, has told us that we need 1,100 additional inpatient psychiatric beds by 2024, correct?
04:30 A Yes.
04:31 Q Great.
04:31 MS. SNEAD: And if we can go to Plaintiffs' 74 which has also been admitted into evidence. Yes, this is the last one.
04:13 *(Mr. Radic complies.)*
04:31 Q. (BY MS. SNEAD) And, Mr. Schalchlin, I'm happy to zoom in, but looking at it like this, do you recognize this document?
04:31 A Yes, I do.
04:31 MS. SNEAD: Okay. And, Rudy, if we can just zoom in on the first paragraph.
04:31 *(Mr. Radic complies.)*
04:31 Q. (BY MS. SNEAD) Before I zoom in, I guess I should have asked you: Did you catch the date on the top of this?
04:31 A I believe it was October of 2022.
04:31 Q Yes. Okay. So I don't need to zoom in again.
04:31 So this paragraph, do you want to read it to yourself real quick?

04:31 A Okay.
04:31 Q Okay. And this is what you mentioned -- I believe you agreed with me before that one of the things CannonDesign did in addition to opining about future -- or making recommendations about future capacity needs, also identified some areas in the state that were under-resourced, correct?
04:32 A Yes.
04:32 Q Okay. And one of those areas was Dallas, correct?
04:32 A Yes.
04:32 Q And so, again, though, HHSC in 2022 is citing the Cannon report as a reliable source for supporting any argument HHSC would have about needed capacity in the Dallas area, correct?
04:32 A Yes.
04:32 Q Okay.
04:32 MS. SNEAD: Judge, it is 4:32 and I would be moving into a completely different section.
04:32 THE COURT: All right. That's good. Thank you for letting me know about your progress and where you're going.
04:32 I'm going to have to have you come back tomorrow morning.
04:32 Is that all right?
04:32 THE WITNESS: Yes, sir.

04:32 THE COURT: All right. Now, let me ask a little bit of logistics if we can. You know we're going to have to break at noon tomorrow?

04:33 MS. SNEAD: Yes.

04:33 MS. GDULA: Yes.

04:33 THE COURT: That's good for many reasons, one of which I can't discuss with you, but suffice it to say, you don't want to be in the building in the afternoon.

04:33 MS. GDULA: Noted.

04:33 MS. SNEAD: Yes, we will clear out swiftly.

04:33 THE COURT: Yeah, not that anything bad is going to happen. But things happen --

04:33 MS. GDULA: That does make me feel better.

04:33 THE COURT: No, there is nothing bad happening. I can't discuss it, but suffice it to say, that it will be a little hectic around here. Okay? You all know what that means. Right? Okay.

04:33 So we will recess at noon.

04:33 Now, do you think you are going to be well done before then?

04:33 MS. SNEAD: With Mr. Schalchlin, yes. I do not anticipate that I have three hours or close to three hours.

04:33 THE COURT: I would hope not.

04:33 MS. SNEAD: Yes, I also hope not, but, no, I do not anticipate that at all, Your Honor.

04:34 THE COURT: And then you'll have redirect?

04:34 MS. GDULA: Hopefully very little, but, yes.

04:34 THE COURT: Okay. And are you going to have another witness available just in case?

04:34 MS. SNEAD: We will, yes.

04:34 THE COURT: Okay. Now, I don't want to -- I would prefer not to start another witness real close to noon because then we break until Monday.

04:34 And while we're all taking notes here, at least you've noticed for me and you've noticed from my Law Clerk, we're taking notes, and we also -- I think you are getting dailies, which is a good idea, and those are available to me as well.

04:34 It's just better not to do a witness and break them for, you know, two days, and then come back and finish them up, if you could avoid it. It's not as bad as if we had a jury, but still. Okay?

04:34 MS. GDULA: Your Honor, while we're talking about scheduling, there was one thing I wanted to raise with the Court.

04:35 We, after Mr. Schalchlin is done, have four more witnesses.

04:35 THE COURT: Okay.

04:35 MS. GDULA: One of those witnesses who we anticipate will be our last called witness is our expert witness. He is from out of state and had planned to return when we thought -- we did not think we were coming back next week.

04:35 THE COURT: Okay.

04:35 MS. GDULA: I was going to ask if the Court would be okay if we planned on him coming in January so that he may return home on his regularly scheduled flight because, logistically, I just don't see us getting to him before noon on Tuesday.

04:35 But I don't want to send him home without letting the Court know that in case we fly through the other three witnesses.

04:35 THE COURT: Well, I do appreciate the heads-up. Yeah, I don't see -- given the pace so far, I don't see us getting -- you have other witnesses you can put on?

04:35 MS. GDULA: We have three other witnesses before him that we would intend to call, yes.

04:36 THE COURT: And we have got to have the Defense's witness -- the Plaintiffs' witness, I'm sorry, anyway.

04:36 MS. GDULA: Ms. Carr, yes.

04:36 THE COURT: Why don't you send him home?

04:36 MS. GDULA: Thank you very much, Your Honor.

04:36 THE COURT: Yeah, there is no sense in him sitting here and just cooling his heels. Let him go home and he can come back in January.

04:36 MS. GDULA: We very much appreciate it.

04:36 *(Proceedings adjourned at 4:36 p.m.)*

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, April Balcombe, Official Court Reporter in and for the United States District Court, Western District of Texas, Austin Division, for the Honorable Judge David Alan Ezra, do hereby certify that the above and foregoing contains a true and correct transcription from the record of proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 11th day of January, 2026.

/S/April Balcombe
April Balcombe, CSR, CRR, CRC
Texas CSR 5752 Exp: 7/31/26
Official Court Reporter
United States District Court
Western District
Austin Division
501 West 5th Street
Suite 4150
Austin, Texas 78701
Telephone: 512.391.8795