THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOSEPH WARD, by his Next Friend, et al., | § § § | No. 1:16-CV-00917-DAE |
| *Plaintiffs*, | § § § § | |
| vs. | § § | |
| STEPHANIE MUTH, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission, | § § § | |
| *Defendant*. | § § § § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is a class action seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to compel Defendant's agency, the Texas Health and Human Services Commission ("HHSC") to timely admit class members to state mental health facilities for competency restoration treatment after they have been found incompetent to stand trial.

In July 2016, Plaintiffs Joseph Ward, Isaac Lemelle, and Michael Anderson, individually and on behalf of all others similarly situated, and Plaintiff Disability Rights Texas filed suit against Dr. John Hellerstedt, the then-

1

Commissioner of HHSC.[1]  (Dkt. # 1.)  In September 2016, Plaintiffs Joseph Ward,

Michael Anderson, Isaac Lemelle, Marc Lawson, Jennifer Lampkin, Alexander

Soto, and Morgan Areshchenko filed an amended complaint.[2]  (Dkt. # 11.)  Over

the following years, Plaintiffs amended their complaint several times, in part to

substitute out various plaintiffs as time went on.  (Dkts. ## 23; 59; 92; 97; 148; see

Dkts. ## 88 at 2–3; 95 at 1–2.)

> In March 2022, the Court certified a class consisting of:
>
> All persons who are now, or will be in the future,
> (a) charged with a crime in the State of Texas,
> (b) ordered by a Texas court to [an HHSC] facility where they are to
> receive competency-restoration services; but
> (c) because [HHSC] maintains insufficient forensic capacity,
> (d) remain detained in a Texas county jail more than 21 days from the
> day [HHSC] receives the court order to the day [HHSC] makes a bed
> available in [an HHSC] mental health facility.

(Dkt. # 137 at 18–19.)

Following class certification, Plaintiffs Joseph Ward, Marc Lawson,

Jennifer Lampkin, Kenneth Jones, Mary Sapp,[3] and Julian Torres ("Named

Plaintiffs"), appearing individually and on behalf of all Class members,

---

[1] As previously noted by the Court, following a reorganization in 2016-2017, references in prior pleadings and orders to the Texas Department of State Health Services and DSHS refer to HHSC.

[2] In the First Amended Complaint, Disability Rights Texas was no longer named as a plaintiff.  (Dkt. # 11.)

[3] Plaintiff Mary Sapp was dismissed from the suit in October 2024 due to her death.  (Dkts. ## 184; 185.)

(collectively, with the Class members, "Plaintiffs") filed their Sixth Amended Complaint, the operative complaint in this case. (Dkt. # 148.) The Sixth Amended Complaint brings one cause of action against Defendant Cecile Erwin Young, the then-Commissioner of HHSC, alleging a violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment to the United States Constitution. (Id. at 23–25.) The complaint seeks declaratory and injunctive relief to "restrain[] Defendant from failing to make a bed available to detainees found incompetent to stand trial for purposes of the state-mandated restoration services within" twenty-one days of receiving the commitment orders for those detainees. (Id. at 25.) On February 27, 2023, this case was reassigned to the undersigned. (Dkt. # 156.)

The parties filed cross motions for summary judgment in March 2024. (Dkts. ## 173, 174-2.) In a February 18, 2025 Order, the Court denied Defendant's summary judgment motion and granted in part and denied in part Plaintiffs' summary judgment motion. (Dkt. # 186.) Specifically, the Court held that: (1) Plaintiffs have standing; (2) the Court is not required to abstain under either the Younger or Pullman abstention doctrines; (3) habeas relief is unavailable to Plaintiffs and so petitions for a writ of habeas corpus are not appropriate remedies for Plaintiffs' alleged harms; (4) rational basis review is an improper standard for evaluating the constitutionality of Plaintiffs' confinement without restoration services; (5) the standard set forth in Jackson v. Indiana, 406 U.S. 715 (1972) is the

3

governing standard in this case; (6) because the <u>Jackson</u> standard applies and Defendant did not meaningfully engage with this standard in her motion, summary judgment in favor of Defendant is not appropriate; and (7) there exists at least one genuine dispute of material fact as to the merits of Plaintiffs' due process claim, thereby precluding summary judgment in favor of Plaintiffs. (<u>Id.</u>)

The Court presided over a 6-day bench trial beginning on December 16, 2025. John Michael Gaddis, Esq., David Antony James, Esq., Beth L. Mitchell, Esq., Lisa A. Snead, Esq., Kyle L. Dockendorf, Esq., and Michael Singley, Esq. appeared on behalf of Plaintiffs. Kimberly Gdula, Esq., William D. Wassdorf, Esq., Amy Snow Hilton, Esq., and Ryan G. Kercher, Esq. appeared on behalf of Defendant.[4] After trial, the parties submitted written closing arguments as well as proposed findings of fact and conclusions of law. (Dkts. ## 255; 256; 253; 254.)

Months after trial concluded and nearly ten years after the start of litigation in this case, Texas Governor Greg Abbott appeared in the case through counsel and submitted an amicus brief to the Court. (Dkt. # 257.) In his amicus brief, Governor Abbott argues that this case is governed by the Prison Litigation Reform Act of 1995 ("PLRA"), and as such, the Court should enter judgment in

---

[4] At the time of trial, Defendant Cecile Erwin Young was the Executive Commissioner of HHSC and administered the agency. (Dkt. # 150 at ¶ 16.)

favor of Defendant.  (Dkt. # 257-1 at 8–9.)  With leave of the Court, Plaintiffs filed a response to the amicus brief on April 2, 2026.  (Dkt. # 259.)  The Court has received and considered Governor Abbott's amicus brief as well as Plaintiffs' response.  See U.S. ex rel. Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 927 (S.D. Tex. 2007), aff'd sub nom. U.S. ex rel. Gudur v. Deloitte & Touche, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) (explaining that in the absence of controlling authority, district courts commonly refer to Federal Rule of Appellate Procedure 29 for guidance concerning the standards for filing an amicus brief); Fed. R. App. P. 29(a)(2) (providing that a state may file an amicus brief without the consent of the parties or the leave of the court); Arnold v. Barbers Hill I.S.D., No. 23-20256, at Dkt. # 122 (5th Cir. Nov. 19, 2025) (docketing amicus brief by Governor Abbott without need for motion or agreement of the parties and noting that "Consent is Not Necessary as Amicus is a Government Entity"); but see Gudur, 512 F. Supp. 2d at 279–29 (striking amicus brief of the United States as untimely because, among other reasons, the United States did not seek leave and "[f]or more than six-and-a-half years the United States has stood on the sidelines of this case").  The Court addresses the arguments raised by Governor Abbott in the sections below.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this civil action arises under the Constitution and laws of the United States.

The Court has considered the record evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the witnesses, and ascertained the probative significance of the evidence presented. Upon consideration of the above, the Court finds the following facts by a preponderance of the evidence, and in applying the applicable law to such factual findings, makes the following conclusions of law.  To the extent any findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law; similarly, to the extent any conclusions of law as stated may be deemed findings of fact, they shall also be considered findings of fact.  See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

I.      FINDINGS OF FACT

**The Parties**

1.      The five current Named Plaintiffs[5] and class representatives—Joseph Ward, Marc Lawson, Jennifer Lampkin, Kenneth Jones, and Julian Torres—

---

[5] As described above, Plaintiff Mary Sapp was dismissed from the suit in October 2024 due to her death.  (Dkts. ## 184; 185.)

brought suit through their next friends on behalf of a class of individuals consisting of "[a]ll persons who are now or will be in the future (a) charged with a crime in the State of Texas, (b) ordered by a Texas court to [an HHSC] facility where they are to receive competency-restoration services; but (c) because [HHSC] maintains insufficient forensic capacity, (d) remain detained in a Texas county jail more than 21 days from the day [HHSC] receives the court order to the day [HHSC] makes a bed available in [an HHSC] mental health facility[.]"  (Dkts. ## 137 at 18–19; 148 at 8.)

2.      Plaintiff Joseph Ward was a defendant in a criminal case in the 351st Judicial District Court in Harris County, Texas.  (Dkt. # 218 at 1 (The Parties' Joint Statement of Stipulated Facts).)  On or about February 17, 2016, Mr. Ward was found incompetent to stand trial and was ordered to be committed to a mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  (Id.)  Mr. Ward was admitted to North Texas State Hospital – Vernon on April 4, 2017.  (Id.)

3.      Plaintiff Marc Lawson is a defendant in a criminal case in the 390th Judicial District Court in Travis County, Texas.  (Id.)  On or about May 11, 2016, Mr. Lawson was found incompetent to stand trial and was ordered to be committed to a mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  (Id.)  The order also required the

Travis County Sheriff to transport Mr. Lawson to an HHSC mental health facility. (Id.)  Mr. Lawson was admitted to North Texas State Hospital – Vernon on July 20, 2017.  (Id.)

4.     Plaintiff Jennifer Lampkin was a defendant in a criminal case in the 403rd Judicial District Court in Travis County, Texas.  (Dkt. # 218 at 2.)  On or about March 31, 2016, Ms. Lampkin was found incompetent to stand trial and was ordered to be committed to a mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  (Id.) The order also required the Travis County Sheriff to transport Ms. Lampkin to an HHSC mental health facility.  (Id.)  Ms. Lampkin was admitted to North Texas State Hospital—Vernon on July 6, 2017.  (Id.)

5.     Plaintiff Kenneth Jones is a defendant in a criminal case in the 185th Judicial District Court in Harris County, Texas.  (Dkt. # 218 at 2.)  On or about August 10, 2017, Mr. Jones was found incompetent to stand trial and was ordered to be committed to a mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  (Id.)  The order also required the Harris County Sheriff to transport Mr. Jones to an HHSC mental health facility.  (Id.)  Mr. Jones was admitted to Rusk State Hospital on July 19, 2018.  (Id.)  After returning to Harris County Jail from Rusk State Hospital, Mr. Jones was again found incompetent to stand trial on or about April 1, 2021 and

8

was again ordered to be committed to a mental health facility for competency restoration services. (Id.)  The order again required the Harris County Sheriff to transport Mr. Jones to an HHSC mental health facility.  (Id.)  Mr. Jones was admitted to an HHSC mental health facility in May 2023.  (Id.)

6.      Plaintiff Julian Torres was a defendant in a criminal case in the 5th County Court at Law in Travis County, Texas.  (Dkt. # 218 at 2.)  On or about April 16, 2019, Mr. Torres was found incompetent to stand trial and was ordered to be committed to a mental health facility for further examination and treatment toward the specific objective of attaining competency to stand trial.  (Id.)  Mr. Torres was admitted to the Montgomery County Mental Health Treatment Facility on May 14, 2019.  (Id.)

7.      Each Named Plaintiff class representative was confined in jail more than 21 days after HHSC received the orders committing them to one of its mental health facilities[6] for purposes of receiving competency restoration services before they began to receive those services.  (Def. Ex. 128 at 5 (providing Ward, Lawson, Lampkin, and Jones' timelines); Dkt. # 218 at 2.)[7]

---

[6] A "mental health facility" includes all state psychiatric hospitals as well as all other psychiatric facilities that HHSC owns, operates, contracts, or from whom HHSC purchases beds.  (Dkt. # 99 at 1 n.1; see also Pl. Ex. 12 at 8–9, 13); TEX. CODE CRIM. PROC. art. 46B.0021.

[7] Although it is undisputed that all the Named Plaintiffs in this case have now been admitted to HHSC mental health facilities, their claims are not moot.  (Dkts. ## 60 at 8–10 (on appeal of the Court's first class certification order, the Fifth Circuit

**8.** At the time of trial, former Defendant Cecile Erwin Young ("Young") was the Executive Commissioner of the Texas Health and Human Services Commission ("HHSC") and administered the agency. (Dkts. ## 150 at ¶ 16; 218 at 2.)

**9.** Defendant Stephanie Muth ("Muth") automatically substituted for Young effective January 13, 2026, as Muth assumed the office of Executive Commissioner. (Dkt. # 243.)

**10.** Accordingly, Defendant Muth is currently the duly appointed Executive Commissioner of HHSC and has been delegated the administration of that agency. (Dkts. ## 218 at 2; 243.)

**11.** The Texas Health and Human Services Commission oversees the Health & Specialty Care Systems, of which the state hospitals are a part. (Dkt. # 218 at 3.)

**12.** In her role as Executive Commissioner of HHSC, Defendant Muth is responsible for "administering human services programs regarding mental health, including: administering and coordinating mental health services at the local and state level; operating the state's mental health facilities," and "designat[ing] the

---

ruled that Plaintiffs' claims were not moot because they fall within the inherently transitory exception to the mootness rule); 137 at 16–17 (holding that Plaintiffs' claims are not mooted because they are capable of repetition, yet evading review).)

state hospitals to which persons with mental illness from each district shall be admitted." TEX. HEALTH & SAFETY CODE §§ 552.001, 1001.072.

## The Competency Process

13.    Texas Code of Criminal Procedure Article 46B ("Article 46B") sets forth the legal standard and process for a court's finding an individual incompetent to stand trial. TEX. CODE CRIM. PROC. art. 46B.

14.    When a Texas criminal court determines there is evidence a defendant may be incompetent to stand trial, the criminal court orders a competency examination and appoints an expert to evaluate whether the defendant is incompetent to stand trial and, if so, whether they are likely to be restored in the foreseeable future. (Dkt. # 218 at 3); TEX. CODE CRIM. PROC. arts. 46B.005(a), 46B.021(b), 46B.025(b)(2).

15.    Once the expert report is completed, the issue of incompetency to stand trial is submitted to a jury (if requested) or the judge, though the state and defense counsel can also agree to the defendant's incompetency and forego a formal hearing as long as the court finds that evidence exists to support the finding of incompetency. (Dkt. # 218 at 3); TEX. CODE CRIM. PROC. arts. 46B.051, 46B.052, 46B.054; see also generally TEX. CODE CRIM. PROC. CH. A-C (setting forth the process for raising, evaluating, and finding incompetency to stand trial).

16. When a defendant is found incompetent to stand trial, the criminal proceedings against them are stayed. (Dkt. # 218 at 3); TEX. CODE CRIM. PROC. art. 46B.004(d).

17. When a defendant is found incompetent to stand trial, the criminal court shall either (A) commit the defendant to a mental health facility designated by HHSC; (B) commit the defendant to a jail-based competency restoration program ("JBCR"); or (C) if the defendant belongs to the class of defendants eligible for bail, release the defendant on bail. TEX. CODE CRIM. PROC. art. 46B.071.

18. Under Texas Law, bond is available for defendants found incompetent to stand trial ("incompetency detainees") only if the defendant can be placed into an outpatient competency restoration ("OCR") program.[8] See id. at arts. 46B.071 (providing that the court can release a defendant on bail under either Article 46B.0711 or Article 46B.072, depending on the severity of the crime for which they are charged); 46B.0711 (requiring that an appropriate OCR program is available for the defendant), 46B.072 (same); Lakey v. Taylor, 435 S.W.3d 309, 313 (Tex. App.—Austin, 2014, no pet.).

---

[8] Because personal bonds require that the criminal defendant be competent, a criminal defendant found incompetent to stand trial cannot be released on a personal bond under Texas law. TEX. CODE CRIM. PROC. art. 17.032(b)(3)(A).

**19.**     OCR programs are available in less than a quarter of Texas counties. (Trial Tr. Vol. 5, 53:24-54:1 (Webb) (testifying that Texas has 16 OCR programs in operation); Pl. Ex. 13 (listing the counties that the 16 OCR programs serve); see Local Government Resources, Texas.gov, https://www.texas.gov/local-government-resources/, [https://perma.cc/8KC7-KVUW] (providing that Texas has 254 counties).[9]

**20.**     Moreover, even where an OCR program is available, a defendant must meet additional requirements before they can be released on bond.  See TEX. CODE CRIM. PROC. arts. 46B.0711, 46B.072; (Trial Tr. Vol. 5, 54:19-55:8 (Webb)); Lakey, 435 S.W.3d at 313.

**21.**     As such, the vast majority of incompetency detainees remain confined in county jails while they await competency restoration services.  (See Trial Tr. Vol 4, 9:22–25 (Schalchlin); Def. Ex. 82 at 1; Pl. Exs. 16-B (providing the number of individuals admitted to OCR programs in FY23); 26 (detailing the total number of individuals on the forensic waitlists through June 2025)); see TEX. CODE CRIM. PROC. art. 17.032(b)(3)(A).

**22.**     Under Article 46B, a defendant found incompetent to stand trial and not released on bail shall be committed to a mental health facility "[f]or purposes

---

[9] The Court may take judicial notice of facts not subject to reasonable dispute.  See Fed. R. Ev. 201.

of further examination and competency restoration services with the specific objective of the defendant attaining competency to stand trial[.]" TEX. CODE CRIM. PROC. art. 46B.073(b).

23.    For all incompetency detainees, whether they are ordered into OCR programs, JBCR programs, or an inpatient mental health facility, Texas law provides that an order committing the defendant for restoration of competency "must place the defendant in the custody of the sheriff or sheriff's deputy for transportation to the facility or program, as applicable, in which the defendant is to receive competency restoration services." Id. at art. 46B.075.

24.    Persons in the custody of the sheriff for transport from a jail to a mental health facility "must be transported directly to the facility within a reasonable amount of time and without undue delay." Id. at art. 46.04, § 2(1).

25.    The initial periods of commitment for competency restoration of incompetency detainees found "likely to restore" and committed to inpatient mental health facilities or jail-based competency restoration programs are 120 days for felony charges and 60 days for misdemeanor charges with an additional 60-day extension permitted for both if the court finds the competency restoration program or facility will likely restore the defendant in that time. Id. at arts. 46B.073(b), 46B.080; (Dkt. # 218 at 3.)

14

26.     Incompetency detainees with a mental illness identified as unlikely to be restored to competency in the foreseeable future "skip" the initial competency restoration commitment under Article 46B.073 and proceed under Article 46B.102 governing extended commitments.  TEX. CODE CRIM. PROC. arts. 46B.071(b), 46B.102.

27.     Criminal courts can re-commit individuals to inpatient treatment at state hospitals who do not restore to competency under their initial commitment only if those individuals meet criteria for civil commitment found in the Texas Health and Safety Code, Title 7, Subtitle C.  (Dkt. # 218 at 3.)

28.     Likewise, criminal courts can commit individuals to inpatient treatment at state hospitals with a mental illness who do not restore in their respective JBCR program or contracted mental health facility under their initial commitment and individuals determined under Article 46B.071(b) to be unlikely to be restored in the foreseeable future only if those individuals meet criteria for civil commitment found in the Texas Health and Safety Code, Title 7, Subtitle C.  (Id.)

29.     Some incompetency detainees gain competency to stand trial but "lose" competency before their cases can proceed to trial and are thus found incompetent to stand trial again by their criminal courts.  (Id.)

30.     Because a court can commit an incompetency detainee for the initial restoration period under Article 46B.073 only once for the same offense, courts

commit these incompetency detainees who lose competency to state hospitals for competency restoration under Article 46B.102 if their charges remain pending. (Id.)

31.     Extended competency restoration commitments expire if the incompetency detainee remains confined after twelve months, requiring the criminal court to determine at least annually whether the incompetency detainee continues to meet civil commitment criteria and issue another commitment order if so.  (Id.)

## Competency Restoration in Texas

32.     Competency restoration services are specialized, individualized treatments, distinct from psychiatric stabilization and general mental health services.  (Pl. Exs. 4 at 9; 9 at 13–14; Trial Tr. Vol. 5, 114:22–24 (Simpson); Am. Trial Tr. Vol. 3, 9:2–5, 89:17–90:6 (Murrie); Trial Tr. Vol. 1, 196:20–197:3 (Chacona); Trial Tr. Vol. 2, 64:13–20 (Murrie); Am. Trial Vol. 3, 104:8-18 (Matthews); see Dkt. # 265-1 at 122:14–124:11, 123:20-124:3, 143:11–22, 139:22–140:2 (Torres).)

33.     Under Texas law, HHSC is solely responsible for admitting criminal defendants who have been ordered to receive competency restoration services to

appropriate treatment facilities.  (Dkt. # 186 at 11); see TEX. HEALTH & SAFETY CODE §§ 533.051(a)(2),[10] (b)(4); id. at 533.052.

34.    HHSC owns, operates, or (at minimum) regulates all competency restoration programs and facilities in Texas.  TEX. CODE CRIM. PROC. art. 46B.091(e)–(f); 26 TEX. ADMIN. CODE § 307.167; TEX. HEALTH & SAFETY CODE §§ 577.010, 577.013; (see Dkt. # 99 at ¶ 1.)

35.    As described above, in Texas, criminal courts order incompetency detainees to receive their initial competency restoration services in one of three types of programs or facilities: (1) outpatient competency restoration ("OCR") programs; (2) formal jail-based competency restoration ("JBCR") programs; and (3) inpatient mental health facilities ("HHSC mental health facilities").  TEX. CODE CRIM. PROC. arts. 46B.071, 46B.073; (Am. Trial Tr. Vol. 3, 101:4–24 (Matthews)).

36.    Outpatient competency restoration ("OCR") is a program type that allows individuals to receive legal education and competency restoration services in a community setting outside of a jail environment.  (Trial Tr. Vol. 5, 53:15-53:23 (Webb).)

---

[10] "[HHSC] . . . shall plan . . . for the proper and separate allocation of beds in the state hospitals for . . . patients who are . . . committed to a state hospital or other facility to attain competency to stand trial under Chapter 46B, Code of Criminal Procedure."

37.     A criminal court may order an incompetency detainee into an OCR program only if (a) one is available in the county, and the court determines that they (b) are not a danger to others and (c) can safely be provided competency restoration services in the community. TEX. CODE CRIM. PROC. arts. 46B.0711, 46B.072.

38.     OCR programs are available in less than a quarter of Texas counties, serve roughly 600 incompetency detainees a year, and restore less than one third of those to competence.  (Pl. Exs. 12 at 10–11; 13; 16-B; 17 at 7, 10; Def. Ex. 137 at 2; Trial Tr. Vol. 2, 72:24–73:14, 75:18–76:2 (Murrie).)

39.     Jail-based competency restoration ("JBCR") is a program type that provides competency restoration services in a jail setting.  (See Trial Tr. Vol. 5, 114:22–24 (Simpson); Pl. Ex. 4 at 32.)

40.     A court may order an incompetency detainee to receive competency restoration services in a JBCR program only if (a) the detainee is not charged with a violent offense as defined in Code of Criminal Procedure Article 17.032(a) and the indictment does not allege the use or exhibition of a deadly weapon, (b) they are confined in a county that has elected to create a JBCR program, (c) they will begin receiving competency restoration services within 72 hours of arriving at the program, and (d) a licensed or qualified mental health professional determines the program is appropriate.  TEX. CODE CRIM. PROC. art. 46B.073(c), (d), (f); (see also

Trial Tr. Vol. 5, 126:15-127:10 (Simpson) (describing the type of individual who would be an appropriate fit for a JBCR program).)

41.    JBCR programs are provided in approximately twenty Texas jails, serve a declining number of incompetency detainees—about 911 in 2023, 800 in 2024, and 678 projected for 2025—and restore approximately half of those to competence.  (Pl. Exs. 12 at 11–13; 16-A; 9 at 15–17; 17 at 21; Trial Tr. Vol. 2, 69:16–70:14, 72:3–13 (Murrie); Trial Tr. Vol. 5, 79:3–15 (Webb).)

42.    Competency restoration services are not provided in Texas jails outside of formal JBCR programs.  (Pl. Exs. 4 at 9; 9 at 13–14; Trial Tr. Vol. 5, 114:22–24 (Simpson); id. at 38:4–10; Am. Trial Tr. Vol. 3, 9:2–5, 89:17–90:6 (Murrie); Trial Tr. Vol. 1, 196:20–197:3 (Chacona); Trial Tr. Vol. 2, 64:13–18 (Murrie); Am. Trial Vol. 3, 104:8-18 (Matthews).)

43.    While not all incompetency detainees are eligible for OCR or JBCR, all are eligible for restoration at HHSC mental health facilities.  (Trial Tr. Vol. 5, 172:17–173:9 (Simpson)); TEX. CODE CRIM. PROC. art. 46B.073(c), (d).

44.    Accordingly, most incompetency detainees in Texas are court-ordered to receive competency restoration services in an HHSC mental health facility. (Def. Ex. 82 at 1; Trial Tr. Vol. 1, 105:10– 105:23 (Shearer); id. at 184:14–20 (Chacona); Trial Tr. Vol. 2, 79:25–80:16 (Murrie); Trial Tr. Vol. 5, 19:17–20:25 (Moravec-Gallagher).)

19

**45.**    HHSC mental health facilities include all state psychiatric hospitals as well as all other psychiatric facilities that HHSC owns, operates, contracts,[11] or from whom HHSC purchases beds.  (See Dkts. ## 99 at 1; 254 at 6; Am. Trial Tr. Vol. 3, 104:24-105:4 (Matthews); Trial Tr. Vol. 5, 126:10-14 (Simpson); Dkt. # 265-9 at 24:1-20 (Carr)); TEX. CODE CRIM. PROC. art. 46B.0021; (see also Pl. Ex. 12 at 8–15).

**46.**    The Texas Legislature has funded HHSC to own or operate inpatient hospital beds at the following state-owned or state-operated facilities: Austin State Hospital, Big Spring State Hospital, El Paso Psychiatric Center, Kerrville State Hospital, Rio Grande State Center, Rusk State Hospital, San Antonio State Hospital, Terrell State Hospital, Vernon State Hospital, Wichita Falls State Hospital,[12] and Dunn Behavioral Health Center.  (Dkt. # 218 at 4.)

**47.**    These facilities serve both the forensic and civil populations.[13]  (Id.)

---

[11] Contracted beds are beds that HHSC contracts out for competency restoration services.  (Am. Trial Tr. Vol. 3, 176:19-177:1 (Schalchlin).)

[12] Vernon State Hospital and Wichita Falls State Hospital are now separate hospitals.  They were previously considered one hospital ("North Texas State Hospital" or "NTSH") that had two campuses in Vernon and Wichita Falls.  Some documents and deposition testimony offered in this case refer to the older nomenclature.

[13] "Forensic" patients are those on commitments under Article 46B as incompetent to stand trial and Article 46C as not guilty by reason of insanity.  As used in this order, "civil" refers to all non-forensic patients (i.e., those voluntarily admitted, those admitted for emergency detention under Chapter 573 of the Health & Safety Code, and those ordered by a court under Chapter 574 of the Health & Safety Code

**48.**     The Texas Legislature has given HHSC the discretion to determine how to allocate state hospital beds between the forensic and civil populations. TEX. HEALTH & SAFETY CODE § 533.051(a).

**49.**     As of June 2025, HHSC had a total of 2,770 funded beds.[14]  (Def. Exs. 137 at 8; 94 at CY2025, Column H).)  This number includes beds at HHSC's state-owned or state-operated facilities as well as contracted beds.  (See id.; Def. Ex. 73 at 4 (showing state-owned and state-operated facilities).)[15]

**50.**     Of these 2,770 beds, 292 of those beds were offline, meaning they were unavailable due to construction or maintenance issues or staff shortages.  (Id.; Am. Trial Tr. Vol. 3, 170:9-25 (Schalchlin).)

**51.**     In addition to these funded beds, HHSC "purchases" beds in facilities outside the state hospital system.  (Def. Exs. 137 at 9; Pl. Ex. 12 at 39–41; see Trial Tr. Vol. 2, 134:15-135:21 (Murrie).)

---

to receive inpatient mental health services).  See TEX. HEALTH & SAFETY CODE § 533.051(a).

[14] These beds serve both forensic and civil patients.  (Def. Exs. 137 at 8; 94 at CY2025; Trial Tr. Vol. 2, 132:13-134:4. (Murrie).)

[15] At the time of trial, the total number of funded beds at facilities owned or operated by HHSC (excluding contracted beds) was 2,391, a number slightly larger than the total number of funded state hospital system beds in June 2025 (2,329). (Compare Am. Trial Tr. Vol. 3, 170:9-173:14 (Schalchlin) with Def. Ex. 73 at 4.) Because the testimony was not clear as to the exact number of contracted beds at the time of trial, the Court instead uses the numbers from June 2025.

**52.**    For fiscal year 2025, the total number of purchased beds was 747.2[16] per day.  (Id.)

**53.**    Accordingly, HHSC's total capacity in 2025 was approximately 3,139.2 beds.[17]  (Def. Exs. 137 at 10; 94 at CY2025, Column H; Pl. Ex. 12 at 39–41.)

**54.**    As testified by HHSC's deputy executive commissioner, HHSC anticipates adding approximately 434 new inpatient beds[18] as well as approximately 416[19] additional contracted beds by 2027.[20]  (Am. Trial Tr. Vol. 3, 173:19-176:3, 169:4-6 (Schalchlin); id. at 177:2-181:11 (Schalchlin).)

**55.**    HHSC designates inpatient mental health facilities in Texas as non-Maximum Security Units (non-MSUs) or Maximum Security Units (MSUs).  (Dkt. # 218 at ¶ 37.)  The MSUs are located at North Texas State Hospital Vernon

---

[16] The vast majority of these purchased beds are civil.  (Def. Ex. 137 at 9; Pl. Ex. 12 at 39–41.)

[17] Again, this number encompasses both forensic and civil patients.  (Def. Exs. 137 at 8; 94 at Column H, CY2025; Trial Tr. Vol. 2, 132:13-134:4. (Murrie).)  And, as noted previously, not all of these beds are online.

[18] The addition of 434 new inpatient beds refers to beds that would be added after the time of trial (i.e., above and beyond the 2,391 state hospital system beds at the time of trial).  (See Am. Trial Tr. Vol. 3, 170:9-175:21 (Schalchlin).)

[19] This number is an estimate based on the testimony provided at trial.  (See Am. Trial Tr. Vol. 3, 170:9-181:12 (Schalchlin).)  Although the testimony did not establish with certainty the number of contracted beds at the time of trial nor the exact number of contracted beds anticipated in the coming years, any discrepancy does not alter the Court's analysis below.

[20] Several of these projects are not expected to be at full capacity until 2028 or 2029, however.  (Trial Tr. Vol. 4, 28:4–8; 30:2–15; 30:21–31:1 (Schalchlin).)

(NTSH-V), NTSH Wichita Falls (NTSH-WF), Rusk State Hospital, and Kerrville State Hospital.  (Id. at ¶ 39.)   All other mental health facilities, including those that contract with HHSC for inpatient competency restoration services, are designated non-MSUs.  (Id. at ¶ 40.)

56.    HHSC has discretion to determine whether an incompetency detainee committed to an inpatient mental health facility can be served in a non-MSU or an MSU.  (Id. at ¶ 39.)[21]

57.    As of June 2, 2025, HHSC allocated 27% of its state hospital beds for civil patients and 73% for forensic patients.  (Id. at ¶ 44.)

58.    HHSC's mental health facilities served and discharged over 1,500 incompetency detainees from July 2024 through June 2025, with a more than 90% restoration rate.  (Def. Exs. 104 (MSU Discharged and IST Discharged); 137 at 16; Pl. Ex. 98 at 9; Trial Tr. Vol. 2, 66:14–19 (Murrie).)

59.    In 2024, 98% of incompetency detainees restored during their initial competency restoration commitments with an average restoration time of 100

---

[21] Incompetency detainees are initially assigned to either the Maximum-Security Unit (MSU) waitlist or the non-Maximum-Security Unit (non-MSU) waitlist based solely on their criminal charges, although HHSC has discretion to "waive" a person off the MSU waitlist and onto the non-MSU waitlist, but which does not move a detainee up or down a waitlist.  (Trial Tr. Vol. 1, 218:20–25, 219:5–12, 244:14–24 (Dunson); Am. Trial Tr. Vol. 3, 111:8–13, 113:1–21, 141:1–10 (Matthews).)

days—less than the current average wait time in jail for incompetency detainees. (Pl. Ex. 23 at 6–7.)

## The Waitlist

60.    Because HHSC does not have sufficient capacity to admit all incompetency detainees committed to its care for competency restoration services immediately upon their commitment, HHSC operates a waitlist.[22]  (Dkt. # 99 at ¶¶ 2, 5, 7; see also Trial Tr. Vol. 1, 214:14–23 (Dunson); Trial Tr. Vol. 4, 51:18-22 (Schalchlin).)

61.    The waitlists for incompetency detainees generally operate on a first-come, first-served basis for an appropriate bed.[23]  (Dkts. ## 99 at ¶¶ 6, 8; 218 at ¶¶ 47, 48; Trial Tr. Vol. 4, 86:24–87:4, 87:8–17, 87:24–88:25 (Moravec-Gallagher); Trial Tr. Vol. 2, 11:10–13, 12:19–23, 42:22–43:6 (Dunson).)

---

[22] HHSC maintains two separate master waitlists of pending forensic admissions: one for pending admissions for individuals who require placement in a maximum-security unit (the MSU waitlist), and one list for the admission of individuals who require placement in a non-MSU facility, which is referred to as the "Clearinghouse" waitlist.  Collectively, the MSU and Clearinghouse waitlists represent the "forensic waiting list."  (Dkt. # 218 at ¶ 46.)

[23] An "appropriate bed" refers to whether the individual is eligible for the particular available bed, that could include: specialty designations (e.g., geriatric, IDD, other specialty needs such as medically fragile or TBI); gender restricted bed (male-only/female-only); for non-MSU beds, the geographic catchment area; and commitment-type restrictions (e.g., contracted facilities do not accept 46B.102 commitments).  These beds also operate on a first/come first serve basis.  (Trial Tr. Vol. 2, 12:2–13:14; 36:12–25; 40:14–43:5 (Dunson); Trial Tr. Vol. 5, 10:2–23 (Moravec-Gallagher); Trial Tr. Vol. 4, 86:24-88:10 (Moravec-Gallagher).)

62.    Incompetency detainees on the forensic waitlist[24] (who are not "on hold"[25]) thus wait in jail solely because they have not yet received competency restoration services.  TEX. CODE CRIM. PROC. arts. 17.032(b)(3)(A), 46B.071, 46B.0711, 46B.072; (see Trial Tr. Vol. 2, 8:19–9:8 (Dunson).)

63.    There is a limited exception to the first-come, first-served practice: the expedited admission process.  (Am. Trial Tr. Vol. 3, 108:16-111:4, 144:10-16 (Matthews); Trial Tr. Vol 6, 94:17-96:7 (Murrie); Trial Tr. Vol. 4, 85:15-25 (Moravec-Gallagher); Pl. Ex. 27-G at 3.)

64.    Expedited admissions are for detained individuals where, due to clinical need, their admission needs to be expedited outside the normal waitlist process.  (Am. Trial Tr. Vol. 3, 108:16-111:4 (Matthews).)

65.    While this process is theoretically available to any incompetency detainee already on a waitlist who clinically deteriorates while they wait, HHSC

---

[24] As noted previously, the "forensic waitlist" encompasses both the MSU waitlist and the Clearinghouse waitlist.  See supra, n. 22.

[25] "On hold" is an HHSC designation on its internal documents indicating the detainee may not be waiting in jail for a mental health facility placement, but HHSC has left them on internal waitlist documents to preserve their place in line should they resume waiting at a later time.  This generally occurs for people in JBCR or OCR, or those who are unable to be placed due to a severe medical problem such as being in a coma.  (See Trial Tr. Vol. 1, 230:25–231:25 (Dunson); Trial Tr. Vol. 4, 87:24–88:3 (Moravec-Gallagher).)  Assuming the reason for the hold is correct, these individuals are excluded from the Plaintiff Class by definition once they are "on hold."  All references in this order to the number of incompetency detainees on the waitlists exclude people HHSC has placed "on hold."  (Compare, e.g., Pl. Ex. 49-A with Pl. Ex. 32 at 5.)

does not evaluate all detainees for this process—it only reacts to stakeholder requests. (Am. Trial Tr. Vol. 3, 108:16-109:5 (Matthews); Trial Tr. Vol. 4, 85:19-25 (Moravec-Gallagher); Trial Tr. Vol. 6, 95:5–96:7 (Murrie).)[26]

66.    Moreover, although HHSC provided testimony that the expedited admission process takes about a week, the Court also heard testimony that the process could potentially take longer. (Am. Trial Tr. Vol. 3, 108:16-109:5 (Matthews); Trial Tr. Vol. 1, 146:5–15 (Shearer) (testifying that it took ten months in total to get a deteriorating client's expedited admission request approved); Trial Tr. Vol. 1, 229:19-230:18 (Dunson); see Pl. Ex. 57-E.)

67.    And, expedited admission can be difficult to obtain. (See, e.g., Pl. Exs. 57-E at 1, Line 12 (C.B. "defecating and urinating on herself," refused meals, but denied expedited admission); id. at 3, Line 30 (K.T. in isolation for a year, has lost 75 pounds); id. at 3, Line 33 (H.H. spitting feces, denied expedited admission); 60-E at 13, Line 113 (M.M. voiced suicidal ideation "numerous times" and "carried through with attempts on several occasions," including hanging herself "last week," denied expedited admission); id. at 1, Line 5 (R.R., reported behaviors of "consumption of feces and urine," denied expedited admission).)

---

[26] At trial, the Court also heard testimony that not all criminal defense attorneys, the only stakeholders that all incompetency detainees have in common, are aware of the expedited admission process. (Trial Tr. Vol. 1, 184:8-13 (Drumheller).)

68.     Regardless, overall, HHSC approves only between 1% to 2% of incompetency detainees for expedited admission.  (See Pl. Exs. 27-G; 26 at 5; Am. Trial Tr. Vol. 3, 144:10–16 (Matthews); Trial Tr. Vol. 4, 85:15–25 (Moravec-Gallagher); Dkt. # 265-9 at 85:1-15 (Carr).)

69.     HHSC has operated a waitlist since early 2006.  (Trial Tr. Vol. 5, 182:13–15 (Simpson); Pl. Exs. 88-D; 28.)

70.     Between December 2007 and February 2012, HHSC's waitlists fluctuated, peaking at 400 detainees in October 2010 before dipping to 263 detainees in February 2012, yielding wait times such as a six month wait time in December 2007.  (Pl. Exs. 26 at 1–2; 37 at 30:24–31:7.)

71.     On February 12, 2012, a Texas court permanently enjoined HHSC's predecessor (DSHS) to make "a bed available at an appropriate State Mental Hospital…for an Incompetent Detainee no later than twenty-one (21) days from the date" of receipt of the commitment order.  (Pl. Ex. 20; Trial Tr. Vol. 1, 119:1–6 (Dec. 16, 2025)); Taylor v. Lakey, Cause No. D-1-GN-07-837, 2012 WL 6840143 (Tex. 250th Dist. Ct., Travis Cnty. Feb. 2, 2012), rev'd sub. nom, Lakey v. Taylor, 435 S.W.3d 309 (Tex. App. — Austin May 2, 2014, no pet.).

72.     Soon after the injunction was entered—although the injunction was almost immediately stayed—HHSC expanded capacity and so was able to admit all incompetency detainees to its mental health facilities for restoration services within

21 days.  (Dkt. # 265-5 at 50:13-19, 50:24-51:14 (Bray); Pl. Ex. 21 at 6–8; Trial Tr. Vol. 1, 119:10–13, 120:9–14 (Murrie)); see Taylor v. Lakey, Cause No. D-1-GN-07-837, Notice of Appeal (Tex. 250th Dist. Ct., Travis Cnty. Mar. 22, 2012).

73.     Nonetheless, shortly after the state court injunction was vacated on May 2, 2014, HHSC's waitlists for incompetency detainees and wait times began growing again.  Lakey v. Taylor, 435 S.W.3d 309, 323 (Tex. App.—Austin, 2014, no pet.); (Pl. Ex. 26 at 1, 3–4.)

74.     By the beginning of December 2019, the 500 incompetency detainees on the non-MSU list waited an average of 66 days while the 506 incompetency detainees waiting for an MSU bed waited an average of 281 days.  (Pl. Ex. 41 at 19.)

75.     By March 2, 2020, immediately before the arrival of COVID-19 in Texas, HHSC funded 2,339 beds with 29 beds "offline," yielding 2,310 operational beds with a combined forensic waitlist of 907 detainees.  (Pl. Exs. 29-B (excluding Waco Center for Youth); 26 at 1, 4.)  The average wait time for incompetency detainees on the non-MSU waitlist on the last day of February 2020 was 76 days, while detainees on the MSU-waitlist had an average wait of 289 days.  (Pl. Ex. 41 at 19.)

76.     HHSC's waitlists peaked in December 2022 with a combined 2,545 detainees waiting in jail and only 1,723 operational beds in its state hospitals, or

28

810 beds "offline" out of 2,533 funded beds.  (Pl. Exs. 29-D; 26 at 4 (excluding Waco Center for Youth).)  At that time, incompetency detainees waited an average of 699 days for admission to an HHSC MSU bed and 227 days for admission to a non-MSU bed.  (Pl. Ex. 11.)

77.     Though HHSC had staffing shortages that contributed significantly to the loss of operational capacity during the pandemic, HHSC's contracted facilities did not lack staff to keep their inpatient capacity operational during this same time. (See Pl. Ex. 29-D (MCMHTF, UTHNE, Palestine, and Dunn were the contracted facilities at this point in time).)

78.     By January 2024, with the easing of COVID-19 restrictions and state hospital staffing levels increasing again, (see Pl. Ex. 32), HHSC funded 2,592 beds with only 401 offline, resulting in 2,191 operational beds, a net increase of 466 operational beds compared to just over a year before.  (Pl. Ex. 29-F (excluding Waco Center for Youth).)  This significant increase in operational capacity corresponded to a 600-person reduction in the forensic waitlists, which fell to 1,945 incompetency detainees (1,163 non-MSU, 782 MSU).  (Def. Ex. 95 at Line 219.)

79.     Between January 2024 and January 2025, HHSC further increased capacity to 2,680 funded beds with only 293 beds offline, providing 2,387 operational inpatient beds, (Pl. Ex. 29-G (excluding Waco Center for Youth)), an

increase of 196 brought online over the prior year (2,191 in January 2024), (Pl. Ex. 29-F (excluding Waco Center for Youth)).

80.     Consistent with the established pattern, this modest capacity increase corresponded to a modest waitlist decrease of 172 detainees, (1,945 in January 2024 – 1,773 in January 2025).  (Pl. Ex. 26 at 5.)

81.     Since January 2025, HHSC has only marginally increased its operational capacity, and the forensic waitlists have plateaued in response.  (Trial Tr. Vol. 4, 68:15-21 (Schalchlin); Pl. Exs. 26; 29-G; Def. Ex. 104; see Pl. Exs. 33; 35.)  As of August 1, 2025, HHSC funded 2,696 beds, with 282 offline, providing 2,414 operational beds, an increase of only 27 beds since January 2025.  (Pl. Ex. 29-G (excluding Waco Center for Youth).)  With this added capacity, the waitlists remained essentially unchanged at 1,769 detainees (1,285 non-MSU; 484 MSU), compared to eight months earlier.  (Compare Pl. Ex. 35 with Pl. Ex. 26; see Pl. Ex. 32.)

82.     As HHSC's operational capacity plateaued, the average wait times for incompetency detainees likewise stagnated.  In January 2025, the average wait time for the MSU waitlist was 252 days and the average wait time for the non-MSU waitlist was 214 days.  (Pl. Ex. 48.)  A few months later, in May 2025, the average wait time was still 241 days for the 482 incompetency detainees on the MSU waitlist while the average wait time was 182 days for the 1,205

incompetency detainees on the non-MSU waitlist. (Pl. Ex. 32 at 5–6; see also Trial Tr. Vol. 2, 77:23–78:8, 78:14–18 (Murrie).)

83.    HHSC's documents show that in May 2025, at least one incompetency detainee had been waiting over 600 days, and two individuals had been waiting over 500 days. (Pl. Ex. 49-A at 1, Line 5 (J.O. spent 535 days on the MSU waitlist between 2023–2025); id. at Line 11 (S.R. spent 544 days on the MSU waitlist between 2023–2025); id. at Line 41 (J.R. spent 615 days on the MSU waitlist between 2023– 2025); see also Trial Tr. Vol. 1, 218:3–11 (Dunson testifying wait lists' "notification date" refers to when HHSC first learned of a commitment order).)

84.    As of August 30, 2025, incompetency detainees on HHSC's non-MSU list had been waiting an average of 178 days after HHSC received the order committing them to HHSC's mental health facilities for competency restoration services while their MSU counterparts had waited an average of 202 days. (Pl. Ex. 115 at 14–16.)

85.    At the time of trial in December 2025, the waitlists continued to hover over 1,700 total incompetency detainees. (Trial Tr. Vol. 4, 67:22–68:3 (Schalchlin).)

86.    Comparing year over year the decrease in the waitlists to HHSC's inpatient capacity shows HHSC's prior successes in decreasing the forensic

waitlists and corresponding wait times have directly correlated with HHSC's increasing its forensic inpatient mental health capacity. (See Pl. Ex. 9 at 8–9; Trial Tr. Vol. 2, 138:19–139:9, 141:9–145:20 (Murrie); Def. Ex. 137 at 12–18.)

87.   Accordingly, absent further improvements, the waitlists are likely to worsen. (See id.; Trial Tr. Vol. 2, 146:14–152:14 (Murrie); Pl. Ex. 9 at 9–11; Def. Ex. 104.)

88.   HHSC has long known that it did not have sufficient inpatient mental health capacity. (See Trial Tr. Vol. 5, 182:13–15 (Simpson); Dkt. # 99 at 1); Lakey, 435 S.W.3d at 314.

89.   With this problem in mind, in 2013, HHSC contracted with CannonDesign to project Texas's future inpatient psychiatric bed needs for the next decade to inform system planning (referred to herein as, the "Cannon Report"). (Trial Tr. Vol. 2 at 131:8-15; 136:5–9 (Murrie); Pl. Exs. 69 at 5; 70 at 7.)

90.   In 2014, CannonDesign estimated that Texas' inpatient psychiatric bed demand was approximately 3,489 beds and determined that HHSC, which at that time had 2,919 state-funded hospital beds for forensic and civil commitments, was already under-capacity—short 570 inpatient beds to meet then-current unmet need. (Trial Tr. Vol. 2, 130:18–20 (Murrie); Pl. Ex. 70 at 12.)

32

91.    The Cannon Report further projected that by the end of 2024, HHSC would need to add 1,849 HHSC owned- or controlled-beds for a total of 4,768 inpatient mental health beds to account for both population growth and latent need to meet the demand.  (Pl. Ex. 70 at 44, 76, 77; Trial Tr. Vol. 2, 132:6-9 (Murrie); Trial Tr. Vol. 4, 31:5–32:4 (Schalchlin).)

92.    The Cannon Report also evaluated employee compensation and determined in November 2014 that state hospital staff compensation lagged behind community pay and cited direct care staff ("PNAs") as specifically underpaid, with a high turnover rate of 33% annually.  (Pl. Ex. 70 at 73.)

93.    Consistent with this conclusion, HHSC's then-Deputy Executive Commissioner Mike Maples identified in February 2017 that staffing and infrastructure needs were the cause of state hospital bed loss.  (Pl. Ex. 79 at 15; see Dkt. # 265-4 at 74:4-75:22 (Maples).)

94.    Between March 2022 and August 2024, HHSC implemented three pay raises, improving staffing, but not restoring it to pre-pandemic levels.  (Pl. Ex. 32 at 1, 3; Def. Ex. 83.)

95.    In March 2025, HHSC still had 237 state hospital beds offline due to staffing, while the contracted facilities had zero offline.  (Trial Tr. Vol. 2, 153:8– 12, 155:8–20 (Murrie); Def. Exs. 137 at 19; 73 at 4; 94 at CY2025, Column H; Pl.

33

Ex. 29-G (the contracted facilities are MCMHTF, UTHNE, Palestine, Dunn, NTBHA, and Integral Care).)

96.     Though the Cannon Report itself cautioned that it was only an estimate and noted that HHSC would need to update the forecast periodically as population growth changed over time, (Pl. Ex. 70 at 18), HHSC did not update the projections and instead consistently relied upon the Cannon Report's recommendations, (Trial Tr. Vol. 2, 135:22-136:9 (Murrie); Trial Tr. Vol. 4, 50:14–24, 51:14–52:5 (Schalchlin); Def. Ex. 120 at 8).

97.     By the end of the Cannon Report's projection period in June 2024, HHSC's operational inpatient capacity was only 2,958 beds, in contrast to the 4,768 Cannon projected would be needed by then.  (Pl. Exs. 70 at 77; 12 at 37–39; Def. Exs. 94 at CY2024, Column H; 137 at 4–7; Trial Tr. Vol. 2, 133:5–134:14, 134:24– 135:21, 136:10–16 (Murrie).)

98.     Indeed, as of 2025, HHSC still had not reached the Cannon projection for 2024: 3,140 actual operational capacity in 2025 versus Cannon projecting 4,768 would be needed by the prior year.  (Trial Tr. Vol. 2, 136:20–137:21 (Murrie); Def. Exs. 137 at 8–10; 94 at CY2025, Column H; Pl. Exs. 70 at 77; 12 at 39–41.)

99.     Accordingly, because existing capacity remains insufficient to meet demand, wait times remain excessive, as even HHSC's chief medical officer agrees.  (Am. Trial Tr. Vol. 3, 134:18-135:3 (Matthews).)

**The Harms Caused by Prolonged Incarceration**

100.   While incompetency detainees wait in jail to receive competency restoration services, they endure severe physical, psychological, and other harms.

101.   As stated by HHSC's own expert and Forensic Director Jennie Simpson, Ph.D., Texas currently faces a "crisis" in effectively serving these individuals.  (Pl. Ex. 113-A.)  Dr. Simpson agreed that this problem constitutes a crisis in part because of the harm that it causes to people waiting for competency restoration in Texas jails.  (Trial Tr. Vol. 5, 176:18–177:5 (Simpson).)

102.   Indeed, HHSC's chief medical officer as well as Plaintiffs' forensic psychology experts all agree that delaying competency restoration services poses risks of clinical harm and that clinically, competency restoration treatment should begin immediately.  (Am. Trial Tr. Vol. 3, 148:9–12, 149:7-14 (Matthews); id. at 48:4–8, 89:17–90:6 (Murrie); Trial Tr. Vol. 2, 79:9–18, 112:4– 21 (Murrie); Trial Tr. Vol. 6, 93:11–15 (Murrie); Pl. Exs. 9 at 21; 4 at 13–14; Dkts. ## 265-7 at 141:16– 143:10; 143:11–146:1 (Kois); 265-8 at 169:1–170:20, 174:9–177:12, 189:7–192:12 (Packer).)

103.   The evidence introduced at trial shows that HHSC's failure to timely admit incompetency detainees to its mental health facilities harms incompetency detainees in three primary ways.

104.   First, incompetency detainees' criminal cases are harmed, as they cannot assist their attorneys in investigating or identifying witnesses; witnesses will be lost; witnesses may forget what happened; the attorney-client relationship will be undermined; and plea negotiations will be next to impossible to engage in. (See Trial Tr. Vol. 1, 109:1–10, 114:12–23 (Shearer); id. at 164:14–165:10 (Drumheller); id. at 189:3–190:14 (Chacona); Trial Tr. Vol. 2, 109:10–22 (Murrie).)

105.   Second, many incompetency detainees' total time in jail is increased. Misdemeanor incompetency detainees tend to spend far more time in jail waiting for admission to an HHSC mental health facility for competency restoration services than they would have if they had been competent.  (Pl. Ex. 10 at 25; Trial Tr. Vol. 2, 88:8–19 (Murrie).)

106.   Many would be eligible for mandatory bail reduction after 30 days but for their need for competency restoration.  TEX. CODE CRIM. PROC. art. 17.151; (Trial Tr. Vol. 1, 114:12–23 (Shearer); id. at 189:3-10 (Chacona).)

107.   In fact, some "time out," meaning they wait in jail for the maximum possible sentence for their charge and are released without being tried or restored to competency.  (See Trial Tr. Vol. 1, 112:19–113:8, 114:12–115:12 (Shearer); id. at 148:16–23, 160:13–161:2 (Drumheller); id. at 190:15–21 (Chacona); id. at

239:1–240:9 (Dunson); Trial Tr. Vol. 2, 79:25–80:16 (Murrie); Def. Ex. 82 at 1); TEX. CODE CRIM. PROC. art. 46B.0095(a).

108.   Third, delaying competency restoration treatment also poses severe mental health and physical risks, as it often causes incompetency detainees' psychiatric symptoms to worsen and these risk escalating to medical complications such as malnourishment, self-harm, and death.  (Trial Tr. Vol. 1, 165:11–21 (Drumheller); Trial Tr. Vol. 2, 81:4–83:15, 89:23–90:9, 92:17–93:4, 95:21–96:5, 98:19–25, 99:5–20, 108:22–109:9 (Murrie); Dkt. # 265-2 at 68:2-8 (Torres); Pl. Exs. 9 at 21–22; 4 at 13; 100 at 5; 107 at 34; see also Trial Tr. Vol. 6, 79:19–80:13 (Petrila).)[27]

109.   All incompetency detainees are exposed to this risk of worsened symptoms, and this risk of worsened symptoms and longer treatment is exacerbated by the jail environments in Texas.  (Trial Tr. Vol. 1, 115:13–116:5 (explaining that when incompetency detainees arrive to jail, they are generally placed in psychiatric lockdown, which means they are confined for 23 hours a day in a cell with a food chute being the only way they can communicate or receive

---

[27] And, of course, if they make it to admission to an HHSC facility, incompetency detainees who decompensate due to excessive wait times in jail ultimately require more (longer or more intensive) restoration treatment to promote clinical improvement and competence restoration.  (Pl. Exs. 4 at 13; 9 at 21–22; 100 at 5; Trial Tr. Vol. 2, 89:1–10, 92:17–93:25, 109:23–110:8 (Murrie).)

meals), 147:4–10, 147:17–21 (Shearer); id. at 165:11–21 (Drumheller); id. at 188:17–189:2 (Chacona); Trial Tr. Vol. 2, 89:15-91:5, 92:17-93:13, 95:21–96:14, 99:10–21 (Murrie); Am. Trial Tr. Vol. 3, 148:9-12 (Matthews); Pl. Ex. 4 at 13, 19, 27–28 (describing conditions in Texas jails).)

110.    Several of the named Plaintiffs and other class members represented by the Next Friends experienced some of these psychological and medical harms from their extended waits in jail, (Trial Tr. Vol. 1, 117:16–24 (Shearer); id. at 181:19–182:2 (Chacona); Pl. Exs. 1-A (Lampkin); 2-A (Jones)), and the trial record contains other detailed anecdotes—most documented by HHSC itself— of other incompetency detainees who experienced psychological harms, self-harm, attempted suicide, dehydration, starvation, and death while waiting for competency restoration treatment, (Trial Tr. Vol. 1, 241:7–17 (Dunson testifying to two examples of incompetency detainees dying on the waitlist); Trial Tr. Vol. 2, 100:13–101:2, 102:25–103:2, 103:14–104:22, 105:24–106:25, 107:23–108:6 (Murrie); Pl. Exs. 53 at 5 at 6 (Georgia Baldwin Death Report); 54-A at 5, Line 435 (Baldwin on waitlist); 55 at 6 (Michael Griego Death Report); 56-A at 17, Line 636 (Griego on waitlist); 57-E at 1, Line 12 (C.B. "defecating and urinating on herself," refused meals, but denied expedited admission); id. at 2, Line 16 (M.A. "breaking cell windows," tearing padding from cell and eating it, smearing feces, and subject of force from staff); id. at 3, Line 30 (K.T. in isolation for a year,

has lost 75 pounds); id. at 3, Line 33 (H.H. spitting feces, denied expedited admission); id. at 3, Line 35 (A.I. obsessively picked his skin until he was "covered in open sores"); id. at 2, Line 23 (E.T. experiencing "recent rapid decline," "smears his feces in cell"); 60-E at 13, Line 113 (M.M. voiced suicidal ideation "numerous times" and "carried through with attempts on several occasions," including hanging herself "last week"); 62-K at 1, Line 196 (O.C.M. "continued decompensation," "eating his feces and packing it into an open wound"); id. at 1, Line 197 (R.S. "required hospitalization for dehydration," exhibiting paranoia, and mute); id. at 1, Line 200 (K.D. "hitting herself in the face and biting herself," "believes a camera was implanted in her arm," jail noting "we do not have 24/7 medical coverage"); id. at 3, Line 222 (G.C. "verbally and physically aggressive" despite medication treatment, eating "paint chips, lint, and dirt"); id. at 6, Line 259 (E.A.A. attempted suicide day before request, endorsing suicidal ideation, previous suicide attempts in different jails); see Trial Tr. Vol 6, 94:17-96:7 (Murrie).)

111. These harms are staggering, and, as further detailed below, they are likely to persist absent court intervention. (See Trial Tr. Vol. 4, 52:22–53:2 (Schalchlin) (testifying that HHSC has not formally set any goal or identified an acceptable wait time for incompetency detainees waiting in jail for admission to an HHSC facility for competency restoration).)

39

**HHSC's Efforts to Reduce the Waitlist**

**112.** Although HHSC has made some commendable efforts to reduce the waitlist, its efforts have not and will not resolve the problem absent court intervention.

**113.** First, although HHSC recently received funding to replace state hospitals and increase inpatient capacity, the anticipated bed gain is insufficient to address the forensic waitlist. (Trial Tr. Vol. 2, 151:7–152:14 (Murrie); Trial Tr. Vol. 6, 99:25–100:11 (Murrie); Pl. Ex. 9 at 9–11; see Trial Tr. Vol. 4, 32:2-14 (Shalchlin).)[28]

**114.** As an initial matter, aside from the more-than-a-decade-old Cannon Report, HHSC itself has no current formal projection for the inpatient capacity it needs now, nor does it have a formal projection for the capacity it will need in the future.[29] (Trial Tr. Vol. 4, 49:19–52:10 (Schalchlin).)

---

[28] This is particularly so where evidence suggests that, historically, HHSC's construction timelines are repeatedly extended, with actual timelines often stretching four to seven years. (See, e.g., Pl. Ex. 84 at 1 (identifying Rusk State Hospital as "95%" complete in August 2025 but estimating construction completion four months earlier in April 2025); Def. Ex. 105 at 1, 3; compare Pl. Ex. 83 at 5, 8 with Pl. Ex. 84 at 1, 2; see also Am. Trial Tr. Vol. 3, 188:9-22 (Shalchlin).)

[29] Notably, the demand for competency restoration services has grown by 100–300 patients every year recently, and a continuation of that pattern would yield between 1,000–4,000 more commitment orders in the next four years compared to the last four. (Trial Tr. Vol. 2, 146:14–148:23 (Murrie); Pl. Ex. 9 at 11; Def. Exs. 104 at Rows 20, 27, 32, 38, 48; 94 at CY2022, 2023, 2024; compare Def. Ex. 137 at 11–15 with id. at 16–18.)

115.   While the increase in HHSC's inpatient capacity over the next four-plus years will provide incremental, one-time decreases to the forensic waitlist, HHSC's anticipated future capacity will fall short of substantially reducing wait times in light of the current waitlist backlog plus the current growth rate of demand for competency restoration services.  (Pl. Ex. 9 at 9–11; Trial Tr. Vol. 2, 141:9–145:20 (Murrie); Trial. Tr. Vol. 6, 99:8–100:11 (Murrie).)

116.   Despite agreeing that it does not have enough beds, HHSC's leadership did not ask the Texas Legislature for any funding for additional inpatient capacity in advance of the 2026-2027 session, (Trial Tr. Vol. 4, 47:23-48:4 (Schalchlin)), still has no specific target to reduce wait times, (Am. Trial Tr. Vol. 3, 138:20–25 (Matthews); Trial Tr. Vol. 4, 51:18-53:2 (Schalchlin); Trial. Tr. Vol. 5, 179:24–180:8 (Simpson)), has no projection for whether reduced wait times will occur, and could not tell the Court when or if incompetency detainees' wait times would be reduced below 90 days, 60 days, or 21 days, (Trial Tr. Vol. 4, 50:14–24, 51:23–52:10 (Schalchlin); Trial Tr. Vol. 5, 179:24–180:12 (Simpson); see also Am. Trial Tr. Vol. 3, 139:16–140:7 (Matthews)).

117.   Its expert likewise could not identify any point in time when HHSCs forensic waitlists would be under 21 days, 30 days, 60 days, or any other threshold. (Trial Tr. Vol. 6, 75:13-76:2 (Petrila).)

118.   HHSC Deputy Executive Commissioner Schalchlin testified that, even assuming HHSC's planned construction and contracted beds were at full capacity by the end of 2027, HHSC will still be 315 beds short of CannonDesign's projection of the need three years earlier in 2024.  (Trial Tr. Vol. 4, 31:5–32:14 (Schalchlin); see also Pl. Ex. 70 at 77.)

119.   Mr. Schalchlin further testified that the beds HHSC projected by the end of 2027 include facilities that will not be at full operating capacity until 2028 or 2029, and HHSC could not say at that time that even the facilities where construction would be complete in 2027 would, in fact, be fully operational and serving patients in 2027.  (Trial Tr. Vol. 4, 28:4–8; 30:2–15; 30:21–31:1 (Schalchlin).)

120.   Second, existing OCR and JBCR programs in Texas have limited impact and are not slated to expand.  (See Pl. Exs. 9 at 15–17, 19–20; 4 at 40, 48–50; Trial Tr. Vol. 2, 70:4-11, 76:14-77:5 (Murrie).)

121.   The first OCR programs in Texas were funded by HHSC in 2008, with the number fluctuating over time, peaking at eighteen in 2023, and then reducing to 16 by the time of trial.  (Trial. Tr. Vol. 5, 53:24–54:18, 87:21–88:7 (Webb); Pl. Ex. 12 at 10–11.)

122.   As noted previously, these OCR programs treat about 600 patients per year, (Pl. Exs. 12 at 10–11; 13; 17 at 7, 10; Def. Ex. 137 at 2; Trial Tr. Vol. 2,

72:24–73:14, 75:18–76:2 (Murrie); see also Trial Tr. Vol. 5, 56:11–25 (Webb)), though three-quarters of the way through fiscal year 2025, 10 of the 16 programs were not on track to serve the number they had contacted with HHSC to serve, (Def. Ex. 91 at "OCR Utilization," Column Y).

123.    Further, in 2025, JBCR programs were provided in only 19 Texas jails and serve a declining number of incompetency detainees—about 911 in 2023, 800 in 2024, and 678 projected for 2025—of which half or less are restored to competency.  (Pl. Exs. 12 at 11–13; 16-A; 17 at 21; 9 at 16–17; Trial Tr. Vol. 2, 69:16–70:14, 72:3–13 (Murrie); see also Def. Ex. 91 at "JBCR Utilization," Column T, (showing 10 of 19 programs had restoration rates at or below 50%, including 3 below 20%).)

124.    In fact, not only are the overall numbers served in JBCR declining but the programs are additionally not serving their contractual targets.  (Trial Tr. Vol. 5, 80:22-82:8 (Webb).)

125.    And, at least some detainees who do not restore in JBCR programs are committed to HHSC's mental health facilities under article 46B.102, and thus still ultimately require admission to an inpatient forensic bed.  TEX. CODE CRIM. PROC. arts. 46B.079(a), (b)(3); 46B.084(e); 46B.102; (see also, Pl. Ex. 49; see, e.g., Pl. Ex. 49-A at 1–3, Lines 7, 51, 69, 85 (examples of JBCR unsuccessful, scheduled for admission to a mental health facility).)

**126.**    Thus, Texas's current OCR and JBCR programs are too small in scope to meaningfully reduce HHSC's forensic waitlists,[30] (see Pl. Ex. 4 at 40, 48–50; Trial Tr. Vol. 2, 70:4-11, 74:1-75:1 (Murrie)), and HHSC did not present any evidence suggesting that either OCR or JBCR would expand to have a larger impact on the waitlist absent Court intervention.

**127.**    Third, HHSC's crisis services, diversion initiatives, and Jail In-Reach Learning Collaborative ("JIRLC") have not measurably stemmed the growth of the forensic waitlists and are not slated to expand.

**128.**    To begin with, although HHSC also funds non-inpatient "initiatives" it asserts will address the forensic waitlist, (Pl. Ex. 12 at 17–29), it has not presented evidence about how these initiatives are expected to meaningfully expand in the future, much less the expected impact of any such expansion, (see Trial Tr. Vol. 5, 95:25–96:24, 98:15–21, 99:7–100:2 (Webb); id. at 177:6-17, 177:20–179:12 (Simpson); see also Trial Tr. Vol. 1, 176:3–8 (Drumheller)).

**129.**    Many of these services have been available for over three decades, yet the waitlists have continued to grow.  (Trial Tr. Vol. 5, 90:22–91:12, 97:24–98:1 (Webb); id. at 97:24–98:1; compare TEX. HEALTH & SAFETY CODE § 534.053(a)

---

[30] For example, in contrast to Texas, Colorado's OCR program serves 500–600 incompetency detainees concurrently and over 1,000 incompetency detainees annually, though it is one-fifth the size of Texas.  (Trial Tr. Vol. 2, 74:5-75:1 (Murrie).)

(Vernon's 1991) (providing that HHSC shall "ensure that, at a minimum" 24-hour emergency screening and rapid crisis stabilization services, community-based crisis residential services or hospitalization, community-based assessments, medication-related services, and psychosocial rehabilitation programs are provided in every service area in the state) with id. at § 534.053(a) (current statute) (providing for these same listed programs); see also id. at § 534.054 (providing HHSC shall identify and contract with a local mental health authority ("LMHA") to ensure services are provided in each service area in the state); (Dkt. # 265-6 at 217:17–21 (Gaines); 26 TEX. ADMIN. CODE § 301.251 (since 2015, LMHAs are required to assemble and maintain a network of mental health service providers); see generally Pl. Ex. 26.)

130.   Likewise, most of the other community initiatives, partnerships, and forensic services initiatives HHSC identified as affecting the waitlists, (see Pl. Ex. 12 at 17–29), were started in 2020 (well after the waitlists topped 1,000 incompetency detainees), (Pl. Exs. 26; 12 at 17–29 (describing the transition team and nursing home transition plan as initiatives from the 2023 legislative session and the length of stay research as an "amendment" to the existing TIEMH contract); id. (describing Eliminate the Wait as starting in October 2021); id. (describing the State SIM Summit as beginning in January 2021); id. (identifying the All Texas Access Initiative as being directed by the legislature during the 2021

session); Dkt. # 265-3 at 153:21–154:6, 222:20–223:2 (Torres)), and, while there is no way to calculate their impact on the waitlist, the decrease in the waitlist after that time is fully explained by increased state hospital occupancy while demand for services continued to increase, suggesting that these programs have not had a substantial impact on the forensic waitlist, (see Pl. Ex. 9 at 8–9; Trial Tr. Vol. 2, 138:19-140:18 (Murrie); see also Trial Tr. Vol. 5, 33:4-34:12 (noting that the step-down programs have a current capacity of 48 individuals and are serving only 23 people at the time of trial) (Moravec-Gallagher); id. at 177:20-178:1 (HHSC has not quantified the number of people that Eliminate the Wait has kept off of the waitlist) (Simpson); id. at 177:6-17 (testifying that in the approximately four years since the JILRC program has been in existence, the program has removed only around 70 people from the waitlist) (Simpson)).[31]

131.    Moreover, even for those programs that have had a measurable effect on the waitlist, the effect has been extremely minimal.  (Trial Tr. Vol. 5, 33:4-34:12 (noting that the step-down programs have a current capacity of 48 individuals and are serving only 23 people at the time of trial) (Moravec-

---

[31] Of course, once an incompetency detainee is placed on one of HHSC's forensic waitlists, none of HHSC's crisis services, diversion grants, or other community mental health services remove an incompetency detainee from the waitlist or shorten their wait.  (Trial Tr. Vol. 5, 169:10-170:5 (Simpson).)  Besides OCR and JBCR programs, the only initiative that HHSC identified that removed incompetency detainees from its forensic waitlists is the Jail In-Reach Learning Collaborative (JIRLC).

Gallagher); id. at 177:6-17 (testifying that in the approximately four years since the JILRC program has been in existence, the program has removed only around 70 people from the waitlist) (Simpson); Pl. Ex. 12 at 69–81.)

**132.**   Accordingly, HHSC's other initiatives and programs are unlikely to meaningfully reduce the forensic waitlist in the future.

**133.**   Therefore, in aggregate, HHSC's future plans are not likely to successfully reduce the wait times for incompetency detainees absent court intervention.

**134.**   Nonetheless, evidence presented at trial suggests that, with additional funds, HHSC has the ability to address the waitlist and eliminate wait times.  (See Def. Exs. 73 at 4 (noting 237 beds offline due to staffing shortages); 137 at 19 (noting percentages of unoccupied beds at state hospitals versus at contracted facilities); Trial Tr. Vol. 2, 153:8–12, 155:8–20, 156:5–21 (Murrie) (describing the impact that staffing these beds would have on the waitlist); Am. Trial Tr. Vol. 3, 87:23–88:16 (Matthews) (noting that the contract hospitals are not experiencing the same staff shortages as the public hospitals); Pl. Exs. 50 at 6, 8 (in August 2024, identifying 375 state-hospital forensic patients who did not need continued hospitalization if appropriate community mental health placements were available and identifying 203 as 46B patients and 69 as 46C patients); 51 at 6–8 (in July 2025, identifying 404 adult state-hospital patients who did not need continued

hospitalization if appropriate community mental health placements were available, at least 314 of whom were forensic); Am. Trial Tr. Vol. 3, 155:5–156:19 (Matthews); Trial Tr. Vol. 5, 33:4-34:12 (Moravec-Gallagher) (noting that the step-down programs have a current capacity of 48 individuals and were serving only 23 people at the time of trial); Def. Exs. 116 (noting that the average cost of a step-down bed is $413 daily compared to $1,013 daily for a state hospital bed); 123 at 6 (HHSC's expert witness reporting that if appropriate community-based placements existed for these discharge-ready patients, those 314 occupied beds would be available (and treating more than one incompetency detainee per year)); Dkt. # 99 at ¶ 12 (providing that the Texas Legislature has given HHSC the discretion to determine how to divide the total number of HHSC inpatient mental health beds between the civil and forensic population); Trial Tr. Vol. 2, 160:24–161:23 (Murrie) (explaining that private hospitals will treat civil patients even if they will refuse forensic patients); id. at 153:13–21 (Murrie) (explaining that contracting for beds is typically faster than building new capacity); Trial Tr. Vol. 4, 70:15–73:17 (Schalchlin) (agreeing that it would take a one-time expenditure of approximately $270 million to provide treatment in contract beds for all of the incompetency detainees currently on the waitlist, assuming that each individual requires the maximum 180 days); Pl. Ex. 9 at 16–17 (providing testimony that JBCR programs could improve timely competency restoration treatment if they are

48

of uniformly high quality and their capacity is expanded); id. at 19–20 (explaining that OCR programs could have an impact on the waitlist if their capacity grows);

### Timeline to Admit

135.   Finally, HHSC's documents and employees' testimony at trial showed that the logistics of planning admission, transporting an incompetency detainee from jail, and admitting them to an HHSC mental health facility typically takes only two weeks or less if there is a bed available.  (Dkt. # 265-9 at 47:5–15 (Carr); Trial. Tr. Vol. 2, 14:19–15:8, 38:18–21 (Dunson); id. at 113:16–115:4 (Murrie); Trial Tr. Vol. 4, 89:16–18 (Moravec-Gallagher); see also Pl. Ex. 47 (providing bed offer dates and dates of admission).)

136.   Because HHSC's staff coordinate discharges of patients from its mental health facilities, including discharge of incompetency detainees back to jails, HHSC knows in advance when a bed will become available for a new incompetency detainee to be admitted to one of its mental health facilities.  (See Am. Trial Tr. Vol. 3, 115:20-116:8 (Matthews); Trial Tr. Vol. 2, 10:19–11:9, 14:14–15:8 (Dunson).)

137.   Once HHSC knows an inpatient bed will be available soon for an incompetency detainee, HHSC's staff immediately reach out to the county detaining the next incompetency detainee appropriate for admission to that bed to

schedule the detainee's admission to the mental health facility.  (Trial Tr. Vol. 2, 10:19–11:9, 14:14–15:8 (Dunson).)

138.   This process of coordinating the admission and transport takes two weeks on average. (Trial Vol. 4, 89:9–18 (Moravec-Gallagher); Dkt. # 265-9 at 47:5–15 (Carr).)

139.   If the next appropriate incompetency detainee's county cannot transport them within two weeks of being notified (thus the available HHSC bed would remain vacant for more than a week), HHSC coordinates with the next appropriate incompetency detainee's county on the waitlist so that beds do not stay vacant more than a few days.  (Trial Tr. Vol. 4, 89:22–90:10 (Moravec-Gallagher); Trial Tr. Vol. 5, 25:4–8 (Moravec-Gallagher).)

140.   HSC's own records contained numerous instances of incompetency detainees being admitted within two weeks or less of their respective county being notified a bed was going to become available, even when incompetency detainees were detained in jails across the state from their admitting facility.  (Trial Tr. Vol. 2, 19:2–15, 19:20–23, 20:19–22:3, 22:14–23:24, 24:7–24:19, 25:2–26:2, 28:19–22, 29:11–30:25 (Dunson discussing Pl. Ex. 47); Pl. Ex. 47.)

141.   Likewise, each of the Named Plaintiffs were admitted to HHSC mental health facilities within seven days of their respective counties being notified a bed was available in an HHSC mental health facility.  (Def. Ex. 128 at 5–6.)

**142.** Many other states have deadlines of 30 days or less in their similar competency restoration service systems, and most achieve timelines under 21 days—including California where, despite a population and prior history of a waitlist larger than Texas, now begins competency restoration services within about five days.  (Pl. Exs. 9 at 23–24; 91 at 1–2 (Alabama, 30 days); 92 at 13 (Oregon, 7 days); 93 at 20 (California, 28 days); 94 at 32 (Oklahoma, 21 days); 96 at 13–14, 47 (Colorado, 7 days for a subset of detainees, 28 days for all others); Trial Tr. Vol. 2, 120:17–121:8, 122:3–5, 122:23–123:2, 123:19–124:2, 124:19–125:6, 126:1–5, 126:17–127:8, 128:21–129:14 (Murrie); Trial Tr. Vol. 5, 174:14–18 (Simpson); Trial Tr. Vol. 6, 93:21–94:7 (Murrie).)  Those states' experiences suggest that Texas could accomplish a timeline of 21 days or less if HHSC maintained sufficient competency restoration treatment capacity.  (Trial Tr. Vol. 2, 128:6–20 (Murrie); see also Dkt. # 265-5 at 50:13-19, 50:24-51:14 (Bray).)

II.    CONCLUSIONS OF LAW

    A.    **Class Certification**

**1.**    On March 29, 2022, the Court certified this matter as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(2).  As described above, the certified class consists of:

> All persons who are now, or will be in the future, (a) charged with a crime in the State of Texas, (b) ordered by a Texas court to [an HHSC] facility where they are to receive competency restoration services; but, (c) because [HHSC] maintains insufficient forensic capacity, (d) remain detained in a Texas

county jail more than twenty-one (21) days from the day [HHSC] receives the court order to the day [HHSC] makes a bed available in [an HHSC] mental health facility.

(Dkt. #137 at 18–19.)

2.      The Court's previous Rule 23 analysis applies equally to and is reinforced by the facts revealed at trial for the reasons stated in the Court's prior order.  (See generally Dkt. # 137.)

3.      In particular, the trial record reinforces the Court's conclusion that the key dispute—the delay in Class members' access to competency restoration services while they wait in jails—affects the entire class and thus generates the predominating common factual and legal issues in this case.

4.      Thus, the trial record supports this Court's earlier finding that the requirements of Federal Rule of Civil Procedure 23 have been satisfied here.  The Court therefore reaffirms and incorporates its prior class-certification rulings as final Conclusions of Law and finds that this case properly proceeds under Rule 23(b)(2).

**B.      Plaintiffs Have Standing to Sue**

5.      The trial record similarly confirms this Court's prior finding that Plaintiffs have standing to sue.  (See Dkt. # 186 at 9–14.)

6.      To establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to

52

the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000).  All three elements are "an indispensable part of the plaintiff's case," and that party seeking to invoke federal jurisdiction bears the burden to establish them.  Lujan v. Defs. Of Wildlife, 504 U.S. 555, 561 (1992).

7.     In the context of a class action, there are two competing approaches to class standing: "the more forgiving 'class certification' approach and [the] more intensive 'standing' approach."  Wilson v. Centene Mgmt. Co., L.L.C., 168 F.4th 217, 230 (5th Cir. 2026) (internal quotations and citation omitted).  "The class-certification approach analyzes only a named plaintiff's individual standing; 'if that is satisfied, any remaining analysis is considered a matter of class certification under Rule 23.'"  Id. (quoting Angell v. GEICO Advantage Ins. Co., 67 F.4th 727, 734 (5th Cir. 2023)).  "By contrast, the standing approach compares 'the injuries or interests of the named plaintiff with those of the putative class and will hold that the named plaintiff lacks standing for the class claims if his or her harms are not sufficiently analogous to those suffered by the rest of the class.'"  Id.

8.     Defendant argues that Plaintiffs lack standing because (1) Plaintiffs failed to show an actual or imminent, concrete and particularized injury-in-fact; (2) Plaintiffs failed to establish an injury that is fairly traceable to HHSC; and (3)

53

Plaintiffs failed to establish that their alleged harm is likely to be redressed by an injunction against HHSC.  (Dkt. # 255 at 17–25.)  These arguments are unavailing.

9. First, Defendant contends that although "Plaintiffs have provided anecdotal evidence that some of the class representatives decompensated in jail while waiting for admission to a state hospital bed," they have not "established that this harm is shared across the class."  (Id. at 18.)  Urging the Court to apply the more stringent "standing" approach to class standing, Defendant insists that Plaintiffs have failed to show that all class members have actually suffered or are at sufficiently imminent and substantial risk of suffering an actual or imminent, concrete and particularized injury-in-fact.  (Id.)

10. In presenting its argument, however, Defendant mischaracterizes Plaintiffs' injury.  Here, Plaintiffs' injury is not that class members decompensate while in jails, though the evidence shows that many do, (see Trial Tr. Vol. 1, 165:11-21 (Drumheller); id. at 115:13-116:5 (Shearer); Trial Tr. Vol. 2, 89:15-91:5, 92:17-93:13, 95:21-96:14 (Murrie); Am. Trial Tr. Vol. 3, 148:9-12 (Matthews); Pl. Ex. 4 at 13, 19), but that the class members remain in county jails for longer than 21 days without access to competency-restoration services, contrary to the sole purpose of their commitments.

11. By nature of the class definition, all of the class members in this case have been ordered by a Texas court to receive competency restoration services and

remain detained in a Texas county jail for more than 21 days because of HHSC's insufficient forensic capacity.  The trial record confirms that, while detained in county jails, class members are not receiving competency restoration services for months to years after HHSC receives their commitment orders.[32]  This is a cognizable injury and one that is shared by the Named Plaintiffs.  Thus, even if the Court were to apply the more stringent "standing" approach to class standing, the Court would find that Plaintiffs have established an injury-in-fact sufficient for Article III standing.[33]  See Wilson, 168 F.4th at 230–31 (holding that because the plaintiffs' injury theory applied equally to the named plaintiffs and all other plaintiffs, it satisfied the class-certification approach and the standing approach).

**12.**    Second, Defendant contends that because HHSC does not control the "front door" or the "back door" of the competency system, Plaintiffs' injuries are not attributable to HHSC.  (Dkt. # 255 at 19–23.)  This contention is merely a restatement of the argument Defendant made previously in this case and that this Court has already rejected.  (See Dkts. ## 173 at 12 (arguing that because other stakeholders control Plaintiffs' confinement and Defendant's control only Plaintiffs' admission to mental health facilities, the injury is not traceable to

---

[32] As noted previously, competency restoration services are not provided in Texas jails outside of formal JBCR programs.  Incompetency detainees in JBCR programs are excluded from the Plaintiff Class by definition.

[33] This injury is not a future harm, as Defendant suggests, but is a real, concrete, and persistent harm that affects every Class Member.

Defendant); 186 at 11 (finding that, while Plaintiffs' confinement may originate with a court order and continue because county Sheriffs detain them, the failure to provide timely admission to state mental health facilities is an injury that is directly attributable to HHSC).)

13.   To satisfy the traceability requirement, Plaintiffs' injuries must only be "fairly traceable" to HHSC's conduct, that is, there must be a causal connection between Plaintiffs' injuries and the conduct complained of, and the injuries must not be "the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (1992) (internal punctuation and citation omitted).

14.   Under Texas law, HHSC is solely responsible for admitting incompetency detainees to appropriate treatment facilities. See TEX. HEALTH & SAFETY CODE §§ 533.051(a)(2), (b)(4); id. at 533.052. As part of this responsibility, HHSC—and only HHSC—is explicitly charged with "determin[ing]…the minimum number of beds that the state hospital system must maintain to adequately serve" forensic and civil patients and actually providing those beds. TEX. HEALTH & SAFETY CODE § 533.051(a), (b)(2).

15.   Plaintiffs in this case are individuals who have been ordered to receive competency restoration services at an HHSC mental health facility but, because HHSC does not have sufficient capacity, remain in county jails for more than 21 days while awaiting admission. HHSC, as the entity responsible for "ensur[ing]

56

the appropriate and timely provision of mental health services to patients . . .

ordered by a court to receive those services" and as the entity mandated to "plan

for . . . the proper and separate allocation of beds in the state hospitals for . . .

patients who are . . . committed to a state hospital or other facility to attain

competency to stand trial under Chapter 46B, Code of Criminal Procedure," TEX.

HEALTH & SAFETY CODE § 533.051(a), is therefore the source of Plaintiffs'

injuries.[34]

16.     Thus, as the evidence at trial confirmed, because HHSC controls

Plaintiffs' admission to its mental health facilities and, due to insufficient capacity,

places Plaintiffs on waitlists that require they remain in jail without competency

restoration services for longer than 21 days, Plaintiffs' injuries are fairly traceable

to HHSC.  (See Dkt. # 186 at 11 ("The fact that HHSC manages the forensic

waitlists and controls the availability of beds in state mental health facilities is

---

[34] In its closing argument, Defendant asserts that Plaintiffs' injuries are not attributable to HHSC because of the roles other entities play in the competency system.  But, where, under Texas law, HHSC is solely responsible for admitting incompetency detainees to its facilities and maintaining adequate capacity to serve those incompetency detainees, the fact that other entities influence the total number of incompetency detainees in the system or that incompetency detainees remain in the custody of other entities while they wait does not at all suggest that Plaintiffs' injuries are not fairly traceable to HHSC.  Rather, as the evidence at trial established, it is HHSC that controls the time that incompetency detainees wait in jails after HHSC receives detainees' commitment orders, not these other entities. See TEX. HEALTH & SAFETY CODE § 533.051(a), (b)(2).  Accordingly, this argument fails.

57

sufficient to establish traceability for the purposes of standing."); see also Oregon Advoc. Ctr. v. Mink, 322 F.3d 1101, 1114–16 (9th Cir. 2003) (addressing an analogous traceability argument made by Oregon's equivalent state entity and concluding that the plaintiffs' injuries were traceable to that defendant's refusal to timely admit those plaintiffs to the state's mental health facility); Disability Rts. N. Carolina v. N. Carolina Dep't of Health & Hum. Servs., No. 1:24CV335, 2025 WL 1665327, at *8 (M.D.N.C. June 12, 2025), report and recommendation adopted as modified, No. 1:24-CV-335, 2026 WL 880084 (M.D.N.C. Mar. 30, 2026) (at the motion to dismiss stage, rejecting an argument by North Carolina's equivalent state entity that causation was not met because external stakeholders outside of the defendant's control affect the plaintiffs' wait times).

17.    Finally, although Defendant argues that an injunction requiring individuals declared incompetent to stand trial be admitted to a state hospital bed within 21 days of that commitment will not redress Plaintiffs' harm, the Court does not agree.  (Dkt. # 255 at 24–25.)

18.    "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'"  Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024) (internal citation omitted).  "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."  Id. at 381.

58

**19.**    Here, Plaintiffs allege that their constitutional rights are being violated due to their extended confinement in county jails without access to competency restoration services, contrary to the sole purpose of their commitments.  By law, HHSC is the agency statutorily required to provide competency restoration services to detainees committed to its mental health facilities for this purpose. TEX. HEALTH & SAFETY CODE §§ 533.051(a)(2), (b)(4); id. at 533.052.  And the trial record demonstrates that HHSC's mental health facilities in fact provide competency restoration services.  (See Dkts. ## 99 at 1; 218 at 4; Pl. Ex. 4 at 20– 25.)  HHSC is also the entity statutorily mandated to "ensure the appropriate and timely provision of mental health services to patients . . . ordered by a court to receive those services" and to "plan for . . . the proper and separate allocation of beds in the state hospitals for . . . patients who are . . . committed to a state hospital or other facility to attain competency to stand trial under Chapter 46B, Code of Criminal Procedure."  TEX. HEALTH & SAFETY CODE § 533.051(a).

**20.**    Accordingly, as this Court previously held, "requiring timely admission to HHSC's mental health facilities will put an end to Plaintiffs' extended confinements in county jails."  (Dkt. # 186 at 13.)  That complying with such an injunction would be challenging or burdensome does not render the injury non-redressable.  Indeed, when other courts have found that incompetency detainees due process rights were violated when they were forced to remain in

59

county jails while awaiting admission to mental health facilities, injunctions were the universal relief granted.  See, e.g., Trueblood v. Wash. St. Dep't of Soc. & Health Servs. ("Trueblood II"), 101 F. Supp. 3d 1010, 1024 (W.D. Wash. 2015) abrogated on other grounds by 822 F.3d 1037 (9th Cir. 2016) (injunction required state to admit incompetency detainees within seven days of commitment orders for restoration); Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosp., 731 F. Supp. 2d 603, 627 (E.D. La. 2010) (injunction required transfer of incompetency detainees from jails to a mental health facility within 21 days of their incompetency orders.); Oregon Advoc. Ctr. v. Mink, No. CV 02–339–PA, 2002 WL 35578910, at *7 (D. Or. May 10, 2002), aff'd, 322 F.3d 1101 (9th Cir. 2003) (injunction requiring state to admit incompetent detainees within seven days of the order determining the criminal defendant's incompetency).  Redressability is met here.

21.     Plaintiffs therefore satisfy all three elements of Article III standing.

C.     **The Prison Litigation Reform Act**

22.     Next, although Governor Abbott argues that this case is governed by the Prison Litigation Reform Act and is therefore subject to certain exhaustion and other requirements, this Court disagrees.

23.     The Prison Litigation Reform Act of 1995 (the "PLRA") was enacted by Congress in an effort to "reduce the quantity and improve the quality of

60

prisoner suits." Perttu v. Richards, 605 U.S. 460, 464–65 (2025). In relevant part, the PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The exhaustion requirement [of the PLRA] is mandatory and 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Fairbanks v. Jones, No. CIVASA02CA0582-XR, 2003 WL 22324893, at *2 (W.D. Tex. Oct. 1, 2003) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)). If a claim is unexhausted, courts have "zero discretion to hear" such a claim. Valentine v. Collier, 978 F.3d 154, 160 (5th Cir. 2020). In addition to its exhaustion requirement, the PLRA also imposes limits on prospective relief and attorney's fees. 18 U.S.C. § 3626(a); 42 U.S.C. § 1997e(d).

24.    In his amicus brief, Governor Abbott contends that because Plaintiffs are a class of pretrial detainees who complain of their continued confinement in jail pending competency restoration, the PLRA applies to their claim. (Dkt. # 257-1 at 8–9.) Thus, according to Governor Abbott, if Plaintiffs have not exhausted their

61

administrative remedies—which Abbott states is "unclear"—the Court cannot grant them relief.  (Id. at 9–11.)[35]

**25.**    Upon its review of the facts and the relevant law, the Court finds that the PLRA does not apply to Plaintiffs' claim.

**26.**    The PLRA applies to suits "with respect to prison conditions."  42 U.S.C. § 1997e(a); 18 U.S.C. § 3626(g)(2); Porter, 534 U.S. at 532 (holding that the PLRA's exhaustion requirement applies to "all inmate suits *about prison life*" (emphasis added)); Valentine, 978 F.3d at 160 (providing that the PLRA's exhaustion requirement is in play when "inmates seek[] to challenge *prison conditions*" (emphasis added)).

**27.**    In this case, Plaintiffs do not challenge the conditions of the individual jails in which they are held, such as the medical care, housing assignments, discipline, or rules and regulations of the jails.  Rather, Plaintiffs are challenging the constitutionality of their continued confinement without restoration services.  Therefore, the PLRA is plainly not applicable.  See 42 U.S.C. § 1997e(a) (discussing the exhaustion requirement for actions brought "*with respect to prison*

---

[35] Abbott also argues that, pursuant to the PLRA, (1) any prospective relief must be narrowly drawn and must be the least intrusive means to correct the violation of the federal right; and (2) any eventual award of attorney's fees to Plaintiffs' counsel must be substantially limited.  (Dkt. # 257-1 at 11–14.)  Because the Court determines that Plaintiffs' claim is not subject to the PLRA, it does not address these arguments.  However, the Court intends to in act in a careful and measured way when determining relief.

*conditions*" (emphasis added)); 18 U.S.C. § 3626(g)(2) (defining "civil action with respect to prison conditions" to mean "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[]"); Cacho v. Gusman, No. 11-225, 2026 WL 456587, at *1, 4–6 (E.D. La. Feb. 18, 2026) (in a suit challenging plaintiffs' unlawful over-detention, finding the PLRA inapplicable and determining that the PLRA is limited to claims "impacting the experience and/or quality of the prisoners' lives in prison, and not the mere fact that they are there")[36]; Willard v. Hearn, No. 1:19-CV-908-RPM, 2021 WL 4099019, at *2 (S.D. Miss. Sept. 8, 2021) (determining that claims related to malicious prosecution were not subject to the PLRA and noting that "while the scope of prisoner lawsuits subject to the PLRA is broad, it is plainly not limitless"); id. ("[W]hen considering whether a claim is about prison life or conditions, the Court focuses on whether the claim *arises from conduct or events occurring in prison*[.]" (emphasis added)); Fuller v. Kansas, No. CIV.A.04-2457-CM, 2005 WL 1936007, at *2 (D. Kan. Aug. 8, 2005), aff'd, 175 F. App'x 234

---

[36] Although the original Cacho plaintiffs were no longer confined, the Cacho court's opinion concerned the consent decree issued fifteen years earlier affecting current and prospective detainees. Cacho, 2026 WL 456587, at *1. Cacho is therefore relevant here.

(10th Cir. 2006) (holding that the plaintiff's claims of false arrest and false imprisonment do not pertain to his "prison conditions" and noting that interpreting the PLRA to extend this far "strays from the plain meaning of the statute"); Almahdi v. Ridge, 201 F. App'x 865, 868 (3d Cir. 2006) (explaining that a claim based on a decision made "outside the prison gates" by "another agency, not the prison," was not a claim falling within the ambit of the PLRA).

28.    Indeed, consideration of the PLRA's stated purposes reinforces the Courts' conclusion that the PLRA does not govern Plaintiffs' claim here.  The PLRA was enacted to "eliminate unwarranted federal-court interference with the administration of prisons" and to reduce frivolous prisoner litigation about issues like bad haircuts, pizza parties, and being served chunky rather than creamy peanut butter.  Woodford v. Ngo, 548 U.S. 81, 93–94 (2006); 141 Cong. Rec. S14413-14 (daily ed. Sept. 27, 1995); Cacho, 2026 WL 456587, at *6 (discussing the legislative history of the PLRA and Congress' concerns with frivolous prisoner lawsuits).  Neither concern is implicated here where Plaintiffs' claim is not frivolous and Plaintiffs' requested relief would not interfere with the administration of Texas jails.[37]

---

[37] By way of illustration, if a Class member were hypothetically housed in some luxury facility—all needs met, good food, exercise, etc.—they would nonetheless suffer from the harm this suit was filed to correct, a lack of competency services mandated by Texas law.

**29.** Moreover, the PLRA's exhaustion requirement—which was intended to "allow[] prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled to court"—would not be advanced by applying the PLRA to Plaintiffs' claims because jail officials cannot remedy the constitutional violation alleged here. Jones v. Bock, 549 U.S. 199, 204 (2007); see TEX. HEALTH & SAFETY CODE § 533.051(a); see also Almahdi, 201 F. App'x at 868 n.1 (noting that requiring exhaustion of plaintiff's claims would not advance the policy underlying the PLRA exhaustion requirement because "another agency, not the prison" made the challenged decision).

**30.** Therefore, the Court holds that Plaintiffs' claim here is not subject to the PLRA.[38]

---

[38] Even if the Court were to find the PLRA to apply, it notes that exhaustion under the PLRA is an affirmative defense. Perttu, 605 U.S. at 469. In the decade that this suit has been pending, Defendant has not once raised exhaustion under the PLRA. (Dkts. ## 10; 14; 30; 51; 61; 94; 98; 150; 173.) Accordingly, Defendant has waived this defense. Carbe v. Lappin, 492 F.3d 325, 328 (5th Cir. 2007); see Giles v. Gen. Elec. Co., 245 F.3d 474, 491–92 (5th Cir. 2001) (providing that, in order to preserve the affirmative defense of exhaustion, a defendant must raise the alleged failure to exhaust in their answer or "at a pragmatically sufficient time" that does "not prejudice the plaintiffs' ability to respond").

**D.**     **Jackson v. Indiana Governs the Court's Substantive Due Process Inquiry.**

31.     The Due Process Clause of the Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1.

32.     To prevail on a substantive due process claim, a plaintiff must establish that he or she holds a constitutionally protected right to which due process protections apply. See Simi Inv. Co. v. Harris Cty., Tex., 236 F.3d 240, 249 (5th Cir. 2000).

33.     The most important of "freedom's first principles" is the "freedom from arbitrary and unlawful restraint." Boumediene v. Bush, 553 U.S. 723, 797 (2008); see Zadvydas v. Davis, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

34.     Accordingly, the Supreme Court has long recognized that even adjudicated criminal defendants retain liberty interests entitled to due process protection. See, e.g., Vitek v. Jones, 445 U.S. 480, 493 (1980) (involuntary mental health commitment of convicted prisoner implicated protected liberty interest); Jones v. United States, 463 U.S. 354, 368 (1983) (liberty interests of persons found not guilty by reason of insanity); Foucha v. Louisiana, 504 U.S. 71, 79 (1992)

66

(same); Morrissey v. Brewer, 408 U.S. 471, 482 (1972) (liberty interests of parolees).

35.      Pretrial detainees are likewise entitled to due process protection because detention prior to trial infringes upon "the individual's strong interest in liberty" such that only a "sufficiently weighty" governmental interest can overcome the "importan[t] and fundamental nature of this right."  United States v. Salerno , 481 U.S. 739, 750–51 (1987); see also United States v. McKown, 930 F.3d 721, 726 (5th Cir. 2019) (only a "sufficiently compelling" interest justifies pretrial detention).

36.      The Supreme Court articulated the standard for evaluating the constitutionality of an incompetency detainee's commitment (as opposed to confinement in jail) in Jackson v. Indiana – holding that "the nature and duration of commitment [must] bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. at 738 ; see also McKown, 930 F.3d at 726–27 (identifying Jackson's standard as the measure of whether an incompetency detainee's commitment violates due process).

37.      Specifically, in Jackson, the Supreme Court evaluated the constitutionality of Jackson's continued commitment in a psychiatric facility and recognized the substantive due process limits on the power of the state to confine an incompetency detainee "solely on account of his incapacity to proceed to trial."

67

406 U.S. at 738. The Court declared Jackson's continued commitment unconstitutional, finding that the nature and duration of his commitment were no longer related to the purpose of his commitment—namely, attaining competency to stand trial. Id. The Court went on to explain that an incompetency detainee's commitment can last only for the "reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future," and that the "commitment must be justified by progress toward that goal." Id.

38.     Defendant argues that the proper standard for evaluating Plaintiffs' claim is rational basis review rather than the Jackson standard. (Dkt. # 255 at 3–6.) According to Defendant, Plaintiffs have not identified a liberty interest that is "so rooted in the traditions and conscience of our people as to be ranked as fundamental" and so rational basis review therefore applies. (Id. at 3–4 (citing Malagon de Fuentes v. Gonzales, 462 F.3d 498, 505 (5th Cir. 2006) and Salerno, 481 U.S. at 751).) Jackson is inapplicable, Defendant asserts, where the defendant is not the entity holding the plaintiff and Plaintiffs are not being indefinitely detained. (Id. at 5–6.)

39.     The Court has previously rejected these arguments, and it does so again now for the same reasons, which are incorporated herein by reference. (Dkt. # 186 at 29–31.)

**40.** As the Court noted in its summary judgment order, numerous courts have applied the <u>Jackson</u> standard to cases like this one. <u>See, e.g.</u>, <u>Mink</u>, 322 F.3d at 1122 (applying <u>Jackson</u> to evaluate whether the defendant's failure to timely admit mentally incapacitated criminal defendants to its state hospital to receive restorative treatment violated those individuals' due process rights); <u>United States v. Donnelly</u>, 41 F.4th 1102, 1105–06 (9th Cir. 2022) (per curiam) ("Although Congress did not provide a specific time limit for a pre-hospitalization commitment period, <u>Jackson</u> requires the duration of any such commitment to 'bear some reasonable relation' to its purpose."); <u>United States v. Calderon-Chavez</u>, 688 F. Supp. 3d 472, 479 (W.D. Tex. 2023) ("This Court agrees that <u>Jackson</u>'s holding 'that the nature and duration of' a defendant's commitment must 'bear some reasonable relation to the purpose for which the individual is committed' applies equally to pre-hospitalization delays."); <u>United States v. Pano-Flores</u>, 784 F. Supp. 3d 960, 967–68 (W.D. Tex. 2025) (applying <u>Jackson</u> to find that an incompetent criminal defendant's extended confinement in county jail while awaiting admission to a medical facility violated his due process rights); <u>Lakey</u>, 435 S.W.3d at 319–20 (determining that <u>Jackson</u> governs the determination of whether the plaintiffs' confinement in county jails before transfer to state hospitals violated their due process rights); <u>Advocacy Center</u>, 731 F. Supp. 2d at 605, 610 (applying <u>Jackson</u> to case where incompetent detainees challenged their

extended confinement in jail before their transfer to a facility to receive restoration treatment); Trueblood v. Washington State Dep't of Soc. & Health Servs. ("Trueblood IV"), No. C14-1178-MJP, 2016 WL 4268933, at *2, 11–12 (W.D. Wash. Aug. 15, 2016) (holding that the framework laid out in Jackson and Mink applied to pretrial detainees waiting in jail for court-ordered competency services that defendants were statutorily required to provide); Disability Rights North Carolina, 2025 WL 1665327, at *1, 11–13 (applying Jackson to case where pretrial detainees incapable to proceed to trial brought due process claims based on the state agency's alleged failure to provide timely restoration services); Glendening as Next Friend of G.W. v. Howard, 707 F. Supp. 3d 1089, 1097, 1106–08 (D. Kan. 2023) (applying Jackson to determine whether the government's waitlist for admission into the state's only facility for competency restoration violates the due process rights of criminal defendants being held under competency restoration orders); United States v. Wazny, No. 3:21-CR-247, 2022 WL 17363048, at *6 (M.D. Pa. Dec. 1, 2022) (taking guidance from "the Supreme Court's decision in Jackson" and concluding that a pre-hospitalization period's duration "must bear some reasonable relation to its purpose" (cleaned up)); United States v. Raja, No. 121CR00368TWPMG2, 2023 WL 3497234, at *5 (S.D. Ind. May 17, 2023) (applying Jackson to pre-hospitalization detention); see also United States v. Lara, 671 F. Supp. 3d 1257, 1262 (D.N.M. 2023) (noting that "several other courts" have

ruled that "Jackson's reasonableness mandate applies to the pre-hospitalization custody period of a defendant awaiting competency restoration treatment" and analyzing that defendant's confinement under Jackson).

41.    Although Defendant argues that Jackson is limited to situations involving indefinite detention, the Court does not agree.  As reasoned by the Calderon-Chavez court, Jackson stands not only for the proposition that the government cannot "indefinite[ly] commit[ ] . . . a criminal defendant solely on account of his incompetency to stand trial," but also "the more general proposition that 'the nature and duration of' any such commitment must 'bear some reasonable relation to the purpose for which the individual is committed.'"  Calderon-Chavez, 688 F. Supp. 3d at 487 (quoting Jackson, 406 U.S. at 731, 738); see also Wazny, 2022 WL 17363048, at *6 (finding that even though the incompetency detainee's pre-hospitalization detention was not "indefinite," "the issue is whether the resulting eight-to-nine month waiting period bears a reasonable relation to its purpose").  Like the court in Calderon-Chavez, this Court does not read Jackson so narrowly as to apply only to cases involving indefinite detention.  See Jackson, 406 U.S. at 378; (see also Dkt. # 186 at 33–34.)

42.    Indeed, the Supreme Court applies Jackson broadly to evaluate the duration of nonpunitive commitments, similar to those at issue here.  See, e.g., Jones v. United States, 463 U.S. 354, 368 (1983) (applying Jackson's "nature and

71

duration" principle to hospital confinement of insanity-acquittee); Foucha v.

Louisiana, 504 U.S. 71, 79 (1992) (same); Zadvydas, 533 U.S. at 690 (applying

Jackson's "nature and duration" principle to post-removal-proceeding detention of

non-citizens).

43.    And, neither the Supreme Court nor the Fifth Circuit confine Jackson

to cases involving indefinite detention.  See, e.g., Brown v. Taylor, 911 F.3d 235,

241, 243–44 (5th Cir. 2018) (applying the Jackson standard to evaluate whether a

period of in-jail confinement of a sexually violent predator for only twenty days

was reasonably related to the asserted purpose of supervision and treatment);

McKown, 930 F.3d at 725, 728 (evaluating whether the federal incompetency

statute's four-month commitment period adhered to the Jackson standard); Seling

v. Young, 531 U.S. 250, 253, 261, 265 (2001) (finding that detention under a

Washington statute authorizing the civil commitment of "sexually violent

predators" was not necessarily indefinite in duration, and yet still noting that due

process requires that the conditions and duration of confinement under that statute

must bear some reasonable relation to the purpose for which persons are

committed).

44.    Accordingly, following the weight of authority, the Court finds that

the Jackson standard applies to Plaintiffs' claim that HHSC violates their

substantive due process rights by causing them to remain in jail more than 21 days

after HHSC receives their orders committing them to HHSC mental health facilities.  See Calderon-Chavez, 688 F. Supp. 3d at 488 ("But Jackson doesn't just hold that the Government can't '*indefinite[ly]* commit[ ] ... a criminal defendant solely on account of his incompetency to stand trial;' it also stands for the more general proposition that 'the *nature and duration* of' any such commitment must 'bear some reasonable relation to the purpose for which the individual is committed.'" (emphasis in original)).  In other words, in this context, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."  Jackson, 406 U.S. at 738.

**E.     Under Jackson, Plaintiffs' Continued Confinement Violates Their Due Process Rights**

46.     Jackson requires "that the nature and duration of [Plaintiffs' confinement] bear some reasonable relation to the purpose of the commitment." 406 U.S. at 738.

46.     For the reasons described below, Plaintiffs have demonstrated that neither the nature nor the duration of their confinement is reasonably related to the purpose of their commitment, and accordingly, that their due process rights are being violated.

47.     The purpose of Plaintiffs' confinement as defined under Texas law is singular: to obtain competency restoration services so that they may be restored to proceed to trial.  TEX. CODE CRIM. PROC. art. 46B.073(b); (Dkt. #186 at 3–4).

48.     Though the purpose of Plaintiffs' commitment is to receive competency restoration services, Plaintiffs remain confined in county jails that are not designed, equipped, or required to provide competency restoration services. Unless a detainee is receiving competency restoration services in a formal JBCR program,[39] Texas law mandates and jails provide only "minimum" mental health care.  TEX. GOV'T CODE § 511.009(a)(2).

49.     The trial record confirms that minimum mental health care, what jails are required to provide, is not competency restoration.

50.     Accordingly, the nature of Plaintiffs' confinement in county jails is not reasonably related to the purpose of their commitments and violates Due Process.  See Advocacy Center, 731 F. Supp. 2d at 621 (finding that the continued imprisonment of incompetent detainees in parish jails does not bear a reasonable relationship to either restoring the Detainees to competency or determining that they will never become competent, and noting that the incompetent detainees

---

[39] While incompetency detainees are actively receiving competency restoration services in a JBCR, they are not class members as they are not remaining in jail "because HHSC maintains insufficient forensic capacity."  TEX. CODE CRIM. PROC. art. 46B.071(1)(B) (noting the court shall commit a detainee to either an HHSC facility or JBCR); (see also, Trial Tr. Vol. 5, 45:22–23 (Webb explaining "[s]omeone has to be Court-ordered in the JBCR program.")); TEX. CODE CRIM. PROC. arts. 46B.073(d–f), 46B.0735(1)(B), 46B.077.  If they do not restore to competency in a JBCR program, are subsequently committed to an HHSC mental health facility, and wait for admission to an HHSC mental health facility, they become class members again.  (See Dkt. #137 at 18–19.)

remain in jail because the state hospital is full, not because there is any suggestion that remaining in jail might restore their competency); Mink, 322 F.3d at 1122 (holding that confining incapacitated criminal defendants in jail for weeks to months violates their due process rights because these individuals are committed for the purpose of evaluating, treating, and restoring their mental health so that judicial proceedings may resume and only a mental health facility, not a jail, can provide these services); Lakey, 435 S.W.3d at 320 ("An incompetent defendant's prolonged detention cannot be 'justified by progress toward [the goal of restoring competency]' if he is not receiving any competency-restoration treatment."); see Trueblood IV, 2016 WL 4268933, at *13 (finding that wait times beyond fourteen days were not constitutionally permissible in Washington because "longer wait times destroy the reasonable relation between the nature and duration of confinement and its purpose" and noting that the incompetency detainee's prolonged incarceration "contravene[s] the state's interest in swiftly bringing the accused to trial, and [is not] the necessary result[] of an efficient and organized competency system that uses public resources appropriately"); see also Terry ex rel. Terry v. Hill, 232 F. Supp. 2d 934, 943 (E.D. Ark. 2002) (finding that the delay in transferring court-ordered pretrial detainees to the state hospital for treatment amounts to unconstitutional punishment and holding that the "lack of inpatient

mental health treatment, combined with the prolonged wait in confinement, transgresses the constitution").

51.    In fact, the trial record demonstrates that the nature of Plaintiffs' confinement is, in actuality, antithetical to the very purpose for which they are confined.

52.    At trial, the Court was presented with evidence that, for incompetency detainees waiting in jails for admission, seclusion and 23-hour lockdowns are common.  (Trial Tr. Vol. 1, 115:13-116:5 (Shearer); Pl. Ex. 4 at 27–31.)  In these conditions and in jail environments more generally, incompetency detainees often become more withdrawn and paranoid, their conditions worsen, and many experience psychiatric decompensation.  (Trial Tr. Vol. 1, 165:11-21 (Drumheller); id. at 115:13-116:5 (Shearer); Trial Tr. Vol. 2, 89:15-91:5, 92:17-93:13, 95:21-96:14 (Murrie); Am. Trial Tr. Vol. 3, 148:9-12 (Matthews).)  This decline can lead to incompetency detainees requiring longer and more intensive competency restoration services than they may have otherwise needed when they do eventually make it to an HHSC mental health facility.

53.    Further, as noted above, HHSC's chief medical officer and Plaintiffs' forensic psychology experts all agree that delaying competency restoration services poses risks of clinical harm and that clinically, competency restoration treatment should begin immediately.

**54.** The nature of this confinement, then, is fundamentally at odds with the stated purpose of Plaintiffs' commitment and is therefore prohibited by Jackson, 406 U.S. at 738 (commitment must be tied to meaningful progress toward restoration and cannot be used as a pretext for custodial warehousing).[40]

**55.** In addition, the duration of Plaintiffs' confinement in county jails is not reasonably related to the purpose of their commitments, thereby violating Plaintiffs' due process rights.

**56.** Due process requires not only that the nature of confinement justified by a specific, nonpunitive objective be reasonably related to that objective, but also that the duration of that confinement remain reasonably related to the purpose for which the person is committed. Jackson, 406 U.S. at 738.

**57.** To determine whether the post-commitment, pre-hospitalization confinement of an incompetency detainee comports with due process, courts must identify the purpose served by that specific period of confinement and then evaluate whether its length remains reasonably related to the stated purpose. Donnelly, 41 F.4th at 1106; Calderon-Chavez, 688 F. Supp. 3d at 479.

---

[40] As demonstrated by the evidence at trial, Plaintiffs are confined solely because HHSC has not made inpatient competency restoration services available, not because jail confinement advances the purpose of restoration. Jackson prohibits precisely this type of confinement.

**58.**     The purpose of Plaintiffs' pre-hospitalization commitment can be found in the statutory language.

**59.**     Under Texas law, upon a determination that a defendant is incompetent to stand trial, the court "shall" commit the defendant to one of the three statutorily designated restoration program settings.  TEX. CODE CRIM. PROC. arts. 46B.071, 46B.073.

**60.**     An initial competency restoration order issued in this situation "must place the defendant in the custody of the sheriff … for transportation to the facility or program . . . in which the defendant is to receive competency restoration services."  TEX. CODE CRIM. PROC. art. 46B.075.

**61.**     That transportation must take place "within a reasonable amount of time and without undue delay."  Id. at art. 46.04, § 2(1).

**62.**     Read together, these provisions confirm that the purpose of the incompetency detainees' pre-hospitalization confinement is to complete the logistics of transfer and admission.

**63.**     Courts evaluating the duration of incompetency detainees' pre-hospital jail confinement under Jackson have reached the same conclusion, namely that due process permits only the time reasonably necessary to complete the ministerial tasks incident to transfer—identifying the appropriate treatment facility and arrangement of transportation to that facility.  See, e.g., Donnelly, 41 F.4th at

1106 ("the duration of the pre-hospitalization commitment period must be limited to the time reasonably required to accomplish those tasks" necessary to place the detainee in the custody of the state in a suitable facility); Calderon-Chavez, 688 F. Supp. 3d at 478–79 (noting that courts applying Jackson to pre-hospitalization detention require that any period of pre-hospitalization detention must be reasonable in relation to its purpose to comport with due process and finding that the purpose of pre-hospitalization confinement is to identify appropriate facility and arrange transport); Pano-Flores, 784 F. Supp. 3d at 968 (noting that the duration of the [detainee's] pre-hospitalization confinement must bear a reasonable relation to its purpose of identifying an appropriate treatment facility and arranging for the [detainee's] transportation to that facility); Raja, 2023 WL 3497234, *5 (identifying "ascertaining the best facility for [that detainee's] restoration, completing paperwork, and physically transporting him safely" as activities reasonably related to the purpose of pre-hospitalization confinement consistent with Jackson); Lara, 671 F. Supp. 3d at 1263–64 (noting that the length of pre-hospitalization detention must bear some reasonable relation to its purpose and holding that the purpose is simply to identify an appropriate treatment facility and arrange for transportation to that facility); Wazny, 2022 WL 17363048, at *6 (concluding that the duration of the detainee's pre-hospitalization confinement must bear a reasonable relation to the confinement's purpose—i.e., the time

79

necessary for the state to identify the suitable facility and arrange for transportation).

64.     Thus, the only constitutionally permissible period of jail confinement after HHSC receives an incompetency detainee's commitment order is the brief window needed to collect paperwork, identify the appropriate facility, coordinate with sheriffs, effect the transfer, and admit the detainee.  Any materially longer period of jail confinement is impermissible under Jackson.  Donnelly, 41 F.4th at 1106; Calderon-Chavez, 688 F. Supp. 3d at 479; Pano-Flores, 784 F. Supp. 3d at 968; Lara, 671 F. Supp. 3d at 1263–64; Raja, 2023 WL 3497234, at *5; Trueblood IV, 2016 WL 4268933, at *13.

65.     Evidence presented at trial demonstrates that the logistics of transfer and admission can be accomplished within an average of 14 days or less.

66.     HHSC itself admits that "[o]n average, it takes approximately two weeks for a county to coordinate travel."  (Dkt. # 254 at 5.)

67.     Additionally, as shown in HHSC's own documents, incompetency detainees on the forensic waitlists were admitted to HHSC's mental health facilities within two weeks or less of HHSC notifying their county that a bed was going to be available for them, even when they were across the state from their appropriate facility.

80

**68.** These time frames are also consistent with the 21 days HHSC demonstrated it could meet in 2012-2014 when under threat of injunction, as well as other states' deadlines for the maximum duration of this period.  (See Pl.. Exs. 91 at 1–2 (Alabama, 30 days); 92 at 13 (Oregon, 7 days); 93 at 20 (California, 28 days); 94 at 32 (Oklahoma, 21 days); 96 at 17–18, 47 (Colorado, 7 days for a subset of detainees, 28 days for all others)); Advocacy Center, 731 F. Supp. 2d at 627 (Louisiana, 21 days); Mink, 322 F.3d at 1123 (Oregon, 7 days); Trueblood IV, 2016 WL 4268933, at *16 (Washington, 14 days).

**69.** Therefore, based on the evidence of HHSC's past ability to comply with a 21-day deadline, the evidence of the time currently required to accomplish the necessary logistical tasks, the evidence regarding the successful deadlines in other states, the evidence of the harms suffered by incompetency detainees while held in jails without access to competency restoration services, and balancing the interests of the class members and the state, the Court determines that 21 days after HHSC receives the criminal court's commitment order is the outer constitutional limit for pre-hospitalization detention in these circumstances.[41]

---

[41] The Court sees no tension between this conclusion and Jackson's guidance that it is not appropriate to "prescribe arbitrary time limits." See 406 U.S. at 738.  In Jackson, the Supreme Court declined to "prescribe arbitrary time limits" on the length of the criminal defendant's commitment specifically "[i]n light of differing state facilities and procedures and a lack of evidence in [the] record [before it]." Id.  Unlike the Supreme Court in Jackson, however, this Court has before it a comprehensive and detailed record on the specific procedures, processes, and

70.    Class members in this case are incompetency detainees kept in jail beyond 21 days after HHSC receives their commitment orders.  Because no progress toward restoration occurs in jail and no statutory purpose is served by such an extended detention, the duration of Class members' confinement on HHSC's forensic waitlists violates the Fourteenth Amendment's substantive due-process guarantee.[42]

71.    Defendant's arguments to the contrary are unpersuasive.

72.    First, Defendant argues that "being placed on a waitlist to receive competency restoration services on a first come, first served basis 'bears some reasonable relation to the purpose for which the individual is committed.'"  (Dkt.

---

systems in Texas related to competency restoration and the maintenance of the forensic waitlist.  The undersigned held a six-day bench trial, listened to hours of expert testimony, and reviewed thousands of pages of documentary evidence in connection with this case.  In determining this outer constitutional limit, then, the Court is not prescribing an arbitrary time limit.  Rather, the Court is conducting a fact-intensive inquiry and analyzing the evidence before it to find the proper limit under these facts and in connection to Texas specifically and its systems and procedures.

[42] Notably, as detailed above, the evidence shows that incompetency detainees typically wait in jails for far longer than 21 days.  As of August 30, 2025, incompetency detainees on HHSC's non-MSU list had been waiting an average of 178 days after HHSC received the order committing them to HHSC's mental health facilities for competency restoration services while their MSU counterparts had waited an average of 202 days.  This amount of time is more than eight to nine times the amount of time it actually takes to arrange for incompetency detainees' transport to HHSC mental health facilities, and twice as long as it takes for the vast majority of incompetency detainees to retore once they actually get to an HHSC facility.

# 255 at 15.)  Defendant, however, provides no justification for this conclusory statement, and the Court sees none.  Defendant merely states, without providing support, that being on a waitlist amounts to "progress towards the goal of restoration."  (Id.)  But case law in this circuit and the evidence at trial suggests the opposite.  See Brown, 911 F.3d at 244 (where an individual was detained for the goals of "long-term supervision and treatment of sexually violent predators," stating that if the state held the individual "without providing any sex offender treatment, . . . the confinement could not possibly further the goals of supervision and treatment"); Calderon-Chavez, 688 F. Supp. 3d at 479 (emphasizing that pre-hospitalization detention in "a nonmedical detention facility without access to competency restoration services does nothing to permit the proceedings to go forward"); Advocacy Center, 731 F. Supp. 2d. at 621–24 (finding that where incompetency detainees wait in jail simply because the state hospital is full, their continued confinement in jails bears no rational relationship to the restoration of their competency); see also Lakey, 435 S.W.3d at 320 ("An incompetent defendant's prolonged detention cannot be "justified by progress toward [the goal of restoring competency]" if he is not receiving any competency-restoration treatment."). The Court therefore rejects this argument.[43]

---

[43] Nor is the Court persuaded by the contrary authorities Defendant cites.  (See Dkt. # 255 at 13–14, citing Disability Rights North Carolina, 2025 WL 1665327; Glendening, 707 F. Supp. 3d 1089; and Indiana Prot. & Advoc. Servs. Comm'n v.

**73.** Next, Defendant contends that Plaintiffs' confinement is not

unconstitutional under <u>Jackson</u> because incompetency detainees receive some

treatment while they wait in jails.  (Dkt. # 255 at 16–17.)  This argument

fundamentally misses the point.  <u>Jackson</u> instructs courts to evaluate whether the

nature and duration of the confinement bear some reasonable relation to the

---

<u>Indiana Fam. & Soc. Servs. Admin.</u>, 630 F. Supp. 3d 1022 (S.D. Ind. 2022).)  In
<u>Disability Rights North Carolina</u>, the court, applying <u>Jackson</u>, held that the
plaintiffs had alleged a plausible due process claim but found that at the early stage
of the case, the plaintiffs had not demonstrated entitlement to preliminary
injunctive relief.  2025 WL 1665327, at *13, 19–21.  <u>Glendening</u> and <u>Indiana
Protection</u> also both involved requests for preliminary injunctive relief and were
decided at the early stages of litigation.  <u>Glendening</u>, 707 F. Supp. 3d at 1107;
<u>Indiana Protection</u>, 630 F. Supp. 3d at 1032.  These cases therefore have limited
application to this case, which has an evidentiary record that has been developed
over ten years, and which involves a different standard of proof.  <u>See</u> <u>Trueblood I</u>,
101 F. Supp. 3d at 1020.  Regardless, the Court respectfully disagrees with the
analyses in those cases.  Nowhere does <u>Jackson</u> suggest that the presence of
external factors influencing wait times relieves the state of its constitutional
obligations, and many courts evaluating analogous situations have come to the
opposite conclusion.  <u>See, e.g.</u>, <u>Advocacy Center</u>, 731 F. Supp. 2d at 624.  And
although each of the opinions Defendant cites concludes that, because demand for
inpatient services exceeds available capacity, some criminal defendants must wait
for admission and that those delays are therefore reasonably related to the purpose
of providing competency restoration services, the Court finds this reasoning
circular and entirely unpersuasive.  If the Court were to adopt this approach, there
would be, in effect, no constitutional limit on the length of time incompetency
detainees may be confined in jails awaiting competency restoration services so
long as Defendant can claim that it lacks sufficient capacity.  Under such a
framework, constitutional safeguards would be rendered meaningless, a result the
Court cannot accept.  <u>See</u> <u>Wyatt v. Aderholt</u>, 503 F.2d 1305, 1315 (5th Cir. 1974)
(holding that a state is not "free, for budgetary or any other reasons, to provide a
social service in a manner which will result in the denial of individuals'
constitutional rights").  The Court therefore declines to follow the reasoning of the
<u>Disability Rights North Carolina</u>, <u>Glendening</u>, and <u>Indiana Protection</u> courts.

84

commitment's purpose.  As Defendant itself acknowledges, the purpose of

Plaintiffs' commitment is to receive competency restoration services.  (See Dkt.

# 255 at 15.)  And, as conceded by Defendant, Plaintiffs are not receiving

competency restoration services in jail.  (See id. at 17; Am. Trial Tr. Vol. 3,

104:24-105:4 (Matthews); Trial Tr. Vol. 5, 126:10-14 (Simpson).)[44]  Confinement

in a facility that is not providing Plaintiffs with competency restoration services,

and that is in fact introducing more obstacles to competency restoration, is not and

cannot be reasonably related to the statutory purpose of their confinement.  See

Brown, 911 F.3d at 244; Calderon-Chavez, 688 F. Supp. 3d at 479; Advocacy

Center, 731 F. Supp. 2d. at 621–24.  That some incompetency detainees receive

some treatment—treatment that is materially distinct from competency restoration

services—and that some incompetency detainees happen to restore to competency

in jails while they are waiting to receive competency restoration services does not

disturb this conclusion.

   74.    Thus, applying Jackson, the Court holds that HHSC's actions violate

Plaintiffs' due process rights.

---

[44] Again, as noted above, if an individual is participating in a JBCR program, they are not a class member.  See supra n. 39.

**F.    Even if Rational Basis Governed the Court's Inquiry, Plaintiffs' Continued Confinement Violate Their Due Process Rights**

75.    Although the Court has determined that <u>Jackson</u> supplies the governing standard in this case, even under a rational basis review, the Court finds that Defendants are violating Plaintiffs' due process rights.  This holding operates as an independent and alternative basis for the Court's ruling.

76.    Under the rational basis test, "government action comports with substantive due process if the action is rationally related to a legitimate government interest. " <u>FM Properties Operating Company v. City of Austin</u>, 93 F.3d 167, 174 (5th Cir. 1996).  While the rational basis test is highly deferential, "it is not toothless." <u>Simi</u>, 236 F.3d at 253 (internal quotations and citation omitted).

77.    Upon its review of the facts and relevant law, the Court finds that keeping incompetency detainees in jails for lengthy periods of time while they await transfer to mental health facilities for competency restoration is not rationally related to any legitimate government interest.

78.    Plaintiffs in this case have been court-ordered to receive competency restoration services.  They are confined so that they can obtain these services. Under Texas law, HHSC is solely responsible for admitting incompetency detainees to appropriate treatment facilities.  TEX. HEALTH & SAFETY CODE §§ 533.051(a)(2) ("[HHSC] shall plan . . . for the proper and separate allocation of beds in the state hospitals for . . . patients who are . . . committed to a state hospital

86

or other facility to attain competency to stand trial under Chapter 46B, Code of Criminal Procedure."), (b)(4); id. at § 533.052.  And, under Texas law, HHSC is mandated to plan for and operate sufficient inpatient capacity to timely admit incompetency detainees to its facilities.  Id. at § 533.051(b).  However, because HHSC maintains insufficient capacity, Plaintiffs wait for months to years in jails without receiving those competency restoration services.

79.    At trial, Plaintiffs' experts provided testimony that there is no clinical or treatment reason for keeping incompetency detainees in county jails after they have been found incompetent to stand trial.  (Am. Trial Tr. Vol. 3, 48:4-8, 89:17-90:6 (Murrie); Trial Tr. Vol. 2, 79:9-18, 112:4-21 (Murrie); Dkts. ## 265-7 at 141:16- 143:10; 143:11-146:1 (Kois); 265-8 at 169:1-170:20, 174:9-177:12, 189:7-192:12 (Packer).)

80.    Indeed, HHSC's own designated expert and chief medical officer agreed that he does not "see a reason" for delaying competency restoration services.  (Am. Trial Tr. Vol. 3, 149:2-14 (Matthews).)

81.    Witnesses also testified that remaining in county jails exposes incompetency detainees to the risk of deterioration, which often *lengthens* the time it takes for an incompetency detainee to restore once they finally reach an HHSC mental health facility.  (Am. Trial Tr. Vol. 3, 148:9-12 (Matthews); Trial Tr. Vol.

1, 188:17-190:23 (Chacona); Pl. Ex. 4 at 13; Pl. Ex. 9 at 21–22; Trial Tr. Vol. 2, 88:11-89:10, 92:17-93:25, 109:23-110:8 (Murrie); Pl. Ex. 100 at 5.)

82.    Far from being rationally related to any legitimate government interest, then, keeping incompetency detainees in county jails for months to years while they await admission to an HHSC mental health facility to receive competency restoration services appears to be *irrationally* related to state interests.

83.    Under Texas law, upon a determination that a defendant is incompetent to stand trial, the court "shall" commit the defendant to one of the three statutorily designated restoration program settings. TEX. CODE CRIM. PROC. arts. 46B.071, 46B.073.

84.    An initial competency restoration order issued in this situation "must place the defendant in the custody of the sheriff … for transportation to the facility or program . . . in which the defendant is to receive competency restoration services." TEX. CODE CRIM. PROC. art. 46B.075.

85.    As previously discussed, the evidence at trial demonstrates that the logistics of transfer and admission can be accomplished within an average of 14 days or less.

86.    And evidence at trial also establishes that HHSC was previously able to admit incompetency detainees within 21 days of receiving their commitment orders.

87.     Finally, the evidence at trial shows that each additional day incompetency detainees remain in county jails without access to competency restoration services has significant and harmful consequences for those incompetency detainees.

88.     As described by a district court in Washington and as established by the evidence in this case:

> For class members who are found incompetent, each additional day spent in jail waiting is an additional day spent without access to desperately needed medication and treatment, incarcerated in a place that cannot provide the environment or type of care needed by incompetent class members . . . For class members suffering from mental illness, each additional day spent incarcerated . . . makes that class member's mental illness more habitual and harder to cure, resulting in longer restoration periods or in the inability to ever restore that person to competency.

Trueblood IV, 2016 WL 4268933, at *13.

89.     "All of these results contravene the state's interest in swiftly bringing the accused to trial, and none are the necessary results of an efficient and organized competency system that uses public resources appropriately." Id.

90.     Therefore, based on the evidence of HHSC's past ability to comply with a 21-day deadline, the evidence of the time currently required to accomplish the necessary logistical tasks, the evidence of the harms suffered by incompetency detainees while held in jails without access to competency restoration services, and balancing the interests of the class members and the state, the Court specifically finds that keeping incompetency detainees in county jails for more than 21 days

89

after HHSC receives the commitment orders is not rationally related to any legitimate government interest, and that doing so violates Plaintiffs' due process rights.

91.    Defendant offers three government interests that it contends justify its actions: (1) ensuring limited resources are used efficiently and effectively; (2) protecting the health and safety of patients and staff; and (3) confining individuals accused of crimes. (Dkt. # 255 at 6–15; Trial Tr. Vol. 1, 61:16-61:15.) However, none of these asserted interests are rationally related to HHSC's delay in admitting incompetency detainees to HHSC mental health facilities.

92.    With respect to its first asserted interest, Defendant argues that because the resources of the state hospital system are limited, and because demand for state hospital beds outpaces the supply, maintenance of a waitlist on a "first come, first served" basis is rationally related to HHSC's legitimate interest in ensuring that its limited resources are used efficiently and effectively. (Dkt. # 255 at 6–15.)

93.    As an initial matter, the Court is skeptical that keeping incompetency detainees in jails for months to years is rationally related to any interest in allocating limited resources where the evidence shows that the delay can and does result in incompetency detainees requiring *more* resources when they are eventually admitted to an HHSC mental health facility. See Trueblood IV, 2016

WL 4268933, at *13–14 ("For class members suffering from mental illness, each additional day spent incarcerated—especially in solitary confinement—makes that class member's mental illness more habitual and harder to cure, resulting in longer restoration periods or in the inability to ever restore that person to competency. Longer restoration treatment periods increase the cost to the state and therefore to the public of treating that individual, and longer restoration periods stymie the efficient use of restoration bed space. All of these results contravene the state's interest in swiftly bringing the accused to trial, and none are the necessary results of an efficient and organized competency system that uses public resources appropriately.").

94. The Court also does not find that HHSC's actions are rationally related to such an interest when this delay merely shifts the financial and administrative burden to the counties. Erwin v. Dallas Cnty., No. 15-24- 00013-CV, 2025 WL 2429525, at *1 (Tex. App. [15th Dist.] Aug. 22, 2025) (noting the county estimated that confining incompetency detainees while they were on HHSC's waitlists cost the county over seven million dollars).

95. Indeed, the Fifth Circuit has expressly rejected general budgetary constraints and operational limitations as lawful bases for prolonged confinement. Wyatt v. Aderholt, 503 F.2d 1305, 1315 (5th Cir. 1974).

91

**96.**     In Wyatt, the Fifth Circuit considered a challenge brought by a group

of individuals civilly committed to state mental institutions regarding the adequacy

of the care provided by the state.  503 F.2d at 1306–07.  The trial court found that

the plaintiffs had a constitutional right to adequate treatment and that the

defendants were violating the plaintiffs' constitutional rights by not providing such

treatment.  Id. at 1306–08.  On appeal, the government argued that the trial court's

order requiring defendants to implement certain standards would burden the state

financially and improperly invade the province of the state legislature.  Id. at 1307,

1314.  The Fifth Circuit rejected this argument, stating that "the state may not fail

to provide treatment for budgetary reasons alone."  Id. at 1315.  It explained that

while the state is ordinarily free to choose among various social services . . . [it is

not] free, for budgetary or any other reasons, to provide a social service in a

manner which will result in the denial of individuals' constitutional rights."  Id. at

1314–15.  "Inadequate resources," the Fifth Circuit said, "can never be an adequate

justification for the state's depriving any person of his constitutional rights."  Id. at

1315 (internal quotations and citation omitted).[45]

**97.**     Moreover, HHSC's asserted interest of limited resources rings hollow

when the evidence from trial reveals that HHSC has been aware for well over a

---

[45] Although these statements arose in the Panel's discussion of federalism and state-sovereignty concerns, the Court nonetheless finds the Fifth Circuit's reasoning instructive in this context as well.

decade that it lacked sufficient inpatient capacity and that it needed to substantially increase that capacity to keep pace with demand and yet did not do so.[46]  As another district court noted in dealing with an analogous situation, the Court "recognizes the limitations that are placed upon [Defendant], and it acknowledges [Defendant's efforts]" but while "[Defendant's] limited resources are a concern, . . . lack of funding cannot justify the continued detention of defendants who have not been convicted of any crime, who are not awaiting trial, and who are receiving next to no mental-health services."  Advocacy Center, 731 F. Supp. 2d at 624.  This is particularly so where HHSC has no formal projections of whether its planned bed expansion will eliminate the waitlist within any timeframe, has no projection for when wait times will return to any benchmark, and has not set any goal or target for what it would consider an acceptable post-order jail wait time.

98.    Under these circumstances, the Court is not convinced that "limited resources" can justify HHSC's actions.  Indeed, the "limited resources" HHSC complains of are the predictable, policy-driven consequence of decades of notice

---

[46] Nor does the COVID-19 pandemic excuse HHSC's failure to adequately expand capacity.  HHSC knew fourteen years before the pandemic arrived that it did not have sufficient inpatient capacity, and it knew by 2014 that it needed to swiftly act to increase forensic capacity, inpatient staffing, and outpatient diversion services.  (See Pl. Ex. 70.)  Even so, on the eve of the pandemic, HHSC had only 2,310 operational inpatient beds—six hundred fewer than it had in November 2013—and a combined forensic waitlist of 907 incompetency detainees.  (Pl. Exs. 29-B; 26 at 1, 4.)

and delay.  HHSC cannot now rely on conditions it helped create to shield itself from liability.

**99.**     The Court therefore finds that Defendant's asserted interest of ensuring that limited resources are used efficiently and effectively is not rationally related to its failure to timely admit incompetency detainees to HHSC's mental health facilities.[47]  See, e.g., Trueblood v. Wash. State Dep't of Soc. & Health Servs. ("Trueblood I"), 73 F. Supp. 3d 1311, 1315 (W.D. Wash. 2014) (finding the State had no legitimate state interest in keeping incompetent criminal defendants in county jails for weeks or months while they awaited transfer to a state hospital to receive competency restoration treatment"); Terry, 232 F. Supp. 2d at 943 (lengthy incarcerations of incompetency detainees because of "lack of space" at state hospitals and lack of funding from the State was related to no legitimate goal, was purposeless, and unconstitutional); see also Alberti v. Sheriff of Harris Cnty.,

---

[47] The Court notes that it is not the waitlists themselves that violate Plaintiffs' constitutional rights, but the time incompetency detainees wait in jails while on those waitlists.  HHSC's arguments would in effect permit *any* length of pre-hospitalization confinement simply because there are limited resources.  The Court does not understand the due process clause to permit such an outcome.  See Gates v. Collier, 501 F.2d 1291, 1320 (5th Cir. 1974) (noting the plethora of precedent holding that if the state chooses to run a prison, it must do so without depriving inmates of their constitutional rights); Miller v. Carson, 563 F.2d 741, 748 (5th Cir. 1977) ("The officials operating the jail here have two choices: to operate the jail constitutionally, or not to operate it at all."); Wyatt, 503 F.3d at 1315 (agreeing with an Arkansas district court that if the state is going to operate a penitentiary system, it must comply with the United States Constitution).

Texas, 406 F. Supp. 649, 669 (S.D. Tex. 1975) ("Lack of adequate economic resources does not excuse, nor does it lessen, the obligation of states and local governments to provide jail facilities which are constitutionally adequate."); cf. Advocacy Center, 731 F. Supp. 2d at 626 (in the preliminary injunction analysis, finding that the defendant's assertion that it would have to cut spending in another area to obtain funding to comply with 21-day injunction was "insufficient," because a "state's constitutional duties toward those involuntarily confined in its facilities does not wax and wane based on the state budget"); Trueblood II, 101 F. Supp. 3d at 1013 (incompetency detainees "are deserving of the protections of the Constitution that our forefathers so carefully crafted. The rights protected can be difficult and sometimes costly to secure; however, the Constitution is a guarantee to all people, and is not dependent upon a price tag."); Terry, 232 F. Supp. 2d at 944 (noting the court could find the State of Arkansas had been deliberately indifferent to the needs of incompetency detainees as the state knew for over five years that incompetency detainees were harmed and "limited resources" were no excuse); Disability L. Ctr. v. Utah, 180 F. Supp. 3d 998, 1012 (D. Utah 2016) (lack of space did not justify Utah's practice of keeping incompetency detainees confined in jails awaiting competency restoration evaluation and services); Wazny, 2022 WL 17363048, *6 ("failure…to designate a sufficient number of facilities, employ the necessary staff, and provide the adequate resources, to serve the

95

increasing demands of the judicial system and requirements of [the incompetency statute]," is of limited significance).

100.  Next, Defendant argues that its actions are rationally related to the legitimate interest of protecting the health and safety of patients and staff. Specifically, Defendant contends that it has an interest in ensuring that the state hospitals provide high quality care to patients in safe settings, which includes preventing overcrowding of the state hospitals. (Dkt. # 255 at 8–9.) Overcrowding, HHSC insists, would increase the safety risk to both staff and patients, negatively impact the quality of care the state hospitals can offer, and would lead to fewer resources available to provide care, which would decrease the restoration rate. (Id.)  This argument misses the mark.

101.  As discussed at length at trial, incompetency detainees suffer greatly while they sit in jails waiting to be admitted to an HHSC mental health facility. Experts from both sides agreed that incompetency detainees remaining in jails for months to years without access to competency restoration services are exposed to the risk of deterioration, injury, and death and that many in fact suffer these injuries.  HHSC's failure to timely admit incompetency detainees to its mental health facilities is accordingly not at all related to protecting those individuals, and in fact causes them harm.

102.   Nor is HHSC's interest in protecting patients and staff in its facilities implicated here.  As this Court has already recognized, Plaintiffs' requested relief "does not necessitate overcrowding, but rather 'requires HHSC to operate a sufficient number of inpatient mental health beds to timely admit them for competency restoration services—relief it can provide [given it controls the percentage of beds allocated between civil and forensic commitments] without relying on overcrowding.'"  (Dkt. # 186 at 18; see id. at 31 n.3.)

103.   Plaintiffs' requested relief thus does not require HHSC to overcrowd its facilities, to lower the quality of care provided to incompetency detainees, or to change the individualized nature of its care.

104.   As shown at trial, HHSC has a multitude of tools at its disposal to achieve timely admissions without overcrowding its mental health facilities or diminishing the care it provides, including rebalancing civil and forensic allocations, contracting for additional beds, improving discharge/step-down placement to free inpatient space, and hiring more personnel.

105.   As testified by Plaintiffs' witness Dr. Murrie, "there is nothing about an imposed timeline that . . . requires poor care or overcrowding."  (Am. Trial Tr. Vol. 3, 88:17-89:16.)  Rather, a phased implementation schedule can accomplish timely admissions while maintaining safe operations.

106.    Accordingly, Defendant's stated interest of protecting patients and staff is not rationally related to forcing incompetency detainees to remain confined in jails without competency restoration services for months after HHSC receives their commitment orders.

107.    Finally, Defendant contends that its actions are rationally related to the state's interest in confining individuals who have been accused of crimes. (Trial Tr. Vol. 1, 61:16-61:15.)

108.    While the Court fully appreciates the legitimacy of this asserted interest, such an interest is not implicated where, here, Plaintiffs are not seeking release from confinement.

109.    The Court thus concludes that Defendant's failure to timely admit incompetency detainees to its mental health facilities is not rationally related to any legitimate state interest.  See Trueblood I, 73 F. Supp. 3d at 1315; Terry, 232 F. Supp. 2d at 943 (E.D. Ark. 2002); Mink, 322 F.3d at 1121 (holding that the court did not discern "a legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months); Lakey, 435. S.W.3d at 320–21 (holding that "[t]he lengthy pretrial detention of an incompetent defendant, without any progress at all toward the stated goal of competency-restoration treatment, is not rationally related to any legitimate governmental interest"); see also Advocacy Center, 731 F. Supp. 2d at 623–24 (weighing the

state's interest and plaintiffs' interests and concluding that "lack of funding cannot justify the continued detention of defendants who have not been convicted of any crime, who are not awaiting trial, and who are receiving next to no mental-health services").

110.    As such, even if the Court applies rational basis review to Plaintiffs' substantive due process claim, it holds that Defendant is nonetheless violating Plaintiffs' due process rights.

### G.    Plaintiffs Are Entitled to Relief

111.    As an initial matter, because the class members have shown that HHSC has violated their constitutional rights regardless of the standard the Court applies, the Court finds that they are entitled to declaratory relief.  See Torch, Inc. v. LeBlanc, 947 F.2d 193, 194 (5th Cir. 1991) ("Declaratory relief is a matter of district court discretion."); see also Powell, v. McCormack, 395 U.S. 486, 517, 550 (1969) (instructing to enter declaratory judgment in light of finding constitutional violations).[48]

---

[48] In federal court, the federal Declaratory Judgment Act ("DJA") is the procedural mechanism by which a party can obtain declaratory relief.  Volvo Trucks N. Am., Inc. v. Crescent Ford Truck Sales, Inc., 666 F.3d 932, 938 (5th Cir. 2012) ("Declaratory relief is available in federal courts pursuant to the Declaratory Judgment Act."); Miller v. Ret. Sys. Grp., Inc., No. CV H-09-834, 2011 WL 13340635, at *4 (S.D. Tex. Jan. 13, 2011), report and recommendation adopted sub nom. Miller v. RSGroup Tr. Co., No. CV H-09-834, 2011 WL 13340638 (S.D. Tex. Feb. 15, 2011) ("In federal court, then, it is the Federal Declaratory Judgment Act that governs whether the court may render a declaratory judgment in a given

**112.**    The class members are also entitled to permanent, injunctive relief.

**113.**    A plaintiff seeking a permanent injunction generally must satisfy a four-factor test: (1) the plaintiff has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate compensation; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) a permanent injunction would not disserve the public interest.  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see Texas v. Yellen, 105 F.4th 755, 774 (5th Cir. 2024).

**114.**    In addition, for an injunction intended to prevent harm in the future, "[a] permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions."  Sec. & Exch. Comm'n v. Life Partners

---

case."); Calderon v. Bank of Am. N.A., 941 F. Supp. 2d 753, 768 (W.D. Tex. 2013) (noting that the DJA "does not does not create substantive rights; it is merely a procedural device that enhances the remedies available to plaintiffs in federal court."); 28 U.S.C. § 2201.  To be entitled to relief under the DJA, there must exist an actual case or controversy.  TIG Ins. Co. v. Woodsboro Farmers Coop., 117 F.4th 715, 722 (5th Cir. 2024).  The parties do not dispute the existence of an actual case or controversy here, and the Court determines that there is indeed one.  See Rowan Companies, Inc. v. Griffin, 876 F.2d 26 (5th Cir. 1989) (describing the test for determining the existence of an actual case or controversy).  The Court thus concludes that Plaintiffs are entitled to declaratory relief.  Torch, 947 F.2d at 194; see Concise Oil & Gas P'ship v. Louisiana Intrastate Gas Corp., 986 F.2d 1463, 1471 (5th Cir. 1993).

Holdings, Inc., 854 F.3d 765, 784 (5th Cir. 2017) (internal quotation marks omitted).  The Plaintiff Class satisfies each element.

### 1.     Plaintiffs have suffered and will suffer irreparable harm

115.   As discussed above, as a result of Defendant's decisions, the Plaintiff Class has been and will continue to be confined in county jails without receiving competency restoration services that are the sole purpose of their commitments for more than 21 days after Defendant receives their commitment orders if the status quo remains, leading to irreparable harm in four ways.

116.   First, as detailed in previous sections, the delay violates the incompetency detainees' constitutional rights, and this infringement on Fourteenth Amendment rights alone is irreparable harm to each Class member.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976) (noting that a constitutional violation "unquestionably constitutes irreparable injury"); De Leon v. Perry, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), aff'd sub nom. De Leon v. Abbott, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.").  Monetary relief cannot undo this violation.  Arms of Hope v. City of Mansfield, Texas, No. 4:23-CV-00131-O, 2026 WL 473041, at *12 (N.D. Tex. Feb. 19, 2026) ("[M]onetary damages cannot compensate Plaintiff for the loss of its constitutionally protected rights under the First and Fourteenth Amendments.");

see De Leon, 975 F. Supp. 2d at 663 ("An injury is irreparable if money damages cannot compensate for the harm."); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."); Elrod, 427 U.S. at 373.

117.    Second, each and every incompetency detainee has their pretrial detention extended and their day in court delayed because of the policy and practice of Defendant, through HHSC, which has persisted for years.  Money will not repair the delay to their criminal proceedings or undo the harm of extended, unnecessary pretrial detention.

118.    Third, many Class members have been and will be further harmed because waiting in jail while incompetent to stand trial places incompetency detainees at a higher risk of psychiatric decompensation and other complications of the underlying mental illnesses which caused their incompetency to stand trial.

119.    Finally, all Class members, even incompetency detainees who do not undergo worsening of their psychiatric condition while they wait, are psychiatrically harmed by the delay alone as the state of being incompetent itself, as well as its necessary impairment of their criminal cases, is harmful and cannot be undone with subsequent money damages.

### 2.    Plaintiffs have demonstrated that they are likely to suffer irreparable harm in the absence of injunctive relief

120.    HHSC's policies and practice will not change absent Court intervention.

121.    Although HHSC has known about the waitlist problem since 2006, HHSC has not been able to eliminate the waitlist.  And, although HHSC has known for over a decade that it lacked sufficient inpatient capacity and that it needed to substantially increase that capacity to keep pace with demand, it did not do so.  (See Trial Tr. Vol. 4, 31:5–32:14 (Schalchlin) (agreeing that even if the Court accepts HHSC's projections for capacity by 2027, HHSC will still have 315 fewer beds in 2027 than the Cannon Report indicated were necessary by 2024).)

122.    Indeed, HHSC has no projected timeline for when reduced wait times will occur and could not tell the Court when or if incompetency detainees' wait times would be reduced below 90 days, 60 days, or 21 days.

123.    Thus, the Court finds that irreparable harm in the form of the lack of competency restoration services, delayed criminal proceedings, delayed competency restoration, and the risk of psychiatric complications to the entire Plaintiff Class is ongoing, continuing, imminent, and indeed likely to continue indefinitely absent Court intervention, so that permanent injunction is warranted.

124.    In so concluding, the Court acknowledges the efforts that Defendant has made over the years to lessen the delays.  However, despite these efforts,

103

unconstitutional delays have continued for many years.  As noted by a California state court in a similar case, "[t]his history demonstrates that existing policy mechanisms alone cannot cure the problem, and we must not let systematic violations of the due process rights of these vulnerable defendants to continue, while hoping that defendants' efforts will eventually improve the situation." Stiavetti v. Clendenin, 65 Cal. App. 5th 691, 731 (2021).

### 3. Other relief is inadequate to compensate for class members' injuries

125.   The class members have no adequate remedy for the ongoing or future violations of their rights.

126.   First, because Plaintiffs have suffered violations of their constitutional rights, nothing more is required for the class members to show that their injuries are irreparable and that, accordingly, monetary relief is inadequate.  See Deerfield, 661 F.2d at 338; Elrod, 427 U.S. at 373; De Leon, 975 F. Supp. 2d at 663.

127.   Furthermore, as described above, there is no amount of money that can compensate Plaintiffs for the delays experienced in their criminal proceedings or their unnecessarily prolonged pretrial detention.  Notably, as a result of HHSC's actions, some incompetency detainees have been kept in jail far longer than they would have been sentenced for the underlying charge.

128.    Second, although Defendant asserts that Plaintiffs have an alternative remedy available in the form of a petition for writ of habeas corpus, the Court disagrees.  (See Dkt. # 255 at 27.)

129.    This Court has already determined that habeas relief is unavailable to Plaintiffs in this case.  (Dkt. # 186 at 20.)  The Court reaffirms its prior analysis and incorporates it herein.

130.    Plaintiffs here are asking not for their release or challenging the validity of their confinements.  Rather, they are seeking timely admission to HHSC's mental health facilities.  Section 1983 is the appropriate vehicle for this type of claim, not a writ of habeas corpus.

131.    In determining whether a claim falls under the ambit of federal habeas rather than § 1983, "the question is whether 'the nature of the challenge … could be such as necessarily to imply the invalidity' of the confinement or sentence." Hill v. McDonough, 547 U.S. 573, 583 (2006) (internal citation omitted); see Nance v. Ward, 597 U.S. 159, 168 (2022).

132.    Here, Plaintiffs do not challenge the validity of their confinements. Plaintiffs do not attack in any way the criminal complaints filed against class members, seek to invalidate their commitment orders, contest the validity of the duration of their commitments to HHSC's mental health facilities for competency restoration, seek release from confinement, seek a guarantee of a shorter sentence,

105

or even seek transfer to a different level of state custody.  Therefore, Plaintiffs' claim does not fall within the habeas exception.  See Nance, 597 U.S. at 167–70 (attack on death penalty procedure properly brought under § 1983 despite delaying sentence because the prisoner was not challenging the death sentence itself); id. at 167 (defining the habeas corpus carveout as claims challenging "the validity of a conviction or sentence"); Skinner v. Switzer, 562 U.S. 521, 534 (2011) (demand for DNA testing properly brought under § 1983 despite possibility of undermining conviction); id. at 533 (Section 1983 is not the appropriate remedy when judgment in favor of the plaintiff would *necessarily* imply the invalidity of his conviction or sentence); Wilkinson v. Dotson, 544 U.S. 74, 82 (2005) (attack on parole eligibility procedure properly brought under § 1983 despite possibility of shortening duration of sentence).

133.   Accordingly, the available remedies at law are inadequate to compensate for Plaintiffs' injuries.

### 4.   The balance of harms and public interest favor Plaintiffs

134.   When the state or one of its officials is a litigant in a case, as is the case here, the balance of hardship merges with the public's interest.  Nken v. Holder, 556 U.S. 418, 435 (2009).

135.   Here, as discussed at length, the harm to Plaintiffs if an injunction is not put in place is severe.

106

136.   HHSC, on the other hand, will not be unduly harmed by an injunction, particularly where the injunction merely requires the agency to do what state law already mandates it do: plan for and ensure the "appropriate and timely provision of mental health services" to all forensic detainees.  TEX. HEALTH & SAFETY CODE § 533.051(a), (b).

137.   Indeed, a permanent injunction in this case serves the public interest, and thus the state's interest as well, because the public has an interest in the protection of the constitutional rights at issue. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  Jackson Women's Health Org. v. Currier, 760 F.3d 448, 458 n.9 (5th Cir. 2014).

138.   While it is possible that the injunction will ultimately require the use of additional taxpayer money to accomplish,[49] that cost does not outweigh the public's interest in incompetency detainees not being confined for longer than necessary, or placed at an ongoing, avoidable risk of psychiatric decompensation, if they are accused of a crime and deemed incompetent to stand trial.  Although the Court can consider the government's budget constraints in crafting relief,

---

[49] Regarding the expense to Texas taxpayers, the Court is doubtful that HHSC's policy and practice are financially beneficial as they merely delay the cost to HHSC, while creating new costs which could have been completely avoided for localities.  See Erwin, 2025 WL 2429525, at *1 (noting the county estimated that confining incompetency detainees while they were on HHSC's waitlists cost the county over seven million dollars).

"inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." Smith v. Sullivan, 553 F.2d 373, 378 (5th Cir. 1977); Rufo v. Inmates of Suffolk Co. Jail, 502 U.S. 367, 396 (1992) (O'Connor, J., concurring) ("[T]he lack of resources can never excuse a failure to obey constitutional requirements[.]"); see Wyatt, 503 F.2d at 1315; Gates v. Collier, 501 F.2d 1291, 1319 (5th Cir. 1974) ("Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts."); see also Laube v. Haley, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002) ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants.").

139.   Other courts considering similar unconstitutional wait times for incompetency detainees have likewise confirmed that injunctive relief is appropriate to redress the constitutional harms. See, e.g., Trueblood II, 101 F. Supp.3d at 1024; Advocacy Center, 731 F. Supp. 2d at 627. Those courts have generally issued orders giving states several years to come into compliance with deadlines similar to the 21-day deadline the Court imposes here. (See, e.g., Trial Tr. Vol. 2, 173:14-174:12 (Murrie describing a three-year compliance timeline in

108

California); Pl. Ex. 91 (providing Alabama two years to bring state into compliance with 30-day deadline).)

140. Defendant argues that if HHSC were judicially required to admit incompetency detainees within 21 days, its facilities would become overcrowded, the quality of care would decrease, and there would be greater risk to staff, current patients, and incoming individuals. The Court, however, does not agree that such harms would occur.

141. As noted previously, Plaintiffs do not seek relief that necessitates overcrowding, reduced quality of care, or increased risks to staff and patients. Rather, Plaintiffs' requested relief requires HHSC to operate a sufficient number of inpatient mental health beds to timely admit incompetency detainees for competency restoration services.

142. Moreover, Plaintiffs do not seek an order demanding immediate compliance but instead request that the Court put in place a phased implementation schedule that will accomplish timely admissions while maintaining safe operations and a high quality of care.

143. Accordingly, the balance of harms and public interest favors Plaintiffs.

144. For the above reasons, the Court finds that Plaintiffs have met the burden of demonstrating that permanent injunctive relief is warranted in this case.

### 5.    Plaintiffs are entitled to attorneys' fees and costs

145.    "In any action or proceeding to enforce provisions of [42 U.S.C. § 1983] the court… may allow . . . a reasonable attorney's fee as part of the costs[.]"  42 U.S.C. § 1988(b).

146.    Claims for attorneys' fees need not be proven at trial but instead shall be made by motion after entry of judgment.  Loc. R. CV-54(b) (W.D. Tex.).

147.    As Plaintiffs have obtained both the declaratory and injunctive relief that they sought, they are prevailing parties within the meaning of 42 U.S.C. § 1988 and are entitled to reasonable attorneys' fees and costs.  Lefemine v. Wideman, 568 U.S. 1, 5 (2012); Murphy v. Fort Worth Indep. Sch. Dist., 334 F.3d 470, 471 (5th Cir. 2003).

148.    As the amount of time spent by attorneys and the total costs were not discernible prior to trial, post-judgment briefing on attorneys' fees and costs is appropriate before the Court finds the amount of the reasonable attorneys' fees and costs.

149.    Federal Rule of Civil Procedure 54(d)(2)(B)(i) provides that a motion for attorneys' fees must be filed no later than 14 days after entry of judgment unless a statute or court order provides otherwise.

150.    In this case, the Court will be soliciting additional input from the parties to implement the injunction and finds that it therefore is appropriate to

extend the deadline for a motion for attorneys' fees.  This will ensure that the attorneys' fees application includes the time spent on that input, as well as avoid distracting the parties from providing expedient relief to the Class Members. Accordingly, the Court will extend the deadline for a motion seeking attorneys' fees until 75 days from the entry of this order.

### H.     Defining the Relief

#### 1.     21 days is the appropriate constitutional limit

##### a.     Under the <u>Jackson</u> standard

**151.**   In crafting the permanent injunction and determining the appropriate timeframe, the Court focus on what amount of time is reasonably related to the purpose for which Plaintiffs are confined.  <u>See</u> <u>Trueblood v. Washington State Dep't of Soc. & Health Servs.</u> ("<u>Trueblood III</u>"), 822 F.3d 1037, 1045 (9th Cir. 2016) (remanding back to the district court for findings supporting the district court's 7-day timeline and instructing the district court to focus on whether the timeline "bears the constitutionally requisite reasonable relationship" and whether the balancing of interests requires that timeline); <u>Trueblood IV</u>, 2016 WL 4268933, at *12–13 (on remand, weighing the interests of the class members and of the state and determining what timeline bears a reasonable relationship to the purpose for which class members are incarcerated); <u>see also</u> <u>Pano-Flores</u>, 784 F. Supp. 3d at 966, 968 (applying <u>Jackson</u> to determine the constitutional time limitation on an

incompetency detainee's pre-hospitalization confinement); Calderon-Chavez, 688 F. Supp. 3d at 478 (noting that many other courts "hold that, to comport with due process, any 'period of pre-hospitalization detention ... must be reasonable' in relation to its purpose"); Donnelly, 41 F.4th at 1106 (holding that, to determine the constitutionally permitted length of the pre-hospitalization commitment period, courts must ask what purpose that period serves); Lara, 671 F. Supp. 3d at 1263–64 (noting that the length of pre-hospitalization detention must bear some reasonable relation to its purpose); Raja, 2023 WL 3497234, at *5 (concluding that the amount of time an incompetency detainee is held after a commitment order must bear some reasonable relation to the purpose of the commitment); Wazny, 2022 WL 17363048, at *6 (agreeing with the Ninth Circuit that the duration of an individual's pre-hospitalization waiting period must bear a reasonable relation to the confinement's purpose).

152.   As described above, supra Section E, when determining the constitutionally permissible duration of pre-hospitalization confinement in the context of competency restoration, courts look to the purpose of the pre-hospitalization detention itself.  Donnelly, 41 F.4th at 1106; Calderon-Chavez, 688 F. Supp. 3d at 479; Pano-Flores, 784 F. Supp. 3d at 968; Lara, 671 F. Supp. 3d at 1263–64; Raja, 2023 WL 3497234, at *5; Trueblood IV, 2016 WL 4268933, at *13.

**153.**    The purpose of the "pre-hospitalization commitment period . . . is simply to identify an appropriate treatment facility and arrange for the defendant's transportation to that facility."  Donnelly, 41 F.4th at 1106; Calderon-Chavez, 688 F. Supp. 3d at 479; Pano-Flores, 784 F. Supp. 3d at 968; see TEX. CODE CRIM. PROC. art. 46B.075 (providing that commitment orders place the defendant in the custody of the sheriff "for transportation to the facility or program . . . in which the defendant is to receive competency restoration services.").

**154.**    For the reasons described previously, supra Section E, the Court finds that 21 days is the outer constitutional limit for the duration of class members' post-commitment order, pre-hospitalization confinement.

**155.**    The Court arrives at this conclusion by balancing the interests of HHSC and of class members and determining what amount of time is reasonably related to the purpose for which Plaintiffs are confined.  Wait times beyond twenty-one days are not constitutionally permissible in this case because longer wait times destroy the reasonable relation between the nature and duration of confinement and its purpose.

### b.    Under rational basis review

**156.**    Alternatively, under rational basis review, for the reasons described previously, supra Section F, the Court also finds that 21 days is still the appropriate constitutional timeframe.

113

**157.** The Court arrives at this conclusion by balancing the interests of HHSC and of class members and determining what amount of time is rationally related to HHSC's legitimate government interests.  Wait times beyond twenty-one days are not constitutionally permissible in this case because longer wait times bear no rational relationship to HHSC's legitimate interests in providing competency restoration services, in conducting necessary logistical and administrative tasks to transfer and admit incompetency detainees to its facilities, and in operating a mental health system that takes into account the individualized needs of its patients by allocating its limited resources effectively.

### 2. Four years is the appropriate outer time limit for coming into compliance

**158.** No court operates in a vacuum detached from the realities surrounding the circumstances of the case before it.  Here, Defendant is attempting to comply with both state law and constitutional requirements under difficult circumstances. Given the fact this Court has not found, nor has it seen, an intentional derogation of Defendant's duty and responsibilities, it is incumbent that Defendant be given adequate time to remedy the constitutional violations this Court has identified. Thus, this Court sets an outside time limit of four years for Defendant to come into compliance, with appropriate interim benchmarks of compliance to be set and determined by the Court and the parties as laid out below.

159.   In setting this limit, the Court is mindful that Plaintiffs had suggested an outside time limit of three years.  The Court, however, after carefully considering the evidence, believes that timeframe to be unrealistic and instead sets an outside time limit of four years, which it believes to appropriately balance the interests at stake and the realities Defendant faces.

160.   In addition, this Court has no desire to engage in prolonged oversight of any state process; that is the duty and responsibility of the duly elected Governor.  Nonetheless, the Court has a duty to ensure that its orders are complied with.  To that end, following input from the parties, the Court will establish an appropriate reporting and/or monitoring mechanism.  This Court intends to keep its oversight to an absolute minimum.

CONCLUSION

For the reasons stated above, the Court **FINDS** and **DECLARES** that Defendant has violated the constitutional rights of the Plaintiffs and the Plaintiff Class members by causing them to remain incarcerated in county and/or municipal jails for protracted periods and not timely making competency restoration services available to them within 21 days of receiving a state court order committing them to receive such competency restoration services from HHSC.  Defendant therefore deprived and is depriving Plaintiffs and the Plaintiff Class members of their due process rights under the Fourteenth Amendment to the United States Constitution.

115

The Court further **GRANTS** Plaintiffs' request for a permanent injunction, and **ORDERS** that Defendant, her agents, representatives, her successors, and all persons or entities acting in concert with her are enjoined as follows:

a. Within four years of the date of this order, Defendant shall admit each incompetency detainee detained in a Texas jail and committed to one of its mental health facilities for competency restoration services within 21 days of HHSC's receiving a state court order committing that person to receive competency restoration services from HHSC (hereafter, "21- day mandate");

b. Within 45 days of entry of this order, the parties shall meet and confer regarding the following: (1) appropriate benchmarks Defendant believes in good faith that it is capable of complying with during the three-year period to come into compliance with the 21-day mandate by the end of that period; and (2) an appropriate monitoring and/or reporting plan concerning Defendant's compliance; and

c. Within 60 days of entry of this order, the parties shall submit to the Court their joint proposed schedule, incorporating the appropriate benchmarks and monitoring or reporting plan.  Following input from

116

the parties, the Court will issue a separate order addressing these issues.

Finally, the Court **FINDS** that Plaintiffs are prevailing parties and entitled to reasonable attorneys' fees and costs paid by Defendant. Plaintiffs' deadline to file a bill of costs and move for attorney's fees is extended until 75 days from the date of this order.

This order constitutes final judgment in this case.

**IT IS SO ORDERED**.

**DATED**: Austin, Texas, July 7, 2026.

_____
David Alan Ezra
Senior United States District Judge

117